IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DAVID FRIEDSON, as Stockholders' Representative of the former Stockholders of the ZONEPERFECT NUTRITION COMPANY, )<br>)<br>)<br>)<br>)<br>) | |
| Plaintiff, )<br>) | |
| v. ) | Civil Action No. 06-382 (GMS) |
| ABBOTT LABORATORIES, an Illinois corporation, WELLS FARGO BANK MINNESOTA, a Minnesota corporate trust, and SWEET PRODUCTIONS LTD., a New York corporation, )<br>)<br>)<br>)<br>)<br>) | |
| Defendants. ) | |

**NOTICE OF DEPOSITION PURSUANT TO FED. R. CIV. P. 30(b)(6)
OF DEFENDANT ABBOTT LABORATORIES**

TO:   John C. Phillips, Esquire
      Brian E. Farnan, Esquire
      Phillips, Goldman & Spence, P.A.
      1200 North Broom Street
      Wilmington, Delaware 19806

      Lawrence R. Desideri, Esquire
      Stephanie S. McCallum, Esquire
      Winston & Strawn
      35 West Wacker Drive
      Chicago, IL 60601

   **PLEASE TAKE NOTICE** that on July 6, 2007 at 10:00 a.m. at the offices of Runfola Reporters, 3948 Townsfair Way, Suite 220, Columbus, Ohio 43219, or some other time and place mutually agreeable to the parties and/or their counsel, the plaintiff David Friedson, in his

capacity as Stockholder Representative, by his attorneys, will take the deposition upon oral examination of the defendant Abbott Laboratories ("Abbott") pursuant to Fed. R. Civ. P. 30(b)(6) before a Notary Public in and for the State of Ohio, or before some other officer authorized by law to administer oaths. The witness(es) who appear will be examined on the topics described in Exhibit A attached hereto. The oral examination will continue from day to day until completed. You are hereby invited to attend and cross-examine.

The deponents are hereby advised of the following provisions of Rule 30(b)(6) of the Federal Rules of Civil Procedure:

> A party may in the party's notice [of deposition] and in a subpoena name as the deponent a public or private corporation or a partnership or association or governmental agency and describe with reasonable particularity the matters on which examination is requested. In that event, the organization so named <u>shall</u> designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which he will testify. * * * The person so designated <u>shall</u> testify as to matters known or reasonably available to the organization. (emphasis added)

ROSENTHAL MONHAIT & GODDESS, P.A.

By: /s/ Norman M. Monhait
Norman M. Monhait (#1040)
919 Market Street, Suite 1401
Citizens Bank Center
P. O. Box 1070
Wilmington, DE 19899-1070
(302) 656-4433
nmonhait@rmgglaw.com

*Admitted Pro Hac Vice*
Gerald J. Caruso, BBO No. 076880
Amy M. McCallen, BBO No. 643657
**RUBIN AND RUDMAN LLP**
50 Rowes Wharf
Boston, MA 02110-3319
(617) 330-7000

*Attorneys for David Friedson, As Stockholders'
Representative Of The Former Stockholders Of The
ZonePerfect Nutrition Company*

Dated: June 15, 2007

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 15th day of June, 2007, a copy of the **Notice Of Deposition Pursuant To Fed.R.Civ.P. 30(b)(6) Of Defendant Abbott Laboratories** was served, as indicated:

### By Electronic Filing

John C. Phillips, Jr., Esquire
Phillips Goldman & Spence, P.A.
1200 North Broom Street
Wilmington, Delaware 19806

### By Email

Lawrence R. Desideri, Esquire
Stephanie S. McCallum, Esquire
Winston & Strawn
35 West Wacker Drive
Chicago, IL 60601

_____
Norman M. Monhait (#1040)
ROSENTHAL MONHAIT & GODDESS, P.A.
919 Market Street, Suite 1401
Citizens Bank center
P.O. Box 1070
Wilmington, Delaware 19899
(302) 656-4433
Email: nmonhait@rmgglaw.com

**EXHIBIT A**

**To Notice of Rule 30(b)(6) Depositions[1]**

Pursuant to Fed. R. Civ. P. 30(b)(6), the deponent Abbott Laboratories[2] is required to designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf. Such person or persons will be questioned on the following topics:

1. Whether he or she has read this Exhibit A.

2. The efforts made by such persons to obtain information with which to respond to the topics listed in this Exhibit A.

3. All discoverable information within the knowledge of each such person.

4. Abbott's decision to bid on ZonePerfect Nutritional Company ("ZonePerfect").

5. Abbott's analysis of the information in Adams, Harkness & Hill's Offering Circular produced as Abbott 10,265.

6. The author of the handwritten notes produced as Abbott 8805, 8796-8799, and 8854-8855, the context in which they were written, the date they were written, their content, meaning and their significance to Abbott's purchase of ZonePerfect (the "ZonePerfect Transaction").

7. The author of the handwritten notes produced at Abbott 9564, the context in which they were written, the date they were written, their content, meaning and their significance to the ZonePerfect Transaction.

---

[1] Unless otherwise noted, the words used in this Exhibit A shall have the same meaning as the definitions set forth in the "Stockholder's Representative's First Set of Document Requests to Defendant Abbott Laboratories." For convenience, Friedson repeats some of those definitions here.

[2] "Abbott" shall refer to defendant Abbott Laboratories; its corporate parent, subsidiaries, affiliates or divisions, including but not limited to, Ross Products Division ("Ross"), ZonePerfect after Abbott purchased ZonePerfect, or any other incorporated or unincorporated division of Abbott; and the past or present officers, directors, employees, partners, consultants, and other persons acting on behalf of each of the foregoing.

8. The author of the handwritten notes produced at Abbott 8934-8935, 8946, the context in which they were written, the date they were written, their content, meaning and their significance to the ZonePerfect Transaction.

9. The conditions to closing the ZonePerfect Transaction imposed by Abbott.

10. Abbott's allegation in paragraph 10 of its counterclaim that it took "Baker's attorney, Lisa Burnett['s] . . .over the next three weeks to draft a new letter that Abbott and Sweet could sign."

11. Ned McCoy's suggestions found in an e-mail at Abbott 90, that Abbott representatives speak with Sweet and tells Sweet that Abbott is "pleased that they focused on reducing costs, but that cannot be allowed to adversely impact quality [and] remind them of Abbott's right to review new supplier per the terms" of Section 2(c) of the November 27, 2001 manufacturing agreement and whether, and who had follow up discussions with Sweet and the substance of those discussions.

12. Discussions that Abbott may have had with companies which were both suppliers of Sweet and Abbott about Sweet attempting to leverage lower prices from those suppliers.

13. Discussions that Abbott had with Sweet as a follow-up to Mr. McCoy's suggestions described in his e-mail described in Question No. 11 above.

14. The Reformulation and Product Certification provisions which appeared in drafts of the Stock Purchase Agreement ("Purchase Agreement") executed by Abbott, ZonePerfect and the Stockholders[3] as of July 22, 2003 and the reasons why Abbott agreed to their removal from the draft Purchase Agreement (Abbott 4449-4501, 11021-11022).

---

[3] "Stockholder(s)" shall refer to the former stockholders of ZonePerfect and the attorneys, agents and representatives acting on behalf of each.

15. Abbott's decision to convert all Bars to Class I standards as described at Abbott 3506.

16. Abbott's decision to move all Third-Party Manufacturing from Nutralite to Sweet.

17. The 150 day compliance period referenced in the document entitled "Project Zebra, Background for Rick Gonzalez", Abbott 3502-2507, including but not limited to, its purpose and its implementation.

18. The timing and content of discussions with Sweet regarding the 150-day compliance period.

19. The author of slide entitled "SKU Rationalization - Protein Pwdr" produced as Abbott 8863, the context in which it was created, including the dates it was created, who it was presented to and its significance to the ZonePerfect Transaction.

20. The creation and meaning of the "ZonePerfect Compliance Plan" produced as Abbott 9602-9603, the reason for its creation, its author, the persons who approved it and the persons at Abbott responsible for its implementation.

21. The timing and content of any discussions with Sweet about the "Zone Bar Compliance Plan Timetable" produced as Abbott 9603, including, but not limited to, the first time it was discussed with Sweet, Sweet's reaction to it, and Sweet's compliance with it.

22. The Standard Manufacturing Plan ("SMP") and discussions that Abbott had with Sweet about the SMP, including, but not limited to, the first time it was discussed with Sweet, by whom and when, Sweet's reaction to it, other discussions with Sweet about it, and Sweet's implementation of it.

23. The confidential memorandum "Project Zebra Transaction Summary for Executive Review", contained at Abbott 4819-4841, and the methodology used to calculate the

various projections, values and returns spread throughout the document, who authored it, and how it was used.

24. The contents of the Report entitled "Project Zebra Due Diligence" contained in Abbott 8059-8064 and the calculations used to support some of the financial conclusions in the Report.

25. Post-closing communications with Sweet about the August Letter Agreement, but prior to Mr. Schacher's September 30 Letter.

26. Post-closing discussions with Dechert regarding the August Letter Agreement.

27. The author of the document produced as Abbott 4943, the context in which it was created, how it was used and any non-privileged discussions with Abbott about it.

28. Each of the drafts of the Purchase Agreement, the non-privileged discussions between and among with the Abbott executives, regarding proposed additions or deletions and any negotiations that Abbott may have had with ZonePerfect or Dechert about those suggested changes.

29. The date when Abbott stopped using Sweet to manufacture the Bars.

30. The facility, plant or entity that Abbott used to manufacture the Bars after Sweet stopped manufacturing the Bars and whether Abbott owns that facility, plant or entity.

31. Abbott's internal calculations of the Weighted Average Price for Section 7.4(b)(x) formula purposes as shown by example from the Ned McCoy e-mail dated September 23, 2003, produced as Abbott 281-286.

32. The negotiation of the October 30 Letter Agreement and any drafts that were exchanged between and among Abbott, Sweet, Dechert and any other Stockholder Representative regarding that Agreement.

33. Post-closing discussions with the Stockholders and/or Dechert about the October 30 Letter.

34. The author of the handwritten notes produced as Abbott 1320-1332, the context in which they were written, and their importance or significance to the Zone Transaction.

35. The contractual and factual basis for Abbott's claims against the escrow account, including the portions of the Purchase Agreement upon which Abbott relies to support the claims for indemnification listed in the Claim Notice for Indemnification[4] (collectively, the "Financial Statement Claims").

36. The author of the schedule and handwritten notes produced as Abbott 9892-9893, the context in which they were developed, and their content, meaning, and significance to Abbott for the Financial Statement Claims raised by Abbott.

37. The discussions that Abbott had with the ZonePerfect insurance brokers regarding the worker's compensation and general liability insurance claims advanced in the Claim Notice for Indemnification.

38. The contractual and factual basis for Abbott's Claim Notice for Indemnification based on the fact that ZonePerfect's financial statements did not reflect a liability of $218,670.00 to UPS for shipping expenses that were incurred prior to the closing as stated in Abbott's Claim Notice for Indemnification.

39. The contractual and factual basis for Abbott's Claim Notice for Indemnification based on the fact that ZonePerfect's financial statements did not reflect a $23,620.00 liability to White Arrow Trucking for shipping expenses incurred prior to the closing.

---

[4] The January 10, 2005 Claim Notice for indemnification pursuant to that certain Stock Purchase Agreement dated July 22, 2003 ("Claim Notice for Indemnification").

40. The contractual and factual basis for Abbott's Claim for Notice Indemnification based on the fact that ZonePerfect's financial statement did not reflect a liability of $229,852.61 to Nutralite for raw material.

41. The contractual and factual basis for Abbott's Claim Notice for Indemnification based on the fact that ZonePerfect's financial statements overstated inventory for wrappers and boxes by $166,589.15.

42. The contractual and factual basis for Abbott's Claim Notice for Indemnification that ZonePerfect's financial statements overrated prepaid expenses by $166,724.00.

43. The contractual and factual basis for Abbott's claim that the financial statement overstated account receivables from customers by $228,395.58.

44. Communications that Abbott had with ZonePerfect's executives or employees regarding the Financial Statement Claims, or upon which Abbott relies to support any Financial Statement Claims.

45. Discussions or communications between Abbott and ZonePerfect regarding the account receivables listed in Abbott 1563.

46. The "Further Limitation" provisions of Stock Purchase Agreement, Section 7.4(i), and how it applies to Abbott's Financial Statement Claims.

47. The author of the following hand-written notes (identified by Abbott bates number), the context in which they were written, their meaning and content and their significance to the ZonePerfect Transaction:

a) 1243-1247      h) 2863-2864

b) 1244-1249      i) 2867-2868

c) 1283-1287      j) 4077-4084

d) 1288-1296

e) 2720-2722

f) 2736

g) 2785

k) 4582

l) 8315-8316

m) 9570-9580

48. Abbott's decision not to renew the Manufacturing Agreement or October 30 Letter Agreement with Sweet.

49. Abbott's decision not to purchase any additional Zone Nutritional Bars from Sweet as reflected in an e-mail dated February 18, 2005 sent by Abbott to Sweet and provided at Sweet 0658.

50. Abbott's conversations with the Internet Insurance Agency about the premium audit from the 01-02 audit and the 02-03 audit for worker's compensation premiums as set forth in the e-mail from J. Sio to M. Dbuzynski produced as Abbott 2275.

51. The contractual basis of Abbott's claim that the shareholders should indemnify Abbott for expenses incurred or invoices received in the ordinary course of business by ZonePerfect after the execution of the Purchase Agreement, but before the closing.

52. The post-closing adjustments as suggested by Ernst & Young in their report (Abbott 8319) and their adoption, or not.

53. The Accounts Payable Reconciliation and the investigation into why the trial balance did not tie to the General Ledger 12/31, as described in Abbott 1946.

54. The notes and Reports located at Abbott 8934-8971 entitled "Accounts Payable and Accrued Inventory Payables Adjustments," "Reconciliation Process for ZonePerfect Accounts, Accounts Payable 4005," "Reconciliation Process for ZonePerfect accounts, Accrued

Inventory Payables (4016)," Abbott 8947-8950 and the "Aged Trial Balance: Payables Management" as of 2/11/04, and their use in calculating the various Financial Statement Claims.

55. The accrued inventory payable tie out procedure and the use of that procedure in Abbott's determination that ZonePerfect's Financial Statement overstated inventory for wrappers and boxes by $166,589.16.

56. The decision to hire Ernst & Young regarding the physical inventory and the services they provided under the engagement letter of June 26, 2003 (Abbott 8033).

57. The contents of notes contained in the Report produced as Abbott 8057 discussing ZonePerfect's Account Receivable Aging Report.

58. The author of the handwritten notes produced at Abbott 8340-8346, the context in which they were written, their meaning and content and their significance to the ZonePerfect Transaction.

59. The reconciliation of ZonePerfect's General Ledger Prepaid Expenses Account for June 30, 2003 and the determination that ZonePerfect overstated its prepaid expenses by $166,724.00.

60. The purchases that Abbott claims ZonePerfect made for wrappers and boxes that were used by Third Party Manufacturers but not included in ZonePerfect's cost of goods sold as explained in Abbott's Amended Responses and Objections to Friedson's First Set of Interrogatories, Response No. 7.

61. The Report produced as Abbott 2276-2279.

62. The author of the handwritten notes at Abbott 8854-8855, the context in which they are written, their meaning, content, significance to the ZonePerfect transaction, and the slides and reports that follow them at Abbott 8855-8871.

63. The draft of the "Working Capital" definition produced at Abbott 11093-11097, its purpose, the non-privileged discussions between and among Abbott employees, regarding it, how and when it was presented to the Stockholders or Dechert, discussions with ZonePerfect regarding it, and why the provision was not included in the execution copy of the Purchase Agreement.

64. Drafting, negotiating and internal non-privileged discussions that Abbott had regarding the exhibits and disclosure documents to the Purchase Agreement.

65. The redrafted letter of September 23 described in Abbott's counterclaim at Paragraph 12.

66. The communications about and meetings with Sweet on September 24, 2003 as described in Abbott's counterclaim at Paragraph 13.

67. The Research and Development Reports and "Zebra Bar Meeting" Minutes/Notes located at Abbott 2771, 2774, 4335, 8628, 9560, 9561, 9644.