## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

DAVID FRIEDSON as Stockholders'
Representative of the former Stockholders of the
ZONEPERFECT NUTRITION COMPANY,

               Plaintiff,

           v.

ABBOTT LABORATORIES, and WELLS
FARGO BANK MINNESOTA, a Minnesota
corporate trust,

               Defendants.

Civil Action No. 06-382 (GMS)

## PLAINTIFF DAVID FRIEDSON'S BRIEF IN OPPOSITION TO DEFENDANT
## ABBOTT LABORATORIES' MOTION FOR
## LEAVE TO AMEND ANSWER AND COUNTERCLAIM

**ROSENTHAL MONHAIT
& GODDESS, P.A.**
Norman M. Monhait (#1040)
919 Market Street, Suite 1401
Citizens Bank Center
P.O. Box 1070
Wilmington, DE 19899-1070
(302) 656-4433
   Attorneys for Plaintiff

OF COUNSEL:

*Admitted Pro Hac Vice*
Gerald J. Caruso
Michael R.Coppock
**RUBIN & RUDMANLLP**
50 Rowes Wharf
Boston, MA 02110
(617) 330-7000

August 14, 2007

## **TABLE OF CONTENTS**

**Page**

NATURE AND STAGE OF PROCEEDINGS ............................................. 1

FACTUAL AND PROCEDURAL BACKGROUND ............................... 2

    A.    Statement Of Facts .................................................................. 2

    B.    Procedural Background ........................................................... 5

ARGUMENT ............................................................................................. 8

    I.    ABBOTT'S MOTION TO AMEND SHOULD BE
    DENIED ...................................................................................... 8

        A.    Abbott's Motion To Amend Should
        Be Decided Using The Standards Of
        Rule 16(b), Not Rule 15 ............................................. 9

        B.    No Good Cause Exists To Permit An
        Amendment In Contravention Of The
        Scheduling Order ......................................................... 10

    II.    EVEN IF FED.R.CIV.P. 15 GOVERNS, ABBOTT
    CANNOT MEET THE LIBERAL STANDARD
    UNDER THE RULE ................................................................... 11

        A.    Abbott's Proposed Claim For Breach
        Of Contract Is Futile ................................................... 12

            1.    The Proposed Amendment Should Be
            Denied Since The Proposed Count III
            Does Not State A Prima Facie Claim ................ 12

        B.    Abbott Has Unduly Delayed Amending The
        Pleadings ....................................................................... 14

        C.    Friedson Is Unduly And Uniquely Prejudiced By
        Any Last-Minute Amendment ...................................... 15

        D.    Abbott's Proposed Amendment Is Made In Bad
        Faith ............................................................................. 17

CONCLUSION .......................................................................................... 18

## TABLE OF AUTHORITIES

**Case**                                                                 **Page**

*Agere Systems Guardian Corp. v. Proxim, Inc.*,
    190 F. Supp.2d 726 (D. Del. 2002)                                9, 12

*Dunkin' Donuts, Inc. v. Dough Boy Mgmt., Inc.*,
    2006 WL 20521 (D. N.J.)                                          13

*Foman v. Davis*, 371 U.S. 178 (1962)                                    9, 11, 12

*Friedman v. Transamerica Corporation*,
    5 F.R.D. 115 (D. Del. 1946)                                      9

*Harrison Beverage Co. v. Dribeck Importers, Inc.*,
    133 F.R.D. 463 (D.N.J. 1990)                                     10

*Johnson v. Mammoth Recreations, Inc.*,
    975 F.2d 604 (11th Cir. 1992)                                    10, 15

*Kilroy v. O'Connor*,
    324 Mass. 238, 88 N.E.2d 441 (1949                               5

*Lake v. Arnold*,
    232 F.3d 360 (3d Cir. 2000)                                      12

*Leary v. Daeschner*,
    349 F.3d 888 (6th Cir. 2003)                                     10

*Massarky v. General Motors Corp.*,
    706 F.2d 111 (3d Cir. 1983)
    *cert. denied*, 464 U.S. 397 (1983)                              12

*Newton v. Dana Corp., Parish Div.*,
    1995 WL 368172 (E.D. Pa.)                                        10

*Parker v. Columbia Pictures Industries*,
    204 F.2d 326 (2d Cir. 2000)                                      10

*Riofrio v. Ralston Purina Co.*,
    959 F.2d 1149 (1st Cir. 1992)                                    10

*Semiconductor Energy Laboratory Co., Ltd.
    v. Sanyo North America Corp.*,
    2001 WL 194303 (D. Del.)                                         15, 16

*Sherlock v. Herdelin*,
    2006 WL 2668532 (E.D. Pa.)    12

*Sosa v. Airpoint Systems, Inc.*,
    133 F.3d 1417 (11th Cir. 1998)    10

*Stiller v. Colangelo*,
    221 F.R.D. 316 (D. Conn. 2004)    13

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
    401 U.S. 321 (1970)    12

**Other Statutes And Authorities**

D. Del. L.R. 16.1(b)    6

D. Del. L.R. 16.3(c)    1, 8

Fed.R.Civ.P. 12(b)(6)    11, 14

Fed.R.Civ.P. 15    12, 17

Fed.R.Civ.P. 15(a)    9, 10, 11

Fed.R.Civ.P. 16    1, 8, 12

Fed.R.Civ.P. 16(b)    *passim*

Fed.R.Civ.P. 16(b)(1)    9

Mass. Gen. Laws c.93A    6

Mass. Gen. Laws c.231A §1    5

Mass. Gen. Laws c.231A §8    5

Wright, Miller & Kane,
    *Federal Practice & Procedure:* Civil §1487 (2d ed. 1990)    9, 13

## NATURE AND STAGE OF PROCEEDINGS

The plaintiff David Friedson ("Friedson"), in his capacity as the representative of the former Shareholders of ZonePerfect Nutrition Company ("ZonePerfect"), files this opposition to Abbott Laboratories' ("Abbott's") Motion for Leave to Amend Answer and Counterclaim ("Motion to Amend"). Plaintiff, on behalf of former ZonePerfect shareholders, seeks declaratory relief regarding Abbott's claims for indemnification under a Stock Purchase Agreement between the parties and damages for Abbott's breach of the covenant of good faith and fair dealing and unfair and deceptive conduct in connection with its acquisition of ZonePerfect. Discovery in the case is ongoing.

Friedson opposes the Motion to Amend to the extent that Abbott seeks to add a new claim for relief based upon factual events that were well known to Abbott before the case ever left the District of Massachusetts and for which Abbott has advanced no good reason for missing the Court-established deadline for bringing such amendments. Abbott's Motion to Amend to add a new claim should also be denied on the grounds of futility, undue prejudice and bad faith.

Friedson does not object to that portion of Abbott's Motion to Amend to the extent that the Motion attempts to clarify certain factual assertions or revise a claim for damages in accordance with discovery in this matter. Those clarifications or revisions may be accomplished by the parties pursuant to Fed.R.Civ.P. 16 and D.Del.L.R. 16.3(c) and do not necessitate any alteration to the Scheduling Order in this case.

## **FACTUAL AND PROCEDURAL BACKGROUND**

### **A.    Statement Of Facts**

This dispute arises out of the sale of ZonePerfect Nutrition Company ("ZonePerfect") to Abbott. ZonePerfect marketed and distributed Zone bars, a dietary meal supplement/substitute complementing the popular "Zone Diet" introduced by Dr. Barry Sears. D.I. #1, Exh. A (Compl. ¶7).

On or about July 22, 2003, Abbott, ZonePerfect and the former Stockholders of ZonePerfect entered into a Stock Purchase Agreement ("SPA"), pursuant to which Abbott purchased all of ZonePerfect's stock for $165 million subject to certain adjustments ("the Purchase Price"). *Id.* (Compl. ¶8 and Compl. Exh. 1). The transactions described in the SPA closed on August 26, 2003. *Id.* (Compl. ¶8).

Prior to execution of the SPA, certain Abbott executives approached the former CEO of ZonePerfect, Christopher P. Baker ("Baker"), and suggested that a $10 million reduction in the Purchase Price might be appropriate. *Id.* (Compl. ¶9). Baker, wishing to maintain the $165 million Purchase Price, proposed that $10 million be placed into escrow, to be paid out if and when Baker obtained an amendment to a manufacturing contract ("Manufacturing Agreement") with a third party manufacturer, Sweet Productions, Ltd. ("Sweet"), which included a price reduction. *Id.* (Compl. ¶10). Abbott agreed, but instead of permitting Baker to sign any new amendment that he negotiated with Sweet, Abbott insisted that Baker simply negotiate an amendment with "acceptable terms" as defined in the SPA. *See id.* (Compl. ¶11, ¶13). Baker could not execute the amendment with Sweet. *Id.* (Compl. ¶11, ¶13). In compliance with the SPA, Baker successfully negotiated the amendment with Sweet, which Sweet's Chief Executive Officer, Paul Schacher, executed on the day of the closing and sent back to Mr. Baker (hereafter

2

the "August Sweet Amendment"). D.I. #1, Exh. A (Compl. ¶¶16-18). As instructed, Baker did not countersign the August Sweet Amendment. *Id.* The August Sweet Amendment contained all of the "acceptable terms" required under Section 7.4(b)(x). *Id.* (Compl. ¶19).

The SPA also contained a formula which allowed the ZonePerfect shareholders to get either a portion of, or the entire, $10 million in escrow, depending upon how close Baker came to securing a 2.5 cents per bar reduction from Sweet. *Id.* (Compl. ¶¶14-15). For the first time in its proposed Answer and Counterclaim, Abbot concedes that the price reduction achieved by Baker would have entitled the former shareholders to approximately $8.9 million of the $10 million held in escrow. *See* Proposed Amended Counterclaim, ¶11.

After the closing, and after Schacher executed the August Sweet Amendment, Abbott continued to negotiate with Sweet and for reasons known only to Abbott, proposed to change other terms of the Manufacturing Agreement, beyond those terms negotiated by Baker. Abbott also agreed to other changes to the August Sweet Amendment regarding forecasting, exclusivity, and pricing. D.I. #1, Exh. A (Compl. ¶¶24-26). At no time after the closing did Abbott instruct Baker to sign the August Sweet Amendment, nor did Abbott sign the Amendment itself. Instead, Abbott continued negotiating with Sweet, and on September 30, 2003, Abbott informed Baker that Sweet had retracted the prices and terms set forth in the August Sweet Amendment. *Id.* (Compl. ¶¶22-23). Ultimately, Sweet and Abbott executed an agreement on October 30, 2003 ("October Sweet Amendment"). The October Sweet Amendment has additional terms other than the terms set forth in Section 7.4(b)(x) as "acceptable" to Abbott. *Id.* (Compl. ¶¶24-26). The October Sweet Amendment also contained higher prices for Sweet and resulted in an average weighted price reduction of 1.25 cents, less than the average weighted price reduction achieved by Baker in the August Sweet Amendment. D.I. #1, Exh. A. (Compl. ¶25, ¶28).

3

According to Abbott, the price reduction in the October Sweet Amendment entitled the former Shareholders to approximately $5,022,040 out of the $10 million held in escrow. *Id.* (Compl. ¶28). In accordance with the procedures both in Section 7.4(b)(x) and the Escrow Agreement, Abbott submitted a claim for indemnification on August 11, 2004, seeking $4,987,960 from the Escrow Fund, representing the deficiency in price between the nearly 2.5 cent weighted price reduction that Baker achieved and the 1.25 cent weighted price reduction that Abbott negotiated in the October Sweet Amendment. *Id.* (Compl. ¶28 and Compl. Exh. 8).

Because Friedson did not believe that Abbott was entitled to such a large amount from the escrow, Friedson filed an objection certificate in accordance with the escrow procedures. *Id.* (Compl. ¶29 and Compl. Exh. 9). Abbott did not submit any other claim for indemnification regarding the Sweet Amendments and SPA, Section 7.4(b)(x).

In January 2005, Abbott submitted a second claim notice for indemnification. D.I. #1, Exh. A (Compl. ¶30 and Compl. Exh. 10). This claim for indemnification was based upon purported misrepresentations in the unaudited financial statements for fiscal year ended June 30, 2003 that were attached to the SPA as Schedule 4.1(f). The total indemnification sought was approximately $1,163,234.35. *Id.* (Compl. ¶30 and Compl. Exh. 11).

Under the SPA, representations and warranties of ZonePerfect are deemed true on both the date on which the SPA is executed and the closing date "except those representations and warranties that address matters only as of a particular date, each of which shall be true, accurate and correct as of that date." D.I. #1, Exh. 1(i) (SPA, Article 3.2(a)(i)). The Financial Statements are for a specific period ending June 30, 2003, and they only address matters existing as of that date and not matters afterwards.

Since it seemed to Friedson that each of Abbott's Financial Statement claims relied upon events that occurred after June 30, 2003, or even after the date when the SPA was executed, July 22, 2003, Friedson objected to the claim until Abbott could show it was entitled to the money.[1] D.I. #1, Exh. A.

## B.    Procedural Background

Following an unsuccessful attempt at mediation, Friedson brought this action in the Business Litigation Session of the Massachusetts Superior Court, seeking a declaratory judgment that the August Sweet Amendment was a binding contract on Sweet Productions and that therefore Abbott was bound to make good on its promise to release the Escrow Amounts based on the price reduction achieved by Baker, as opposed to the price reduction achieved by Abbott in the October Sweet Amendment. The difference between the amount owed the former Shareholders under the August Sweet Amendment and the amount owed the former shareholders under the October Sweet Amendment is approximately $4 million.[2]

Friedson's position then, as it is now, is that under the Massachusetts Declaratory Judgment Statute, Mass.Gen.Laws. c. 231A §1, et seq., Sweet is a necessary party to that claim. Under §8 of the Massachusetts Statute, "all persons shall be made parties who have or claim any interest which would be affected by the declaration." Mass.Gen.Laws. c. 231A, §8 (emphasis supplied); *see Kilroy v. O'Connor*, 324 Mass. 238, 242, 88 N.E. 2d 441, 443 (1949). Consequently, Friedson was compelled to join Sweet.

---

[1] Friedson was not a Shareholder of ZonePerfect. Thus, he will not recover any money from this case, should he be victorious.
[2] Abbott demanded $4,987,960 in its August 11, 2004 Claim Notice. The former Shareholders claim the right to the entire $8.9 million alleged in the proposed amendment.

5

Abbott timely removed the action. Subsequently, Abbott filed a motion to dismiss the Complaint in its entirety, or in the alternative to dismiss Count II of the Complaint, Friedson's claim for unfair trade practices under Mass. Gen. Laws c.93A. *See* D.I. #12.

Friedson filed a Motion to Remand and later an Opposition to Abbott's Motion to Dismiss. *See* D.I. #6, #19. In his Opposition to the Motion to Dismiss, Friedson argued that if the Court determined that the case was not properly filed in Massachusetts, the Court should transfer the case to Delaware, rather than dismiss it. *See* D.I. #19.

The Honorable Rya Zobel denied both the Motion to Dismiss and the Motion to Remand. She then, as requested by Friedson, not Abbott, transferred the action to the District of Delaware. D.I. #24.

On July 13, 2006, following the transfer of this action to the District of Delaware, Abbott filed its Answer and Counterclaim. Abbott's Counterclaim contained no claims related to either Friedson's filing in Massachusetts or any claims related to damages allegedly incurred with regard to removing the action and transferring it to the District of Delaware.

On January 3, 2007, the parties and counsel participated in a Scheduling Conference with the Court. On January 25, 2007, the Court entered a Scheduling Order pursuant to Fed.R.Civ.P. 16(b) and D.Del. L.R. 16.1(b) providing, *inter alia*:

 a. The deadline for amended pleadings was March 1, 2007;

 b. The deadline for fact discovery is August 30, 2007;

 c. The deadline for dispositive motions is September 14, 2007; and

 d. A five-day jury trial is scheduled for January 28, 2008.

On July 31, 2007, five months after the deadline to amend pleadings had expired, Abbott filed its Motion for Leave to Amend Answer and Counterclaim, proposing to add a new Count

6

for breach of contract. The new count alleges a damages claim for breach of contract, stemming

from Friedson's decision to begin this case in the Massachusetts courts, rather than Delaware.

## ARGUMENT

### I.   ABBOTT'S MOTION TO AMEND SHOULD BE DENIED

Abbott has waited almost one year since filing its Answer and Counterclaim and almost five months past the deadline to amend pleadings before bringing the instant motion. Friedson maintains that Abbott should be denied the opportunity to raise a new count in its counterclaim at this stage as Abbott lacks the good cause required under Fed.R.Civ.P. 16(b) for such an amendment. Moreover, such amendment is not only futile, but unduly prejudicial and rooted in bad faith.

In the interest of judicial economy, Friedson would not object to Abbott's proposed amendments that seek only to conform the pleadings to factual information purportedly uncovered in discovery in this matter. Chief among these proposed amendments is a reduction in Abbott's claimed damages by approximately $242,000 and by introducing additional facts to define the pending claims. *See* Proposed Amended Counterclaim, ¶23(a) - (d). Any such concession on Friedson's part in no way condones Abbott's failure to comply with the terms of the Scheduling Order and in no way acknowledges that Abbott has approached a showing of good cause and good faith necessary to permit such an amendment at this point in the case. Should the Court be unwilling to bifurcate the proposed amendments, or determines that Friedson cannot pick and choose which proposed amendments to which he objects under Fed.R.Civ.P. 16(b), Friedson objects to the Motion for Leave to Amend in its entirety. As a practical matter, the factual clarifications and revisions proposed by Abbott may also be achieved by the parties pursuant to Fed.R.Civ.P. 16 and D.Del.L.R. 16.3(c).

8

### A.     Abbott's Motion To Amend Should Be Decided Using The Standards Of Rule 16(b), Not Rule 15

Generally, amendments to pleadings are governed by Fed. R. Civ. P. 15(a). After a responsive pleading has been served, Rule 15(a) permits amendments to pleadings only with leave of court or the consent of the adverse party. Fed.R.Civ.P. 15(a). While it is universally agreed that Rule 15(a) should be liberally construed, and by its terms, requires that "leave be freely given", that does not mean that "leave to amend is to be granted without limit; otherwise, the right to amend would be absolute and not rest in the sound discretion of the Court." *Friedman v. Transamerica Corp.*, 5 F.R.D. 115, 116 (D. Del. 1946); *see Agere Systems Guardian Corp. v. Proxim, Inc.*, 190 F. Supp.2d 726, 732 (D. Del. 2002); *see also* Wright, Miller & Kane, 6 *Federal Prac. & Proc.*: Civ. §1487 at 611 (2d ed. 1990).

In *Foman v. Davis*, 371 U.S. 178, 182 (1962), the United States Supreme Court stated,

> [i]n the absence of any apparent or declared reason-such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. - the leave sought should, as the rules require be "freely given."

In this case, however, the liberal standard of Rule 15(a) is restrained by Fed. R. Civ. P. 16(b)(1).

On January 25 2007, the Court entered a Scheduling Order that explicitly established March 1, 2007 as the deadline for the Amendment of Pleadings. Here, Abbott missed that deadline by five months. Once a time period to amend the pleadings has been established as part of a Rule 16 Scheduling Order, that Order "shall not be modified except upon a showing of good cause." Fed. R. Civ. P.16(b). Numerous courts have applied the "good cause" standard of Rule 16, rather than the more liberal standard of Rule 15 when determining whether to allow a

9

Motion to Amend filed beyond the time allowed in the Scheduling Order. *See Leary v.*
*Daeschner*, 349 F.3d 888, 909 (6th Cir. 2003); *see Parker v. Columbia Pictures Indus.*, 204
F.3d 326, 339-341 (2d Cir. 2000); *see Sosa v. Airprint Systems, Inc.*, 133 F.3d 1417, 1418-1419
(11th Cir. 1998)(finding that applying liberal standard of Rule 15(a), rather than good cause
standard of Rule 16 would render the scheduling order meaningless and would read good cause
standard out of the Federal Rules); *see Riofrio Anda v. Ralston Purina Co.*, 959 F.2d 1149,
1155 (1st Cir. 1992). To permit parties to inject pleadings on any lesser showing after the
expiration of scheduling deadlines would nullify the "careful scheme of framing and
enforcement of scheduling orders." *See Harrison Beverage Co. v. Dribeck Importers, Inc.*, 133
F.R.D. 463, 469 (D.N.J. 1990). Thus, the Court should require Abbott to demonstrate good
cause for missing the Scheduling Order deadline to add the proposed new claim.

## B.   No Good Cause Exists To Permit An Amendment In Contravention Of The Scheduling Order

Generally, to show good cause to amend a Scheduling Order, a party must demonstrate
that the delay in filing stemmed from "mistake, excusable neglect, or any other factor which
might understandably account for failure of counsel to undertake to comply with the scheduling
order." *Newton v. Dana Corp., Parish Div.*, 1995 WL 368172 *1 (E.D. Pa.). The standard is
similar for the granting of a motion to amend after the expiration of the time to amend
established in the Scheduling Order. The finding of good cause depends upon the "diligence of
the moving party." *Parker*, 204 F.2d at 340; *see Sosa*, 133 F.3d at 1418. "Although the
existence or degree of prejudice to a party opposing the motion might supply additional reasons
to deny the motion, the focus of the injury is upon the moving party's reasons for seeking
modification . . .. If that party was not diligent, the inquiry should end." *Johnson v. Mammoth*
*Recreations, Inc.*, 975 F.2d 604, 609 (11th Cir. 1992) (citations omitted). Abbott cannot assert

10

diligence here. First, Abbott makes only the generalized claim that it wishes to amend its

"answer and counterclaim to conform to the evidence discovered during the course of

discovery." *See* Defendant's Motion for Leave to Amend, at ¶4. However, the new Count III to

the Counterclaim was based on information that Abbott possessed long before any discovery

started here.

Abbott identifies no newly discovered evidence giving rise to its new claim for breach of

contract for the simple reason that it cannot. Since December of 2005, Abbott was aware that

this action was originally filed in Massachusetts state court, as evidenced by Abbott's removing

the matter to federal court in the District of Massachusetts. Since June of 2006, Abbott has been

aware of exactly what fees and costs it incurred with respect to removing the action to federal

court or with respect to its Motion to Dismiss pursuant to Fed.R.Civ.P. 12 (b)(6) (discussed

*supra*). And yet, on July 13, 2006, when Abbott filed its Answer and Counterclaim, nary a

reference was made to a claim stemming from Friedson's election to file his complaint in

Massachusetts. Whether that omission was tactical strategy or simply error cannot change the

fact that Abbott was fully cognizant of the procedural history of the case and was, in fact, the

only party with any information regarding the amount of costs.

## II.    EVEN IF FED.R.CIV.P.15 GOVERNS, ABBOTT CANNOT MEET THE LIBERAL STANDARD UNDER THE RULE

Pursuant to Fed.R.Civ.P. 15(a), once responsive pleadings have been served, a party is

precluded from amending its claim(s) without first obtaining leave from the Court or consent

from the adverse party. Leave to amend should be freely given when justice so requires.

*Foman*, 371 U.S. at 182; *see* Fed.R.Civ.P. 15(a). As stated above, though a permissive standard,

Fed.R.Civ.P. 15 hardly encourages judicial rubber-stamping of untimely, unwarranted or

undeserved amendments. Rather, the Court has the manifest discretion to deny leave to amend

11

whenever the record reflects that (1) the amendment would be futile; (2) the moving party has demonstrated undue delay in pursuing the amendment; (3) the amendment would prejudice the other party; or (4) the moving party has shown bad faith or dilatory motives. *See Sherlock v. Herdelin*, 2006 WL 2668531 *1 (E.D. Pa.); *see Lake v. Arnold*, 232 F.3d 360, 373 (3d Cir. 2000); *accord Foman*, 371 U.S. at 182; *see Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330 (1970).

Abbott is unable to meet the permissive *Foman* standard for amendments pursuant to Fed.R.Civ.P. 15, let alone the heightened standard to show good cause standard pursuant to Fed.R.Civ.P. 16, now that the Scheduling Order deadline has passed.

### A.    Abbott's Proposed Claim For Breach Of Contract Is Futile

Not only has Abbott been fully aware of all relevant facts regarding the filing of this case, it must also be fully aware that the proposed claim is futile on its face. A court may deny a motion to amend where the claims sought to be added would not withstand a Motion to Dismiss. *Massarky v. General Motors Corp.*, 706 F.2d 111, 125 (3d Cir. 1983), *cert. denied,* 464 U.S. 937 (1983); *Agere Systems Guardian Corp.*, 190 F. Supp.2d at 736. Abbott's proposed amendment is futile since it fails to raise a claim upon which it may be entitled to relief.

#### 1.   The Proposed Amendment Should Be Denied Since The Proposed Count III Does Not State A Prima Facie Claim

The proposed new claim is nothing more than an attempt to cobble together a colorable claim out of stale facts and new hopes. Abbott pleads a breach of the stock purchase agreement, namely Friedson's filing of his complaint in Massachusetts state court. As a practical matter, any breach must have a corresponding cure. In this case, if indeed filing was in an improper

12

forum, that breach was necessarily remedied on June 8, 2006 when Judge Zobel transferred the case to the District of Delaware, a venue that Abbott acknowledges is appropriate.[3]

Moreover, Abbott has not plead cognizable damages to support its proposed claim for breach of contract. Abbott alleges that it "was forced to incur costs" associated with transferring the matter to Delaware. At bottom, those damages are comprised of legal fees and costs. Legal expenses alone cannot form the basis of a subsequent claim. "A party must prevail on all essential elements of their cause of action <u>including</u> damages before attorneys' fees can even become an issue; thus attorneys' fees cannot be part of the prima facie claim." *Dunkin' Donuts, Inc. v. Dough Boy Mgmt., Inc.*, 2006 WL 20521 *10 (D.N.J.).

Even if Abbott's counterclaim could withstand a motion to dismiss, the Court should still deny leave to amend as the proposed additional counterclaim because the issues now raised are remote from all other pending issues. Moreover, the new claim directed to the conduct of the litigation and not the underlying dispute, and could confuse or mislead a jury due to its separate and distinct nature. *See Stiller v. Colangelo*, 221 F.R.D. 316, 317 (D.Conn. 2004); *see* Wright & Miller, 6 *Fed.Prac. & Proc.* §1487 at 626-628 (2d ed. 1990).

Abbott represents as part of the proposed Count III, Breach of Contract claim that "in order to get its contractually promised venue, Abbott was forced to move to dismiss and/or transfer this action to Delaware." *See* Motion for Leave to Amend Answer and Counterclaim, at ¶40. While Abbott would have this Court believe that this action made its way to the District of Delaware through Abbott's laborious efforts, the record reveals a starkly different story.

---

[3] Friedson does not believe he breached his obligations under the Stock Purchase Agreement by bringing the case in the District of Massachusetts. While the Forum Selection Cause in the SPA is mandatory, the Forum Selection Clause in the Escrow Agreement is permissive. *Compare* D.I. #1, Exh. 1(ii) and (iii) (SPA Forum Selection Clause and Escrow Agreement Forum Selection Clause). Since Friedson's claims were upon the money held in escrow by Wells Fargo, and both he and Sweet were residents of New York, Friedson was well within his right to bring the Complaint declaring the right to that money in Massachusetts.

13

On January 11, 2006, Abbott filed its Notice of Removal, removing the action from state court to the District of Massachusetts. Upon removal, Abbott filed a Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6). Nowhere in its Motion, or in its supporting Memorandum did Abbott request, suggest, or even reference a transfer to Delaware. In fact, in its Reply Brief to Friedson's Opposition to the Motion to Dismiss, Abbott advanced the position that transfer to the District of Delaware was an inappropriate resolution. *See* D.I. #20. Abbott made the strategic decision to place all of its chips on a dismissal, only to see its Motion to Dismiss denied.

In his Opposition to Abbott's Motion to Dismiss, Friedson argued that in lieu of dismissal of the action, which would give rise to refiling, "the court should transfer it to the Delaware district court." D.I. #19, at 20. Ultimately, Judge Zobel denied Abbott's Motion to Dismiss and Friedson's Motion to Remand. On June 8, 2006, the Court transferred the action to the District of Delaware.

This action found its way to Delaware only through the explicit request of Friedson and the providence of Judge Zobel in the District of Massachusetts. Having lost its Motion to Dismiss, and having failed in any filed papers to request a transfer to Delaware, Abbott now seeks to appropriate the efforts of others as its own and beyond that, purports to be entitled to compensation for those third-party efforts. Since Abbott is not be entitled to attorneys' fees for a motion on which it did not prevail, the proposed amendment to add Count III to the Counterclaim should be denied, as it represents the very essence of futility.

## B.    **Abbott Has Unduly Delayed Amending The Pleadings**

Abbott chose to wait one year after the time of transfer to the District of Delaware and five months after the expiration of the Court's "drop dead" date for the amendment of pleadings

14

before filing its Motion for Leave to Amend.[4]  A review of the record reveals <u>no</u> possible or plausible justification for such an extensive delay and tellingly, Abbott does not offer one in its own motion.

In fact, Abbott makes no pretense of establishing reasons for the undue delay.  Abbott had been a named, actively involved, defendant at every step of this litigation.  It has retained the same counsel of record throughout this matter -- counsel, who along with local counsel, participated in the Scheduling Conference which gave rise to the Scheduling Order and its March 1, 2007 deadline to amend pleadings.  Friedson's production of documents has been timely.  No smoking gun nor shocking twist has emerged and none has been alleged, to give rise to a new claim.

The mere desire to amend unsupported by fact or explanation for the delay in seeking the amendment cannot give rise to good cause necessary to amend a pleading well after the Court's own deadline.  *See Semiconductor Energy Laboratory Co., Ltd. v. Sanyo North America Corp.*, 2001 WL 194303 *3 (D. Del.)(finding that a motion to amend due to "simply wanting" to add claims and filed four months late under the Scheduling Order was not timely and did not constitute good cause).

### C.    Friedson Is Unduly And Uniquely Prejudiced By Any Last-Minute Amendment

Assuming *arguendo* that the Court finds Abbott's proposed counterclaim a colorable one, Friedson nevertheless would incur undue prejudice if leave to amend was granted.

As this Court has found, "undue delay and prejudice are interrelated." *Semiconductor*

---

[4]  At no time did Abbott seek the Court's permission for or opposing counsel's assent to the alteration or extension of the March 1, 2007 deadline for filing amended pleadings as set forth in the Scheduling Order.  In its pending Motion for Leave to Amend, Abbott simply elects to ignore entirely the fact that the Court imposed a March 1, 2007 deadline for the amendment of pleadings.  The failure to move to amend the Scheduling Order alone may be grounds for the denial of leave to amend. *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d at 609.

15

*Energy Laboratory Company, Ltd.*, 2001 WL 194303 \*2. A "showing of long delay may ameliorate degree of prejudice to which nonmovant must establish in order to defeat the proposed amendment." *Semiconductor Energy Laboratory Company, Ltd.*, 2001 WL 194303 \*2.

Abbott asserts that inserting this new claim against Friedson "will not cause Friedson to expend additional resources to conduct discovery or prepare for trial..." Defendant's Motion for Leave to Amend, at ¶6. Abbott represents that the new claim will "require little or no discovery." Those statements may be true for Abbott, but not for Friedson.

Throughout this action, Abbott has been fully aware of the extent of its efforts to remove this action and fully aware of any alleged damages it may have incurred. Only Friedson has been in the dark with respect to all facts relevant to the proposed claim.

This proposed amendment burdens both Friedson and the Court by introducing a profoundly tardy amended pleading one month prior to the close of discovery. The parties have submitted a Joint Motion to Extend the Discovery Deadline which is currently pending. They have left intact the deadline for filing amendments to pleadings. Extending the discovery deadline is no automatic remedy for the prejudice Friedson faces. Both parties evaluated how much time would be necessary to complete discovery on the currently pending claims and requested only that amount of time as an extension. Even if the discovery deadline was extended, Friedson is still left to shoehorn discovery for an entirely new claim into a period designed to accommodate pending claims only.

Under these circumstances, the Court should deny the proposed amendment. Abbott would need nothing additional to prosecute the new claim (if permitted to amend) which it has had one year to contemplate, while Friedson has one month to conduct necessary discovery,

16

likely to include discovery from Abbott's trial counsel, given the nature of the proposed claim and damages. [5]

## D.    Abbott's Proposed Amendment Is Made In Bad Faith

Abbott's attempt to add a claim for breach of contract stemming for the filing of this Complaint in state court in December 2005, and one year after the transfer to the present venue, serves only to undercut the purpose of Fed.R.Civ.P. 15. To suggest at this late date, only one month prior to the close of discovery, that justice requires the insertion of this new claim is disingenuous, at best. The effect of this new claim is simply to nullify the effect of Abbott's decision to subtract $242,290.00 (representing certain shipping expenses) from its counterclaim. It is unlikely to be happenstance that contemporaneous with Abbott's realization that it must downwardly state a claim for damages is the "discovery" of a new claim upon which Abbott claims to be entitled to relief.[6]

---

[5] Even if Abbott was to offer expedited discovery on this brand-new claim, the burden on the Court might be lessened but certainly not the burden on Friedson. He would still be faced with a needless last-minute rush to conduct discovery on a claim destined for futility.

[6] Under the SPA, there is a "damages threshold" which the parties must surpass in order to advance certain claims. The threshold is $500,000.00. SPA Section 7.4(i)(j). Friedson has not analyzed whether the proposed Breach of Contract claim would fall within the SPA's definition of damages. If it did, that might more clearly call into question Abbott's motives, since the new claim could be considered a hedge to keep Abbott's damages substantially above the threshold.

17

## CONCLUSION

For the reasons stated herein, the plaintiff, David Friedson as Stockholder's

Representative of the former stockholders of ZonePerfect Nutrition Company, requests that the

Court deny the Defendant Abbott Laboratories' Motion for Leave to Amend its Answer and

Counterclaim.

**ROSENTHAL MONHAIT & GODDESS, P.A.**

By: _____

Norman M. Monhait (#1040)
Citizens Bank Center, Suite 1401
919 Market Street
P. O. Box 1070
Wilmington, DE 19899-1070
Attorneys for Plaintiff

OF COUNSEL:

*Admitted Pro Hac Vice*
Gerald J. Caruso
Michael R. Coppock
**RUBIN AND RUDMAN LLP**
50 Rowes Wharf
Boston, MA 02110-3319
(617) 330-7000

August 14, 2007

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 14th day of August, 2007, a copy of **Plaintiff**

**David Friedson's Opposition To Defendant Abbott Laboratories' Motion For Leave To**

**Amend Answer And Counterclaim** was served, by electronic transmission, upon:

> John C. Phillips, Jr., Esquire
> Phillips Goldman & Spence, P.A.
> 1200 N. Broom Street
> Wilmington, Delaware 19806

and a copy was sent, by email transmission, and by first class mail, postage prepaid to:

> Lawrence R. Desideri, Esquire
> Stephanie McCallum, Esquire
> Winston & Strawn LLP
> 35 W. Wacker Drive
> Chicago, Illinois 60601

Norman M. Monhait (#1040)

# EXHIBIT A

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 20521 (D.N.J.)

**(Cite as: Not Reported in F.Supp.2d)**

C

Dunkin' Donuts Inc. v. Dough Boy Management, Inc.
D.N.J.,2006.
Only the Westlaw citation is currently available.
United States District Court,D. New Jersey.
DUNKIN' DONUTS INCORPORATED, et al.,
Plaintiffs,
v.
DOUGH BOY MANAGEMENT, INC., et al.,
Defendants.
**No. Civ.A. 02-243(JLL).**

Jan. 3, 2006.

Craig R. Tractenberg, Nixon Peabody LLP, Philadelphia, PA, for Plaintiffs.
Stephen J. McGee, Vernon, NJ, John F. Higgins, Hamburg, NJ, for Defendants.

OPINION

LINARES, J.

**\*1** This matter comes before the Court on the motion for summary judgment of Plaintiffs Dunkin' Donuts Incorporated and Dunkin' Donuts USA, Co. (hereinafter collectively " Plaintiffs" ) on Defendants' counterclaims, pursuant to Rule 56 of the Federal Rules of Civil Procedure. The Court has considered the papers submitted by the parties, as well as the oral arguments of the parties held on May 17, 2005. For the reasons that follow, Plaintiffs' motion for summary judgment [Docket # 82] is GRANTED as to Counts I and III of Defendants' counterclaims, and DENIED as to Count II of Defendants' counterclaims.

BACKGROUND

I. Factual Background

This case stems from a franchise relationship between Plaintiffs and Defendants. The underlying action is one for breach of contract based on the operation of four Dunkin' Donuts franchises by the Defendants.[FN1] On November 15, 1999, Plaintiffs filed a Complaint against Defendants in a related case styled: *Dunkin' Donuts, Inc. v. Dough Boy Management, Inc.,* Civil Action No. 99cv5388 (hereinafter referred to as " Dunkin' I" ). Dunkin I was administratively dismissed by this Court and on

June 26, 2003 Plaintiffs filed their Second Amended Complaint in this action (hereinafter referred to as " Dunkin' II" ) incorporating the claims brought in the earlier filed action.

> FN1. On July 30, 2004, the parties stipulated to dismissal with prejudice of Counts IX, X, XI, XII and XIII of Plaintiffs' Second Amended Complaint. Therefore, the fraud, trademark infringement, trademark dilution, and unfair competition claims are no longer at issue.

*The Parties:*

Plaintiff Dunkin' Donuts Incorporated (" Dunkin" ') is a Delaware corporation with its principal place of business in Randolph, Massachusetts. Dunkin' is engaged in the business of franchising independent business persons to operate " Dunkin' Donuts" shops throughout the United States. Plaintiff Dunkin' Donuts USA, Inc. (" Dunkin' USA" ) is a Michigan corporation with its principal place of business in Southfield, Michigan.

Defendant Dough Boy Management is an owner and operator of a Dunkin' Donuts shop located at 2903 Route 23, West Milford (" the Dough Boy/Newfoundland shop" ). Dough Boy is a franchisee pursuant to the Franchise Agreement dated July 20, 1993. This shop produces the doughnuts and other products sold at all four of Defendants' shops.

Defendant Double-D I, L.L.C., is an owner and operator of a Dunkin' Donuts shop in Florida, New York (" the " Double-D I/Florida shop" ). Double-D I is a franchisee pursuant to the Franchise Agreement dated March 1, 1996.

Defendant Double-D II, L.L.C., is an owner and operator of a Dunkin' Donuts shop located at 1521 Union Valley Road, West Milford (" the Double-D II/West Milford shop" ). Double-D II is a franchisee pursuant to the Franchise Agreement dated August 27, 1999.

Defendant Double-D III, L.L.C., is an owner and operator of a Dunkin' Donuts shop located at Route 94 and Church Street, Vernon, NJ (" the Double-D III/Vernon shop" ). Double-D III is a franchisee

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

pursuant to the Franchise Agreement dated November 24, 1999.

Defendant Dollars for Donuts, NWNJ, L.P., is the operating entity for the Dough Boy/Newfoundland shop, which is the shop that produces the doughnuts and other products sold at all four of Defendants' shops. The four non-producing shops are called " satellite shops."

**\*2** Defendant Vernon Merritt IV, a citizen of New Jersey, is a franchisee for the Dough Boy/New foundland shop, pursuant to the Dough Boy Franchise Agreement. Mr. Merritt executed personal guaranties under which he agreed to perform and be bound by the obligations of Defendants Double-D, I, II and III under their respective Franchise Agreements with Dunkin'.

Defendant Sandra Merritt, a citizen of New Jersey, executed personal guaranties under which she agreed to perform and be bound by the obligations of Defendants Double-D I, II and III under their respective Franchise Agreements with Dunkin'. Both Mr. and Mrs. Merritt have been active in the operation of the Dough Boy Network shops.

Defendant Gregory Pier, a citizen of New Jersey, executed personal guaranties under which he agreed to perform and be bound by the obligations of Defendants Double-D I, II and III under their respective Franchise Agreements with Dunkin'.

Defendant John F. Higgins, a citizen of New Jersey, is a member of, and has a five percent ownership interest in, Double-D, I, II and III.

### Defendants' Counterclaims:

Count I Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing
Count II Violation of New Jersey Franchise Practices Act,
Count III Promissory Estoppel

### The Four Franchises:

On May 18, 2000, Dunkin' issued a Notice of Default and Termination with respect to the Dough Boy Network franchises. The alleged defaults under the Franchise Agreements included: operating two locations as Dunkin' Donuts franchisees without

Franchise Agreements for those locations; failing to accurately report Gross Sales to Dunkin' Donuts; failure to pay franchise and advertising fees to Dunkin' Donuts; and failure to properly maintain accounting records. On April 10, 2001 (for failure to maintain Dunkin's standards for health, sanitation and safety) and November 19, 2001 (for failure to maintain accurate books and accounts), Dunkin' sent Defendants Dough Boy Management, Inc., Double-D I, Double-D II, Double-D III, Mr. Merritt, and Mr. Pier Supplemental Notices of Termination. On September 6, 2002 (for material misstatements and omissions in applications for franchises and false statements on tax returns), Dunkin' sent Defendants Dough Boy Management, Inc., Double-D I, Double-D II, Double-D III, Mr. Merritt, Mrs. Merritt, and Mr. Pier a Supplemental Notice of Termination. Each notice explained that if Defendants contested the claimed defaults and contended that termination of their franchises was not justified, Dunkin would " not enforce this termination by itself," and would " submit the matter to a court to determine which party is right." (Plaintiffs' Ex. 1(E)-(H)). The Notice further provided:
During the time between the effective date of this Notice and any judicial determination, Dunkin' Donuts and its subsidiaries will continue to honor their obligations under the Franchise Agreement and any other agreements as if those obligations were still in effect. This interim arrangement is to create a framework for preserving rights while the issues are being decided....

**\*3** (Plaintiffs' Ex. 1(E)). If this Court ultimately concludes that there is no good cause for the termination, the Notice explains that the Notice will be void and the relationship will continue as before.

Plaintiffs advise that the manuals and guidelines which it provides to franchisees, set forth standards of health, sanitation and safety, and also procedures and standards applicable to the operation of a Dunkin' Donuts shop. (Laudermilk Aff. ¶¶ 15-16). These standards for health, sanitation and safety are based on the U.S. Public Health Service's Model Food Code. (Pl.Ex. 10, Grottenthaler Depo. at 4:15-17; 39:18-19).

In a previously filed Declaration by Mr. Merritt, he attested that Defendants' shops " are extremely well-maintained." (Pl.Ex. 6, Merritt Decl. ¶ 9). Mr. Merritt represented that his shops were operated in

accordance with Dunkin's standards and procedures and that none of the standards violations found by Dunkin' at Defendants' shops really existed. (Pl.Ex. 6, Merritt Decl. ¶¶ 9-13, 15-18, 22-23, 26-29, 34). He further testified at his deposition that Defendants' operation of their shops was " among the very best, as it's always been, of Dunkin' Donuts franchisees." (Pl.Ex. 3, Merritt Depo. At 382:14-16). Defendants' District Manager has also supported Mr. Merritt's statements-in her previous Declaration Patricia Sullivan attested that Defendants' shops " are extremely well maintained" and they were operating their shops in accordance with Dunkin's standards and procedures. (Pl.Ex. 7, Sullivan Decl. ¶¶ 7-8, 10, 15, 18, 23-24, 27-29, 31-32).

Plaintiffs point out that in Defendants' first counterclaim they allege that after Defendants were served with the Notices of Termination, Dunkin' materially breached the Franchise Agreements by failing to provide Defendants with operating manuals, for failing to update the manuals, limiting Defendants' opportunity for growth, applying materially different and more burdensome methods and standards when evaluating Defendants' shops. (Counterclaim ¶ 58). However, Plaintiffs allege that throughout discovery Defendants have not identified any facts supporting these allegations.

The Court acknowledges that Mr. Merritt's Declaration provided in opposition to this motion does detail the flaws in Dunkin's health, sanitation and safety standards (i.e., issues regarding the milk and cream refrigeration containers, the sanitizing solution, and inconsistent and unreasonable standards), and Dunkin's failure to perform its contractual obligations (i.e., failure to provide current operating procedures, failure to provide support, training and consultation, failure to visit and assist shops, and the imposition of unreasonable standards of performance to set them up for failure). (Pl.Ex. A, Merritt Decl.).

*Defendants' Damages:*

Throughout discovery, Defendants were required to supply information and documents supporting their claims for damages. Plaintiffs contend that neither Defendants' Initial Disclosures nor Answers to Interrogatories provide either a dollar amount of their alleged damages or a computation thereof. For example, Mr. Merritt's answer to paragraph 12 of the second set of interrogatories stated: " Defendants

have expended hundreds of hours and tens of thousands of dollars in locating and developing a site in Jefferson, New Jersey, beginning in late 1993 through the time the Territory Development Agreement (" TDA" ) was originally discussed and negotiated in mid-1996 up through May 2000, when plaintiff purported to rescind the agreement with Defendants to develop the site on Route 15 South." (Pl.Ex. 15, ¶ 13). Defendants only computation of their damages, according to Plaintiffs, was provided by Defendants' proposed expert, Irwin Mittleman. Mittleman only offered an opinion with respect to Defendants promissory estoppel counterclaim concerning the proposed development of a shop in Jefferson Township, New Jersey. This expert opinion was ultimately struck by the Honorable Ronald J. Hedges, U.S.M.J., and Mittleman was precluded from testifying at trial concerning Defendants' damages.

*4 By way of Mr. Merritt's Certification, Defendants contend that they have adduced evidence of damages. Mr. Merritt sets forth the following statements that demonstrate such evidence was provided in discovery:

[I]n my Supplemental Objections and Responses to Plaintiff's First Set of Interrogatories I explicitly stated as follows:

Defendant has suffered significant damages (i.e., millions of dollars), including but not limited to, lost profits from his Dunkin' Donuts shops, lost business opportunities due to being deprived of the right to qualify for expansion opportunities with Dunkin' Donuts, lost profits from the development of the Jefferson site, lost business opportunities and profits due to being deprived of the right to sell new products and take advantage of new technology and equipment, procedures and methodologies, and expenditure of a significant amount of unnecessary attorneys' fees and costs.

(Def. Ex. A, Merritt Decl. ¶ 46).[T]he documents supporting our claim for damages as they relate to Plaintiffs' wrongful rescission of the Jefferson Township franchise were listed as Exhibit 161 on our exhibit list [attached to the Final Pretrial Order].

(Def. Ex. A, Merritt Decl. ¶ 49). In the Final Pretrial Order, Defendants describe Exhibit 161 as " Jefferson Township cost and expense documents."

Mr. Merritt also supplements this evidence produced

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 20521 (D.N.J.)

**(Cite as: Not Reported in F.Supp.2d)**

during discovery with further calculations in his Certification, provided in opposition to the present motion for summary judgment. He states:

47. Solely with respect to the lost profits as a result of Plaintiffs' wrongful rescission of their approval of the Jefferson Township franchise and breach of the Territory Development Agreement, we have suffered damages in the approximate amount of One Million Three Hundred Forty Five Thousand Dollars ($1,345,000.00). Such figure is a very conservative amount and does not take into account the current sales being generated by a franchisee that is now operating a Dunkin' Donuts shop in what is rightfully our Jefferson TDA territory. In fact, from May 18, 2000 to the present, we have repeatedly advised Dunkin' about that [sic] substantial damages that we are seeking for Dunkin's wrongful termination of the TDA.

48. This amount is derived based on a variety of factors, including but not limited to, the following: (I) annual projected sales for the first year in the amount of One Million Fifty Nine Thousand Four Hundred Fifty Eight and 40/100 Dollars ($1,059,458.40); (ii) the fact that the market value of a Dunkin' Donuts shop is approximately one hundred ten percent (110%) of its gross sales based on my knowledge of the purchase and sale of Dunkin' Donuts shops; (iii) the amount of monies that we expended for the purchase of the real estate and the costs expended in pursuing this lost opportunity; and (iv) various purchase offers made to me for my other Dunkin' Donuts shops.

(Def. Ex. A, Merritt Decl. ¶¶ 47-48).*5 In addition, as a result of Plaintiffs' failure to perform under the terms of the franchise agreement, as set forth above, we have suffered damages in the approximate amount of the total continuing franchise fees paid by us to Plaintiffs. Specifically, we paid continuing franchise fees under the terms of the franchise agreements; yet, Dunkin' did not provide us with support, training and consultation in exchange for such fees. Dunkin' is already in the possession of the pertinent documents which reflect the amount of franchise fees paid by us.

(Def. Ex. A, Merritt Decl. ¶ 50).

*The Proposed Development of a Dunkin' Donuts Shop in Jefferson Township, New Jersey:*

On September 6, 1996, Dunkin' and Defendant Double-D II entered into a Territory Development Agreement (" TDA" ), pursuant to which Double-D II was granted a license to develop a Dunkin' Donuts shop in a specific territory in Jefferson Township, New Jersey (the " Jefferson Township shop" ). (Pl.Ex. 13). Schedule C of the TDA provided that the Jefferson Township shop must be opened by September 15, 1997, over a year after the parties entered into the TDA. (Pl.Ex. 13, Sched.C). Section 18 of the TDA stated: " No amendment, change or variance from this Agreement shall be binding on either party unless executed in writing." (Pl.Ex. 13 ¶ 18). Despite Defendants' failure to open their Jefferson Township shop by September 15, 1997, Dunkin' extended the TDA's deadline until the TDA was terminated on August 7, 1998. (Pl.Ex. 14, Persico Cert. ¶¶ 4-6).

It appears that although the TDA was terminated, Plaintiffs continued to provide Defendants with additional time within which to develop the Jefferson Township shop. (Pl.Ex. 14, Persico Cert. ¶ 7). By letter dated February 26, 1999, Dunkin' conditionally approved Defendants' development of a proposed site, provided that the store opened by December 1, 1999. (Pl.Ex. 14, Persico Cert. ¶ 8). When this deadline was not met, by letter dated March 2, 2000, Dunkin' extended the deadline, to April 30, 2000, for Defendants to obtain engineering and design approval from Dunkin' (which were to be approved before submission to any governmental authority), to submit executed franchise documents, and to pay applicable fees. (Pl.Ex. 14, Persico Cert. ¶ 9). The letter provided that failure to meet this deadline would result in " all approvals on this site rescinded and terminated." (Pl.Ex. 14, Persico Cert. Ex. C). It further provided that " There will be no further extensions beyond this date." (*Id.*). Defendants never sought or obtained Dunkin's approval on their engineering and design plans for the proposed Jefferson Township shop. (Pl.Ex. 14, Persico Cert. ¶ 10). The rescission of all approvals was further confirmed in the May 18, 2000 Notice of Default and Termination. The final paragraph in this Notice stated: " Finally, Dunkin' Donuts hereby confirms its rescission of approval of your proposed development of a Dunkin' Donuts shop on Route 15 in South Jefferson, New Jersey." (Pl.Ex. 1, Laudermilk Cert., Ex. E). In Mr. Merritt's answers to Dunkin's second set of interrogatories, he stated that the TDA did not expire on August 18, 1998. (Pl.Ex. 15, ¶ 12). The TDA was extended orally and in writing by Dunkin' Donuts until May 18, 2000 when the Notice of Default and Termination purported to rescind the TDA. (*Id.*).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 20521 (D.N.J.)

(Cite as: Not Reported in F.Supp.2d)

*6 Although Defendants had received the Notice of Default and Termination rescinding the TDA, Mr. Merritt alleges that he continued to have conversations with Mr. Persico, from Dunkin', about continuing to develop the Jefferson Township shop and was encouraged by Mr. Persico to proceed. (Def. Ex. A, Merritt Decl. ¶¶ 40-41). Specifically, Mr. Merritt states: " Mr. Persico advised me that we should continue to diligently pursue the development and construction of the Jefferson shop and unequivocally led me to believe that we would still be permitted to open the Jefferson shop despite the purported termination." (Def. Ex. A, Merritt Decl. ¶ 41). In fact, Defendants did proceed to develop the Jefferson Township shop and on or about August 29, 2000 Mr. Merritt verbally advised Mr. Persico that the Planning Board had approved the project for the construction of his Jefferson Township shop. (Def. Ex. A, Merritt Decl. ¶ 43). This approval was further confirmed in a letter from Mr. Merritt to Mr. Persico dated October 5, 2000. (Def. Ex. A, Merritt Decl. ¶ 44). Mr. Merritt states that at no time did Mr. Persico advise them that they were not permitted to continue with the project. (Def. Ex. A, Merritt Decl. ¶ 45).

## LEGAL STANDARD

To prevail on a motion for summary judgment, the moving party must establish that " there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Gleason v. Norwest Mortgage, Inc.*, 243 F.3d 130, 138 (3d Cir.2001). " A ' genuine' issue is one where a reasonable jury, based on the evidence presented, could hold in the movant's favor with regard to that issue." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When considering a motion for summary judgment, all evidence must be reviewed and all inferences drawn therefrom must be in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Once the moving party files a properly supported motion, the burden shifts to the nonmoving party to demonstrate the existence of a genuine dispute of material fact. Fed.R.Civ.P. 56(e); *Anderson*, 477 U.S. at 256. " The mere existence of a scintilla of evidence in support of the [nonmovant]'s position will be insufficient; there must be evidence of which the jury

could reasonably find for the [nonmovant]." *Id.* at 252. In order to defeat summary judgment, the non-moving party is required to identify the specific evidence of record which supports the claim and upon which a verdict in its favor may be based, and may not rest upon a vague argument that the record somewhere contains facts sufficient to support its claims. *Childers v. Joseph*, 842 F.2d 689, 694-95 (3d Cir.1988).

Conclusory statements and arguments do not raise triable issues which preclude summary judgment. *Ridgewood Board of Educ. v. N.E.*, 172 F.3d 238, 252 (3d Cir.1999). Instead, the nonmoving party must " present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 257 (citation omitted). If the opponent fails to make a sufficient showing regarding an essential element of his or her case upon which he or she will bear the burden of proof at trial, all other facts are necessarily immaterial and summary judgment must be granted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 321, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 289-90, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968), the Supreme Court stated that while it recognized " the importance of preserving litigants' rights to a trial on their claims," the Court refused " to extend those rights to the point of requiring that anyone who files a [ ] complaint setting forth a valid cause of action be entitled to a full-dress trial notwithstanding the absence of any significant probative evidence tending to support the complaint."

## LEGAL DISCUSSION

*7 The Court's present task is to determine whether genuine issues of material fact exist as to damages and whether plaintiff is entitled to judgment as a matter of law on all three of Defendants' counterclaims. It is undisputed that all of the relevant Franchise Agreements contain a Massachusetts choice of law provision.

The issue here is really one about damages-whether Plaintiffs can demonstrate through admissible evidence sufficient facts that would permit a jury to arrive at an intelligent damages estimate without speculation or conjecture. The answer is a resounding no with regard to the breach of contract claim, the breach of the covenant of good faith and fair dealing claim, and the promissory estoppel claim. Each will be discussed in turn along with the Court's reasoning

as to why the New Jersey Franchise Practices Act claim must proceed.

Plaintiffs assert that in light of the decisions by Magistrate Judge Hedges granting Plaintiffs' motion to strike Defendants' expert report of Irwin Mittleman and precluding him from testifying at trial, Defendants counterclaims must fail as a matter of law because damages are an element of each of the three claims. If Defendants cannot establish their damages at trial, then the claims must be dismissed. Defendants' contend that genuine issues of material fact exist as to the amount of damages suffered in this action. They argue that they have submitted ample evidence of their damages and, additionally, actual damages are not a necessary element for a breach of contract claim.

Since Defendants no longer have the benefit of expert testimony to present their damages, they must rely on non-expert testimony. A review of Defendants' counterclaims reveal that Defendants request actual and compensatory damages, including attorneys' fees, costs and interest for the counterclaims. In addition, the New Jersey Franchise Practices Act counterclaim also seeks treble damages.

Defendants bear the burden of proving their counterclaim damages to a reasonable degree of certainty, and may not be compensated for purely speculative damages. They are entitled only to reasonable damages. Mathematical certainty is not required in calculating damages, and an element of uncertainty is permitted. *Herbert A. Sullivan, Inc. v. Utica Mut. Ins. Co.,* 439 Mass. 387, 788 N.E.2d 522, 543 (Mass.2003). That said, Defendants " must establish [their] claim upon a solid foundation in fact, and cannot recover when any essential element is left to conjecture, surmise or hypothesis." *White Spot Constr. Corp. v. Jet Spray Cooler, Inc.,* 344 Mass. 632, 183 N.E.2d 719, 722 (Mass.1960) (citation omitted). Damages must nevertheless be proven and not left to speculation. *Hendricks & Assoc., Inc. v. Daewoo Corp.,* 923 F.2d 209, 217 (1st Cir.1991). To obtain an award of consequential damages for their lost profits and lost business opportunities, Defendants' damages must be " ' capable of ascertainment upon some definite standard, either of market value, established experience, or direct inference from known circumstances,' and an award of consequential damages must be based on evidence which demonstrates ' with a fair degree of certainty what the profits would have been." ' *Id.* (quoting

*John Hetherington & Sons, Ltd. v. William Firth Co.,* 210 Mass. 8, 95 N.E. 961, 963 (Mass.1911)).

**\*8** Federal Rule 26(a)(1)(C) requires that a party must provide to other parties

a computation of any category of damages claimed by the disclosing party, making available for inspection and copying as under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of injuries suffered.

Fed.R.Civ.P. 26(a)(1)(C). Since Defendants' Initial Disclosures did not set forth this computation of damages, Defendants were under a duty to supplement their Initial Disclosures when they acquired the pertinent information. Fed.R.Civ.P. 26(e). Such was never done.

According to Defendant Mr. Merritt, his Supplemental Objections and Responses to Plaintiff's First Set of Interrogatories states that he has suffered " significant damages (i.e., millions of dollars)" in lost profits from his, lost business opportunities due to inability to expand, " lost profits from the development of the Jefferson site, lost business opportunities and profits due to being deprived of the right to sell new products and take advantage of new technology and equipment, procedures and methodologies, and expenditure of a significant amount of unnecessary attorneys' fees and costs." (Def. Ex. A, Merritt Decl. ¶ 46). Mr. Merritt also asserts that Exhibit 161 on Defendants' exhibit list attached to the Final Pretrial Order includes evidence supporting their damages claim. Exhibit 161 is identified as " Jefferson Township cost and expense documents." There is no other evidence relating to Defendants' alleged damages that has been presented to this Court, that was produced during discovery. Discovery has long since closed and the parties filed their Final Pretrial Order on April 23, 2004.

In support of Defendants' opposition to Plaintiffs' present motion, Mr. Merritt supplements this evidence produced during discovery with damages calculations in his Certification. While these calculations in paragraphs 47, 48, and 50 of his Certification do set forth dollar figures for the first time-$1,345,000.00 for wrongful termination of the TDA; and a refund of the franchise fees paid for failure to provide support, training and consultation services-there is notably an absence of

documentation to support these figures and no explanation as to how these figures were calculated. It is true that Mr. Merritt explains that, of the $1,345,000.00, $1,059,458.40 is the annual projected sales for the Jefferson Township shop, the alleged market value of the shop based solely on Mr. Merritt's knowledge of the market, the amount of money expended in purchasing the real estate, and other purchase offers made to him for his other shops. (Def. Ex. A, Merritt Decl. ¶¶ 47-48). However, this is speculation and no foundation is presented to this Court to substantiate these amounts. Further, merely stating that " Dunkin' is already in the possession of the pertinent documents which reflect the amount of franchise fees paid by us," (Def. Ex. A, Merritt Decl. ¶ 50), is not enough to demonstrate the calculation of their damages. In order to defeat summary judgment, the non-moving party is required to identify the specific evidence of record which supports the claim and upon which a verdict in its favor may be based, and may not rest upon a vague argument that the record somewhere contains facts sufficient to support its claims. *Childers v. Joseph,* 842 F.2d 689, 694-95 (3d Cir.1988). Defendants' damages evidence is altogether inadequate as a matter of law; no factfinder would be able to arrive at a reasonable estimate of Defendants' damages without speculation or conjecture. *See Scully v. U.S. WATS, Inc.,* 238 F.3d 497, 515 (3d Cir.2001).

**\*9** Defendants argue that if they cannot demonstrate their damages, they are still entitled to nominal damages and attorneys' fees. While Massachusetts law would permit Defendants to at least nominal damages for a breach of a contract, where no actual damages are proven, *Damiano v. National Grange Mut. Liability Co.,* 316 Mass. 626, 56 N.E.2d 18, 20 (Mass.1944), Defendants here never pled a claim for nominal damages, nor asserted such a claim in discovery. Further, Defendants' general prayer for relief does not suffice. *See Arizonans for Official English v. Arizona,* 520 U.S. 43, 71, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997) (" a claim for nominal damages, extracted late in the day from [plaintiffs] general prayer for relief and asserted solely to avoid otherwise certain mootness, [bears] close inspection" ). It appears evident to this Court that Defendants newfound claim for nominal damages arises out of a failure to ultimately prove actual damages and a desire to ultimately obtain attorneys' fees. At oral argument, defense counsel explained that if a jury would not give them actual damages, " [t]hen the jury

could say give them nominal damages for that, and we are entitled to attorneys' fees and costs which we had to incur. (May 17, 2005 Oral Argument Transcript (" Tr." ) at 57). " At the very least, the nominal damages argument is foreclosed by dictates of Judicial Estoppel." *A.P. Boyd, Inc. v. Newark Pub. Sch.,* 44 Fed. Appx. 569, 571-72 (3d Cir.2002) (citing *New Hampshire v. Maine,* 532 U.S. 742, 749, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001) (" Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him ... This rule, known as judicial estoppel, generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." ) (internal citations omitted)). Thus, Defendants are precluded from resorting to nominal damages when, all throughout discovery, Defendants only alleged actual and consequential damages. Furthermore, if Plaintiffs knew that Defendants' were seeking solely nominal damages on their claims, Defendants counterclaims may have been settled long ago, hence avoiding unnecessary discovery, motion practice, and expert reports.

In *Atlantic Research Mktg. Sys. v. Saco Defense,* 997 F.Supp. 159, 165-66 (D.Mass.1997), the court noted that the plaintiffs only asserted a claim for lost profits, not one for nominal damages, but then went on to theorize as to why a plaintiff would want to go to the time, trouble, and expense of proceeding with a lengthy trial on the liability issues raised ... if there were no possibility of their recovering anything more than one dollar at the conclusion. Even if they did wish to do so and could persuade the court that they at least had a right to attempt to recover nominal damages, it might still be possible to avoid the issue altogether, if, for example, [defendants] were willing to make a voluntary payment (without prejudice) of one dollar to each plaintiff, thus eliminating any concern that dismissal might leave Plaintiffs with less than the full compensation to which the law entitled them.

**\*10** This Court agrees. While defense counsel has argued that " We are not here because we want to be here. We are here because they brought us here ...," (Tr. at 57), the Court notes that Defendants have also filed their own counterclaims, as they are certainly

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 20521 (D.N.J.)

**(Cite as: Not Reported in F.Supp.2d)**

entitled to do, which are the subject of the present motion. Thus this case is being perpetuated. Nevertheless, Defendants have not explicitly sought nominal damages and Plaintiffs had no notice that nominal damages were being sought.

Also at oral argument, defense counsel suggested, for the first time, that an element of his client's damages is attorneys' fees because the Franchise Agreements are unilateral and do not provide such fees for his clients if they prevail on their counterclaims. (Tr. at 58). Plaintiffs' counsel pointed out that Defendants must first establish the elements of their claims in order to prevail and only then would they even have a claim for attorneys' fees. (Tr. at 63). Simply stated, a party must prevail on all essential elements of their cause of action, including damages, before attorneys' fees can even become an issue; thus attorneys' fees cannot be part of the *prima facie* claim.

Therefore, since there is no question that Defendants' evidence of damages is insufficient as a matter of law, any of Defendants' counterclaims that are contingent on an element of damages will be dismissed.

### A. Breach of Contract and Breach of Implied Covenant Counterclaims (Count I)

Defendants first counterclaim asserts causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing arising from Plaintiffs' alleged failure to comply with the express terms of the franchise agreements, in addition to Plaintiffs' allegedly wrongful termination of the Jefferson Territory Development Agreement (" TDA" ).

" Under Massachusetts law, in order to sustain a cause of action for breach of contract, a plaintiff must plead and prove that the parties had an agreement supported by valid consideration; that plaintiff was ready willing and able to perform; and that plaintiff was damaged." *Petricca v. Simpson,* 862 F.Supp. 13, 17 (D.Mass.1994). Damages are an unambiguous element of a breach of contract cause of action. Moreover, damages must also be established under a theory of breach of an implied covenant of good faith and fair dealing. *See McCone v. New England Tel. & Tel. Co.,* 393 Mass. 231, 471 N.E.2d 47, 50 (Mass.1984).

Ergo, Defendants' causes of action for breach of

contract and breach of the implied covenant of good faith and fair dealing in Count I must be dismissed since they are predicated on proving some measure of damages, and this Court has already foreclosed nominal damages.

### B. New Jersey Franchise Practices Act Counterclaim (Count II)

In their second counterclaim, Defendants allege violations of the New Jersey Franchise Practices Act (" NJFPA" ), N.J.S.A. § 56:10-1, *et seq.* The specific provisions at issue are N.J.S.A. § 56:10-5, for terminating the Franchise Agreements without good cause, and N.J.S.A. § 56:10-7, for imposing unreasonable standards of performance on Dough Boy. Their counterclaim for violation of the NJFPA seeks actual, compensatory and treble damages, including attorneys' fees, costs and interest.

**\*11** The NJFPA provides that a franchisor may not terminate a franchise without good cause to do so. N.J.S.A. § 56:10-5. Good cause is " limited to failure by the franchisee to substantially comply with those requirements imposed upon him by the franchise." *Id.* Defendants' civil remedy is provided in N.J.S.A. § 56:10-10 which states:
Any franchisee may bring an action against its franchisor for violation of this act in the Superior Court of the State of New Jersey to recover damages sustained by reason of any violation of this act and, where appropriate, shall be entitled to injunctive relief. Such franchisee, if successful, shall also be entitled to the costs of the action including but not limited to reasonable attorney's fees.

Although this latter section does specify that it is to " recover damages," the NJFPA does not explicitly require a showing of damages in order to establish a violation. Given the importance of the NJFPA in protecting franchisees, this Court will not read this provision so restrictively. *See, e.g., Westfield Centre Serv., Inc. v. Cities Serv. Oil Co.,* 158 N.J.Super. 455, 386 A.2d 448, 464 (N.J.Super.Ct. Ch. Div.1978) (allowing claim to proceed for nominal damages, attorneys fees, and possibly punitive damages, even though no actual damages were proven; however franchisee was not eligible for attorneys' fees for other unsuccessful claims brought against the franchisor). Without permitting this claim to go forward, franchisees might not pursue purported violations of their rights. Thus, the Court will not dismiss this claim on the basis that no damages have

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

been established.

The Court now turns to the merits of Defendants' NJFPA claims. As already stated, Defendants' claims under the NJFPA are purportedly established based on the unreasonable standards of performance imposed upon Defendants, and the termination of the Franchise Agreements without good cause. On these claims the Court agrees with Defendants; there are questions of fact as to each of these claims.

Whether Plaintiffs terminated the Franchise Agreements without good cause is not contingent on Defendants proving damages. Admittedly, the Defendants have continued to operate their shops pending the outcome of this litigation, but it does not matter for purposes of establishing a violation that their sales have actually increased. " New Jersey takes a restrictive view of what constitutes ' good cause' for termination." *Beilowitz v. GMC,* 233 F.Supp.2d 631, 644 (D.N.J.2002). " It is a violation of the NJFPA to cancel a franchise for any reason other than the franchisee's substantial breach, even if the franchisor acts in good faith and for a bona fide reason." *Atlantic City Coin & Slot Serv. Co. v. IGT,* 14 F.Supp.2d 644, 658 (D.N.J.1998).

Defendants provide a litany of examples as to how Plaintiffs set them up for failure so that the Franchise Agreements could be terminated. It is without doubt that if a franchisor manipulates the system causing a franchisee's breach so that a Franchise Agreement is terminated, the termination occurs without good cause in violation of the NJFPA, N.J.S.A. § 56:10-5. Drawing all inferences in the light most favorable to the non-moving party, the Court finds that a reasonable jury may, after considering Mr. Merritt's testimony, find that Defendants' shops were operated in accordance with Plaintiffs' standards and procedures, and that there was no " substantial breach" justifying termination. Similarly, under this set of facts, whether the standards that Dunkin' imposed on Defendants constituted an " unreasonable standard[ ] of performance" are questions for a jury. N.J.S.A. § 56:10-7(e); *Carlo C. Gelardi Corp. v. Miller Brewing Co.,* 502 F.Supp. 637, 653 (D.N.J.1980) (where court denied summary judgment where fact issue existed as to whether unreasonable standards of performance were imposed upon distributor). Hence, Plaintiffs' motion for summary judgment on Defendants claims under the NJFPA is denied.

### C. Promissory Estoppel Counterclaim (Count III)

**\*12** Lastly, in Count III of their counterclaim, Defendants' assert a cause of action for promissory estoppel. Defendants' promissory estoppel claim arises from Plaintiffs' alleged encouragement to continue to develop the Jefferson Township shop notwithstanding the rescission of the TDA-thus it involves the time frame after the rescission of the TDA when no contract existed.

To prevail on a promissory estoppel claim, Defendants must present evidence that Plaintiffs made:

(1.) A representation or conduct amounting to a representation intended to induce a course of conduct on the part of the person to whom the representation is made.

(2.) An act or omission resulting from the representation, whether actual or by conduct, by the person to whom the representation is made. (3.) Detriment to such person as a consequence of the act or omission.

*Clickner v. City of Lowell,* 422 Mass. 539, 663 N.E.2d 852, 856 (Mass.1996). Under Massachusetts law, damages are " an essential element of a claim for promissory estoppel." *Veranda Beach Club Ltd. Partnership v. Western Sur. Co.,* 936 F.2d 1364, 1381 (1st Cir.1991) (citing *Hall v. Horizon House Microwave, Inc.,* 24 Mass.App.Ct. 84, 506 N.E.2d 178, 184 (Mass.App.Ct.1987). Therefore, Defendants' promissory estoppel claim must be dismissed as it fails for lack of damages.

### CONCLUSION

For the reasons set forth above, this Court concludes that Plaintiffs' motion for summary judgment [Docket # 82] is GRANTED as to Counts I and III of Defendants' counterclaims, and DENIED as to Count II of Defendants' counterclaims. The parties are advised to contact my Deputy Clerk, Lissette Rodriguez, to schedule a trial date for this matter. An appropriate Order follows.

D.N.J.,2006.
Dunkin' Donuts Inc. v. Dough Boy Management, Inc.
Not Reported in F.Supp.2d, 2006 WL 20521 (D.N.J.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

Westlaw.

Not Reported in F.Supp.

Not Reported in F.Supp., 1995 WL 368172 (E.D.Pa.)

**(Cite as: Not Reported in F.Supp.)**

**H**

Newton v. Dana Corp.
E.D.Pa.,1995.
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
Robert Lee NEWTON, Plaintiff,
v.
DANA CORPORATION PARISH DIVISION,
Defendant.
**No. CIV. A. 94-4958.**

June 21, 1995.

BUCKWALTER.

\*1 Presently before the court is plaintiff's Motion to Amend Scheduling Order. The court issued a scheduling order on March 23, 1995, directing that all discovery in the case be completed by June 1, 1995. Plaintiff seeks to amend the scheduling order to extend discovery through September of 1995. For the reasons stated below, plaintiff's motion is denied.

Plaintiff Robert L. Newton, originally proceeding pro se, filed the present action on August 15, 1994, and later was granted leave to amend his complaint after retaining counsel.[FN1] The amended complaint states a cause of action under Title VII of the Civil Rights Act of 1964 and 1991; it alleges that defendant, as plaintiff's employer, discriminated against plaintiff during the course of his employment on the basis of race.

Courts have broad discretion in deciding whether to permit additional discovery. See *Wisniewski v. Johns-Manville Corp.,* 812 F.2d 81 (3d Cir.1987); *In re Fine Paper Antitrust Litigation,* 685 F.2d 810 (3d Cir.1982); *McElyea v. Navistar Intern. Transp. Corp.,* 788 F.Supp. 1366 (E.D.Pa.1991). Under Fed.R.Civ.P. 16(b), " a schedule shall not be modified except upon a showing of good cause ...." (emphasis added). The movant is required to show that discovery " cannot reasonably be met despite [her] diligence." Fed.R.Civ.P. 16(b) advisory committee's note; 6A Wright & Miller, *Federal Practice and Procedure,* § 1522.1 (1990), at 231. In the absence of proof of good cause, " the scheduling order shall control." Wright & Miller, at 231. To otherwise allow amendments when no good cause is shown would render the scheduling order a "

frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril." *Forstman v. Culp,* 114 F.R.D. 83 (M.D. N.C.1987) (citing *Gestetner Corp. v. Case Equipment Co.,* 108 F.R.D. 138, 141 (D. Me.1985)). It would also " cause delay in disposition of disputes by creating confusion in trial dockets and prejudice the opposing party by injecting an unnecessary element of uncertainty into trial strategy and preparation." *Philadelphia Gear Corp. v. Techniweld, Inc.,* 1992 WL 96300 (E.D. Pa.) (citing *Lee v. Boyle-Midway Household Products, Inc.,* 1992 WL 45492 (W.D. Pa.1992)).

Good cause may be satisfied if the movant shows that his inattention to the case over a period of time is " due to any mistake, excusable neglect or any other factor which might understandably account for failure of counsel to undertake to comply with the Scheduling Order." *Gestetner Corp. v. Case Equipment Co.,* 108 F.R.D. 138, 141 (D. Me.1985). Plaintiff has made no effort to proceed with discovery. Counsel has made no arguments as to why he has failed to pursue discovery or why the court should extend the discovery period. Instead, plaintiff simply states that he originally filed his complaint pro se and that he had a reasonable belief that defendant would not oppose the present motion.[FN2] The court finds neither argument to be persuasive. First, when the scheduling order was issued, plaintiff had already retained counsel. Second, defendant is not bound by his original decision not to oppose plaintiff's motion if he later reasonably decides that he may be prejudiced by that motion. See also *Hewlett v. Davis,* 844 F.2d 109, 113 (3d Cir.1988) (stating that movant is required to show proof that more diligent discovery was impossible); *McElyea v. Navistar Intern. Transp. Corp.,* 788 F.Supp. 1366 (E.D.Pa.1991). Because nothing prevented plaintiff from complying with the discovery schedule, " neither justice nor fairness to the plaintiff' requires that the court amend the scheduling order. *Lampe v. Woog,* 1993 WL 39540 (E.D. Pa.).

\*2 Although the court presently holds that discovery will not be extended, we will allow defendant to depose plaintiff Newton within a reasonable amount of time after the entry of the court's order. Defendant had properly sent plaintiff a Notice of Deposition prior to the discovery deadline but was unable to depose plaintiff due to plaintiff's cancellation of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1995 WL 368172 (E.D.Pa.)

**(Cite as: Not Reported in F.Supp.)**

Page 2

deposition the day before it was scheduled to take place. At that time, plaintiff also informed defendant that he would be unavailable for discovery purposes " through the close of discovery."    To preclude defendant from pursuing its deposition of plaintiff Newton would be to reward plaintiff for his dilatory tactics. Accordingly, defendant is permitted to depose plaintiff within a reasonable amount of time after entry of this court's order.

An order follows.

## ORDER

AND NOW, this 21st day of June, 1995, upon consideration of plaintiff's Motion to Amend Scheduling Order, together with the responses thereto, it is hereby ORDERED that:

1. Plaintiff's Motion to Amend Scheduling Order is DENIED; and

2. Defendant's request to depose plaintiff Newton after the discovery deadline is GRANTED. Said deposition is to be conducted within a reasonable amount of time after entry of this order.

> FN1. Court records indicate that plaintiff retained counsel on or before March 17, 1995, the date on which plaintiff's counsel prepared the Case Status Report.

> FN2. The sum and substance of plaintiff's motion is:
> 1. Plaintiff originally filed a pro se Complaint against Defendant.
> 2. Plaintiff has since employed counsel.
> 3. On March 23, 1993[sic], based upon case status reports filed by the parties, it was ordered, inter alia, that all discovery in this case be completed by June 1, 1995.
> 4. As of this date, no discovery has been completed.
> 5. Plaintiff has also sought and received permission to amend his Complaint.
> 6. Plaintiff avers that the additional time required for this Amended Complaint, Discovery and the Motions necessitates that this court amend its Order of March 23, 1993[sic], as follows:
> Paragraph 1. September 1, 1995
> Paragraph 3. September _____, 1995
> 7. Plaintiff has a reasonable belief, based on

communications with Defendant's counsel, that Defendant may not oppose this Motion to Amend Scheduling Order.
8. Plaintiff alleges that no surprise or prejudice will be done to Defendant.

E.D.Pa.,1995.

Newton v. Dana Corp.

Not Reported in F.Supp., 1995 WL 368172 (E.D.Pa.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT C

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 194303 (D.Del.)

**(Cite as: Not Reported in F.Supp.2d)**

**C**

Semiconductor Energy Laboratory Company, Ltd. v. Sanyo North America Corp.

D.Del.,2001.

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.

SEMICONDUCTOR ENERGY LABORATORY COMPANY, LTD., Plaintiff,

v.

SANYO NORTH AMERICA CORPORATION andSANYO ELECTRIC CO., LTD. Defendants.

**No. C.A. 00-018-GMS.**

Feb. 22, 2001.

*MEMORANDUM AND ORDER*

SLEET, J.

*1 On January 12, 2000, the plaintiff, Semiconductor Energy Laboratory Ltd. (" SEL" ), filed a complaint against the defendants, Sanyo North America Corp. and Sanyo Electric Co., Ltd (collectively " Sanyo" ), claiming infringement of four patents (D.I.1).[FN1] The complaint did not include a claim for monetary damages and did not request a jury. Sanyo timely answered and asserted counterclaims (D.I.13, 34). SEL, in turn, timely answered the counterclaims (D.I.42).

> FN1. The patents listed in the complaint are U.S. Patent No. 5,953,597 (" the '597 Patent" ), U.S. Patent No. 5,530,265 (" the '265 Patent" ), U.S. Patent No. 5,956,105 (" the '105 Patent" ) and U.S. Patent No. 5,893,190 (" the '990 Patent" ).

Presently before the court is SEL's motion to amend the complaint filed on December 29, 2000 (D.I.77). SEL's motion proposes the following changes to the complaint: (1) add claims that Sanyo infringed two new patents that relate to the technology at issue in the case issued after the filing of the original complaint,[FN2] (2) add factual allegations, (3) withdraw the '265 Patent, (4) add a request for a jury trial and (5) add a claim for money damages-including treble damages for willful infringement.[FN3] The court will deny SEL's motion for the most part. The following discussion more fully explains the basis for the court's ruling.

> FN2. U.S. Patent No. 5,352,291 (" the '291 Patent" ) was issued as a reexamination certificate on April 18, 2000 and U.S. Patent No. 6,057,183 (" the '183 Patent" ) was issued on May 2, 2000.

> FN3. SEL also proposes " stylistic changes for improved readability" .

The court conducted a scheduling conference with the parties pursuant to Local Rule 16.2(b) on June 1, 2000. At the conference, the parties discussed the cut-off date for amendment of the complaint and joinder of parties. SEL noted that it was thinking of adding several additional patents to the complaint but that it needed discovery from Sanyo to develop a good faith basis for determining infringement.[FN4] Based on the arguments, the court agreed to permit 90 days for joinder and amendment of the complaint-September 1, 2000. In so doing, the court told SEL that it could seek relief from the September 1, 2000 date if it was having problems simply by submitting a letter to the court.

> FN4. SEL stated that it thought it would add " five more" patents to the case.

During the scheduling conference the parties also addressed potential discovery problems and how they would impact any amendment to the complaint. The court, however viewed the protective order and associated discovery issues as distinct from the issue of amending the complaint. As the court stated at the June 1, 2000 conference, " I need to interrupt, because ... we're addressing a discovery concern you have and also attempting to set a ... drop-dead for amending the pleadings. That concern [the discovery issues] is subsumed within the issue, but I don't want to resolve that, I'll call it [a] discovery dispute, which in my judgment is not yet ripe for my intervention." In setting a ' drop-dead' date of September 1, 2000, the court balanced SEL's concern for discovering evidence of additional infringement against the need to move the case forward expeditiously.

After the June 1, 2000 conference, the parties began engaging in extensive discovery in both the United States and Gizu, Japan (the site of one of Sanyo's manufacturing and design plants). Presumably, at the same time SEL was conducting an investigation to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                 Page 2

Not Reported in F.Supp.2d, 2001 WL 194303 (D.Del.)

**(Cite as: Not Reported in F.Supp.2d)**

determine whether any of its additional patents were infringed. Although the parties have each produced a substantial number of documents, their failure to agree on a protective order means that Sanyo has not given SEL any of its " Highly Confidential Documents." SEL has moved to compel Sanyo to produce several documents that are the subject of the protective order.[FN5]

> FN5. From the submissions, it appears the sticking point is the wording of the patent prosecution bar in the proposed protective order. The court will conduct a teleconference regarding the discovery dispute and the protective order. Nevertheless, the court repeats the statement it made on June 1, 2000 that:
> " I would hope not to see the protective order issue, quite frankly, counsel. I am of the view that a whole lot goes into a protective order, that a Court [sic] can't possibly know the reason that things are in there. That's business reasons, I'm mainly referring to. And I think that courts [and] judges are particularly ill suited to resolving these issues. If you put us to the task, we'll do it. But I just encourage you to do whatever you can to resolve your differences regarding the protective order .... [m]y interest is not in doing something that is arbitrary and really dosen't serve the needs of either party. Because I don't have the background in terms of knowing what you know about your clients and your clients' needs, and I cannot possibly be as immersed in the litigation as counsel."

\*2 SEL never filed a request with the court for relief from the " drop-dead" date of amending the pleadings. Neither did it seek to amend the pleadings before the " drop-dead" date of September 1, 2000. Instead, the present motion to file an amended complaint appears to arise simply out of SEL's desire to amend the complaint once rather than a recent discovery of ' good cause' to believe that two additional patents were infringed. On November 30, 2000, SEL sent Sanyo a letter stating, in part,
[W]e anticipate amending the complaint to add additional patents after a review of Sanyo's confidential documents. We have already identified two additional patents *prior* to receipt of those confidential documents. Should there be any impediment to amending the complaint, we anticipate

filing a separate suit relating to those two patents. The reason we are writing now is so that there will be no question that any such separate suit is not to be based on any confidential documents produced under the protective order.

Therefore, at least approximately one month in advance of the instant motion SEL had a good faith basis to believe Sanyo infringed two additional patents and that it planned to amend the complaint.

The logical implication of SEL's letter-and the factual circumstances-gives its argument in the instant motion away. First, the patents SEL seeks to now include in the complaint were issued (or issued a reexamination certificate) not only well in advance of the amendment deadline, but also in advance of the June 1, 2000 status conference. At the status conference, SEL indicated that it believed it wanted to include several ' process patents' in the case since it was " pretty sure a number of them are infringed".[FN6] Second, as its November 30, 2000 letter makes clear, since SEL cannot claim that it needs any " Highly Confidential Documents" to develop a good faith basis for infringement of the '291 and '183 Patents, the dispute over the protective order is irrelevant to its ability to amend the complaint.

> FN6. The court notes, without deciding, that SEL's statement at the scheduling conference may have been enough to constitute ' good cause' to have amended the complaint to include additional patents at that time.

Aside from simply wanting to add two patents, SEL's motion also includes an eleventh hour request for money damages and possibly treble damages for willful infringement. Not only is this request several months past the deadline for amendment, but it directly contradicts SEL's statements at the June 1, 2000 scheduling conference. During the scheduling conference, SEL's counsel stated, " this is a case where we have chosen to seek injunctive relief only, so there is not only no damage but there is no jury."

Although amendments to complaints are to be " freely given when justice so requires," *Foman v. Davis,* 371 U.S. 178, 182 (1962), a court may deny a motion to amend if there is sufficient reason to do so. Among the ' sufficient reasons' are undue delay and prejudice to the opposing party. *See id.,* at 182; *see also* Fed.R.Civ.P. 15(a). Although the mere passage

of time does not prevent amendment, at some point the delay places an unwarranted burden on the court or an unfair burden on the opposing party. *See Centerforce Technologies, Inc., v. Austin Logistics, Inc.,* Civ.A.No. 99-243-MMS, 2000 WL 652943, at *3 (D.Del. Mar, 10, 2000) (citing cases). As numerous courts have noted, the touchstone for denying motions to amend is prejudice to the nonmoving party. *See id.* Nevertheless, undue delay and prejudice are interrelated. *See id.,* at *4 (citing *Proctor & Gamble Co. v. Nabisco Brands, Inc.,* 125 F.R.D. 405, 410 (D.Del.1987)) (stating that showing of long delay may ameliorate degree of prejudice which nonmovant must establish in order to defeat a proposed amendment) (internal quotations omitted).

**\*3** Contrary to SEL's assertions, the court does not consider a motion to amend almost four months later to be timely. Although the court set a deadline for amending the pleadings, it made clear to SEL that it could seek relief via a letter. SEL failed to communicate its desire to amend its complaint by September 1, 2000, nor did it ask for relief from the deadline. Although SEL contends that the delays in discovery impeded its ability to conduct an investigation, the court notes both that substantial discovery has taken place and that SEL admits that it did not need the " Highly Confidential Documents" to have a good faith basis for asserting infringement of the '291 and '183 Patents. Additionally, SEL proffers no reason why it waited until now to seek monetary damages rather than just injunctive relief, as it originally asserted-and subsequently reaffirmed.

Furthermore, the court finds that allowing SEL's amendment would both place an unfair burden on the court and prejudice Sanyo. First, although SEL contends that the addition of the '291 and '183 Patents constitute minimal disruption since they involve the same technology, witnesses, and products, Sanyo contests this. The correct inquiry for the court is what prejudice results from the late addition of claims rather than prejudice from the nature of the claims added. *See Barkauskie v. Indian River Sch. Dist.,* 951 F.Supp. 519, 528 (D. Del 1996). The four month delay comes at a point where discovery is substantially complete and would require the parties to engage in additional discovery. For instance, it is unclear whether the '291 and '193 Patents really are substantially similar to those already claimed; the parties would have to engage in additional discovery to determine the relationship between the patents and technology already in the litigation and the proposed

additions. FN7 Second, injecting monetary damages (and possible willful infringement) into the case would require both parties to engage in an entirely new discovery aspect of the case. Although Sanyo proposes, in the event the court grants the amendment, that the trial should be bifurcated and damages discovery be conducted later, the court is unwilling to do this. Third, the parties' claim charts and briefs on claim construction are due in a few weeks in anticipation of the *Markman* hearing scheduled for May 11, 2001. The court is unwilling to alter its scheduling order at this point in the case.

> FN7. Sanyo disputes SEL's characterization that the new patents involve the substantially same technology as the patents already in suit. Although SEL states that Sanyo's distinctions are illusory, the court is unwilling to construe the patents at this time. Merely making the argument, however, undermines SEL's position. The court-and the parties-would have to engage in a long and detailed comparison of the ' new' and the ' old' patents.

In contrast to the above discussion, the other proposed amendments-deleting the '265 Patent, requesting a jury trial, adding factual allegations, and making stylistic changes-do not appear to unfairly prejudice Sanyo. First, SEL gave Sanyo notice on June 27, 2000, that it intended to drop the '265 Patent from the suit. Further, it is hard to see how Sanyo would be prejudiced by deleting claims. Second, Sanyo asked for a jury trial for its counterclaims on June 16, 2000 (D.I.36). Not only is Sanyo not prejudiced by the request for a jury trial, but judicial economy counsels in favor of having a jury hear both SEL and Sanyo's claims. Finally, it is beyond question that stylistic changes and new factual allegations-to the extent they do not involve monetary damages or the '291 or '183 Patents-do not prejudice Sanyo.

**\*4** For the aforementioned reasons, the court will deny SEL's motion to amend regarding monetary damages and adding two new patents but will allow SEL to amend its complaint to withdraw the '265 Patent, ask for a jury trial, make other factual allegations and stylistic changes. At this point, the court is unwilling to enter into a new schedule and delay the trial in a case that was filed more than one year ago in which both the court and the parties have spent considerable resources.

Not Reported in F.Supp.2d, 2001 WL 194303 (D.Del.)

**(Cite as: Not Reported in F.Supp.2d)**

Therefore, IT IS HEREBY ORDERED that:

1. SEL's motion for leave to amend its complaint (D.I.77) is DENIED in part and GRANTED in part:

a) SEL's claims are limited to the '597 Patent, the '105 Patent and the '990 Patent.

b) SEL may not amend its complaint to include a claim for money damages.

c) SEL may amend its complaint to include a claim for a jury trial.

d) SEL may amend its complaint to add only those factual and stylistic changes that encompass and expand upon claims included in the complaint.

2. Within 10 days from the date of this order, SEL shall submit a revised amended complaint which incorporates the changes contemplated by this order. The revised amended complaint shall conform to Local Rule 15.1.

3. The court will conduct a teleconference with the parties on *Tuesday, March 6, 2001 at 2:00 p.m.* to hear any outstanding discovery disputes, including the entry of a protective order. Counsel for plaintiff shall initiate the phone call to (302) 573-6470.

D.Del.,2001.

Semiconductor Energy Laboratory Company, Ltd. v. Sanyo North America Corp.

Not Reported in F.Supp.2d, 2001 WL 194303 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT D

Westlaw.

Slip Copy
Slip Copy, 2006 WL 2668531 (E.D.Pa.)
**(Cite as: Slip Copy)**

Sherlock v. Herdelin
E.D.Pa.,2006.
Only the Westlaw citation is currently available.
United States District Court,E.D. Pennsylvania.
William F. SHERLOCK, Patricia A. Sherlock.
v.
Robert HERDELIN, 44 Financial Corp.
**Civil Action No. 04-3438.**

Sept. 11, 2006.

Robert J. Reger, Debra Lynn Sherlock, Reger Rizzo
Kavulich & Darnall LLP, Philadelphia, PA, for
William F. Sherlock and Patricia A. Sherlock.
Michael P. Dignazio, Media, PA, Roger E. Grimaldi,
White & Williams LLP, Philadelphia, PA, for Robert
Herdelin.
Patrick J. Doran, Pelino & Lentz, Dashika R.
Wellington, Stradley Ronon, Philadelphia, PA, for 44
Financial Corp.

### *MEMORANDUM AND ORDER*
JOYNER, J.

\*1 Pending before the Court is Plaintiffs' Motion for
Leave to **Amend** Amended Complaint and to Extend
Time of the Second Amended **Scheduling Order**
(Doc. No. 35), and Defendant 44 Financial
Corporation's ("44 Financial") response thereto (Doc.
No. 36). For the reasons outlined below, Plaintiffs'
Motion to **Amend** is DENIED and its Motion to
Extend Time of the Second Amended **Scheduling
Order** is DENIED as MOOT.

#### **Background**

Plaintiffs filed their initial Complaint on July 21,
2004. They filed an Amended Complaint on October
6, 2004. On December 1, 2004, this Court dismissed
Count IV of Plaintiffs' Amended Complaint alleging
violations of New Jersey's Consumer Fraud Act and
Licensed Lenders Act, and common law fraud (Doc.
No. 13). Both defendants subsequently answered, and
the deadline for discovery was set for April 20, 2005
(Doc. No. 20). Upon Plaintiffs' initiative, and
agreement by the parties, the discovery deadline was
stayed twice pending settlement negotiations. No
settlement agreement was reached, and this Court
entered an Amended Scheduling Order on November

15, 2005 setting a January 30, 2006 discovery
deadline (Doc. No. 25). On January 11, 2006,
Plaintiffs changed attorneys and shortly thereafter
filed a Motion for Extension of Time to Complete
Discovery, which this Court granted. The deadline
for discovery was extended until March 31, 2006
(Doc. No. 34). On May 1, 2006, one month after the
deadline for completing discovery had passed,
Plaintiffs filed this motion to amend their Amended
Complaint to include claims of fraud, civil
conspiracy and unjust enrichment (and extend the
discovery deadlines). *See* Memorandum of Law in
Support of Plaintiffs' Motion for Leave to **Amend**
Complaint and to Extend Time of the Second
Amended **Scheduling Order** ("Pl.Memo.") at 15, 21.

#### **Discussion**

##### *1. Plaintiffs' Motion to **Amend***

Under Fed.R.Civ.P. 15(a), a plaintiff is entitled to
**amend** her claim "once as a matter of course at any
time before a responsive pleading is served ...
[o]therwise a party may amend the party's pleading
only by leave of court or by written consent of the
adverse party; and leave shall be freely given when
justice so requires." While Rule 15(a) provides that
leave to amend should be "freely given," the Court
has the "discretion to deny this request if it is
apparent from the record that (1) the moving party
has demonstrated undue delay, bad faith, or repeated
failure to cure deficiencies by previous amendments,
(2) the amendment would be futile, or (3) the
amendment would prejudice the other party." *Lake v.
Arnold,* 232 F.3d 360, 373 (3d Cir.2000) *(citing
Foman V. Davis,* 371 U.S. 178, 182 (U.S.1962)).

The Court DENIES Plaintiffs' Motion to Amend.
Plaintiffs have not adequately justified their delay in
bringing claims of fraud and misrepresentation, civil
conspiracy and unjust enrichment. They had access
to, or knowledge of, all of the documentation
necessary to bring these claims well before May
2006, if not at the time they filed their Amended
Complaint. Moreover, to allow these claims now,
more than two years after this litigation began, would
undoubtedly prejudice Defendants who have
complied in a timely manner with each of the
Plaintiffs' discovery requests.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**\*2** Essentially, plaintiffs are seeking to amend their complaint to include claims that this Court has already dismissed. Plaintiffs either re-allege the same facts as in their Amended Complaint to support these claims or allege facts that were in most instances known to them, but not included, at the time they filed the October 2004 Amended Complaint. Nevertheless, Plaintiffs' contend that they have only recently discovered the necessary facts to fully appreciate and ascertain the true nature of Defendants' conduct. There is absolutely no support for this position.

First, Count IV of Plaintiffs' proposed Second Amended Complaint ("2nd Amend. Compl.", Pl. Memo, Ex. A) is a *verbatim* recitation of the Count that this Court already *dismissed* on December 1, 2004. Plaintiffs never filed a motion seeking reconsideration of that decision. In fact, when 44 Financial sought to question Plaintiff William Sherlock on the fraud claim in March 2006, Plaintiffs' new counsel, Debra Sherlock, objected to the question because the fraud count had been dismissed. See Defendant 44 Financial Corporation's Memorandum of Law in Opposition to Plaintiff's [sic] Motion for Leave to **Amend** Complaint and to Extend Time of Second Amended **Scheduling Order**("D.Memo.") at 11-12. The Court dismissed this claim approximately twenty-one months ago, and Plaintiffs offer no newly discovered facts to justify the Court reinstating it now.

Second, Plaintiffs' allegations with respect to Count V (Fraud and Misrepresentation), Count VI (Civil Conspiracy) and Count VII (Unjust Enrichment) of the proposed 2nd Amend. Compl. are based principally on facts and documents that were known to (or readily available to) the Plaintiffs at the time of the filing of the Amended Complaint. Count V basically rehashes Count IV, although it contains somewhat more detailed factual allegations, namely that the Truth-in-Lending Statement and Good Faith Estimate contain forgeries of Plaintiffs' signatures and 44 Financial and Herdelin conspired to inflate the amount of the loan by purchasing several bankruptcy judgments against Plaintiffs for discounted sums. While this all may be true, this information was available *at the time* Plaintiffs filed their Amended Complaint. Indeed, Plaintiffs specifically reference in their Amended Complaint the Truth-in-Lending Statement and Good Faith Estimate that purportedly contain their forged signatures. See Amended Compl. ¶ 7. As for the assignments of the bankruptcy judgments in connection with Plaintiffs' loan

transaction, it is uncontested that Plaintiffs were responsible for reporting this information to the Defendants. *Compare* Pl. Memo. at 7 *with* D. Memo. at 11. Plaintiffs also had the documentation in which Herdelin allegedly made false and fraudulent representations about some of the bankruptcy judgments. Plaintiffs do not identify any recently discovered facts that indicate Defendants 44 Financial and Herdelin conspired or acted in concert to inflate the amounts of any of the bankruptcy proceedings. In other words, Plaintiffs had access to, or knowledge of, all of the necessary documentation that could have possibly supported their claims of fraud and misrepresentation at the time they filed their Amended Complaint.

**\*3** This same analysis applies to Plaintiffs' proposed civil conspiracy claim (Count VI). Plaintiffs claim that they did not learn about the purported conspiracy between 44 Financial and Herdelin to inflate the amount of the Bridgeton Meat Judgment ("Bridgeton Judgment") until deposing each Defendant on March 30, 2006. *See* Pl. Memo. at 17 (Further, [Plaintiffs'] Counsel learned for the first time at Defendants [sic] depositions ... that Defendants in a concerted plan increased the total amount due under the loan by inflating the amount[ ] of the Bridgeton Meat Judgment[.]"). This is simply not true.

Plaintiffs do not cite any specific deposition testimony that enlightened them as to the conspiracy between the Defendants. Rather, Plaintiffs make general statements that they learned of this conspiracy only as result of the depositions. The Court has reviewed Defendants' deposition testimony appended to Plaintiffs' motion (Pl. Memo., Ex. H, K, V, Z and AA) and concludes that none of the testimony even touches upon the issue of the Bridgeton Judgment. But Plaintiffs do cite in their motion correspondence from *May 2003* as evidence that 44 Financial and Herdelin were in concert to inflate the amount of the Bridgeton Judgment. *See* Pl. Memo. at 7-8. Thus, Plaintiffs had access to, or knowledge of, all of the necessary documents to bring a civil conspiracy claim well before May 2006, if not at the time they filed their Amended Complaint.

Finally, in Count VII Plaintiffs allege that Defendant Herdelin unjustly benefitted from his purchase of the Bridgeton Judgment. Plaintiffs argue that they only determined this fact as result of the Herdelin's March 30, 2006 deposition. See Pl. Memo at 17. Plaintiffs cite documents in their motion, however, dated May 10, 2003 and June 2, 2003, as the sources for their

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2668531 (E.D.Pa.)
**(Cite as: Slip Copy)**

calculation. Therefore, again, Plaintiffs had access to all of the necessary documentation to make this claim well before May 2006.

Plaintiffs have failed to present any evidence suggesting that the discovery process provided them with information without which they could not have brought the fraud, civil conspiracy and unjust enrichment claims they now seek to add. Given the lack of justification for Plaintiffs' delay in raising these claims, and undeniable prejudice to Defendants to do so now, the Court DENIES Plaintiffs' Motion to **Amend** their Amended Complaint.

### *2. Motion to Extend Time of the Second Amended Scheduling Order*

This Court ordered on September 5, 2006 that all discovery shall be completed by *October 2, 2006.* Therefore, Plaintiffs' Motion to Extend Time of the Second Amended Scheduling **Order** is DENIED as MOOT.[FN1]

> FN1. To be clear: The Court shall not entertain any further requests from the Plaintiffs to extend discovery in this case. Plaintiffs represented to this Court in their January 17, 2006 Motion for Extension of Discovery Deadlines that they would "work diligently to ensure that the discovery will be completed in a timely manner." Plaintiff's [sic] Motion for Extension of Discovery Deadlines ("Pl. Jan. 17 Mot. for Ext.")(Doc. No. 20). Yet between January 17, 2006 and March 31, 2006 (the second amended discovery deadline), Plaintiffs neither requested a *single* document from the Defendants nor issued any subpoenas for the information outlined in their motion. Plaintiffs then waited for a month after the March 31, 2006 deadline expired before filing the present motion for another discovery extension. Because Plaintiffs have failed to conduct discovery in a diligent manner, or offer any justification for their claim that the information they seek was not previously discoverable, the Court will not extend the time for discovery beyond October 2, 2006.

### Conclusion

For the reasons set forth above, Plaintiffs' Motion to

**Amend** is DENIED and its Motion to Extend Time of the Second Amended **Scheduling Order** is DENIED as MOOT.

### *ORDER*

AND NOW, this 11th day of September, 2006, upon consideration of Plaintiffs' Motion for Leave to **Amend** Amended Complaint and to Extend time of Second Amended **Scheduling Order** (Doc. No. 35), and Defendant 44 Financial Corporation's ("44 Financial") response thereto (Doc. No. 36), it is hereby ORDERED:

*4 1. Plaintiffs' Motion for Leave to **Amend** the Amended Complaint is DENIED.

2. This Court ordered on *September 5, 2006* that all discovery is to be completed by *October 2, 2006.* Plaintiffs' Motion to Extend Time of the Second Amended **Scheduling Order** is therefore DENIED as MOOT.

E.D.Pa.,2006.
Sherlock v. Herdelin
Slip Copy, 2006 WL 2668531 (E.D.Pa.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.