## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

DAVID FRIEDSON, as Stockholders'
Representative of the former Stockholders of the
ZONEPERFECT NUTRITION COMPANY,

        Plaintiff,

        v.

ABBOTT LABORATORIES, and WELLS
FARGO BANK MINNESOTA, a Minnesota
corporate trust,

        Defendants.

Civil Action No. 06-382 (GMS)

## PLAINTIFF DAVID FRIEDSON'S ANSWERING BRIEF
## IN OPPOSITION TO DEFENDANT ABBOTT LABORATORIES'
## MOTION FOR (PARTIAL) SUMMARY JUDGMENT

**ROSENTHAL, MONHAIT
& GODDESS, P.A.**
Norman M. Monhait (#1040)
919 Market Street, Suite 1401
Citizens Bank Center
P.O. Box 1070
Wilmington, DE 19899-1070
(302) 656-4433
Attorneys for Plaintiff

OF COUNSEL:

*Admitted Pro Hac Vice*
Gerald J. Caruso
Michael R. Coppock
**RUBIN & RUDMAN LLP**
50 Rowes Wharf
Boston, MA 02110
(617) 330-7000

October 25, 2007

764919_1

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................. iii

NATURE AND STAGE OF THE PROCEEDING ......................................................... 1

SUMMARY OF ARGUMENT ....................................................................................... 1

STATEMENT OF FACTS ............................................................................................... 2

    A.    SWEET PRODUCTIONS AND THE MANUFACTURING AGREEMENT ....... 3

    B.    ABBOTT'S QUALITY ASSURANCE DUE DILIGENCE ............................... 4

        1.    Class I v. Class II Standards ........................................................................ 5

        2.    Abbott Standards for Quality Control and the Standard Manufacturing Plan ... 6

        3.    The SMP or Standard Manufacturing Plan ................................................. 6

    C.    DAY ONE OPTIONS ........................................................................................ 7

    D.    STOCK PURCHASE AGREEMENT ................................................................ 8

        1.    Section 7.4(b)(x) of the SPA ....................................................................... 9

        2.    Baker's Compliance with SPA Section 7.4(b)(x) ....................................... 11

        3.    Post-Closing Sweet Activities .................................................................... 13

        (a)    Microbiological Testing ......................................................................... 15

        (b)    The SMP, Post-Closing ......................................................................... 15

        (c)    Post-Closing Quality Control Issues ..................................................... 16

        (d)    Undermining Sweet's Ability to Get Price Reductions from its Suppliers ... 17

        4.    Retraction of the Price in the August 2003 Sweet Amendment ................ 18

    E.    THE OCTOBER 30, 2003 AGREEMENT ...................................................... 20

    F.    ABBOTT'S FINANCIAL CLAIMS .................................................................. 21

ARGUMENT ................................................................................................................... 22

    A.    SUMMARY JUDGMENT STANDARD ......................................................... 22

B.  ABBOTT IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON
    FRIEDSON'S CLAIMS UNDER THE MASSACHUSETTS CONSUMER
    PROTECTION ACT.                                                          23

    1.  The Choice Of Law Clauses Are Sufficiently Narrow To Permit Friedson's Claims
        Under Mass. Gen. Laws ch. 93A, §§ 2 and 11.                         23

    2.  Delaware Choice Of Law Principles Allow The Application Of Massachusetts Law
        To Friedson's Tort-Based Claims Under Mass. Gen. Laws ch. 93A, §§ 2 and 11.  25

    3.  Friedson's Claims Under Mass. Gen. Laws ch. 93A, §§ 2 and 11, Sound In Tort
        Rather Than Contract And Raise Genuine Issues Of Material Fact.     27

C.  ABBOTT IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON
    FRIEDSON'S CLAIMS UNDER SECTION 2532 OF THE DELAWARE DECEPTIVE
    TRADE PRACTICES ACT.                                                    37

D.  ABBOTT IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON ITS
    PREMATURE MOTION FOR SUMMARY JUDGMENT ON COUNT III OF ITS
    PROPOSED COUNTERCLAIM.                                                  38

CONCLUSION                                                                  40

# TABLE OF AUTHORITIES

**Case**                                                              **Page**

*Accu Personnel, Inc. v. Accustaff, Inc.*,
    F. Supp. 1191 (D.Del. 1994)                                         25

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)            22

*Anthony's Pier Four v. HBC Associates*,
    583 N.E.2d 806 (1991)            28,29

*Arthur D. Little, Inc. v. Dooyang Corp.*,
    147 F.3d 47 (1st Cir. 1998)            29

*Aspinall v. Phillip Morris Companies, Inc.*,
    813 N.E.2d 476 (2004)            27

*Blackburn v. United Parcel Serv.*,
    179 F.3d 81 (3d Cir. 1999)            22

*Carter v. Exxon Co.*,
    177 F.3d 197 (3d Cir. 1999)            22

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)            22

*Dura Pharmaceuticals, Inc. v. Scandipharm, Inc.*
    713 A.2d 925 (Del. Ch. 1998)            39

*Eby v. Thompson*,
    2005 WL 1653988 (Del. Super. 2005)            24

*Gloucester Holding Corp. v. U.S. Tape and Sticky Products, LLC*,
    832 A.2d 116 (Del. Ch. 2003)            23, 24

*Grand Ventures, Inc. v. Whaley*,
    632 A.2d 63 (1993)            37

*Incase, Inc. v. Timex Corp.*,
    421 F.Supp.2d 226 (D.Mass. 2006)            27

*Jacobson v. Mailboxes Etc. U.S.A., Inc.*,
    646 N.E.2d 741 (1995)            24,35
                                                              36

*Kitner v. CTW Transport, Inc.*,                                    28,36
    762 N.E.2d 867 (2002)

*Linkage Corp. v. Trustees of Boston University*,                   29
    679 N.E.2d 191 (1997)

*Massachusetts Employers Insurance Exchange v.*                     28
*Propac-Mass, Inc.*,
    648 N.E.2d 435 (1995)

*Massachusetts Eye and Ear Infirmary*,                              27
    495 F.Supp.2d 188 (D. Mass. 2007)

*NASCO, Inc. v. Public Storage, Inc.*,                              28
    127 F.3d 148 (1st Cir. 1997)

*Northeast Data Systems, Inc. v. McDonnell Douglas*                 34,35
*Computer Systems Co.*,                                             36
    986 F.2d 607 (1st Cir. 1993)

*Pepsi-Cola Metropolitan Bottling Co., Inc. v.*                     29,30
*Checkers, Inc.*,
    754 F.2d 10 (1st Cir. l985)

*Purity Supreme, Inc. v. Attorney Gen.*,                            27
    407 N.E.2d 297 (1980)

*Stagecoach Transp., Inc. v. Shuttle, Inc.*,                        24
    741 N.E.2d 862 (2001)

*Standard Register Co. v. Bolton-Emerson, Inc.*,                    27, 28
    649 N.E.2d 791 (1995)                        30

*State ex rel. Brady v. Preferred Florist Network, Inc.*,           37
    791 A.2d 8 (2001)

*Suburban Trust and Sav. Bank v. Univ. of Delaware*,                23
    910 F.Supp. 1009 (D.Del. 1995)

*Traveler's Indem. Co. v. Lake*,                                    25
    594 A.2d 38 (Del. 1991)

*Trustees of Boston Univ. v. Ligand Pharmaceuticals, Inc.*,         28
    2003 WL 1873839 (D.Del. 2003)

*Valley Juice Ltd., Inc. v. Evian Waters of France, Inc.,*                35,36
    87 F.3d 604 (2nd Cir. 1996)

*Weiss v. Northwest Broadcasting, Inc.,*                22,23
    140 F.Supp.2d 336 (D.Del. 2001)


**Other Statutes and Authorities**

Fed. R. Civ. P. 36                1

Fed. R. Civ. P. 56(c)                22

21 C.F.R. §109(g)(3)                5

G.L. c. 93A                passim

G.L. c. 93A, §2                1,22
                                25,26

G.L. c. 93A, §2(a)                27

G.L. c. 93A, §11                1,22,25
                                26,27

Delaware Deceptive Trade Practice Act,                1,2,37
    6 Del. C. §2532

Delaware Deceptive Trade Practices Act,                38
    6 Del. C. §2532(a)(11)

Delaware Deceptive Trade Practices Act,                38
    6 Del. C. §2532(a)(12)

Restatement (Second) of Conflicts §6 (1971)                23,25

Restatement (Second) of Conflicts §145(1) (1971)                23,25

## NATURE AND STAGE OF THE PROCEEDING

With the exception of a possible motion to compel and a motion to take as admitted under

Fed. R. Civ. P. 36, non-expert discovery is largely complete, only a small amount remains.

Friedson is waiting for a final Privilege Log from Abbott's counsel, which may generate some

further requests for discovery or motion practice. Friedson does not believe he needs any such

discovery to respond to Abbott's Motion for (Partial) Summary Judgment ("Abbott's Motion").

Abbott styles its motion as a Motion for Summary Judgment, but moves for summary

judgment on less than all counts in both Friedson's complaint and its own counterclaim. (DI

34).[1] Specifically, Abbott asks the court to dismiss Friedson's claims under the Massachusetts

Consumer Protection Act, Mass. Gen. Laws ch. 93A (Count II), and the Delaware Deceptive

Trade Practice Act, 6 Del. C. §2532 (Count III). Friedson's Count I (declaratory relief) and

Count IV (breach of covenant of good faith and fair dealing) will continue. Abbott further seeks

summary judgment on Count III of its proposed Counterclaim that Friedson breached the Forum

Selection Clause in the SPA, when he brought his original action in the Massachusetts Superior

Court, rather than in the courts of Delaware.

## SUMMARY OF ARGUMENT

Abbott is not entitled to judgment as a matter of law on Counts II and III of Friedson's

Complaint and Count III of Abbott's proposed Counterclaim. First, the choice of law clauses

contained in the SPA and the Escrow Agreement are sufficiently narrow to permit the application

of Massachusetts law to Friedson's tort-based claim (Count II), alleging unfair and deceptive

conduct on Abbott's part under the Massachusetts Consumer Protection Act, M.G.L. ch. 93A, §§

2 and 11, and the summary judgment record demonstrates the existence of genuine issues of

---

[1] Abbott has moved to amend its counterclaim by adding an additional claim for damages and conforming some of
the factual statements made in counterclaims. Abbott's Motion to Amend is still pending. Whether the Motion to
Amend is allowed or not, should not affect the merits of Friedson's Opposition.

material fact as to that claim. Second, there are genuine issues of material fact as to Friedson's

claim (Count III) alleging unfair and deceptive conduct under the Delaware Deceptive Practices

Act, 6 Del. C. § 2532. Third, as the Court has yet to rule on Abbott's Motion for Leave to

Amend Answer and Counterclaim, Abbott's summary judgment motion as to Count III of its

proposed Counterclaim is premature and, even if the Court entertains Abbott's motion, the claim

is meritless, as this action arises under the Escrow Agreement and Friedson complied with the

permissive forum selection clause contained in Section 14 of the Escrow Agreement in initiating

this action in Massachusetts.

## STATEMENT OF FACTS[2]

In 2003, ZonePerfect Nutrition Company ("ZonePerfect") was a "leading, nationally

recognized brand in the development and sale of high quality nutritional food products." Pl. Ex.

5 (FA 480). Its flagship product was the ZonePerfect Nutritional Bars ("the Bars"), which were

sold in different flavors. (FA 486). At that time, the Bars were the number one selling

nutritional bars in a number of key accounts, including Target, CVS, Rite Aid and 7-Eleven

Stores. *Id.*

ZonePerfect's financial growth was explosive. Revenues increased 70% between fiscal

year 2001 and 2002 from $23.8 million to $48 million. Pl. Ex. 88, p. 1 (FA 709). Revenues

were set to double again in fiscal year 2003, rising to over $100 million at the end of fiscal year

2003. Pl. Ex. 94, p. 1 (FA 739). ZonePerfect's gross profit was approaching 48%. Pl. Ex. 88, p.

18 (FA 726). ZonePerfect's growth and financial performance made it an appealing acquisition

target for a number of companies. During the course of Abbott's due diligence, Abbott learned

that companies expressing strong interest in acquiring ZonePerfect included Hershey, Pepsi and

---

[2]  In accordance with the Local Rules, Friedson includes the documents and transcripts he relies upon in his
Appendix in Support of Friedson's Opposition to Abbott's Motion for Summary Judgment ("FA __").

others. McCoy Dep. at 34 (FA 006).

By letter dated March 26, 2003, Abbott expressed interest in a possible transaction to acquire ZonePerfect. Pl. Ex. 84 (FA 684). Abbott's potential purchase would not be contingent upon financing, but would depend upon the "satisfactory completion of due diligence." *Id.* Abbott would consider a purchase price in the range of $150-$200 million. *Id.*

## A.    SWEET PRODUCTIONS AND THE MANUFACTURING AGREEMENT

ZonePerfect used independent third-party manufacturers to manufacture the Bars, including Sweet Productions Ltd. ("Sweet") and Access Business Group, Inc., a/k/a Nutrilite ("Nutrilite"), in the United States, and Sunny Crunch in Canada. McCoy Dep. at 28, 48 (FA 005, 012); Pl. Ex. 5 at 31 (FA 511). As ZonePerfect's business grew, ZonePerfect engaged other outside manufacturing sources. Pl. Ex. 5 at 31 (FA 511). In 2003, Sweet manufactured nearly three quarters of ZonePerfect's bar needs. Pl. Ex. 6 (FA 524-525).

Sweet and ZonePerfect executed, and operated under, a Manufacturing Agreement dated November 27, 2001, but executed in January 2002 ("the SMA"). Schacher Dep. at 21 (FA 129); Pl. Ex. 7 (FA 526, 538). The SMA had a seventeen-month term, and could be extended for another two years if ZonePerfect gave 90 days written notice of its intent to extend prior to the end of the initial term. Any such extension was contingent upon the parties reaching an agreement during that 90-day period on both the minimum aggregate totals for the products purchased by ZonePerfect and the prices to be paid for those products during the additional term. P. Ex. 7 (FA 526 at ¶1).

Initially, ZonePerfect committed to purchase 48,000,000 Bars, Pl. Ex. 7 (FA 528 at p. 3, ¶3), and for that commitment, ZonePerfect was given a reduced price from the then current prices. Pl. Ex. 7 (FA 529 at pp. 4 (¶8) and Pl. Ex. 7 (FA 540 (Ex. B)). If ZonePerfect purchased more product, it received a greater discount, while lesser amounts resulted in higher prices to

"Current Pricing." *Id.* The SMA could only be terminated for cause upon thirty (30) days notice. Pl. Ex. 7, ¶18(a) (FA 534).

By letter agreement dated October 30, 2002 ("October 30, 2002 Extension") Sweet and ZonePerfect extended the SMA for an additional two years. Pl. Ex. 8 (FA 545-550); Schacher Dep. at 33-36 (FA 132-133). They also modified the prices slightly and agreed upon volume discounts for up to 90 million bars. Pl. Ex. 8, at B-1 (FA 545-550). The new prices were to be in effect during the first year of the additional term. Pl. Ex. 8 (FA 546). As for the second year prices, the Sweet 2002 Amendment stated:

> "No later than August 31, 2003, the parties shall negotiate in good faith and mutually agree upon the basic price for each product for the second twelve (12) month period of the additional term."

*Id.*

The SMA placed most of the responsibility for quality control on Sweet. Schacher Dep. at 22-23 (FA 130). Except for a micro-biological laboratory analysis of randomly selected samples twice a day, the remaining quality control procedures set forth in the SMA consisted of after-the-fact, or post-manufacture, collection of samples, which were sent to ZonePerfect, or its designated laboratory, for analysis. Pl. Ex. 7. (FA 532 at ¶13(a) and ¶(b)). There was no automatic mechanism to halt production and isolate and/or discard non-conforming batches. Pl. Ex. 13 (FA 585); *see also* Pl. Ex. 7 at ¶13 (FA 526).[3]

## B.  ABBOTT'S QUALITY ASSURANCE DUE DILIGENCE

Prior to Abbott's acquisition of ZonePerfect, and during the course of Abbott's early due diligence, Abbott determined that Sweet did not meet the quality control standards imposed by Abbott on its independent manufacturers. Abbott determined that the Nutritional Bars had to be

---

[3] In the event that product was found to be non-conforming, "the parties [were to] promptly meet in person or by telephone to discuss the measures that supplier must take to inspect and cure such failure." Pl. Ex. 7 at ¶B(a) (FA 532).

4

manufactured to Food & Drug Administration (FDA) Class I standards, which Sweet did not do. Pl. Ex. 13 at 1-2 (FA 585). Abbott executives also believed both that Sweet failed to meet Abbott's specifications for manufacturing nutritional bars and that Sweet's manufacturing practices were not up to Abbott's standards. Gorman Dep. at 91 (FA 199); Pl. Ex. 10 (FA 556-559).

### 1.    Class I v. Class II Standards

None of ZonePerfect's independent manufacturers, including Sweet, met Class I standards concerning the amount of nutrients in the bars, as compared to the claims on the label. Pl. Ex. 10 (FA 556-559). Class I standards are standards used by the FDA for measuring the accuracy of declarations on food labels for added nutrients in fortified or fabricated foods. Under 21 C.F.R. §109(g)(3), a food is mislabeled if the Class I nutrients (vitamin, mineral, protein, dietary fiber, carbohydrate, fat or potassium) are less than the actual value for that nutrient declared on the wrapper, within reasonable deviations (hereinafter "Class I standards" or "label claims compliance"). *See* 21 C.F.R. §109(g)(3). Pl. Ex. 42 (FA 632-634).

The Class II standards apply to agricultural commodities. Joseph Dep. at 52-54 (FA 289-291). Naturally occurring products have more leeway. Under Class II standards, the product is not misbranded if the nutrient is equal to at least 80% of the value for that nutrient declared on the label. *Id*. Pl. Ex. 42 (FA 632-634). For manufacturers, Class I standards mean tighter controls, and smaller variances in terms of what is listed on the label and what is in the tested product. Schacher Dep. at 26 (FA 131); Cool Dep. at 61 (FA 361)..

Abbott determined that the ZonePerfect Bars had to be produced to Class I standards. McCoy Dep. at 44 (FA 11). This meant ZonePerfect's Third Party Manufacturers ("TPMs") such as Sweet would have to reformulate the Bars, Pl. Ex. 122 (FA 754-758), and would have less tolerance or leeway when manufacturing the Bars. Schacher Dep. at 26 (FA 130). This

increased the likelihood that such TPMs would be out of specification and thereby experience more rejected products. Pl. Ex. 134 at 2 (FA 775). ZonePerfect's Chief Operating Officer, Paul Pruett ("Pruett"), believed that manufacturing to Class I standards was more complicated than necessary. Pruett Dep. at 34-35 (FA 269).[4]

### 2. Abbott Standards for Quality Control and the Standard Manufacturing Plan

Abbott performed due diligence on each TPM used by ZonePerfect to make the Bars. Pl. Ex. 162 (FA 795-817). Of those, Abbott found only three that were acceptable, or could be made acceptable. *Id.* Sweet was acceptable, but would require a significant amount of time, money and personnel to bring up to minimum Abbott standards. (FA 796). Rough, early estimates of the amounts necessary to raise the Sweet facility to Abbott standards were $120,000 to $560,000. Pl. Ex. 96 (FA 748).

### 3. The SMP or Standard Manufacturing Plan

Abbott's Quality Assurance Division also decided that Sweet did not meet Ross/Abbott procedures for handling, blending, weighing, and manufacturing the products. (called "Abbott Process Specifications"). Pl. Ex. 10 (FA 558-559); Pl. Ex. 13 (FA 687-688).[5]

On May 28, 2003, Abbott executives made a PowerPoint presentation to Sweet and ZonePerfect regarding the "Ross Third Party Manufacturing (TPM) Requirements: Standard Manufacturing Plan ("SMP")." Pl. Ex. 16 (FA 589-598). The SMP is different from the Class I specifications to which Abbott wanted the Bars manufactured. Cool Dep. at 87 (FA 375); Gorman Dep. at 128-129 (FA 128). The Class I specifications simply set the tolerances which

---

[4] In 2003, none of ZonePerfect's major competitive nutritional or sports bars complied with Class I production standards. Pl. Ex. 11 at Abbott 3463-3464 (FA 560-561). Abbott was the only major company that believed these types of bars had to comply with Class I production standards. Abbott saw its decision to comply as providing it with a real competitive advantage from a marketing point of view. Pl. Ex. 11 (FA 560); Pl. Ex. 88 (FA 737).
[5] For example, Abbott executives found that there was also no isolation procedure for out of specification products. Adjustments are simply made "on the fly." *Id.*

6

govern the manufacturing process i.e., how much leeway the manufacturer has to deviate from the claims made on the label. Cool Dep. at 60-61 (FA 361-362); Cool Dep. at 85-86 (FA 373-374). The SMP sets out the manufacturing processes and quality control protocols which help the TPMs manufacture to those specifications. Cool Dep. at 87 (FA 375).[6]

The document ("the SMP outline") presented at the May 28, 2003 meeting was not an SMP, but simply an outline of one. Cool Dep. at 69-70 (FA 364-369). It also was not as detailed as the SMP that was actually issued. Cool Dep. at 78-80 (FA 369-371). In fact, it was not even a summary of the SMP that was to be used by Sweet. Cool Dep. at 80-81 (FA 371-372). Abbott did not even have a generic draft of the actual SMP to share with Sweet in May 2003. *Id.* The May 28 outline was from another TPM's SMP.[7] *Id.* The final Sweet SMP was only issued in June, 2004. Cool Dep. at 77 (FA 368); Pl. Ex. 187 (FA 839-897); Schacher Dep. at 185-186 (FA 170-171).

During the May 28 meeting, Sweet admitted that it was not doing some of the things listed in the SMP outline, or talked about during the meeting. Cool Dep. at 89-90 (FA 377-378). There were no discussions of costs of the various items listed in the SMP. Cool Dep. at 92 (FA 379). At the time, Abbott did not have that information. *Id*.

## C.    **DAY ONE OPTIONS**

While Abbott and ZonePerfect were negotiating the SPA, Abbott was engaged in an internal discussion about what it should do beginning with the first day after the closing (referred to as "Day One"). As due diligence began, Abbott employees were asked to identify which issues had to be resolved before the closing and which could wait until after the closing. Estay

---

[6] SMP is a term or concept unique to Ross. It is different from current (or good) manufacturing practices. Cool Dep. 80-81 (FA 371-372). The SMP governs (or is used in) the manufacturing process. It sets out the procedures for manufacturing the Bars and the processes by which the ingredients are stored, mixed, tested for quality, baked, and wrapped. Cool Dep. at 85, 169-170 (FA 373, 390-391); Schacher Dep. at 200-201 (FA 174).
[7] Each SMP is unique to each TPM. Cool Dep. at 80. Cool, therefore, could not provide Sweet Productions with a copy of another TPM's SMP. *Id.*

Dep. at 120-121 (FA 113-114); Pl. Ex. 95 (FA 747). Issuance of the SMP was a task that could be completed after the closing. Ex. 96 (FA 748); Cool Dep. at 43-46 (FA 355-358).

Abbott determined that after the closing, a "grace period" was needed to permit Sweet and the other manufacturers time to reformulate the bars and get them to Class I standards. Abbott executives were told not to tell either Sweet or ZonePerfect about this "grace period" because Abbott wanted to use it "as a key negotiating point" with Sweet. Pl. Ex. 49 (FA 645); Belletire Dep. at 116-118 (FA 314-316).

In addition, on June 26, 2007, Abbott's Manager for Quality Assurance determined that during the "grace period," Abbott would release product for sale to customers, if the product was within 20% of the nutrient claims made on the label. Pl. Ex. 20 (FA 601); Gorman Dep. at 98-99 (FA 200-201). At the same time, ZonePerfect and Sweet would be told that the product must meet the "label claims for protein and carbohydrate and was within ± 1 gram for fat." Pl. Ex. 20 (FA 601); McCoy Dep. at 171-176 (FA 32-37); Gorman Dep. at 99-106 (FA 201-208).[8] Neither ZonePerfect nor Sweet was told of the Abbott internal release criteria of 20%. Gorman Dep. at 99-100 (FA 201).

### D.    STOCK PURCHASE AGREEMENT

Upon determining that it had to meet Class I FDA standards for manufacturing the Bars, Abbott decided that it would proceed with the acquisition of ZonePerfect if Sweet could reformulate and manufacture seven of the top selling flavors of Bars and prove that it could commercially manufacture three of those seven to Class I standards without affecting the taste of the product. Pl. Ex. 122 (FA 754-758); Pl. Ex. 163 (Abbott 4574) (FA 818). Sweet successfully produced the reformulated Bars. Pl. Ex. 93 at 4 (FA 737).

---

[8]  After the closing, Sweet was told as part of a "Zone Bar Compliance Timetable," published on or about mid-September, 2003: "(2) all bars to meet protein and CHO label claim and be within ±1 gram of fat." Pl. Ex. 58 (FA 649-650).

While that testing was underway, Abbott and ZonePerfect began negotiating the SPA.[9]
Initially, Abbott proposed to place the burden (or cost) of reformulating the Bars to Class I
standards upon the former shareholders by requiring that the shareholders certify as a condition
of closing that the Bars complied with the Class I specifications, Pl. Ex. 21 (FA 603-604), and
covenant to cover the costs of reformulating the products to Class I standards. *Id*. These
provisions did not make it into the SPA. Estay Dep. at 143-145 (FA 119-121). Instead, Section
7.4(b)(viii) of the SPA, the parties divided any future liability which resulted from ZonePerfect
not producing the products to Class I standards by the time of ownership, prior to and after the
closing. SPA at 44.

### 1.    Section 7.4(b)(x) of the SPA

About a week or two before the proposed execution of the SPA, Abbott determined that,
at current margins, ZonePerfect would not add to Abbott's internal rate of return at the level that
it had projected. Gorman Dep. at 137-140 (FA 213-216); Estay Dep. at 72-73, 100-106 (FA 97-
98, 101-107); Pl. Ex. 125 (FA 766). For that reason, Abbott proposed that the purchase price be
reduced by $10 million.[10]

ZonePerfect's Chief Executive Officer, Christopher Baker ("Baker"), and ZonePerfect's
investment banker, Paul Thibodeau ("Thibodeau"), proposed that $10 million be placed in
escrow, to be paid out if and when Baker obtained a written extension of the Sweet
Manufacturing Agreement, which included a price reduction. Baker Dep. at 39-43 (FA 51-55);
Thibodeau Dep. at 33-34 (FA 226-227). Abbott agreed, but did not want Baker to sign any new
amendment with Sweet. Thus, the SPA was drafted to allow Baker to negotiate a written

---

[9]  A copy of the SPA is included with Abbott's Motion and Memorandum. Friedson relies upon that copy.
[10]  The $10 million was determined by amortizing the purchase price of $165 million over an expected revenue
stream of 10 years, assuming that ZonePerfect would continue to use Sweet Productions as a Third Party
Manufacturer. Gorman Dep. at 138-140 (FA 214-216); Estay Dep. at 72-73 (FA 97-98). As it turned out, Abbott
ended its relationship with Sweet Productions in March, 2005, and started manufacturing the Nutritional Bars itself.
Belletire Dep. at 288-290 (FA 34-1343); Pl. Ex. 183, 184 (FA 827-828).

9

agreement as President of ZonePerfect prior to the closing, or as Abbott's agent after the closing.
Thibodeau Dep. at 39-40 (FA 228); Baker Dep. at 64-65 (FA 60-61).[11]

If Baker was not able to obtain the entire 2.5 cent reduction contemplated by Section
7.4(b)(x), the shareholders could still recover a portion of the $10 million. Thus, Section
7.4(b)(x) contains a formula under which the shareholders receive a percentage of the $10
million based upon the percentage that the actual price reduction is to 2.5 cents.

Prior to the drafting of this provision of the SPA, Baker received permission from Abbott
to offer Sweet terms that it might find inviting and which might give Sweet incentive to agree to
a price reduction. These terms were included in Section 7.4(b)(x)'s definition of "acceptable
terms." By far the most significant term to Sweet was a commitment that ZonePerfect would
purchase 180 million bars over the remaining two years of the agreement.[12]

To Abbott, a significant term was a commitment to comply with the Class I specifications
in Exhibit H. Exhibit H is a single-page chart designating specifications for manufacturing
products to Class I standards. Pl. Ex. 27 (FA 609-610). When Abbott circulated Section
7.4(b)(x) internally for comment. Louis Belletire ("Belletire") suggested that Abbott "add some
language noting the fact that [Sweet] will also have to adhere to practices discussed and
presented in the SMP. Otherwise, practices such as allergen control are open to significant issue

---

[11]  The provision, SPA Section 7.4(b)(x), appears in the shareholder indemnification section of the SPA, and states:
(x) the failure of Christopher Baker, either before the Closing or as agent authorized to negotiate but not execute an
agreement on behalf of the Company after the Closing by October 1, 2003, to negotiate a written agreement with
acceptable terms (as "acceptable terms" is defined below) providing for a prospective price reduction of at least 2.5
cents per unit. . . ."

[12]  Section 7.4(b)(x) definition of "acceptable terms" is as follows: For purposes of this Section 7.4(b)(x),
"acceptable terms" shall mean the same terms and conditions as in existence as of the date hereof, except that: (i)
the term shall be no less than one (1) year and up to two (2) years with an effective date no later than October 1,
2003; (ii) by December 1, 2003, the products manufactured shall be required to meet the specifications heretofore
provided by the Buyer to Sweet Productions, Ltd. which are attached hereto as Exhibit H; (iii) the manufacturer
shall commit to being capable of supplying under such agreement at least 90 million units of product in each
contract year; (iv) the Company may agree to place orders in each contract year committing to purchase 90 million
units of products; and (v) the Company may agree to be required to provide six (6) months' notice of termination
rather than the 30 days required under the Agreement identified in the first sentence of this Section 7.4(b)(x)." Pl.
Ex. 25A (FA 607).

10

. . .." Pl. Ex. 32 (FA 617).[13]

## 2.    Baker's Compliance with SPA Section 7.4(b)(x)

Not long after the execution of the SPA, Baker and Sweet's Chief Executive Officer, Paul Schacher ("Schacher") began negotiating the Extension contemplated in Section 7.4(b)(x). The parties engaged in a lot of posturing. Initially, Schacher proposed on August 7, 2003 to raise his prices because of the price increases associated with the change to Class I ingredients. Def. Ex. 12 (FA 402); Baker Dep. at 119-120 (FA 65-66).[14] In response, Baker advanced the possibility that the bulk of ZonePerfect's manufacturing needs could be moved to Nutrilite. Def. Ex. 12 (FA 402); Baker Dep. at 131 (FA 68); Def. Ex. 13 (FA 403-404). Under the October 30, 2002 Extension, Sweet acknowledged that it would be installing "new machinery that should reduce its production costs." Pl. Ex. 8, ¶6 (FA 545-550). So, the significant issue was how much savings should ZonePerfect (to be owned by Abbott) share with Sweet. Baker Dep. at 50-53, 122, 134-139, 154-155 (FA 56-59, 67, 69-73, 76-77).

In addition, under the October 30, 2002 Letter Extension, the prices to be charged for the next year had to be agreed upon by August 31, 2003. Schacher apparently had this date in mind when he was negotiating the August 26 Sweet Extension. Schacher Dep. at 33, 76-77, 78 (FA 132, 143, 144). As he was negotiating, Schacher also attempted to obtain from Abbott an understanding of the full costs of implementing the SMP. Schacher Dep. at 78-79, 195 (FA 144). Schacher was never able to determine those costs because Abbott never gave him the information. Schacher Dep. at 78-79 (FA 144). He therefore made an educated guess about what the costs would be and agreed upon the new prices with Baker. Schacher Dep. at 78 195

---

[13]  In response, Ned McCoy ("McCoy") asked Belletire whether there was a grace period "on the SMP or do they hit them all out of the gate?" McCoy Dep. at 178-180 (FA 38-40). McCoy did not remember what Belletire responded. McCoy Dep. at 180 (FA 40).

[14] Nutrilite was aggressively seeking to expand its business with ZonePerfect. FA 273; Pruett Dep. at 52. It was also contemplating expanding its manufacturing capacity. Belletire Dep. at 31, 76-81 (FA 305, 308-313); Pl. Ex. 174 (FA 824).

11

(FA 144, 173).

On August 25, 2003, Thibodeau sent Ned McCoy ("McCoy") of Abbott a draft of the amendment extension then being negotiated with Schacher. Pl. Ex. 33 (FA 618-624). Thibodeau asked if it was "acceptable [with Abbott] for Chris [Baker] to execute?" *Id.* McCoy forwarded the draft to Belletire. *Id.* The draft had five paragraphs, none of which included a reference to the SMP. Pl. Ex. 33 (FA 620-621). In fact, the proposed amendment would have maintained the Quality Control provisions in the SMA. Proposed paragraph 6 maintained the terms and conditions of the SMA and the 2002 Sweet Extension, "[e]xcept as expressly amended hereby." *Id.* Since no provision in the proposed August 25, 2003 draft changed those Quality Control provisions, those provisions would remain in effect.

The next day, August 26, 2003 (the day of the closing), Thibodeau sent another draft to McCoy, indicating that he had removed paragraph 4 (a paragraph which gave Sweet a 6-month cure period, rather than the 30-day cure period in the SMA). Pl. Ex. 45 (FA 638); Thibodeau Dep. 85-86 (FA 239-240). Thibodeau was working with Abbott and Baker and then sent the document to Schacher. Thibodeau Dep. at 68 (FA 235). When Schacher received the draft, Schacher changed the agreement by making the date of compliance with Abbott's specifications, October 22, 2003, rather than the October 1, 2003 date that Baker used. Pl. Ex. 28 at Abbott 2679-2680 (FA 613-614). Schacher then signed and initialed the agreement and sent it back to Baker on August 26, 2003 ("August 2003 Sweet Extension").

Both Baker and Thibodeau (who also negotiated the August 2003 Extension) understood that Baker did not have authority to execute any extension negotiated under Section 7.4(b)(x).

Baker Dep. at 74-75, 250-252 (FA 62-63, 91-93); Thibodeau Dep. at 40-43 (FA 228-229).[15]

Abbott admits that the August 2003 Sweet Extension contains all of the "acceptable terms" set forth in Section 7.4(b)(x). McCoy Dep. at 135-136, 140-141 (FA 22-23, 26-27).[16] The only reason that Abbott refuses to give the shareholders their share of the $10 million based on the approximate 2.23 cents weighted average price reduction negotiated by Baker, is that Baker, in Abbott's view, did not "negotiate a written agreement," since a written agreement would require two signatures, rather than one. McCoy Dep. at 159 (FA 31).[17]

When he received the August 2003 Sweet Extension, Baker sent it to Thibodeau. Baker Dep. at 163 (FA 78). As Abbott had not given Baker permission to sign the August 2003 Sweet Extension, Baker did not sign it. Thibodeau Dep. at 40-43, 44 (FA 228-230); Baker Dep. at 82 (FA 64). Thibodeau faxed the August 2003 Sweet Extension to McCoy on September 3, 2003. Thibodeau Dep. at 86-87 (FA 240); Pl. Ex. 28 (FA 611-616). Mr. Thibodeau faxed the Schacher executed document to Abbott on September 3, 2003. On that day, Mark Gorman ("Gorman"), McCoy and Baker spoke by phone. Neither Gorman nor McCoy asked Baker to execute the August 2003 Sweet Extension. Nor did they claim that the August 2003 Sweet Extension did not contain "acceptable terms" under Section 7.4(b)(x) of the SPA. They also did not countersign the August 2003 letter agreement themselves. Baker Dep. at 182 (FA 80). Instead, they asked Baker to assist them in getting a revised draft of the August 2003 Sweet Extension. Baker Dep. at 182-185 (FA 80-83).

### 3.    Post-Closing Sweet Activities

For a few months, and especially in August 2003, leading up to the closing Sweet had

---

[15]  Thibodeau understood that Baker was obligated to get Abbott's consent under Section 5.1(xiii) of the SPA. Thibodeau Dep. at 44 (FA 228-229). Under that provision, ZonePerfect could not commit ZonePerfect or Abbott to such a long term contract, without Abbott's explicit consent. *Id.*

[16] Abbott calculated that, under the formula, the shareholders would have owed Abbott only $1,070,000, and not the $4,987,960 that Abbott now claims. Pl. Ex. 74 (FA 660-666)

[17]   Friedson obviously disagrees.

difficulty with demand. Pruett Dep. at 54-55 (FA 274); Def. Ex. 306 (FA 468). This was a major issue for Abbott, which was placing overwhelming pressure on Pruett to rectify the inventory situation. Pruett Dep. at 83 (FA 281); Def. Ex. 307, 308, 309, 310 (FA 469-470, 471, 472-473, 474); Belletire Dep. at 218, 233-235 (FA 326, 327-329). On September 2, 2003, Pruett called Sweet to complain about the inventory problems. Pruett Dep. at 84 (FA 281); Def. Ex. 313 (FA 477-478). Pruett learned that Sweet had reduced the number of production lines used to produce the Nutritional Bars. *Id.*

When Abbott did not immediately execute and send back to Sweet the August 2003 Sweet Extension, Sweet became concerned that Abbott might have other plans for the production of the Nutritional Bars.[18] Pruett Dep. at 59 (FA 275). Pruett informed Gorman of Schacher's comments. Pruett Dep. at 61 (FA 275). Belletire also had a phone call with Schacher in which Belletire confirmed that Abbott was operating under "the terms and conditions of the existing agreement between ZonePerfect and Sweet. We do, however, need to come to terms on pricing for the next 12 months as per paragraph 6 of the extension dated October 30, 2002." Pl. Ex. 44 (Friedson 394) (FA 636).

On September 3, 2003, the day after Belletire's telephone phone call, Nancy Brennemann ("Brennemann"), an Abbott employee, told Belletire that Sweet was servicing other customers because "we [Abbott] have not signed the extension." Pl. Ex. 44 (Friedson 393) (FA 635). Sweet told the same thing to Pruett, who in turn told Gorman and Belletire. Pruett Dep. at 59-60 (FA 275-276). Abbott did nothing to countersign the August 2003 Sweet Agreement, or to have Baker countersign it. *Id.*

---

[18] Since June 2003, Sweet was seeking a commitment for future business from Abbott in exchange for implementing Abbott's SMP. Belletire Dep. at 117, 133 (FA 315, 317); Pl. Ex. 49 (Abbott Bates Number 4300) (FA 645).

14

### (a)  Microbiological Testing

In August, 2003, Abbott learned that Sweet was not doing the microbiological testing required by the SMA. Cool Dep. at 126-128 (FA 381-383); Pl. Ex. 189 (FA 898-899); Belletire Dep. at 185-186 (FA 319-320; Pl. Ex. 170 (FA 821). Belletire asked Pruett to have Sweet resume the microbiological testing required under the SMA. *Id*.

The SMA only required this testing twice a day, at any time, no matter how many batches of products were produced. Pl. Ex. 170 (FA 821); Cool Dep. at 133-134 (FA 386-387). Abbott's testing scheme required that samples be pulled every 30-60 minutes of production time and across all shifts and all lines. Pl. Ex. 170 (FA 821) So, if production was on a 24-hour basis, then the microbiological testing would occur during those times as well. *Id*. Cool Dep. at 130-131 (FA 384-385).

Even though Abbott executives knew that Baker and Schacher were negotiating the prices for the August 2003 Sweet Extension, Abbott did not inform Sweet about the testing that Abbott would require after the closing. The rationale is set in an e-mail from Belletire to Pruett on August 15, 2003, eleven days before the closing. Belletire states:

> Paul, thanks for passing along. It will be good that we are getting this started before "Day One."

> Blake, please call Laurie today if at all possible and work out a protocol. Though we would normally test each of three shifts, let's start with the "twice per day" as outlined per the existing contract. We can worry about changes later but in the mean time we can get started without getting bogged down debating the cost/price. Please also pass along to Laurie any info you have on Siliker (sp?) and give her the option of sending samples here.

Pl. Ex. 172 (Friedson 361) (FA 822); Cool Dep. at 130-131 (FA 384-385).

### (b)  The SMP, Post-Closing

While Baker was negotiating with Schacher over the prices in the August 2003 Sweet Extension, the information that Schacher needed for pricing purposes was what Abbott would

15

impose for manufacturing procedures and quality control, and what those costs would be.

Schacher Dep. at 33, 76-77, 108 (FA 136, 143, 151); Pl. Ex. 102 (FA 749-750). Sweet requested

the SMP, or a draft of it from Abbott.[19]

When Abbott's manufacturing manager and quality control personnel visited Sweet, they

started many upgrades that Sweet was not currently doing. Schacher Dep. at 32 (FA 131). They

also suggested changes and then decided against them. Schacher Dep. at 72-73, 79 (FA 143,

144). Without the handling specifications, Schacher could not meet the pricing that he agreed

upon with Baker. *Id.* at 185; Schacher Dep. 123-125, 192-193, 211 (FA 155, 172 177).[20]

### (c)    Post-Closing Quality Control Issues

Almost immediately after the closing, Abbott conducted another inspection of Sweet's

facility. Brennemann took a tour of the facility on August 28, 2003. Pl. Ex. 153 (FA 793-794);.

Cool Dep. at 150 (FA 388). She also arranged to work at Sweet on a daily basis, drafting a

weekly summary of what was accomplished and what needed more work. Cool Dep. at 167 (FA

389); Pl. Ex. 190, 191 (FA 900-904). Abbott "set up camp" in Sweet's facility. Schacher Dep.

at 64 (FA 140).

Schacher had to recalculate manufacturing costs because of Abbott's numerous demands.

Schacher Dep. at 193-195 (FA 172-173). Schacher also did not know how the costs of

implementing the SMP. Some terms were negotiable while others were not. Schacher Dep. at

---

[19] On August 15, 2003, Lorie Scola, Sweet's Quality Assurance Manager, e-mailed Mr. Cool of Abbott, confirming that Sweet was currently operating under ZonePerfect's requirements. Pl. Ex. 34 (FA 625-627). She also stated that "as of today . . . Sweet Productions has yet to receive Ross Laboratories SMP requirement plan as stated during the May 28th meeting. Please confirm as to when Sweet Productions can expect to receive Ross SMP requirement plan for Sweet Productions' review." Pl. Ex. 34 (Friedson 364) (FA 627). In response, Cool stated that he was targeting the end of August to have a draft of the SMP submitted for Sweet's review. (Friedson 363) (FA 626). Cool stated that after the closing Sweet will continue to operate under ZonePerfect requirements until the SMP gets issued, with the exception that analytical and micro samples will be pulled and submitted by Abbott for testing to Abbott designated laboratories on a daily basis. *Id.*

[20] Abbott wanted more tests than ZonePerfect. Sweet needed to have more people to check things because Abbott wanted more check points. Schacher Dep. at 185 (FA 170). Abbott also wanted Sweet to change uniforms, make more reports, create more reports and recordkeeping than Sweet. There was so much red tape with Abbott that he could not maintain the prices. Schacher Dep. at 186 (FA 170).

16

197 (FA 173); Cool Dep. at 71-72 (FA 366-367). Certainly, Schacher did not know what was required of Sweet at the time he signed the August 2003 Sweet Extension. Schacher Dep. at 191, 194-195 (FA 172, 173). At the September 23, 2003 meeting, Schacher told Abbott executives that he could not perform the August 2003 Sweet Extension at these prices. Schacher Dep. at 183-184 (FA 170). He told them that because of the higher ingredient costs for Class I production and some additional handling costs he could not meet their price.

In addition, Abbott Quality Assurance published a 150-day Compliance Timetable, beginning on September 8, 2003 and ending on February 16, 2003. Pl. Ex. 58 (FA 649-650). One of the first tasks scheduled for September 8, 2003, was to begin SMP work assessment of needs. *Id*. (Abbott 9603).

### (d) Undermining Sweet's Ability to Get Price Reductions from its Suppliers

After executing the August 2003 Sweet Extension, Schacher called his suppliers to see if he could obtain better prices from them. Schacher Dep. at 76-77 (FA 143); Pl. Ex. 62 (FA 651-652). Some of those suppliers were also Abbott's suppliers. Pl. Ex. 62 (FA 651-652). When Schacher threatened to stop using two suppliers if they did not give a price reduction, the suppliers called their friends at Abbot to complain. *Id*. Those individuals referred the complaints to Gorman and McCoy. Pl. Ex. 62 (FA 651-652)

McCoy responded with an explanation that the SMA only permitted a change of suppliers with the permission of ZonePerfect, now Abbott. *Id*. McCoy suggested that someone call Sweet and inform it that Abbott was happy that Sweet was seeking to reduce its costs, but that Abbott was just as happy with the quality of these suppliers' products, and therefore, would not permit Sweet to change suppliers at that time. Someone from Abbott called Sweet and told them not to change suppliers. Joseph Dep. at 128 (FA 300). It is also possible that Dr. Joseph ("Joseph")

17

spoke to persons at one of the complaining suppliers, Fortitech, and gave them assurances that Sweet would not be allowed to change pre-mix suppliers. Joseph Dep. at 135 (FA 301).

### 4.    Retraction of the Price in the August 2003 Sweet Amendment

As Abbott demanded increasingly onerous quality control processes of Sweet, Schacher began to realize that Sweet's costs were mounting and its profits were narrowing. Schacher Dep. at 189, 192, 194-195 (FA 171, 172, 173). He decided at some point that he was unable to adhere with both the prices he agreed with Baker and Abbott's quality control obligations. Schacher Dep. at 183-186, 187-190, 192 (FA 170-171, 171-172, 172). In addition, because Sweet was prevented by Abbott from obtaining additional price reductions from its suppliers, Sweet retracted the prices that it offered in Baker's letter dated September 20, 2003.[21]

After the closing, Abbott requested that Baker continue negotiating with Sweet on Abbott's behalf. Burnett Dep. at 55 (FA 915); McCoy Dep. at 144-145, 155 (FA 28-29, 30); Baker Dep. at 181-184, 188 (FA 79-82, 84). Revisions to the August 2003 Sweet Amendment were made by Dechert for the benefit of McCoy and Abbott. Def. Ex. 20 (FA 601-602); Baker Dep. at 188 (FA 84). McCoy and others at Abbott kept on making changes to the draft or approved changes suggested by Sweet. Baker Dep. at 205-206, 207 (FA 85-86, 87); Def. Ex. 21 (FA 424); Def. Ex. 25 (FA 437).

Even though the drafts were changing, the prices negotiated by Baker were available as late as September 16, 2003. Baker Dep. at 210 (FA 88); Belletire Dep. at 194-195 (FA 321-322). However, rather than countersign the August 2003 Sweet Extension, Abbott strove to revise the Agreement. McCoy Dep. at 55 (FA 14). Abbott wanted the flexibility to terminate the August 2003 Sweet Extension early or move production in-house or to another supplier. Belletire Dep.

---

[21]    There is no evidence that Abbott told Baker or the other officers at ZonePerfect about the conversations that Joseph and the others had with Sweet's raw material suppliers.

18

at 264-265 (FA 335-336). Abbott was also concerned about the low inventories and being short
of product. Pruett Dep. at 80 (FA 780).

During a meeting on September 24, 2003, Abbott executives met with Schacher and
allowed Schacher to repudiate the prices that Schacher had negotiated with Baker. Apparently,
at this meeting, these Abbott executives and Schacher agreed that he could increase his prices by
substituting an average weighted price reduction of approximately 1 cent, rather than the 2.23
cents obtained by Baker. Pl. Ex. 54 (FA 646-648). Belletire thought "the $.01 per bar that is on
the table right now is a good value." Belletire Dep. at 257-258 (FA 333-334); Pl. Ex. 54 (Abbott
2650-2652) (FA 646-648).

As for the minimum commitments that Baker had agreed to, Belletire thought they
needed to be "qualified with a percentage . . . the lesser of 90,000,000 or 75% of the flavors
Sweet Productions currently is capable of running is reasonable." Pl. Ex. 54 (FA 646-648). As
far as minimums, Belletire warned:

> Keep in mind that giving them this minimum severely limits our ability to either
> buy another company or bring production in house over the next two years. The
> numbers above would assume that we keep Access (Nutrilite) at roughly their old
> run rate. I would look at moving whatever volume we have left to Elan, assuming
> their price is in line. Depending on how Elan pricing looks, they could also pick
> up volume from Nutrilite. As we discussed briefly yesterday, Elan looks good on
> paper but is not yet a proven supplier for us and did come in high originally on the
> Glucerna bar before Nancy negotiated them down.

*Id*.

Finally, Belletire thought there should be provisions that should Sweet not produce a
competitive bar, that Sweet Productions commit to a 10,000,000 bar per month capacity and a
quality assurance provision, "with an out if they fail to consistently meet [Abbott's] SMP
requirements, label claims or other quality issues." *Id*. As an added benefit to Sweet
Productions, Abbott would give a "'right of first refusal' for Sweet in the event we are offered a

19

lower cost." *Id*.

Subsequently, McCoy took over all negotiations with Sweet. From the time of the September 24, 2003 meeting, to the execution of an extension on October 30, 2003 ("October 2003 Extension"), McCoy did not include Baker, or anyone else from the former ZonePerfect company to assist him.

During the summer and fall of 2003, while Baker was negotiating the August 2003 Sweet Amendment, Abbott executives were contemplating bringing the production of the ZonePerfect Nutritional Bars in-house. Belletire Dep. at 265-266 (FA 336-337).

As explained below, Schacher retracted the prices because he could not make money at those prices in light of the quality and other obligations being imposed on him by Abbott. *See* Section 32-33.

### E.    THE OCTOBER 30, 2003 AGREEMENT

Eventually, Abbott and Sweet executed a new extension dated October 30, 2003. McCoy Dep. at 269-274 (FA 41-46);; Def. Ex. 31 (FA 458); Pruett Dep. at 88-89 (FA 282); Pl. Ex. 71 (FA 653-659). This extension brought significant benefits to Abbott which the August 2003 Sweet Extension did not have, and which Section 7.4(b)(x) of the SPA did not require. For example, while the basic price charged by Sweet was the starting price under the extension, there was no firm commitment for ZonePerfect to buy 90 million bars each year for the remaining two years of the extension. The October, 2003 Extension had a 12 month rolling forecast which penalized Abbott for not placing orders equal to 75% of the rolling forecast. October, 2003 Extension ¶6. (Friedson 434.) However, Abbott was able to use this provision to move the production from Sweet entirely and to its own manufacturing plant in Fairfield, California, as well as Elan. Belletire Dep. at 285, 290-291 (FA 338, 343-344). In February, 2005 Abbott used this provision to forecast zero purchases, essentially discontinuing all purchases as of March,

20

2005. Belletire Dep. at 288-290 (FA 342-343); Pl. Ex. 183, 184 (FA 827, 828).

In addition, in the October, 2003 Sweet Extension, Abbott was able to get a covenant not to compete from Sweet, and a commitment that Sweet would reserve for ZonePerfect 10 million in bar capacity per month. Pl. Ex. 71 (FA 653-659). For these benefits, and knowing the stockholders would indemnify them under Section 7.4(b)(x) of the SPA, Abbott agreed to a price reduction of 1.25 cents as opposed to the 2.23 cents obtained by Baker.

## F.    ABBOTT'S FINANCIAL CLAIMS

After the closing, CP Baker and Company ("CP Baker"), a company owned by Baker, executed a 6 month Transition Agreement with Abbott. Baker Dep. at 243 (FA 89); Def. Ex. 29 (FA 447-457). From its earliest days, CP Baker managed certain functions of ZonePerfect as well as other companies. Baker Dep. at 243-244 (FA 89-90). Abbott executed the agreement with CP Baker because it wanted to be assured that its business functions could continue without disruption. Def. Ex. 29 (FA 442-457).

On January 10, 2005, Abbott submitted a claim for indemnification based upon alleged misrepresentations in the Financial Statements attached to the SPA as Schedule 4.1(f). (FA 667-668). These Financial Claims ("Abbott's Financial Claims") are based upon Abbott's assertion that the Financial Statements required by SPA Section 4.1(f) are inaccurate, untrue and misrepresent the financial state of the company. (FA 667). Specifically, Abbott's Financial Claims relate to the entries, or lack thereof, on the unaudited balance sheets for the fiscal year ending June 30, 2003 which was required under SPA, Section 4.1(f). SPA, p. 13. Initially, Abbott advanced seven separate paragraph claims. (FA 667-668). Abbott proposes to dispense with a claim of $242,000.00 for certain transportation expenses. (FA 667-668) (DI 64).

21

## ARGUMENT

### A. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the record shows that there are no issues of material fact and that the party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). Thus, summary judgment is appropriate only if the moving party shows there are no genuine issues of material fact that would permit a reasonable jury to find for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it might affect the outcome of the suit. *See id.* at 247-248. An issue is genuine if a reasonable jury could possibly find in favor of the non-moving party with regard to that issue. *See id.* at 249. The moving party bears the initial burden of demonstrating that there are no genuine issues of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), and in deciding a motion for summary judgment, the evidence is to be viewed in the light most favorable to the non-moving party, with all doubts resolved against entry of summary judgment. *See Blackburn v. United Parcel Serv.*, 179 F.3d 81, 91 (3d Cir. 1999). In determining if summary judgment is appropriate, the Court's "function is not to weigh the evidence and determine the truth of the matter," but to determine whether there are genuine issues of material fact in dispute. *See Weiss v. Northwest Broad., Inc.,* 140 F.Supp.2d 336, 338 (D.Del. 2001) (citing *Carter v. Exxon Co.*, 177 F.3d 197, 202 (3d Cir. 1999)).

For the reasons elaborated below, genuine issues of material fact exist relating to Friedson's Count II and Count III and Abbott's proposed Count III. Consequently, Abbott is not entitled to summary judgment as a matter of law on those counts.

22

**B.    ABBOTT IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW
ON FRIEDSON'S CLAIMS UNDER THE MASSACHUSETTS
CONSUMER PROTECTION ACT.**

**1.    The Choice Of Law Clauses Are Sufficiently Narrow To Permit
Friedson's Claims Under Mass. Gen. Laws ch. 93A, §§ 2 and 11.**

Before determining Abbott's summary judgment motion as to Friedson's claims under

Mass. Gen. Laws ch. 93A ("the Massachusetts Consumer Protection Statute" or "chapter 93A"),

the Court must first determine which law applies. Thus, as a threshold matter, a federal court

sitting in a diversity case must address the issue of what law governs the rights and liabilities of

the parties before it and, in doing so, the Court looks to the substantive law of the forum state in

which it sits. *See, Suburban Trust and Sav. Bank v. Univ. of Delaware*, 910 F.Supp. 1009, 1013

(D.Del. 1995). The forum state's choice of law doctrine is included within its substantive law.

*See id.* Delaware courts apply the modern "most significant relationship" test of the

Restatement (Second) of Conflicts to resolve conflicts issues arising out of the interpretation of

contracts and in tort cases. *See Weiss*, 140 F.Supp.2d at 342; *Traveler's Indem. Co. v. Lake*, 594

A.2d 38, 47 (Del. Supr. 1991). Delaware courts honor the parties' choice of law, as expressed in

their agreement "unless the state whose law would control in the absence of a choice has a

materially greater interest in the subject matter." *Weiss,* 140 F.Supp.2d at 342.

In the present case, the SPA and the Escrow Agreement ("Escrow Agreement") both

contain choice of law clauses which provide that the respective agreements shall be "governed"

and "construed" under Delaware law. It is noteworthy, however, that the choice of law

provisions do not mandate that Delaware law applies to all disputes arising out of, or related to,

the SPA or the Escrow Agreement. Section 7.15 of the SPA states:

> *This Agreement* shall be governed by and construed in accordance with the
> internal laws of the State of Delaware applicable to agreements made and to be
> performed entirely within the State of Delaware, without regard to conflicts of
> law principles thereof (emphasis added).

23

The Escrow Agreement contains nearly identical language and states: "This *agreement* shall be construed in accordance with the laws of the State of Delaware." Escrow Agreement, ¶ 14(a) (emphasis added).

Delaware courts have held that similar language in choice of law provisions does not apply to tort-based claims. *See e.g.*, *Gloucester Holding Corp. v. U.S. Tape and Sticky Prod., LLC*, 832 A.2d 116, 124 (Del. Ch. 2003); *Eby v. Thompson*, 2005 WL 1653988 at \*3 (Del. Super. 2005). In *Gloucester Holding*, the choice of law clause stated that *the agreement* "shall be construed, interpreted and the rights of the parties determined in accordance with the laws of the State of Delaware." *Gloucester Holding*, 832 A.2d a 124. The Delaware Chancery Court held that the choice of law clause merely provided that Delaware law applied to the "rights of the parties" *derived from the contract* and "was simply not sufficiently broad to cover tort claims such as fraud in the inducement." *Id*. The Court found that the claims were governed by Massachusetts law. *See id*.

In the context of claims under chapter 93A, courts have emphasized the distinction between a choice of law provision that provides that an *agreement* is to be governed and construed by the law of a given state and one which provides that *the rights of the parties* are to be governed by the laws of that state. *See, e.g., Jacobson v. Mailboxes Etc. U.S.A., Inc.*, 646 N.E.2d 741, 746 n.9 (1995); *Stagecoach Transp., Inc. v. Shuttle, Inc.*, 741 N.E.2d 862, 868 (2001). Like the SPA and the Escrow Agreement, the agreement in *Jacobson* provided that "it is to be construed under and governed by [non-Massachusetts law]." *Jacobson*, 646 N.E.2d at 743. The Massachusetts Supreme Judicial Court held that "[an] agreement [which] does not state that the rights of the parties are to be governed by [non-Massachusetts law] but only that the agreement is to be governed and construed by [non-Massachusetts] law . . . does not purport to

24

bar the application of [chapter 93A] to the parties' dealings in Massachusetts." *Id.*, 646 N.E.2d at 746 n.9.

As in *Jacobson*, the choice of law provisions contained in both the SPA and the Escrow Agreement do not apply to all claims "arising" between the parties or to claims not relating to the construction of the Agreements. Rather, they provide only that the Agreements themselves be "governed by" and "construed in accordance with" Delaware law. Consequently, although Delaware law applies to the interpretation of the SPA for purposes of Friedson's request for declaratory relief, to the extent that Friedson asserts claims other than those sounding in contract, such claims do not fall within the narrow scope of the choice of law provisions in the SPA and Escrow Agreements.

> ### 2. Delaware Choice Of Law Principles Allow The Application Of Massachusetts Law To Friedson's Tort-Based Claims Under Mass. Gen. Laws ch. 93A, §§ 2 and 11.

For tort-based claims, such as Friedson's claims under Chapter 93A, Delaware has adopted the 'most significant relationship' test for choice of law. *See Accu Personnel, Inc. v. Accustaff, Inc.*, F.Supp. 1191, 1212 (D.Del. 1994); *Travelers Indem.*, 594 A.2d at 47. That is, "the local law of the state which 'has the most significant relationship to the occurrence and the parties' under the principles stated in [section 6 of the Restatement (Second) of Conflicts] will govern." *Id.* (quoting Restatement (Second) of Conflicts § 145(1) (1971)). The relevant factors are:

> (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and the uniformity of result, and (g) ease in the determination and application of the law to be applied.

*Id.* (quoting Restatement (Second) of Conflicts § 6 (1971)).

25

Under Section 145 of the Restatement (Second) of Conflicts, the following contacts should be considered by Delaware courts:

> (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered. These contacts are to be evaluated according to their relative importance with respect to the particular issue.

*Id.* (quoting Restatement (Second) of Conflicts § 145 (1971)).

These factors favor application of Massachusetts law. Massachusetts is where ZonePerfect's principal place of business was, where it had its major warehouses, and where a substantial number of its executives and employees worked and resided. Pl. Ex. 5, at 33 (FA 513).

In addition, Abbott employees and executives visited ZonePerfect's offices and facilities in Massachusetts many times from the very beginning of the transaction, McCoy Depo at 63 (FA 15); Pl. Ex. 9 (Logistic Review dated 5/1/03 - Abbott 3373-3377) (FA 551-555), until the closing, Pl. Ex. 118 (CP Baker visit August 13 and 14, 2003 - Abbott 9564-9565) (FA 751-752). The Abbott visits continued after the closing during an integration period. Dluzynski Dep. at 93 (FA 397); Pl. Ex. 198 (FA 906-910). Following the closing, Abbott continued for some time to operate the Massachusetts facilities, and Abbott also retained Pruett, a former shareholder and Chief Operating Officer of ZonePerfect. Pruett Dep. at 14-17 (FA 264). CP Baker executed a Transition Agreement with Abbott to help with Abbott's integration. Def. Ex. 29 (FA 442-457). Consequently, the conduct that is the basis for the alleged wrong has its greatest effect in Massachusetts. No other state or jurisdiction has any significant contacts with the transaction or the wrongs committed by Abbott. As such, Massachusetts law should apply to Friedson's tort-based claims.

3.    **Friedson's Claims Under Mass. Gen. Laws ch. 93A, §§ 2 and 11,
Sound In Tort Rather Than Contract And Raise Genuine Issues Of
Material Fact.**

The general policy of the Commonwealth is stated in section 2 of Mass. Gen. Laws ch.

93A:

"Unfair methods of competition and unfair or deceptive acts or practices in the
conduct of any trade or commerce are hereby declared unlawful."

M.G.L. c. 93A, § 2(a). Specifically, chapter 93A creates a private cause of action for unfair and

deceptive trade practices to be brought by one business enterprise against another. *See* Mass

Gen. Laws ch. 93A, § 11. Willful or intentional violations of chapter 93A may subject the liable

party to treble damages and attorneys fees. See *Id.*

For the purposes of chapter 93A, although the case law offers no static definition of the

term "deceptive," a practice will be deceptive "if it 'could reasonably be found to have caused a

person to act differently from the way he [or she] otherwise would have acted.'" *Aspinall v.*

*Phillip Morris Cos., Inc.*, 813 N.E.2d 476, 486 (2004) (quoting *Purity Supreme, Inc. v. Attorney*

*Gen.*, 407 N.E.2d 297 (1980)). Whether conduct is unfair or deceptive is a question of fact that

focuses on "'the nature of the challenged conduct and on the purpose and effect of that conduct

as the crucial factors.'" *Incase, Inc. v. Timex Corp.*, 421 F.Supp.2d 226, 239 (D.Mass. 2006)

(citations omitted). *See also Massachusetts Eye and Ear Infirmary*, 495 F.Supp.2d 188, 193-194

(D. Mass. 2007) (noting that Massachusetts courts routinely try Chapter 93A cases to a jury

whenever related contractual or tort claims deserve such a trial and that "[t]his practice of

submitting chapter 93A cases to the jury has resulted in the rigorous development of chapter 93A

jurisprudence because jury fact-finding necessarily requires the most precise explication of the

law").

A cause of action under chapter 93A is "'neither wholly tortious nor wholly contractual

27

in nature.'" *Standard Register Co. v. Bolton-Emerson, Inc.*, 649 N.E.2d 791, 793 (1995) (citations omitted). "[C]laims of unfair or deceptive acts or practices may be founded on activities that more closely resemble either a traditional breach of contract action . . . or an action in tort." *Id.* (citing cases). In *Standard Register Co.*, the deceitful conduct supporting the plaintiff's chapter 93A claim related to misrepresentations inducing the plaintiff "both to enter the contract *and to refrain from cancelling it.*" *Id.*, 649 N.E.2d at 794 (emphasis added). The Massachusetts Appeals Court held that the facts supporting the deceitful conduct of the defendants which were the basis of the chapter 93A claim were distinct from those giving rise to the breach of contract claim. *See id.* Thus, the chapter 93A claim sounded in tort rather than contract. *See id.*

This Court has noted that "[e]ven in the presence of a choice of law provision mandating choice of another state's law for resolution of the contract dispute, courts have allowed claims under 93A to proceed if the complaint alleges facts unrelated to the contract claim that would support the 93A claim." *Trustees of Boston Univ. v. Ligand Pharms., Inc.*, 2003 WL 1873839 at *3 (D.Del. April 11, 2003) (Robinson, C.J.). And, in revisiting the choice of law analysis to determine if a chapter 93A claim is available to a plaintiff where a choice of law clause selects the law of another jurisdiction, the Massachusetts Appeals Court has stated that "if a particular defendant's unfair conduct with respect to a contract sounds in tort, c. 93A will apply to that contract notwithstanding a contract provision that states that contractual claims will be interpreted under another State's law." *Kitner v. CTW Transp., Inc.*, 762 N.E.2d 867, 872 (2002).

Liability under chapter 93A does not require there to be a breach of contract. *See NASCO, Inc. v. Pub. Storage, Inc.*, 127 F.3d 148, 152 (1st Cir. 1997). The focus of the court in a

28

case premised on chapter 93A is "the nature of challenged conduct and . . . the purpose and effect of that conduct." *Massachusetts Employers Ins. Exch. v. Propac-Mass, Inc.*, 648 N.E.2d 435, 438 (1995). Conduct "in disregard of known contractual arrangements and intended to secure benefits for the breaching party constitutes an unfair act or practice for c. 93A purposes." *Anthony's Pier Four v. HBC Assocs.*, 583 N.E.2d 806, 821 (1991). "A practice is unfair if it is 'within . . . the penumbra of some common-law, statutory, or other established concept of unfairness; . . . is immoral, unethical, oppressive, or unscrupulous; [and] . . . causes substantial injury to [other businessmen].'" *Linkage Corp. v. Trustees of Boston Univ.*, 679 N.E.2d 191, 209 (1997) (citations omitted). In *Linkage Corp.*, the Massachusetts Supreme Judicial Court held that it was an unfair and deceptive trade practice for a party to repudiate certain contracts and then commit the resources of the injured party to its own benefit. *See id.*

In the paradigm case *of Anthony's Pier Four*, the Court held that the defendant's unfair withholding of its approval of certain real estate development plans in order to extract price concessions from the plaintiff violated chapter 93A. *See Anthony's Pier Four*, 583 N.E.2d at 819-820, 822. Similarly, in *Pepsi-Cola Metro. Bottling Co., Inc. v. Checkers, Inc.*, 754 F.2d 10, 18 (1st Cir. 1985), the First Circuit affirmed a finding that the defendants had violated chapter 93A by withholding a payment that was due the plaintiff as a "wedge" to "enhance [the defendants'] bargaining power for more product." In other words, the defendants "had withheld monies which they legally owed as a form of extortion – to force [the plaintiff] to do what otherwise it could not be legally required to do." *Id.*[22]

In the present case, Abbott's conduct is similar to the line of cases following the facts of

---

[22] In *Arthur D. Little, Inc. v. Dooyang Corp.*, 147 F.3d 47, 51 (1st Cir. 1998), the defendant "repeatedly promised to pay outstanding invoices, though it had no intent to do so." The Court found that the defendant made those promises "with the intention of extract[ing] a favorable settlement from [the plaintiff] for less than the amount [the defendant] knew that it owed . . . stringing out the process, and forcing [the plaintiff] to sue." *Id.* at 56. The court found this conduct to be violative of 93A.

*Anthony's Pier Four*. As stated above, the SPA was drafted to allow Baker to negotiate, but not sign, the new agreement with Sweet, as President of ZonePerfect prior to the closing, or as agent of Abbott after the closing. Thibodeau Dep. at 39-40 (FA 228). Once Baker had negotiated a new agreement with Sweet on acceptable terms as defined in Section 7.4(b)(x) of the SPA, ZonePerfect had satisfied Section 7.4(b)(x). However, as in cases such as *Anthony's Pier Four* and *Pepsi-Cola*, Abbott, by unilaterally deciding not to sign the August 2003 Sweet Extension, and subsequently withholding payment of the monies held in escrow, abused its power under the SPA as a means of forcing the shareholders to share the cost of bringing the Nutritional Bars to Class I standards and of upgrading Sweet's facilities to meet Abbott's process specifications through the implementation of Abbott's SMP, or quality control mandates. Subsequently, Abbott was able to use its heightened bargaining position to agree to a price increase for Sweet while building into the October, 2003 Extension the flexibility that permitted it, fifteen months later, to move production to Abbott's own facilities, thereby capturing both Sweet's profit and its own. Schacher Dep. 130 (FA 157); Pl. Ex. 183 (FA 827). The only reason Abbott was in that bargaining position was because it knew the former shareholders would be subsidizing its price concessions to Sweet.

Since the shareholders specifically rejected Abbott's proposed provisions of the draft SPA, which would have imposed these costs upon them, this case presents a classic case for the application of c. 93A. It is this conduct, not a "mere breach[] of contract," which underlies Friedson's chapter 93A claim. Indeed, Friedson's complaint raises no classic breach of contract claim. Under Count I, Friedson seeks a declaratory judgment that Abbott owes money under the SPA and the Escrow Agreement. As in *Standard Register*, 649 N.E.2d at 794, the facts supporting Abbott's deceitful conduct which are the basis of Friedson's ch. 93A claim are

entirely distinct from those giving rise to a breach of contract claim.

This case also presents a classic case of deception by non-disclosure of material information. Belletire suggested that the Sweet SMP be made an "acceptable term" of the extension to be negotiated with Sweet. Belletire Dep. at 116 (FA 314); Pl. Ex. 32 (FA 617). In Belletire's view, reference to the SMP would have eliminated confusion over what terms applied to the TPM after the closing. *Id.* Abbott chose not to include compliance with the SMP, as a condition of the new extension that Baker would negotiate with Sweet Productions.

While the actual tolerances or specifications were attached as Exhibit H to the SPA, Pl. Ex. 27 (FA 609-610); McCoy Dep. at 116-117 (FA 20-21), those specifications have little to do with the procedures and protocols used to manufacture the products. Cool Dep. at 87 (FA 375). Exhibit H only identifies the deviation from label claims that are allowed for each bar produced in order to be compliant with Class I specifications. Pl. Ex. 27 (FA 609-610). The SMP contains the detailed manufacturing protocols and practices that are used to achieve those results. Schacher Dep. at 68, 199-200 (FA 141, 174).

When Schacher was discussing pricing with Baker, he attempted to obtain either the SMP or a better understanding of what it would require in terms of manufacturing processes. Schacher Dep. at 33, 76-77, 108, 207 ( FA 132, 143, 151, 171). He received limited information. *Id.* Abbott chose not to provide this information to Schacher before the closing. Schacher Dep. at 194-196 (FA 713). So, Schacher was forced to guess at what compliance with Abbott's SMP might cost him. Schacher Dep. at 78-79, 195 (FA 144, 173). Nothing prepared Schacher for the deluge of Quality Assurance demands that Abbott made upon Sweet Productions after the closing. Schacher Dep. at 59, 60, 194, 195 (FA 139, 173). In light of the demand, he realized that he would not be making any money at the prices he negotiated with Baker. Schacher Dep. at

31

108, 121-122 (FA 151, 154-155).

For purposes of this Motion, another obviously deceitful Abbott act had to do with microbiological testing. By August 2003, Sweet had stopped doing the microbiological testing required under the Sweet Manufacturing Agreement. The Sweet Manufacturing Agreement required only two tests per day, no matter how many Bars were being manufactured in a day. Pl. Ex. 7, ¶13 (FA 532-533). The samples could be done any time throughout the day. The Abbott protocol mandated 24-hour testing at 30 to 60 minute intervals during that 24-hour period. Cool Dep. at 130-131 (FA 384-385); Pl. Ex. 172 (FA 822-823). This was obviously, a more expansive request.

On August 15, 2003, less than two weeks before Schacher executed the August 2003 Sweet Extension, Belletire asked ZonePerfect to have Sweet resume the microbiological testing. Pl. Ex. 172 (FA 822-823). Rather than advise Sweet and Schacher that they would be required to comply with the Abbott protocols, Abbott chose to have him resume the less costly protocols under the Sweet Manufacturing Agreement. *Id.* The rationale was that Belletire did not want to get "bogged down debating ... price." *Id.*

Rather than hiding pricing information from Schacher, Belletire and the others should have openly discussed these issues so that Schacher could have had a better understanding of his costs. Not surprisingly, after the closing, when Schacher learned how much complying with Abbott demands would cost him, he retracted the pricing that he negotiated with Abbott. Schacher Dep. at 123-125, 207-208, 211 (FA 155, 177). There is no justification for imposing these added costs upon the former shareholders, as Abbott has tried to accomplish through its August 11, 2004 claim for indemnification under Section 7.4(b)(x).

The tortious and unfair nature of Abbott's conduct is further demonstrated by the fact that

32

after executing the August 2003 Sweet Extension, Schacher called Sweet's suppliers in an effort to obtain better prices from them. Schacher Dep. at 76-77 (FA 143); Pl. Ex. 62 (FA 651-652). Some of those suppliers were also Abbott's suppliers. *Id.* When Schacher threatened to stop using two suppliers if they did not give Sweet a price reduction, the suppliers contacted Abbott to complain. *Id.* Upon receipt of the supplier's complaints, McCoy instructed that Sweet be informed that the Sweet Manufacturing Agreement only permitted Sweet to change suppliers with the permission of ZonePerfect, now owned by Abbott. *Id.* As Abbott was happy with the quality of the supplier's products, it was not prepared to permit Sweet to change suppliers at that time. *Id.* In short, as a direct result of Abbott's conduct, Sweet was caught between the proverbial rock and a hard place.

At a meeting held on September 24, 2003 ("the September 24, 2003 meeting"), Abbott executives met with Schacher and allowed him to repudiate the prices he had previously negotiated with Baker. Pl. Ex. 54 (FA 646-648). At the September 24, 2003 meeting, or shortly thereafter, Abbott executives and Schacher agreed that he could reduce Sweet's prices by substituting an average weighted price reduction of approximately 1 cent, rather than the 2.23 cents obtained by Baker. *Id.* Belletire thought "the $.01 per bar that is on the table right now is a good value." Belletire Dep. at 257-258 (FA 333-334); Pl. Ex. 54 (FA 646-648).

Abbott's claimed indemnification is based upon a weighted average price reduction of 1.25 cents. In Abbott's view, it is entitled to nearly $5 million based upon the alleged failure to negotiate the required price reduction with Sweet, in addition to over $1 million in claims based upon the financial statements claims, have held up disbursement of a substantial amount of money over whether Baker had actually negotiated a price reduction. Baker negotiated the precise terms, including a price reduction that Abbott demanded, even if Abbott did not

33

ultimately execute the amended agreement. The SPA required that only certain specified terms be incorporated into any new agreement with Sweet, which terms Baker successfully negotiated. Hence, there was no cause for Abbott to reject the new agreement that Baker negotiated. Indeed, Abbott admits that the August 2003 Sweet Extension contains all the "acceptable terms" set forth in Section 7.4(b)(x). McCoy Dep. at 139 (FA 25). The only reason that Abbott refuses to give the shareholders their share of $10 million based on the 2.23 cents weighted average price reduction negotiated by Baker, is that Baker, in Abbott's view, did not "negotiate a written agreement," since a written agreement would require two signatures, rather than one. McCoy Dep. at 138-139 (FA 24-25).

There is a genuine issue of material fact over whether Abbott wanted Baker to sign the agreement so that it could have the most flexibility when determining how much money it really wanted to pay the shareholders. By limiting Baker's discretion, Abbott maximized its own ability to manipulate the purchase price or impose additional demands on Sweet and then reimburse itself from the Escrow Funds if Sweet required additional price concessions. Abbott's claims are thus but a thinly disguised attempt to force ZonePerfect's former stockholders to compensate Abbott for its poor business decision in allowing Sweet to increase its costs through the imposition of additional terms on Sweet. By charging a portion of the price increase to ZonePerfect's former shareholders, Abbott is attempting to do through Section 7.4(b)(x) what it could not negotiate directly into the SPA. The record, when viewed in the light most favorable to Friedson thus presents a paradigm, albeit highly sophisticated, example of the type of conduct that is actionable under chapter 93A. And, for the reasons stated *supra*, Friedson's claims under chapter 93A, sound in tort rather than contract and are entirely distinct from Friedson's claims

34

under the SPA.[23]

In addition, in light of both the facts Friedson alleges pursuant to his chapter 93A claim and the language of the SPA and Escrow Agreement forum selection clauses, the case that Abbott relies upon to support its argument, *Northeast Data Sys., Inc. v. McDonnell Douglas Computer Sys. Co.*, 986 F.2d 607 (1st Cir.1993), is distinguishable. In *Northeast Data*, the plaintiff asserted claims including *inter alia* breach of contract and violation of chapter 93A. *See id.,* 986 F.2d at 608. The contract in *Northeast Data* stated: "This Agreement *and the rights and obligations of the parties hereto* shall be governed by and construed in accordance with [California law]." *Id.*, 986 F.2d at 609 (Emphasis added.) Thus, the First Circuit noted, the parties agreed that all "contract related claims" would be brought under California law. *Id.,* 986 F.2d at 610. The Court further stated that "*depending on the facts*, a Chapter 93A claim *may* essentially reduce to a contract claim." *Id.* (Emphasis added.) The Court held that the plaintiff's chapter 93A claims merely amounted to "embroidered 'breach of contract' claims" and its "state of mind" allegations that the defendant "acted 'willfully' or 'knowingly' or with a bad motive" did not take the plaintiff's chapter 93A claims outside the scope of the choice of law provision. *See id.*, 986 F.2d at 609. To the extent the plaintiff's chapter 93A claim rested upon allegations of fraud, however, it fell outside the choice of law provision. *See id.*, 986 F.2d at 611.

In *Jacobson*, the Massachusetts Supreme Judicial Court distinguished *Northeast Data*. *See Jacobson*, 646 N.E.2d at 746 n. 9. The choice of law clause in *Jacobson* provided that the agreement "is to be construed under and governed by" California law. *See id.* Noting the contrast between that language and the language of the choice of law clause in *Northeast Data*,

---

[23] Similarly, with its financial claims, Abbott has attempted to put itself in a position to leverage a settlement from the shareholders. Although discovery is not complete on those claims, the evidence gathered so far shows that Abbott in part advanced some of those claims to gain revenge on CP Baker and its alleged poor performance after the closing. Pl. Ex. 208 (FA 911-913).

35

which referred to the parties' "rights and obligations", the Court held that an agreement which "does not state that the *rights* of the parties are to be governed by [non-Massachusetts] law but only that the agreement is to be *governed and construed by* [non-Massachusetts] law . . . does not purport to bar the application of [c. 93A] to the parties' dealings in Massachusetts." *Id.* (Emphasis added.) *See also Valley Juice Ltd., Inc. v. Evian Waters of France, Inc.*, 87 F.3d 604, 612 (2nd Cir.1996) (in action brought in Massachusetts and transferred to Connecticut, noting that *Jacobson* distinguishes *Northeast Data* and "requires a different result" where a choice of law clause selects New York law and states that it governs "the agreement" rather than all "rights and obligations" arising out the agreement, in such a case the clause does not bar the chapter 93A claims).

As in *Jacobson* and *Valley Juice*, and unlike *Northeast Data*, the choice of law clauses in the SPA and the Escrow Agreement provide only that the Agreements themselves be "governed by" and "construed in accordance with" non-Massachusetts law. Compl., Ex.1, Section 7.15 and Ex. 2, Section 14(a). Thus, Abbott and Friedson agreed only that the SPA and the Escrow Agreement, and *not* all claims relating thereto, would be governed by Delaware law.

Further, unlike *Northeast Data*, Friedson does not assert a breach of contract claim against Abbott. Rather, Friedson seeks declaratory judgment as to monies owed by Abbott under the SPA and the Escrow Agreement. Friedson's chapter 93A claim is based upon Abbott's deceptive conduct *subsequent* to all performances under the SPA being completed and sounds more in tort than contract. As such, it is not "merely duplicative" of the contract-based claims in Counts I and IV. Thus, *Northeast Data* is inapplicable and because Abbott's "unfair conduct with respect to [the SPA and the Escrow Agreement] sounds in tort, c. 93A will apply . . . notwithstanding a contract provision that states that contractual claims will be interpreted under

36

[Delaware]'s law." *Kitner*, 762 N.E.2d at 872.

For the foregoing reasons, the record demonstrates there are genuine issues of material fact in dispute and consequently, Abbott is not entitled to summary judgment on Friedson's chapter 93A claim.

## C.    ABBOTT IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON FRIEDSON'S CLAIMS UNDER SECTION 2532 OF THE DELAWARE DECEPTIVE TRADE PRACTICES ACT.

Under Section 2532 of the Delaware Trade Practices Act ("DTPA"), a person engages in a deceptive trade practice when, in the course of a business, vocation, or occupation, that at person: (11)   makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of, price reductions; or (12) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.  6 Del. C. § 2532.

Unlike the Delaware Consumer Fraud Act, the DTPA addresses unreasonable or unfair interference with "horizontal" relationships between various business interests. *See Grand Ventures, Inc. v. Whaley*, 632 A.2d 63, 70 (Del. 1993). "[T]he [DTPA] specifically makes unnecessary proof of competition between the parties, monetary damages or intent to deceive." *Id.*, 632 A.2d at 67. The DTPA is "remedial in nature and liberally construed." *State ex rel. Brady v, Preferred Florist Network, Inc.*, 791 A.2d 8, 20 (Del. Ch. 2001).

Most fundamentally, as outlined in Section II C *supra*, the summary judgment record demonstrates that Abbott intentionally left itself the power to determine whether it would honor the provision in the SPA which would allow the former ZonePerfect shareholders to recover their share of the $10 million from the escrowed funds.  Viewed in the light most favorable to Friedson, the record raises a genuine issue of material fact as to whether Abbott deceptively claimed and/or misrepresented that the August 2003 Sweet Extension does not comply with or

37

satisfy Section 7.4(b)(x).[24]  Further, Abbott made false or misleading statements concerning the

price reduction that ultimately to obtain from Sweet.  Gorman informed Baker that Abbott would

be making a claim against the $10 million escrow fund in an amount equal to 1.25 cents or 50%

of the 2.25 cent that Baker was supposed to achieve under Section 7.4(b)(x).  Def. Ex. 27 (FA

440-441).  Gorman indicated that Abbott was advancing the claim because Sweet had retracted

its pricing offer under the August 23, 2003 agreement and explained that Sweet withdrew its

pricing offer contained in the August 23, 2003 agreement because of Sweet's "inability to

negotiate greater discounts from suppliers."  *Id.*  However, Gorman omitted to mention that

Abbott's processing requirements made it virtually impossible for Schacher to make a profit,

effectively forcing to Sweet to withdraw its pricing offer.  Thus, Abbott misled ZonePerfect

concerning the price reduction that Baker had obtained from Sweet and/or engaged in conduct

that created a likelihood of confusion or of misunderstanding on ZonePerfect's part, giving rise

to liability under Del. C. § 2532(a)(11) and/or (12).

    Abbot's motion for summary judgment on Friedson's Count III should be denied.  As the

summary judgment record demonstrates genuine issues of material fact concerning Abbott's

liability under the DTPA.[25]

### D.  ABBOTT IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON ITS PREMATURE MOTION FOR SUMMARY JUDGMENT ON COUNT III OF ITS PROPOSED COUNTERCLAIM.

    This Court has yet to rule on Abbott's Motion for Leave to Amend Answer and

Counterclaim, filed on July 31, 2007.  Thus, Abbott's motion for summary judgment on Count

III of its proposed Counterclaim should be denied as premature.  However, even were the Court

---

[24]  The record also indicates that Abbott misrepresented that Baker need not execute an agreement with Sweet, only to subsequently claim that he was obligated to bind Sweet to the new reduced price.  Such conduct, if proven, establishes that Abbott engaged in "conduct which . . . creates a likelihood of confusion or of misunderstanding" under Del. C. § 2532(a)(12).

[25]  In the alternative, Friedson seeks leave to amend the Complaint in order to take into account facts supporting Friedson's claim under the DTPA developed during the course of discovery in this action.

to grant Abbott leave to amend its Answer and Counterclaim,[26] Abbott's motion for summary judgment on Count III of its proposed Counterclaim is meritless.

Friedson has addressed the stale arguments now advanced by Abbott on two prior occasions. Pl.'s Opp'n to Def.'s Mot. to Dismiss at 6-11; Pl.'s Opp'n to Def.'s Mot. for Leave to Amend Answer and Counterclaim at 12-14. In sum, both the SPA and the Escrow Agreement contain forum selection clauses. However, in marked contrast to the forum selection clause in the SPA, which contains mandatory language, the Escrow Agreement's forum selection clause contains permissive language, stating only that "any suit, action or proceeding arising under or relating to [the Escrow Agreement] *may* be instituted in the United States District Court located in Delaware." Compl., Ex. 2, Section 14 (Emphasis added.) Absent clear language, Delaware courts will not interpret a forum selection clause as manifesting an intent to make jurisdiction exclusive. *See Dura Pharmaceuticals, Inc. v. Scandipharm, Inc.* 713 A.2d 925, 930 (Del. Ch. 1998) (identifying a forum selection clause that provided that the parties "may" bring an action in Delaware as being non-exclusive). The Escrow Agreement was executed on August 26, 2003, one month after the SPA, demonstrating the parties' clear intent to be bound thereby. This action arises out of the Escrow Agreement. *See* Pl.'s Opp'n to Def.'s Mot. to Dismiss at 6-7. Thus, Friedson was entitled to initiate this action in Massachusetts.

For these reasons and those detailed more fully in Friedson's Opposition to Abbott's Motion to Dismiss[27] at 6-11 and his Opposition to Abbott's Motion For Leave to Amend Answer and Counterclaim at 12-14, incorporated hereto pursuant to Fed R. Civ. P.10(c), Abbott is not entitled to judgment as a matter of law on Count III of its proposed Counterclaim.

---

[26] In which event, Friedson reserves the right to respond fully to Abbott's Motion for Summary Judgment as to Count III of its proposed Counterclaim.
[27] The docket reflects that Abbott's Motion to Dismiss was denied by Judge Zobel .

## CONCLUSION

For the foregoing reasons, Friedson respectfully requests that this Court deny Abbott's

Motion for Summary Judgment.

**ROSENTHAL, MONHAIT & GODDESS, P.A.**

By: _____

Norman M. Monhait (#1040)
Citizens Bank Center, Suite 1401
919 Market Street
P.O. Box 1070
Wilmington, DE 19899-1070
(302) 656-4433
   Attorney for Plaintiff

OF COUNSEL:

*Admitted Pro Vice*
Gerald J. Caruso
Michael R. Coppock
**RUBIN AND RUDMAN LLP**
50 Rowes Wharf
Boston, MA 02110-3319
(617) 330-7000

October 25, 2007

# EXHIBIT A

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 1653988 (Del.Super.)
(Cite as: Not Reported in A.2d)

H

Eby v. Thompson
Del.Super.,2005.
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Delaware.
EBY
v.
THOMPSON, et al.
No. Civ.A. 03C-10-010THG.

Submitted Feb. 21, 2005.
Decided April 20, 2005.

Dear Counsel:

GRAVES, J.

*1 This is the Court's decision regarding Rental Equipment Center's request to apply Maryland law to the Plaintiffs' claims. For the following reasons, the motion is DENIED.

Rental Equipment Center (hereinafter "REC") is a Maryland corporation that rents equipment to the general public. On June 28, 2003, Allawishes Gove rented a trailer and stump grinder from the REC store in Salisbury, Maryland. Before releasing the equipment, REC required Mr. Gove to complete and authorize a written contract containing the rental terms and conditions.

The rented trailer and stump grinder were later directly involved in a motor vehicle accident in Seaford, Delaware. The accident resulted in the death and physical injuries of two Delaware residents. The Plaintiffs filed a civil action for damages arising out of the accident in the Sussex County Superior Court.

The Plaintiffs insist that the application of strict liability to a lessor, according to Delaware law, is appropriate. REC, however, requested that this Court apply Maryland law, which precludes strict liability of lessors. REC contends that Maryland law should apply since its store is located in Maryland, the rental agreement was formed in Maryland, the lease

agreement requires the equipment to be used in Maryland and the contract leasing the stump grinder to Mr. Gove specifically cites the application of Maryland law.

These arguments, however, ignore the fact that the central issue and parties in this case are essentially unrelated to the equipment rental and lease agreement. If this case was a personal injury or wrongful death action by Mr. Gove, the lessee, then the contractual formation and obligations between those parties might be more relevant. But the case before the Court centers around the death of William Eby and the physical injury of Jeanette Eby, who had no connection to the rental agreement.

The only connection between the Ebys and REC is an automobile accident that occurred in Delaware. The accident did not arise out of the contract formed in Maryland nor are the Plaintiffs in this action bound by that contract. Therefore, any breach of the agreement between REC and Mr. Gove as to usage or any expectation of the applicable law established by the leasing agreement shall have minimal effect on the choice of law in this action. Instead of focusing on the contractual agreement between Mr. Gove and REC, this Court will interpret the choice of law question in relation to the automobile accident that resulted in this wrongful death and personal injury action.

In 1991, the Delaware Supreme Court adopted the "most significant relationship" test found in RESTATEMENT (SECOND) OF CONFLICTS (1971) as the appropriate standard to apply for conflict of law disputes.[FN1] The state with the "most significant relationship" to the claim at issue is determined by balancing the following factors:

FN1.*Travelers Indem. Co. v. Lake,* 594 A.2d 38, 47 (Del.1991).

1. The needs of the interstate and international systems;
2. The relevant policies of the forum;
*2 3. The relevant policies of other interested states

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 1653988 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

and the relevant interests of those states in the determination of the particular issue;

4. The protection of justified expectations;

5. The basic policies underlying the particular field of law;

6. Certainty, predictability and uniformity of result; and

7. Ease of determination and application of the law to be applied.

First, as applied to this case, the needs of the interstate and international systems are not likely to be affected by the choice of law decision in this case. The application of strict liability to Maryland lessors whose products injure Delaware residents will not likely change the course of commerce between the two states or affect either state's liability systems.

Second, the relevant policies of the forum state, Delaware, provide for the added protection of its citizens by holding lessors strictly liable for the inspection and upkeep of rental equipment.[FN2]Holding lessors strictly liable for damages arising out of the use of its equipment creates a system whereby 1) liability is borne by the individual profiting from the rental; 2) the lessor is in the best position to inspect rental equipment and avoid the rental of defective equipment; 3) an implied representation of fitness accompanies the rental of equipment; and 4) the risk of defective equipment is lessened by the caution taken by lessors to prevent the application of strict liability.[FN3]Strict liability is not limited to the parties to a lease contract because "[t]he doctrine of strict liability in tort has been extended to injured bystanders."[FN4]Therefore, the Court sees no reason why the added protection of Delaware law should be denied to Delaware residents harmed on a Delaware roadway by equipment leased in Maryland.

> FN2.*Martin v. Ryder Truck Rental, Inc.,* 353 A.2d 581 (Del.1976).

> FN3.*Wilson v. Dover Skating Center, Ltd.,* 566 A.2d 1020 (Del.Super.1989).

> FN4.*Martin v. Ryder Truck Rental, Inc.,*

353 A.2d 581, 587 (Del.1976)

Third, Maryland's approach to lease and bailment liability is quite different from Delaware law. Maryland applies a general negligence standard to the lessor of equipment.[FN5]A lessor's liability there will depend on the Plaintiff's ability to show that the lessor knew of a defect or that a reasonable inspection of the rental equipment would have exposed a defect prior to leasing.[FN6]Maryland's interest in the application of Delaware law to a Maryland lessor lies in the potential strict liability judgments against lessors that will result under the more stringent standard.

> FN5.*Bona v. Graefe,* 285 A.2d 607, 611 (Md.1972)(finding that "the liability of the lessor of a chattel, as distinguished from that of a vendor, if it is to be imposed at all in Maryland, must be imposed in a tort action for negligence.").

> FN6.*Id. citing Smith v. Kelly,* 229 A.2d 79, 81 (Md.1967).

While Maryland lessors may be harmed by the application of strict liability to actions that arise in Delaware, they are in a better position to absorb the costs of those risks than an individual resident of Delaware. The potential harm occasioned by the application of Delaware law can only result in Maryland lessors taking greater care before releasing equipment to consumers. To avoid the application of strict liability, lessors can prohibit the transport of rental equipment across the border into Delaware. Here, the evidence supports an inference that REC knew the equipment would be used in Delaware. Delaware provided sound reasoning for its adoption of lessor strict liability. I am persuaded by the same reasons in finding that Delaware's interest in protecting its residents from injuries caused by defective leased equipment is greater than Maryland's protection of its lessors from strict liability judgments.

*3 Fourth, the justified expectations of the parties in this action are at odds. According to its lease agreement, REC required its equipment to be used

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:06-cv-00382-GMS    Document 79    Filed 10/25/2007    Page 50 of 53

in the Salisbury metropolitan area exclusively. REC contends that it expected Maryland law to encompass any action arising out of its rental, as a function of its anticipated rental area and the language contained it its lease agreements.

However, the lease agreement also put REC on notice that Mr. Gove was a Delaware resident. Mr. Gove listed a Delmar, Delaware address in the rental agreement. In Paragraph 2(b) of the lease contract, the lessee agrees to use the rental equipment "only at the address designated ..." in the agreement. By releasing the equipment to Mr. Gove, pursuant to the lease agreement, REC effectively released the property into Delaware. Plaintiffs also contend that discovery revealed numerous REC rental contracts with Delaware residents. REC's history of renting to Delaware residents, its knowledge that this specific lessee resided in Delaware and its lease language requiring that rental equipment be used at the address listed was sufficient to alert REC to Delaware's jurisdiction of personal injury actions involving this equipment.

Additionally, REC contends that its rental contract to Mr. Gove set forth the applicable law governing their agreement. But the fact that the agreement between REC and Mr. Gove sets forth Maryland law as governing the contract does not indicate that torts arising out of the contract will be treated similarly. Courts have previously found that broad choice of law clauses encompass tort actions that arise out of contractual agreements.[FN7]However, the choice of law clauses in those cases used broader governing language such as "any litigation arising out of or relating to [this] Agreement"[FN8] or "any claim arising out of or relating to" the agreement.[FN9]

> FN7.*Turtur v. Rothschild Registry Int'l, Inc.,* 26 F.3d 304 (2d Cir.1994); *VGS, Inc v. Castiel,* 2003 WL 723285 (Del. Ch.2003).

> FN8.*VGS, Inc.* 2003 WL 723285, at *7 & n. 29 (Del. Ch.2003).

> FN9.*Turtur v. Rothschild Registry Int'l,*

*Inc.,* 26 F.3d 304, 309 (2d Cir.1994).

Here, the rental agreement is narrowly drawn, stating only that "[t]his Rental Contract is consummated in the State of Maryland and shall be governed by Maryland law."[FN10]Similar choice of law clauses have been rejected as encompassing tort actions.[FN11]The choice of law clause chosen by REC refers only to the terms of the agreement and is not broad enough to cover torts arising out of the rental agreement.

> FN10. Rental Contract between REC and Allawishes Gove, of 6/28/03 at 2.

> FN11.*Gloucester Holding Corp. v. U.S. Tape & Sticky Prods., LLC,* 832 A.2d 116, 124 (Del. Ch.2003)(finding that a choice of law clause calling for Delaware law to apply "to the rights of the parties ... is simply not sufficiently broad enough to cover tort claims.").

The Ebys expected Delaware law to apply as they traveled Delaware's roadways. They never subjected themselves to Maryland jurisdiction. The Plaintiffs chose to file this action in Delaware, the location of the accident. The Plaintiffs expectations should not be altered simply because a contract unrelated to their action was formed in Maryland.

Fifth, this case involves personal injury and wrongful death actions. In personal injury actions, the law of the State where the injury occurred usually applies.[FN12]In this case, the only connection between the parties is their alleged involvement in an automobile accident in Delaware. Despite REC's contentions, Maryland's relationship to this action remains tenuous and does not override Delaware's general jurisdiction over the matter.

> FN12.*Travelers,* 594 A.2d at 47 (citing RESTATEMENT (SECOND) CON-FLICTS OF LAWS § 146 (1980)).

*4 Sixth, uniformity and predictability weigh in favor of applying Delaware law. Personal injury and wrongful death claimants expect to have their cases

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

adjudicated according to the laws of the state where their injuries occurred. This Court will not upset that general rule to appease a lessor which subjected itself to Delaware's strict liability laws by leasing equipment into Delaware territory.

Finally, the Court must consider the ease of determination and application of the law to be applied. REC contends that if this Court applies Delaware law, it will become strictly liable, whereas Maryland law would allow the jury to attribute liability among the Defendants. It argues that "Delaware courts should always consider fault in assessing liability in tort cases."[FN13] REC also argues that applying strict liability would affect its cross-claims against other Defendants.

> FN13.*Id.* at 48.

But allowing REC to be subject to strict liability does not mean that it is instantly liable, *res ipsa loquitor,* based on a rental of equipment that is involved in a personal injury action. Nor does it mean that all other defendants are absolved of liability. Instead, the strict liability system allows that a lessor "may be held liable in tort, without proof of negligence, if the [item] it placed in circulation proved to have a defect that proximately caused personal injury or property damage to the plaintiffs."[FN14] I find that Delaware's strict liability standards may be fairly and appropriately applied to this claim.

> FN14.*Martin v. Ryder Truck Rental, Inc.,* 353 A.2d 581, 588-589 (Del.1976).

When determining the appropriate law to apply to a tort claim, the Court must consider additional contacts including:
(a) the place where the injury occurred,
(b) the place where the conduct causing the injury occurred,
(c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and
(d) the place where the relationship, if any, between the parties is centered.[FN15]

> FN15.*Travelers,* 594 A.2d at 47 (citing RESTATEMENT (SECOND) CONFLICTS OF LAWS § 145 (1980)).

These contacts are to be weighed relatively given their importance to the particular issue.[FN16]

> FN16.*Id.*

REC's alleged failure to maintain its rental equipment, its rental agreement with Mr. Gove and its Maryland incorporation and principal place of business are the only factors that connect this action to Maryland. These factors, which only relate to one Defendant, are not enough to outweigh Delaware's connection to this matter.

First, and most importantly, the only connection between the Plaintiffs and the Defendants named in this action is an automobile accident that occurred on a Delaware roadway. Generally, in actions for personal injury, the law of the State where the injury occurred applies.[FN17] Second, the conduct causing the injury may have occurred in Maryland or Delaware, depending on the jury's determinations of liability. Third, the Plaintiffs and at least one other Defendant are residents of Delaware. REC is the only Maryland corporation requesting that Maryland law apply. Finally, the relationship between the parties in this action centers on the accident that occurred in Delaware. A balance of these factors leaves Delaware with the most significant relationship to this accident and an overriding interest in ensuring that its residents are adequately compensated for any injuries they suffer on Delaware highways. Applying Maryland law to the Plaintiffs' action would unjustly strip Delaware residents of their full rights of recovery. The Court considers these factors to be the relevant and integral connections to Delaware, thereby establishing the proper application of Delaware law. For the foregoing reasons, the motion is DENIED.

> FN17.*Travelers,* 594 A.2d at 47 (citing RESTATEMENT (SECOND) CONFLICTS OF LAWS § 146 (1980)).

Del.Super.,2005.
Eby v. Thompson

Not Reported in A.2d                                                    Page 5
Not Reported in A.2d, 2005 WL 1653988 (Del.Super.)
**(Cite as: Not Reported in A.2d)**


Not Reported in A.2d, 2005 WL 1653988
(Del.Super.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 25th day of October, 2007, a copy of **Plaintiff**

**David Friedson's Answering Brief In Opposition To Defendant Abbott Laboratories'**

**Motion For Partial Summary Judgment** was served, by electronic transmission, upon:

> John C. Phillips, Jr., Esquire
> Phillips Goldman & Spence, P.A.
> 1200 N. Broom Street
> Wilmington, Delaware 19806

and a copy was sent, by email transmission, to:

> Lawrence R. Desideri, Esquire
> Stephanie McCallum, Esquire
> Winston & Strawn LLP
> 35 W. Wacker Drive
> Chicago, Illinois 60601

Norman M. Monhait (#1040)