# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

DAVID FRIEDSON, as Stockholders'
Representative of the former Stockholders of
the ZONE PERFECT NUTRITION
COMPANY,

      Plaintiff,

v.

ABBOTT LABORATORIES, an Illinois
corporation,

      Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 06-382 (GMS)

## DEFENDANT ABBOTT LABORATORIES' REPLY
## IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

### PHILLIPS, GOLDMAN & SPENCE, P.A.

John C. Phillips Jr. (#110)
Brian E. Farnan (#4089)
1200 N. Broom Street
Wilmington, DE 19806
Tele: (302) 655-4200
Fax: (302) 655-4210

Lawrence R. Desideri (admitted *pro hac vice*)
Stephanie S. McCallum (admitted *pro hac vice*)
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601
Tele: (312) 558-5600
Fax: (312) 558-5700

*Attorneys for Defendant Abbott Laboratories*

Dated: November 1, 2007

# TABLE OF CONTENTS

I.  INTRODUCTION ............................................................................................... 1

II. ARGUMENT ..................................................................................................... 2

    A.  Plaintiff Has Failed to Demonstrate that Any Genuine Issues of Material Fact Exist With Regard to Plaintiff's Claims Under Chapter 93A of the Massachusetts Consumer Protection Act and Therefore Abbott is Entitled to Judgment as a Matter of Law on Count II of Plaintiff's Complaint ........................... 2

    B.  Plaintiff Has Failed to Demonstrate That Any Genuine Issues of Material Fact Exist With Regard to Plaintiff's Claims Under Section 2532 of the Delaware Deceptive Trade Practices Act and Therefore Abbott is Entitled to Judgment as a Matter of Law on Count III of Plaintiff's Complaint .................................................. 6

    C.  Plaintiff Has Failed to Demonstrate that Any Genuine Issues of Material Fact Exist With Regard to Abbott's Counterclaim for Breach of the Mandatory Forum Selection Clause Contained in Section 7.9 of the Stock Purchase Agreement and Therefore Abbott is Entitled to Judgment as a Matter of Law on its Counterclaim III. ....................................................................................... 9

III. CONCLUSION ................................................................................................. 12

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page**

*Aspinall v. Phillip Morris Cos., Inc.*,
   813 N.E.2d 476 (Mass. 2004)……………………………………………………….     8

*Computer Sales Int'l, Inc. v. Lycos, Inc.*,
   2005 WL 3307507 (D. Mass. Dec. 6, 2005)…………………………………     5

*Cornerstone Brands, Inc. v. O'Steen*,
   2006 WL 2788414 (Del. Ch. 2006)…………………………………………     11

*El Paso Nat'l Gas Co. v. TransAmerican Nat'l Gas Corp.*,
   669 A.2d 36 (Del. 1995)…………………………………………………………..     11

*ePresence, Inc. v. Evolve Software, Inc.*,
   190 F. Supp. 2d 159 (D. Mass. 2002)……………………………………….     2

*Grand Ventures, Inc. v. Whaley*,
   632 A.2d 63 (Del. 1993)………………………………………………………..     7

*Gloucester Holdings Corp. v. U.S. Tape and Sticky Products, LLC*,
   832 A.2d 116 (Del. Ch. 2003)……………………………………………………..     5

*Jacobson v. Mailboxes, Etc.*,
   419 Mass. 572 (1995)………………………………………………………….     4-5

*Laboratory Corp. of Am. v. Upstate Testing Lab., Inc.*,
   967 F. Supp. 295 (N.D. Ill. 1997)……………………………………………     11

*Mead Corp. v. Stevens Cabinets*,
   938 F. Supp. 87 (D. Mass. 1996)………………………………………….     2

*Stagecoach Transportation, Inc. v. Shuttle, Inc.*,
   50 Mass. App. Ct. 812 (2001)……………………………………………….     5

*Trustees of Boston University v. Ligand Pharmaceuticals, Inc.*,
2003 WL 1873839 (D. Del. 2003)……………………………………………………….     2-3, 5

**Statutes and Other Authorities**

Delaware Deceptive Trade Practices Act, 6 <u>Del.</u> <u>C.</u> § 2532………………….     *passim*

Massachusetts Consumer Protection Act, Mass. Gen. Laws. ch. 93A §§ 2, 11…………..     *passim*

## I.    INTRODUCTION

Despite his 20-page recitation of facts, the overwhelming majority of which are not germane to the arguments at issue in Abbott Laboratories' Motion for Summary Judgment, Plaintiff David Friedson nonetheless fails to demonstrate that any genuine issues of material fact exist as to Plaintiff's Count II, Plaintiff's Count III, and Abbott's Counterclaim III. Abbott is, therefore, entitled to judgment as a matter of law as to each Count.

First, Plaintiff erroneously asserts that its claim for unfair and deceptive conduct under Chapter 93A of the Massachusetts Consumer Protection Act ("MCPA") lies in tort and thereby renders Delaware law inapplicable, regardless of the choice-of-law provision found in the Stock Purchase Agreement ("SPA"). Plaintiff's claim under Chapter 93A amounts to nothing more than a basic bad-faith breach of contract claim, which cannot stand in light of the valid and enforceable choice-of-law provision governing disputes arising from the SPA.

Second, Plaintiff's crafty use of catch phrases like "deceptively claimed," "misrepresented," or "false or misleading statements of fact" are insufficient to transform Plaintiff's common law bad-faith breach of contract claim into actionable injury under Section 2532 of the Delaware Deceptive Trade Practices Act ("DTPA"). Because Plaintiff's claims under Section 2532 amount to nothing more than a bad-faith breach of contract claim, even when viewed in the light most favorable to Plaintiff, no facts exist supporting a violation of Section 2532 of the DTPA.

Third, without explanation or factual support, Plaintiff asserts that this action arises out of the Escrow Agreement and, thus, that the permissive forum selection clause contained therein shields Plaintiff from liability for initially filing this lawsuit in Massachusetts state court. Plaintiff, however, is simply wrong. Indeed, the Massachusetts District Court has already rejected Plaintiff's argument in this regard and concluded that the SPA, *not* the Escrow

Agreement, is the operative and controlling agreement. Accordingly, the proper forum in which to file this lawsuit was unquestionably Delaware. Because Plaintiff initially filed this action in Massachusetts state court, no genuine issue of material fact exists to as whether Plaintiff breached the forum selection clause contained in the SPA.

## II.    ARGUMENT

### A.    Plaintiff Has Failed to Demonstrate that Any Genuine Issues of Material Fact Exist With Regard to Plaintiff's Claims Under Chapter 93A of the Massachusetts Consumer Protection Act and Therefore Abbott is Entitled to Judgment as a Matter of Law on Count II of Plaintiff's Complaint

Plaintiff's argument opposing Abbott's motion for summary judgment on Count II for violation of Chapter 93A of the Massachusetts Consumer Protection Act ("MCPA") is based entirely upon the false premise that the facts alleged by Plaintiff in support thereof lie in tort. Massachusetts courts have made it clear that "a choice-of-law clause selecting some state's law to govern 'contract-related' claims precludes a Chapter 93A claim when that claim essentially reduces to a contract claim." *Mead Corp. v. Stevens Cabinets*, 938 F. Supp. 87, 90 (D. Mass. 1996). That is precisely the situation here.

Plaintiff has done nothing more than allege a claim for bad-faith breach of contract dependent upon the construction and interpretation of Sections 7.4(b)(x) and 4.1(f) of the SPA. (*See* D.I. 27, Ex. 1 at ¶¶ 57, 62.) It is well-established, however, that in the context of 93A claims, "[t]he mere fact that [a party] 'acted with a bad motive' does not render [an] Agreement's choice of law provision inapplicable." *ePresence, Inc. v. Evolve Software, Inc.*, 190 F. Supp. 2d 159, 164-65 (D. Mass. 2002). Simply "adding the allegation that [a] defendant acted willfully or knowingly does not transform a simple breach of contract claim into a 93A claim." *Trustees of Boston University v. Ligand Pharmaceuticals, Inc.*, 2003 WL 1873839, *4 (D. Del. 2003). Indeed, "whether a 93A claim should be allowed to proceed [in this context]

2

depends solely on whether the acts alleged to violate 93A arise from within or outside the contract." *Id.* In this case, the facts on which Plaintiff rests his 93A violation arise solely from the terms and construction of the SPA.

In attempting to place his claims outside of the sanctuary of the choice-of-law provision contained in the SPA, which Plaintiff concedes governs disputes arising from the SPA (D.I. 79 at 25), Plaintiff cites a myriad of facts purportedly evidencing the tort-based nature of Plaintiff's claims under Chapter 93A. The facts offered by Plaintiff, however, only confirm that Plaintiff's claims and allegations under Chapter 93A sound in contract rather than tort. For example, Plaintiff argues that Abbott violated Chapter 93A when it unilaterally decided not to sign the August 26, 2003 Sweet Productions agreement ("August 2003 Sweet Extension") and withhold payment of the monies held in escrow. (D.I. 79 at 30.) Plaintiff asserts that Abbott "abused its power *under the SPA*" and therefore engaged in unfair and deceptive tortious conduct under Chapter 93A. (D.I. 79 at 30 (emphasis added).) Although couched in terms of "deceptive conduct," Plaintiff's claim in this regard complains of nothing more than Abbott's alleged bad-faith disregard for its obligations in ratifying the August 2003 Sweet Extension set forth by Section 7.4(b)(x)—*i.e.*, bad-faith breach of Section 7.4(b)(x). In fact, in the sentences preceding his argument, Plaintiff concedes that Section 7.4(b)(x) sets forth the terms by which Baker satisfies Section 7.4(b)(x) in negotiating a new agreement with Sweet Productions and the obligations of Abbott and Zone Perfect related thereto in ratifying that new agreement. (D.I. 79 at 30.) Accordingly, whether, as Plaintiff asserts, Abbott "abused its power *under the SPA*," depends entirely upon the construction and interpretation of terms and conditions of Section 7.4(b)(x) of the SPA. (D.I. 79 at 30 (emphasis added).) In this light, Plaintiff's claims of deceptive conduct under Chapter 93A are clearly based in contract, not tort.

3

Furthermore, even if some of Plaintiff's claims could be construed to sound in tort, the "court looks to the 'predominant claims' and their 'principal focus'" when determining whether a 93A claim is subject to a contract's choice-of-law provision. *Computer Sales Int'l, Inc. v. Lycos, Inc.*, 2005 WL 3307507, at * 2-3 (D. Mass. Dec. 6, 2005). A review of Plaintiff's Complaint clearly demonstrates that the principal focus of Plaintiff's claims is Abbott's alleged bad-faith conduct in violating the terms of the SPA. For example, Plaintiff asserts:

> Abbott has denied that the August Letter complied with and satisfied the *conditions set forth in Section 7.4(b)(x)* in order to improperly assert a claim over the Escrowed Funds, when Abbott was aware that it was not entitled to the sum it has claimed.

(D.I. 27, Ex. 1 at ¶ 57 (emphasis added).)  In this instance, Plaintiff alleges that Abbott acted with a bad motive *under the terms of the Agreement.*  Likewise, Plaintiff asserts:

> Abbott has raised improper and unsubstantiated claims of misrepresentations and omissions from the Financial Statements [in violation of Section 4.1(f)] to intentionally and willfully deprive the Former Stockholders of their proper share of the Escrowed Funds.

(D.I. 27, Ex. 1 at ¶ 62).  Again, Plaintiff alleges that Abbott acted improperly *under the terms of the Agreement.*  Moreover, as noted above, the fact that Plaintiff has alleged that Abbott intentionally and willfully acted with improper motive under the terms of the SPA is not sufficient to transform this contract-based claim into a claim for tortious conduct.  There are simply no facts or allegations that can properly be said to arise *outside* of the SPA.

Furthermore, Plaintiff's reliance of *Jacobson v. Mailboxes, Etc.*, 419 Mass. 572, 580 n.9 (1995), in attempting to parse out the language of the choice-of-law clauses present in the SPA is simply not relevant to the issue at hand and should be disregarded.  In *Jacobson*, the Supreme Judicial Court allowed a 93A claim to proceed in spite of a forum-selection clause because the claim alleged wrongful conduct by the defendant *prior to the formation* of the

contract. *Jacobson*, 419 Mass. at 579-80. In *Stagecoach Transportation, Inc. v. Shuttle, Inc.*, a case following *Jacobson*, the Appeals Court of Massachusetts allowed a 93A claim to proceed in spite of a choice-of-law clause because the claim stemmed from deceitful action *unrelated to the contract* itself. *Stagecoach Transportation, Inc. v. Shuttle, Inc.*, 50 Mass. App. Ct. 812, 818-19 (2001). Courts interpreting these decisions have recognized that these cases "do not alter the fact that whether a 93A claim should be allowed to proceed depends *solely* on whether the acts alleged to violate 93A arise from within or outside the contract," and not on the language of the choice-of-law clause. *Trustees of Boston University v. Ligand Pharmaceuticals, Inc.*, 2003 WL 1873839, at *4 (D. Del. 2003) (emphasis added). In the end, Plaintiff's claims arise solely from within the SPA itself. Therefore, Plaintiff's discussion of the nuance of the language contained in the choice-of-law provisions is simply irrelevant to the issue at hand.

As demonstrated above, Plaintiff's claim under Chapter 93A amounts to nothing more than a claim for bad-faith breach of contract, a claim which depends upon the construction and interpretation of the SPA. Accordingly, no genuine issues of material fact exist with regard to whether Plaintiff's claims under Chapter 93A are based in contract or governed by the contractual choice-of-law provision contained in Section 7.15 of the SPA. As such, Delaware law is the governing law and Plaintiff's claims under the MCPA cannot succeed as a matter of law. *See Gloucester Holdings Corp. v. U.S. Tape and Sticky Products, LLC*, 832 A.2d 116, 124 (Del. Ch. 2003). Thus, Abbott is entitled to summary judgment on Plaintiff's Count II alleging a violation of Chapter 93A of the MCPA.

**B.    Plaintiff Has Failed to Demonstrate That Any Genuine Issues of Material Fact Exist With Regard to Plaintiff's Claims Under Section 2532 of the Delaware Deceptive Trade Practices Act and Therefore Abbott is Entitled to Judgment as a Matter of Law on Count III of Plaintiff's Complaint**

Despite Plaintiff's continued use of catch phrases like "deceptively claimed," "misrepresented," or "made false or misleading statements," Plaintiff has nonetheless failed to present any facts or evidence demonstrating the existence of anything more than a dispute over an alleged bad faith breach of contract, which cannot provide the basis for a violation of Section 2532 of the DTPA, 6 Del. C. § 2532. Because no facts exist supporting a violation under Section 2532 of the DTPA, Abbott is entitled to summary judgment on Plaintiff's Count III.

First, Plaintiff claims that the record raises genuine issues of material fact as to whether Abbott "deceptively claimed and/or misrepresented" that the August 2003 Sweet Extension does not comply with or satisfy Section 7.4(b)(x) of the SPA. (D.I. 79 at 37-38.) To the contrary, the record quite clearly demonstrates that Abbott was neither deceptive nor misrepresentative of its objection to the August 2003 Sweet Extension. (*See* September 30, 2003 Letter from Abbott at 1, attached hereto as Exhibit 1.) In a letter to Christopher Baker dated September 30, 2003, Mark Gorman explicitly informed Baker that Abbott "did not feel the objectives of Section 7.4(b)(x), including, but not limited to, *a price reduction of 2.5 cents per bar*, have been satisfied" by the August 2003 Sweet Extension negotiated by Baker. (Exhibit 1 at 1.) Abbott did not deceive or mislead Plaintiff into believing that it was accepting the August 2003 Sweet Extension when it was not, nor did Abbott deceive or mislead Plaintiff as to why Abbott concluded the August 2003 Sweet Extension did not meet the obligations set forth in Section 7.4(b)(x). In no uncertain terms, Gorman expressly conveyed to Baker that Abbott objected to the August 2003 Sweet Extension for its failure to achieve the price reduction

required by Section 7.4(b)(x).  (*See* Exhibit 1 at 1.)  There was nothing deceptive or misleading about Abbott's actions.

Second, Plaintiff claims that the record demonstrates that Abbott made false or misleading statements to Zone Perfect or created a likelihood of confusion or of misunderstanding concerning the price reduction proposal withdrawn by Sweet Productions. (D.I. 79 at 38.)  Specifically, Plaintiff alleges that Abbott omitted to mention that Abbott's processing requirements, not Sweet Productions' inability to negotiate greater discounts from suppliers, effectively forced Sweet Productions to withdraw its price reduction proposal.  (D.I. 79 at 38.)  However, in a letter dated September 30, 2003, Sweet Productions *itself* expressly informed Ned R. McCoy that it was retracting its price reduction offer "for several reasons," *including* its inability to negotiate greater discounts from suppliers.  (*See* September 30, 2003 from Sweet Productions at 1, attached hereto as Exhibit 2 (emphasis added).)   In its corresponding letter dated September 30, 2003, Abbott parroted back to Baker what Sweet Productions had explicitly conveyed to it on that very day—*i.e.*, that Sweet Productions was retracting its prior price reduction offer due to, *among other things*, its inability to negotiate greater discounts from suppliers.  In this regard, Abbott neither made false or misleading statements nor created a likelihood of confusion concerning Sweet Productions' withdrawal of its previously offered price reduction.  Again, there was nothing deceptive or misleading about Abbott's actions.

Furthermore, even when viewed in the light most favorable to Plaintiff, neither of the facts presented above give rise to liability under Section 2532.  As stated previously, Section 2532 of the DTPA "prohibits unreasonable *interference* with the promotion and conduct of another person's business." *Grand Ventures, Inc. v. Whaley*, 632 A.2d 63, 67 (Del. 1993).  As

Plaintiff himself concedes, "a practice will be deceptive 'if it could reasonably be found to have caused a person to act differently from the way he [or she] otherwise would have acted.'" (D.I. 79 at 27, *quoting Aspinall v. Phillip Morris Cos., Inc.*, 813 N.E.2d 476, 486 (Mass. 2004).) None of the allegedly false, misleading, or deceptive statements made by Abbott interfered with the promotion or conduct of Zone Perfect's business. The allegedly false, misleading, or deceptive statements did not induce Abbott or change the way Abbott would have acted in filing its claim against the escrowed funds or holding the August 2003 Sweet Extension violative of Section 7.4(b)(x); instead, these allegedly false, misleading, or deceptive statements were merely ancillary to action already taken by Abbott. Accordingly, even if the statements alleged by Plaintiff were false, misleading, or deceptive, none of them interfered with or caused injury to Zone Perfect's business, thereby precluding any resulting actionable violation of Section 2532 of the DTPA.

Moreover, the facts alleged by Plaintiff, at best, amount to nothing more than a genuine dispute over an alleged bad-faith breach of contract by Abbott. Although couched in terms of "deceptive claims," "misrepresentations," and "false or misleading statements," all of Plaintiff's claims in support of his Count III center around the justification and intent underlying Abbott's decision to hold the August 2003 Sweet Extension in violation of Section 7.4(b)(x). In fact, Plaintiff himself concedes this point. In his opposition brief, Plaintiff asserts that "the summary judgment record demonstrates that Abbott intentionally left itself the power to determine *whether it would honor* the provision in the SPA . . . ." (D.I. 79 at 37 (emphasis added).) From this statement alone, it is obvious that whether Abbott would "honor" Section 7.4(b)(x) of the SPA provides the factual foundation on which Plaintiff sought to rest his claim for violation of Section 2532 of the DTPA. Accordingly, the dispute over Abbott's alleged

8

common law bad-faith breach of contract does not give rise to any genuine issues of material fact as to whether Abbott engaged in deceptive trade practices in violation of Section 2532 of the DTPA. No set of facts exist demonstrating that Abbott engaged in deceptive or misleading practices in violation of either subparts (11) or (12) of Section 2532 of the DTPA and Abbott is, therefore, entitled to summary judgment on Count III.

**C.    Plaintiff Has Failed to Demonstrate that Any Genuine Issues of Material Fact Exist With Regard to Abbott's Counterclaim for Breach of the Mandatory Forum Selection Clause Contained in Section 7.9 of the Stock Purchase Agreement and Therefore Abbott is Entitled to Judgment as a Matter of Law on its Counterclaim III.**

By mere reference to his arguments contained in previously filed opposition briefs, Plaintiff asserts, without factual support or explanation, that this action arises out of the Escrow Agreement and that the permissive forum selection clause contained therein controls Plaintiff's choice of forum. (D.I. 79 at 39.) Notably, however, this argument has already been rejected by the District of Massachusetts in its review of Plaintiff's previously filed opposition brief, to which Plaintiff directly refers this Court. Further, Plaintiff's blithe and dismissive response here fails to demonstrate that any genuine issues of material fact exist surrounding the application and breach of the SPA's forum selection clause. Abbott is, therefore, entitled to summary judgment on its Counterclaim III.

Plaintiff claims that this action arises out of the Escrow Agreement. (D.I. 79 at 39.) In support thereof, Plaintiff flippantly refers this Court to the arguments contained in its opposition brief to Abbott's motion to dismiss ("motion to dismiss opposition"), which was previously filed with the District of Massachusetts. (D.I. 79 at 39.) In its motion to dismiss opposition, Plaintiff, in essence, argued that because the parties dispute the release of the escrowed funds, Plaintiff's claims relating thereto arise out of the Escrow Agreement. (D.I. 24,

Ex. 19 at 6-7.)  The Massachusetts District Court, however, expressly rejected this argument in deciding Abbott's motion to dismiss.  Specifically, upon studied review of the parties' briefs, the Massachusetts District Court held that **"there is no question but that the availability of the escrow fund to the shareholders depends ultimately on an interpretation of the stockholder—the Stock Purchase Agreement."**  (Mot. to Dismiss Hr'g Tr. at 6:10-13 (emphasis added), attached hereto as Exhibit 3.)  Recognizing this key point, the Massachusetts District Court concluded that this action arose out of the SPA and accordingly enforced the forum selection clause contained in the SPA, resulting in the transfer of this action to Delaware. (Exhibit 3 at 6:5-19, 20:4-10.)

        While this lawsuit admittedly precipitated because of a dispute surrounding the release of the escrowed funds, which necessarily implicates certain mechanical provisions of the Escrow Agreement regarding payment, the crux of Plaintiff's claims—how much, if any, Abbott owes Plaintiff out of the escrowed funds—depends entirely upon the interpretation and application of Section 7.4(b)(x) of the SPA, as the Massachusetts District Court expressly held. (*See* Stock Purchase Agreement ¶¶ 50-53, 57-64, 68-70, 74-75, attached hereto as Exhibit 4.)  As Plaintiff has previously conceded, the Escrow Agreement merely sets forth the procedures that the parties must follow to submit a claim for or objection to the release of the escrowed funds. (*See* D.I. 24, Ex. 19 at 6-7 (noting that the parties followed "those procedures" contained in the Escrow Agreement prior to the institution of this lawsuit).)

        For disputes, such as this one, which center around whether and how much a party is entitled to receive out of the escrowed funds, neither the Court nor any party could turn to the terms of the Escrow Agreement for guidance in resolving this dispute.  (The Escrow Agreement, attached hereto as Exhibit 5.)  The Escrow Agreement contains no provision setting forth the

instances under which a party fails to comply with Section 7.4(b)(x) and thereby becomes entitled to indemnification from the escrowed funds; Section 7.4(b)(x) of the SPA controls such matters. The Escrow Agreement contains no provision calculating the amount of escrowed funds to receive for failing to satisfy the obligations of Section 7.4(b)(x); the indemnification provisions of Section 7.4(b) of the SPA controls such matters. Moreover, the Escrow Agreement explicitly states that the determination of any distribution from the escrowed funds is governed by Section 7.4 of the SPA. (*See* Exhibit 5 ¶ 4.) There is no question, therefore, that this lawsuit arises out of or relates to the SPA.

Because all claims asserted by Plaintiff arise out of and relate to provisions contained within the SPA, Plaintiff was required to bring this action in the District of Delaware pursuant to the forum selection clause contained in Section 7.9 of the SPA. As Plaintiff chose to pursue his claims in Massachusetts state court, Plaintiff has, without question, breached Section 7.9 of the SPA. As a result, Abbott has incurred significant damages and attorneys' fees and expenses. As Plaintiff has failed to put forth any facts or evidence demonstrating that a genuine issue of material fact exists surrounding the enforcement and application of the forum selection clause of the SPA, Abbott is entitled to summary judgment on its breach of contract counterclaim. *See El Paso Nat'l Gas Co. v. TransAm. Nat'l Gas Corp.*, 669 A.2d 36, 40 (Del. 1995) (enforcing provisions of forum selection clause and acknowledging right to recover damages for breach thereof under Delaware law); *Cornerstone Brands, Inc. v. O'Steen*, 2006 WL 2788414, *4 (Del. Ch. Aug. 24, 2006) (same); *Laboratory Corp. of Am. v. Upstate Testing Lab., Inc.*, 967 F. Supp. 295, 299 (N.D. Ill. 1997) (granting summary judgment for movant on its claims for breach of forum selection clause).

## III.    CONCLUSION

For all of the foregoing reasons, Abbott respectfully requests that this Court grant its Motion for Summary Judgment.

Dated:  November 1, 2007                        Respectfully submitted,

ABBOTT LABORATORIES

By: _Brian E. Farnan_____
         One of Its Attorneys

John C. Phillips Jr. (#110)
Brian E. Farnan (#4089)
PHILLIPS GOLDMAN & SPENCE, P.A.
1200 N. Broom Street
Wilmington, DE 19806
Tele: (302) 655-4200
Fax: (302) 655-4210

-and-

Lawrence R. Desideri (admitted *pro hac vice*)
Stephanie S. McCallum (admitted *pro hac vice*)
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois  60601
Tele: (312) 558-5600
Fax: (312) 558-5700

*Attorneys for Defendant Abbott Laboratories*

**Exhibit 1**



## ROSS PRODUCTS DIVISION • ABBOTT LABORATORIES

625 CLEVELAND AVENUE • COLUMBUS, OHIO 43215-1724 • (614) 624-7677

September 30, 2003

Christopher P. Baker
Chief Executive Officer
CP Baker & Co.
303 Congress Street, Suite 301
Boston, MA 02210

Dear Chris:

Unfortunately, we have been unable to enter into an amendment or agreement with Sweet
Productions relating to the price reductions and other terms outlined in Section 7.4(b)(x)
of the Stock Purchase Agreement for ZonePerfect. Sweet Productions withdrew the
August 25th, 2003 proposal referring to their inability "to negotiate greater discounts from
suppliers..." (see letter from Paul Schacher attached).

We do not feel the objectives of Section 7.4(b)(x), including, but not limited to, a price
reduction of 2.5 cents per bar, have been satisfied and Abbott reserves the right to make a
claim for indemnification under such agreement.

We are very disappointed that a greater price reduction could not be achieved, but wanted
to inform you of this situation as soon as possible.

Sincerely,

Mark P. Gorman
Vice President & General Manager
Medical Nutritionals

**Exhibit 2**

# SWEET PRODUCTIONS LTD.

EFINING THE SCIENCE OF NUTRITION"

5100 New Horizons Boulevard • Amityville, New York 11701
Tel: 631-842-0548 • Fax: 631-842-0805 • Toll Free: 800-805-8575
e-mail: sweetsltd@aol.com

Ned R. McCoy                                        September 30, 2003
Director, Business Development
Ross Products Division
Abbott Laboratories
625 Cleveland Avenue
Columbus, OH 43215-1724

VIA FAX: (614) 624-7313

RE: Sweet Productions / ZonePerfect Contract

Dear Ned:

This letter serves as notice that I am retracting our offer for the pricing stated on the
Sweet Productions / ZonePerfect contract dated August 25, 2003 and signed by me on
August 26, 2003.

There are several reasons for our inability to enter a contract at the prices set forth in the
August 25th contract. First, we assumed that we would be able to negotiate greater
discounts from suppliers during September with the promise of increased volumes in the
coming year. However, discounts on raw ingredient volumes greater than we already
have negotiated for this year's 90,000,000 production levels were minimal.

The pricing set forth in the August 25, 2003 contract makes it impossible for Sweet
Productions to generate any profit on some products, negligible profit on others and some
at a loss. It is impossible for us to dedicate more production to ZonePerfect products
without having minimal profitability on the product lines.

After an intense review of our cost structure, negotiations with our vendors, and
including anticipated cost cutting and production improvements in the coming year, we
have been able to create a weighted average reduction from the original contract price of
$0.0125. The attached table indicates the prices that we are able to offer by product.

This should enable us to finalize a contract. I look forward to working with you.

Very truly yours,

Paul Schacher

enclosure

ZonePerfect Nutrition Bar Flavor Unit Analysis - Sweet Productions
July 1, 2002-June30, 2003

| Product Name | % of ZPN Units | SP Price at 90 MM units Old | New | Difference | DIF x % |
|---|---|---|---|---|---|
| 01063 CHOCOLATE PEANUT BUTTER BAR | 26.40% | 0.4288 | 0.4068 | 0.022 | 0.0058 |
| 01061 FUDGE GRAHAM BAR | 25.10% | 0.4188 | 0.3938 | 0.025 | 0.0063 |
| 01004 STRAWBERRY YOGURT BAR | 12.10% | 0.4088 | 0.3988 | 0.010 | 0.0012 |
| 01035 CHOCOLATE MINT | 13.10% | 0.3738 | 0.3488 | 0.025 | 0.0033 |
| 01104 CHOCOLATE RASPBERRY BAR | 5.60% | 0.4088 | 0.3988 | 0.010 | 0.0006 |
| 01005 APPLE CINNAMON CRUNCH BAR | 5.90% | 0.3786 | 0.3538 | 0.025 | 0.0015 |
| 01036 LEMON YOGURT | 6.90% | 0.3988 | 0.3688 | 0.030 | 0.0021 |
| 01062 BLUEBERRY YOGURT BAR | 3.70% | 0.4236 | 0.3886 | 0.035 | 0.0013 |
| 01129 CHOCOLATE VANILLA CREME BAR | 0.00% | | | | |
| 01128 CHOCOLATE CARAMEL CLUSTER BAR | 0.00% | | | | |
| 01127 DOUBLE CHOCOLATE BAR | 0.00% | | | | |
| 01001 HONEY PEANUT BAR | 0.20% | | | | |
| 01126 CARAMEL APPLE BAR | 0.00% | | | | |
| 01125 PEACH YOGURT BAR | 1.00% | 0.4888 | 0.4538 | 0.035 | 0.0004 |
| | | | | | |
| Total Bar Gross Sales | 100.00% | | | | 0.0223 |

| Weighted Average | 0.0223 |
|---|---|
| Percentage of .025 | 89.1% |

| SP REVISED - 9/30/03 Product Name | % of ZPN Units | SP Price at 90 MM units Old | New | Difference | DIF x % |
|---|---|---|---|---|---|
| 01063 CHOCOLATE PEANUT BUTTER BAR | 26.40% | 0.4288 | 0.4220 | 0.007 | 0.0017 |
| 01061 FUDGE GRAHAM BAR | 25.10% | 0.4188 | 0.4022 | 0.016 | 0.0041 |
| 01004 STRAWBERRY YOGURT BAR | 12.10% | 0.4088 | 0.4075 | 0.001 | 0.0001 |
| 01035 CHOCOLATE MINT | 13.10% | 0.3736 | 0.3500 | 0.024 | 0.0031 |
| 01104 CHOCOLATE RASPBERRY BAR | 5.60% | 0.4086 | 0.4025 | 0.006 | 0.0003 |
| 01005 APPLE CINNAMON CRUNCH BAR | 5.90% | 0.3786 | 0.3726 | 0.006 | 0.0004 |
| 01036 LEMON YOGURT | 6.90% | 0.3986 | 0.3800 | 0.019 | 0.0013 |
| 01062 BLUEBERRY YOGURT BAR | 3.70% | 0.4236 | 0.3925 | 0.031 | 0.0012 |
| 01129 CHOCOLATE VANILLA CREME BAR | 0.00% | | | | |
| 01128 CHOCOLATE CARAMEL CLUSTER BAR | 0.00% | | | | |
| 01127 DOUBLE CHOCOLATE BAR | 0.00% | | | | |
| 01001 HONEY PEANUT BAR | 0.20% | | | | |
| 01126 CARAMEL APPLE BAR | 0.00% | | | | |
| 01125 PEACH YOGURT BAR | 1.00% | 0.4886 | 0.4575 | 0.031 | 0.0003 |
| | | | | | |
| Total Bar Gross Sales | 100.00% | | | | 0.0125 |

| Weighted Average | 0.0125 |
|---|---|
| Percentage of .025 | 50.1% |

**Exhibit 3**

COPY

1

UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

DAVID FRIEDSON, as Stockholders'      )
Representative of the former          )
Stockholders of the ZONEPERFECT       )
NUTRITIONAL COMPANY,                  )
                                      )
            Plaintiffs,               )
                                      )
vs.                                   )
                                      )  Civil Action No.
                                      )  06-10057-RWZ
ABBOTT LABORATORIES, an Illinois      )
corporation, WELLS FARGO BANK         )
MINNESOTA, a Minnesota corporate      )
trust, and SWEET PRODUCTIONS LTD.,    )
a New York corporation,               )
                                      )
            Defendants.               )


**MOTION TO REMAND**
**MOTION TO DISMISS**


BEFORE THE HONORABLE RYA W. ZOBEL
UNITED STATES DISTRICT COURT JUDGE


United States District Court
John J. Moakley U.S. Courthouse
1 Courthouse Way
Boston, Massachusetts 02210
June 7, 2006
2:22 p.m.

* * * * *

CATHERINE A. HANDEL, CM
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way, Room 5205
Boston, MA 02210
(617) 261-0555

```
 1

 2  APPEARANCES:

 3  For the Plaintiffs:
    RUBIN & RUDMAN, LLP
 4  (by Gerald J. Caruso, Esq.)
    50 Rowes Wharf
 5  Boston, MA 02110

 6

 7  For the Defendant Abbott Laboratories:
    DONNELLY, CONROY & GELHAAR, LLP
 8  (by Michael S. D'Orsi, Esq.)
    One Beacon Street
 9  33rd Floor
    Boston, MA 02108
10
    - and -
11
    WINSTON & STRAWN LLP
12  (by Lawrence R. Desideri, Esq.)
    35 West Wacker Drive
13  Chicago, IL 60601-9703

14
    For the Defendant Sweet Productions Ltd.:
15  BURNS & LEVINSON LLP
    (by Jeffrey R. Martin, Esq.)
16  125 Summer Street
    Boston, MA 02110
17
    -and-
18
    THE PASCARELLA LAW FIRM, PLLC
19  (by James A. Pascarella, Esq.)
    1551 Franklin Avenue
20  Mineola, NY 11501

21
    For the Defendant Wells Fargo Bank:
22  EDWARDS ANGELL PALMER & DODGE, LLP
    (by Scott R. Magee, Esq.)
23  111 Huntington Avenue
    Boston, MA 02199
24

25
```

```
 1                P R O C E E D I N G S
 2                (The following proceedings were held in open court
 3      before the Honorable Rya W. Zobel, United States District
 4      Judge, United States District Court, District of Massachusetts,
 5      at the John J. Moakley United States Courthouse, 1 Courthouse
 6      Way, Boston, Massachusetts, on June 7, 2006.)
 7                THE COURT:  Who is here for the plaintiff?
 8                MR. CARUSO:  Your Honor, my name is Gerald Caruso.
 9      I'm here representing the plaintiff.
10                THE COURT:  And for Abbott?
11                MR. DESIDERI:  Lawrence Desideri, your Honor.
12                MR. D'ORSI:  Michael D'Orsi, your Honor.
13                THE COURT:  Also for Abbott?
14                MR. D'ORSI:  Also for Abbott.
15                THE COURT:  Michael D'Orsi, did you say?
16                MR. D'ORSI:  Yes.
17                THE COURT:  And for Wells Fargo?
18                MR. MAGEE:  Scott Magee of Edwards Angell Palmer &
19      Dodge.
20                THE COURT:  And Sweet Productions is not
21      represented?
22                MR. MARTIN:  Your Honor, I apologize.  We are
23      represented.  I'm Jeffrey Martin from Burns & Levinson, local
24      counsel, and Sweet has its counsel from New York here, James
25      Pascarella.
```

```
 1                 THE COURT:  I'm sorry, your last name?
 2                 MR. MARTIN:  Martin, M-a-r-t-i-n, and then
 3       Pascarella, P-a-c-a-r-e-l-l-a.
 4                 THE COURT:  And Mr. Pascarella's first name?
 5                 MR. PASCARELLA:  James.
 6                 THE COURT:  Does the plaintiff seek a ruling in
 7       this lawsuit that the August letter to Sweet -- which was
 8       signed by Sweet, nobody else, binds Sweet?
 9                 MR. CARUSO:  Yes, your Honor, I do seek that
10       ruling.  The plaintiff does.
11                 THE COURT:  Do you have standing to seek such a
12       ruling?
13                 MR. CARUSO:  Sure, your Honor.
14                 THE COURT:  How?
15                 MR. CARUSO:  Well, the letter was necessary for
16       the shareholders to obtain $10 million of the purchase price
17       that --
18                 THE COURT:  Yes.  But how can the shareholders
19       enforce a contract like that or what purports to be a contract?
20                 MR. CARUSO:  Well, that's the question, isn't it?
21       What is it, your Honor?  Does it purport to be a contract?
22       They would say it's a proposed contract.  Our guys and our
23       shareholders say it is a contract.  And Sweet may say something
24       else once we hear from them.  We don't know what the facts are
25       at this circumstance, and I think the shareholders are entitled
```

```
 1    to a declaration as to precisely what the legal character of

 2    that August 26th letter is.

 3              THE COURT:  This purports to be a contract between

 4    Zone and Sweet, right?

 5              MR. CARUSO:  Yes.  In our --

 6              THE COURT:  And you're the shareholder of -- former

 7    shareholder of Zone?

 8              MR. CARUSO:  At the time the contract was executed

 9    by Sweet, we owned ZonePerfect and we controlled ZonePerfect.

10              THE COURT:  What do you mean, "controlled"?

11              MR. CARUSO:  Well, Christopher Baker --

12              THE COURT:  You were a shareholder?

13              MR. CARUSO:  Christopher Baker was the officer of

14    ZonePerfect who negotiated that contract and he has the

15    authority to execute it.

16              THE COURT:  Yes, but he's not a plaintiff.

17              MR. CARUSO:  Well, he's not a plaintiff because

18    Friedson acts as a representative under 6.2 of the Stock

19    Purchase Agreement for all the shareholders and is substituted

20    for them as attorney-in-fact and has a right to litigate these

21    claims for all the shareholders.

22              THE COURT:  Let me ask, the matter -- I understand

23    that the matters before me are the plaintiff's motion to remand

24    to the state court.

25              MR. CARUSO:  Yes.
```

```
 1                THE COURT:  And the defendant's motion to dismiss,
 2     which I assume can be transferred -- can be turned into a
 3     transfer to Delaware.
 4                MR. CARUSO:  Yes.
 5                THE COURT:  There is no question, is there, but
 6     that the Stock Purchase Agreement has a Mandatory Forum
 7     Selection Clause, correct?
 8                MR. CARUSO:  That's right, the Stock Purchase
 9     Agreement does.
10                THE COURT:  And there is no question but that the
11     availability of the escrow fund to the shareholders depends
12     ultimately on an interpretation of the stockholder -- the Stock
13     Purchase Agreement?
14                MR. CARUSO:  Ultimately, probably -- yes, that's
15     true.
16                THE COURT:  So, I don't understand why the
17     Mandatory Forum Selection Clause wouldn't govern this case
18     since it implicates the Stock Purchase Agreement as well as the
19     Escrow Agreement.
20                MR. CARUSO:  Well, the -- and that's because it
21     has its own Forum Selection Clause, your Honor, and they treat
22     it --
23                THE COURT:  So, we have a piece of this goes to
24     Delaware and a piece of it stays here?
25                MR. CARUSO:  Yes, that's how they wrote it.  That's
```

```
 1    how they wrote the agreement.  Some claims get litigated under
 2    the strict adherence to -- or the strict compulsory Forum
 3    Selection Clause in the Stock Purchase Agreement.  Some claims
 4    get litigated under the Escrow Agreement.
 5                 THE COURT:  Why would you want to do that?
 6                 MR. CARUSO:  I don't know, but that's the way they
 7    did it.  They did it --
 8                 THE COURT:  No, but we can agree to go to
 9    Delaware.  You don't have to make a fight about it.
10                 You know, if I sent the case back to the state
11    court, the same questions that are here now are going to arise
12    in the state court, with the almost inevitable result that the
13    case will be dismissed because that court doesn't have the
14    power to send it to Delaware.
15                 MR. CARUSO:  But, your Honor, I think that --
16                 THE COURT:  So, why keep litigating all of this
17    stuff?  You're the plaintiff.  You want money.  You don't want
18    litigation.
19                 MR. CARUSO:  I agree that I want the money and that
20    I want it as quickly as possible, but I also would like to keep
21    the litigation in Massachusetts, and I --
22                 THE COURT:  You may not be able to do both.
23                 MR. CARUSO:  I think if you look at the structure
24    of this transaction, you will see that there are claims set
25    forth in the Stock Purchase Agreement, Section 7.4, that need
```

```
 1    to be litigated in Delaware.  Then there are escrow claims.
 2    Let's call them claims --
 3              THE COURT:  Yes, but the escrow claims depend, in
 4    part, on 7.4.  I mean, this is an inter-related bunch of
 5    questions.
 6              MR. CARUSO:  Only in this case.
 7              When you're dealing with the escrow funds, for
 8    whatever reason, the parties decided that the escrow funds
 9    could be litigated in Delaware, but they need not be litigated
10    in Delaware, and I can think of a few reasons why they might
11    have wanted that, and one of them was Wells Fargo was a party
12    to the Escrow Agreement.
13              THE COURT:  Well, if the escrow part of it is to
14    stay here and the Stock Purchase Agreement is to go there, it's
15    not at all clear to me why Sweet is in the case.
16              MR. CARUSO:  Well --
17              THE COURT:  I mean, if this is the only the escrow
18    piece of it, then Sweet is out of this piece of it.  I mean, as
19    a practical matter -- Mr. Caruso, right?
20              MR. CARUSO:  Yes, your Honor.
21              THE COURT:  -- it simply doesn't make sense to
22    divvy up the case like that.
23              MR. CARUSO:  I don't think we would be divvying up
24    the case because I think the -- the rights that we are seeking
25    to enforce under Section 7.4(b)(x), which was the provision
```

1    that said if you get the price reduction from Sweet, we'll give

2    you $10 million, we'll release $10 million from the escrow.

3    That provision is an exclusive remedy under the contract, and

4    it is --

5             THE COURT:  Whose remedy?

6             MR. CARUSO:  What?

7             THE COURT:  Whose remedy?

8             MR. CARUSO:  Mine.  The Friedson's remedy.  That's

9    the only remedy that the stockholders can have under the

10   contract for a -- it's both ours, actually.  It's both Abbott's

11   and Friedson's.

12            The Stock Purchase Agreement says that the remedies

13   under that provision are limited to -- let me read it, so I'm

14   not misquoting it.  "The parties acknowledge and agree that

15   damages for the purposes of this Section 7.4(b)(x) shall be

16   limited to the amount, if any, required to be paid shareholders

17   pursuant to the immediate prior sentence, which is the weighted

18   average price formula, in accordance with the formula set forth

19   above, and Sections 7.4(d) and 7.4(e) shall not be applicable

20   to the indemnification required."

21            Now, what that says to me, your Honor, is the

22   remedy for this -- whether or not we breach that letter is

23   contained in the -- as part of the escrow funds.  So, Abbott

24   makes a claim against the escrow funds for everything -- well,

25   up to $4.9 million, and we're fighting over whether or not

```
 1    they're entitled to that escrow money.

 2            Now, the escrow money -- the Escrow Agreement says

 3    that we may go into Delaware to litigate that issue and --

 4            THE COURT:  Well, I understand all that.  I'm not

 5    quarreling about what the agreement says.

 6            As I said, to begin with, I understood that the

 7    Stock Purchase Agreement has a Mandatory Forum Selection

 8    Clause.  The Escrow Agreement has one that is less mandatory.

 9    I understand that.

10            MR. CARUSO:  And when I answered you on the

11    Mandatory Forum Selection Clause in the Stock Purchase

12    Agreement, what I was really saying to you is that Stock

13    Purchase Agreement Forum Selection Clause is mandatory for

14    certain claims under the SPA.  For example, the covenant not to

15    compete, that you would have to litigate in Delaware, but other

16    claims, escrow fund claims, they can be litigated anywhere

17    because they're governed by the Escrow Agreement.

18            And does it make sense to me why the parties chose

19    that?  Not really, but if they want --

20            THE COURT:  Well, if it doesn't make sense, why not

21    work around it?

22            MR. CARUSO:  Well, why -- I know I have

23    jurisdiction over Sweet in the Massachusetts courts.  I don't

24    know whether I'll have jurisdiction over Sweet in Delaware.

25    That may have been one of the reasons why the shareholders --
```

```
 1                    THE COURT:  I don't understand that.  If you have
 2       jurisdiction here and I send it to Delaware, you're not going
 3       to get dismissed for lack of jurisdiction --
 4                    MR. CARUSO:  Well, personal --
 5                    THE COURT:  -- because they asked to go there.
 6                    MR. CARUSO:  Personal jurisdiction --
 7                    THE COURT:  But if they ask to go there, they
 8       waived their -- any objection to personal jurisdiction.
 9                    MR. CARUSO:  Well, I'm not sure if Sweet has asked
10       to go there, your Honor.  I think --
11                    THE COURT:  We can find out, can't we?
12                    MR. CARUSO:  Yes, I think we should find out before
13       we do that.  That would be something --
14                    THE COURT:  Let me talk to the defendants, then.
15                    MR. CARUSO:  Sure.
16                    THE COURT:  If the case gets transferred, does
17       Sweet propose to waive -- object to personal jurisdiction or
18       waive it?
19                    MR. PASCARELLA:  Your Honor, first I'd like to
20       apologize for not filing an appearance, not making our motion
21       yet, although we have it ready to submit for pro hac vice
22       admission.
23                    THE COURT:  It's okay.
24                    MR. PASCARELLA:  I appreciate the Court giving me
25       an opportunity to speak.
```

```
 1                  To put it delicately, my clients have instructed me
 2       to be fiscally conservative, so to speak, so that I'm not
 3       incurring expense if I don't have to, and our feeling is Sweet
 4       should not be in this case at all, and I think that Abbott
 5       agrees because they've said it in at least six to eight
 6       different ways in their papers.
 7                  Strangely enough, I think that the plaintiff agrees
 8       by some of the statements that they made, too.  And so --
 9                  THE COURT:  Is it agreeable to Sweet to agree to
10       cooperate with discovery of Sweet --
11                  MR. PASCARELLA:  Sure.
12                  THE COURT:  -- if Sweet gets out?  Because the
13       ultimate issue, really, is whether they -- whether Abbott or
14       the escrow agent has to pay out the money.
15                  MR. PASCARELLA:  Sure, your Honor.  In fact, I've
16       told both counsel that Sweet is a witness and will be a
17       cooperative witness.  That's what Sweet's position is in this
18       case, simply a witness.  It should not be a party defendant,
19       and I don't think --
20                  THE COURT:  Let me ask Mr. Caruso.
21                  If there is an agreement to cooperate by Sweet to
22       cooperate in the discovery, then you don't need them, do you?
23       Because you can get a full remedy from the escrow fund once you
24       showed that that agreement is an enforceable agreement.
25                  MR. CARUSO:  Well, that gives me a substantial
```

1    piece of the relief that I was hoping to get by keeping it in

2    Massachusetts, but, your Honor, I don't --

3              THE COURT:  It doesn't have to stay in

4    Massachusetts for that.

5              MR. CARUSO:  Your Honor --

6              THE COURT:  Not that I wouldn't love to have it.

7              MR. CARUSO:  I think once we decide -- you know as

8    well as I that under the declaratory judgment statute in the

9    federal court and state court precedent further relief is

10   always permissible once the status of the parties is determined

11   by the Court.  So, once I know the facts -- Abbott has been

12   very secretive about why it didn't sign that agreement or

13   didn't let ZonePerfect sign the agreement.  They draw some

14   pretty interesting inferences from the complaint, which just

15   aren't supported by the complaint and just aren't true.

16             I don't know what the facts are.  The shareholders

17   don't know what the facts are.  So, it could be that Sweet has

18   some liability to the shareholders and we don't even know about

19   it.  It could be that Abbott could decide that --

20             THE COURT:  How can they have more liability that

21   has to do with the -- with a reduction in price?

22             MR. CARUSO:  Well, the shareholders --

23             THE COURT:  I mean, that's all this has to do

24   with.  It's essentially an agreement between the plaintiff and

25   Abbott.

```
 1              MR. CARUSO:  Well, it was also an agreement where
 2    Sweet had agreed to a certain price reduction, which would have
 3    resulted in the shareholders getting that $10 million.  We
 4    don't know why Sweet -- Sweet withdrew the agreement almost 30
 5    days after it was signed.  We don't know why.  We don't know
 6    why Abbott wouldn't have it signed right away.  They say that
 7    it was because Baker was supposed to get it in a different
 8    form.  Well, that's not supported by anything in the record or
 9    the complaint.
10              THE COURT:  All right.  Well, so far there isn't
11    much of a record.
12              MR. CARUSO:  Yes, that's right.
13              THE COURT:  Mr. Desideri?
14              MR. DESIDERI:  No.
15              MR. D'ORSI:  Yes, your Honor.  A few points.
16              First with respect to something that may turn up
17    against Sweet.  Your Honor, I believe that the Court should
18    examine the remand motion based on the pleadings that were
19    filed and under those pleadings, there is no basis for
20    liability to the plaintiff on behalf of Sweet.  It is not a
21    party to any contract with Sweet.  It does not allege a cause
22    of action against Sweet, and as we set forth in our papers,
23    there is no actual controversy between the plaintiff and Sweet
24    in this action.  In a similarly very closely related
25    doctrines --
```

1           THE COURT:  I don't have a motion to dismiss by

2    Sweet, do I?

3           MR. D'ORSI:  Pardon?

4           THE COURT:  There's no motion by Sweet to dismiss.

5    There's a motion by Abbott to dismiss, but Sweet hasn't sought

6    to get out yet.

7           MR. D'ORSI:  No, but the plaintiff is seeking to

8    remand, and we are claiming they are not properly joined here

9    because there is no valid of cause action by the plaintiff

10   against Sweet.  So, there's no contract and there's no

11   relationship, and under the caselaw that we cite, not only is

12   there no actual case in controversy, as your Honor has

13   identified, there is no standing.  The closely related

14   doctrines -- they're almost actually the same.  If you read the

15   cases, it's hard to figure out exactly what the differences

16   are.  The courts always say they're very similar, but this is

17   the same concept.

18           If there is a contract or if there isn't between

19   Abbott and Sweet -- Abbott believes there isn't, but whether

20   there is or isn't, the plaintiff certainly isn't in a position

21   to obtain declaratory judgment, whether there is or isn't,

22   because it isn't a party to that agreement.

23           Abbott would respectfully submit, your Honor, with

24   respect to the -- the Forum Selection Clause issue, we believe

25   that the mandatory Shareholder Purchase Agreement  -- that that

1    clause governs.  We believe that a review of the plaintiff's

2    actual complaint and actual claims in this case -- what they

3    allege is that Abbott has failed to comply with Section

4    7.4(b)(x), Section 7.4(e), and Section 4.1(f) of the

5    Shareholder Purchase Agreement.  Each and every count of their

6    complaint is premised upon the rights and liabilities arising

7    out of those sections, and its prayer for relief seeks relief

8    with respect to specifically those sections.

9            Now, we don't believe, your Honor, there is any

10    escrow case, nor is there any dispute under the Escrow

11    Agreement, and here's why we believe that:

12            The Escrow Agreement is referenced in the complaint

13    and, indeed, the funds are being held in escrow, but none of

14    the claims in this complaint are brought under or deal with the

15    Escrow Agreement.  For example, there is no dispute as to the

16    meaning of the Escrow Agreement in this case, and there's no

17    allegation that Abbott has ever breached the Escrow Agreement

18    in any way.

19            In other words, the Shareholder Purchase Agreement

20    defines whether Abbott owes the money or not, and the Escrow

21    Agreement provides the mechanics for payment, but there has

22    never been any dispute over how those mechanics apply or

23    whether Abbott has or has not failed to comply with those

24    provisions.  The whole dispute is under the Shareholder

25    Purchase Agreement.

1          In fact, your Honor, other than referencing the

2      Escrow Agreement, the plaintiffs don't refer to a single

3      provision in their complaint of the Escrow Agreement, much less

4      allege that Abbott has somehow breached that.

5          In fact, the plaintiffs' claims in this case would

6      be no different and it would still have the same rights if

7      rather than attaching the Escrow Agreement, they just mentioned

8      that the funds are in escrow somewhere.  So, they are not

9      really seeking to enforce anything under the Escrow Agreement

10     because there's no dispute under the Escrow Agreement.

11         Accordingly, your Honor, we believe that the

12     Shareholder Purchase Agreement's Mandatory Forum Selection

13     Clause is the only one that's applicable here, and under that

14     clause, the entire case should be dismissed, and venue is

15     properly in Delaware.

16         THE COURT:  Well, why shouldn't I transfer it

17     rather than dismiss it?

18         MR. D'ORSI:  Because the weight of authority in the

19     First Circuit is that the proper remedy is dismissal.

20         THE COURT:  I didn't know that.  I usually transfer

21     instead of dismissing.

22         MR. D'ORSI:  In this situation, your Honor, I'm

23     almost -- your Honor, I've reviewed all the caselaw --

24         THE COURT:  Your 12(b)(6) motion is premised on

25     lack of jurisdiction because there's not adequate diversity, or

```
 1    what?
 2              MR. D'ORSI:  No.  12(b)(6) was brought because they
 3    have violated the Forum Selection Clause.  And under the First
 4    Circuit cases we cite in our brief, they say under those -- the
 5    First Circuit holds in that situation, that the proper -- it
 6    says the Court can transfer, I believe, but they say that the
 7    proper remedy is dismissal.  If your Honor is asking me --
 8              THE COURT:  All that means is that the courts
 9    collect another filing fee.
10              MR. D'ORSI:  If you're asking me whether I believe
11    that to be a hugely significant or practical distinction, your
12    Honor, the answer is no.
13              THE COURT:  Does the bank want to be heard?
14              MR. MAGEE:  Wells Fargo really has no position on
15    the merits of this, your Honor.  We just know that under the
16    Escrow Agreement, we're obligated to disperse the accounts
17    according to whatever this Court or whatever court has
18    jurisdiction decides.  So, we've offered to stipulate that
19    we'll do that if any -- at another time, but apart from that,
20    we have no merits.
21              THE COURT:  Anything else, Mr. Caruso?
22              MR. CARUSO:  Are you going to -- do you want me to
23    talk about the 93A motion to dismiss directed at the 93A?
24              THE COURT:  No.
25              MR. CARUSO:  No.  You're just talking about the
```

```
 1    Forum Selection Clause.
 2              THE COURT:  Right.  There is a claim under the
 3    Delaware motion as well.  So, I'm not sure what difference it
 4    makes.
 5              MR. CARUSO:  No.  I said my piece, your Honor.
 6              THE COURT:  Mr. Pascarella, anything else?
 7              MR. PASCARELLA:  No, your Honor.
 8              THE COURT:  No, I didn't mean for me.  I just --
 9              MR. PASCARELLA:  Okay.
10              THE COURT:  I just wanted to finish with him before
11    I got to you.
12              MR. PASCARELLA:  Okay.  You know what it is, your
13    Honor?  I'm not used to not taking an active part in filing
14    motions and so, perhaps, I am --
15              THE COURT:  So don't.
16              MR. PASCARELLA:  -- overly apologetic about that,
17    but what I wanted to point out was the Abbott arguments
18    regarding the diversity argument were basically the arguments
19    we would make.
20              THE COURT:  Okay.
21              MR. PASCARELLA:  And if the case stays here, I
22    don't think we can stay in because there wouldn't be
23    diversity.  If the case goes to the Federal District Court in
24    Delaware, I don't think we can be in for the same reasons.  So,
25    I would ask your Honor, most respectfully, to dismiss against
```

```
 1   us.  It's only if the case goes to the state court that we
 2   would have a situation where we'll have to probably make active
 3   motions to get out.
 4              THE COURT:  It seems to me that the case belongs to
 5   Delaware and not here and not in the state court.  The
 6   operative agreement is the Stock Purchase Agreement.  It has a
 7   Forum Selection Clause that says the District Court in
 8   Delaware.  So, it doesn't make sense to me to dismiss, only to
 9   have the plaintiff start it up again in Delaware.  So, I'm
10   going to transfer it.
11              With respect to Sweet, I do not believe that this
12   plaintiff has standing to enforce an agreement between Sweet
13   and Zone and the successor of Zone, Abbott.
14              Moreover, I do believe that Sweet's presence does
15   destroy diversity.  So, I will dismiss Sweet from the case, and
16   transfer the rest of it to the District Court in Delaware.
17              Thank you all.  And the motion to remand is denied,
18   and the escrow agent can file its -- whatever -- its assurance
19   that the money will be there, if and when it is decided --
20              MR. MAGEE:  Along with the motion to dismiss, if
21   appropriate, because there are no claims really against Wells
22   Fargo?
23              THE COURT:  Well, once you file whatever assurance
24   you're going to file, then I'll let the Delaware court decide
25   how to deal with you.  It's not before me at the moment.  So,
```

```
 1    I'm not going to --

 2              MR. MAGEE:  Thank you, your Honor.

 3              THE COURT:  Thank you.

 4              MR. CARUSO:  Thank you, your Honor.

 5              MR. D'ORSI:  Thank you, your Honor.

 6              (Adjourned, 2:47 p.m.)

 7

 8

 9                     CERTIFICATE

10         I, Catherine A. Handel, Official Court Reporter of

11    the United States District Court, do hereby certify that the

12    foregoing transcript, from Page 1 to Page 21, constitutes to

13    the best of my skill and ability a true and accurate

14    transcription of my stenotype notes taken in the matter of

15    Civil No. 06-10057-RWZ, David Friedson, et al. vs. Abbott

16    Laboratories, et al.

17

18

19    1-3-07
      _____         _____
20    Date                               Catherine A. Handel, RPR-CM

21

22

23

24

25
```

**Exhibit 4**

EXECUTION COPY

STOCK PURCHASE AGREEMENT

among

ZONEPERFECT NUTRITION COMPANY,

ABBOTT LABORATORIES

and

THE SHAREHOLDERS OF ZONEPERFECT NUTRITION
COMPANY NAMED HEREIN

009737.16 01

<u>TABLE OF CONTENTS</u>

<u>Page</u>

ARTICLE I DEFINITIONS .................................................................................................1
    1.1.    Definitions.........................................................................................................1

ARTICLE II PURCHASE AND SALE OF THE SHARES; CLOSING ..........................5
    2.1.    Purchase and Sale of the Shares..................................................................5
    2.2.    Purchase Price...............................................................................................5
    2.3.    Closing............................................................................................................5
    2.4.    Closing Obligations. ......................................................................................6
    2.5.    Escrow.............................................................................................................6

ARTICLE III CONDITIONS TO CLOSING .....................................................................7
    3.1.    Conditions to the Obligations of Buyer and the Shareholders....................7
    3.2.    Conditions to the Obligations of Buyer. .......................................................7
    3.3.    Conditions to the Obligations of the Shareholders ......................................9

ARTICLE IV REPRESENTATIONS AND WARRANTIES ..........................................11
    4.1.    Representations and Warranties of the Company.......................................11
    4.2.    Representations and Warranties of the Shareholders................................23
    4.3.    Representations and Warranties of Buyer ................................................ 24

ARTICLE V COVENANTS..............................................................................................26
    5.1.    Covenants of the Company .........................................................................26
    5.2.    Covenants of Buyer.....................................................................................30
    5.3.    Mutual Covenants .......................................................................................32
    5.4.    Shareholder Confidentiality.........................................................................34
    5.5.    Shareholder Non-Competition.....................................................................35
    5.6.    Solicitations of Employees..........................................................................37
    5.7.    No Negotiation .............................................................................................37
    5.8.    Guaranties....................................................................................................37
    5.9.    Brand Development Promotions ..................................................................38
    5.10.    Disclosure of Formulations.........................................................................38
    5.11.    Bonus Letter Agreements............................................................................38

ARTICLE VI OTHER AGREEMENTS ...........................................................................38
    6.1.    Certain Understandings...............................................................................38
    6.2.    Shareholders' Representative.....................................................................39

ARTICLE VII MISCELLANEOUS ............................................................................... 41

| | | |
|---|---|---|
| 7.1. | Assignment. | 41 |
| 7.2 | No Third-Party Beneficiaries. | 41 |
| 7.3. | Termination. | 41 |
| 7.4. | Survival of Representations, Warranties and Covenants | 42 |
| 7.5 | Expenses. | 51 |
| 7.6. | Amendments. | 51 |
| 7.7. | Notices. | 51 |
| 7.8 | Fees. | 53 |
| 7.9. | Consent to Jurisdiction. | 53 |
| 7.10. | Severability. | 53 |
| 7.11. | Interpretation. | 53 |
| 7.12. | Waiver. | 53 |
| 7.13. | Counterparts. | 54 |
| 7.14. | Entire Agreement. | 54 |
| 7.15. | Governing Law. | 54 |

## LIST OF EXHIBITS AND SCHEDULES

| | | |
|---|---|---|
| Schedule | 4.1(a) | Organization and Standing of the Company |
| Schedule | 4.1(c)(i) | Company No Conflict |
| Schedule | 4.1(c)(ii) | Buyer No Conflict |
| Schedule | 4.1(d) | Capital Structure of the Company |
| Schedule | 4.1(f) | Financial Statements |
| Schedule | 4.1(g) | Absence of Changes or Events |
| Schedule | 4.1(h) | Undisclosed Liabilities |
| Schedule | 4.1(i) | Taxes |
| Schedule | 4.1(j)(i) | Encumbrances on Properties |
| Schedule | 4.1(j)(iii) | Leases |
| Schedule | 4.1(j)(iv) | Assets |
| Schedule | 4.1(k)(i) | Intellectual Property |
| Schedule | 4.1(k)(ii) | Intellectual Property Claims |
| Schedule | 4.1(k)(iii) | Infringement Claims |
| Schedule | 4.1(l) | Contracts |
| Schedule | 4.1(m) | Litigation; Decrees |
| Schedule | 4.1(n) | Insurance |
| Schedule | 4.1(o) | Benefit Plans |
| Schedule | 4.1(p) | Compliance with Applicable Laws |
| Schedule | 4.1(q) | Licenses; Permits |
| Schedule | 4.1(r) | Environmental Matters |
| Schedule | 4.1(s) | Employee and Labor Matters |
| Schedule | 4.1(u) | Assets |
| Schedule | 4.1(w) | Affiliate Transactions |
| Schedule | 4.2(b) | Ownership of Shares |
| Schedule | 5.1(b) | Ordinary Conduct |
| Schedule | 5.2(c) | Notice |
| Schedule | 5.2(f) | Promissory Notes |
| Schedule | 5.8(a) | Shareholder Guaranties |
| Schedule | 5.8(b) | Company Guaranties |
| | | |
| Exhibit A | | Escrow Agreement |
| Exhibit B | | Shareholder Indemnification |
| Exhibit C | | Intentional Omitted |
| Exhibit D | | Payment to Option Holders |
| Exhibit E | | Payment to Shareholders |
| Exhibit F | | Inventory Average Cost |
| Exhibit G | | Promotion Commitments |

## STOCK PURCHASE AGREEMENT

STOCK PURCHASE AGREEMENT, dated as of July 22, 2003 (the "Agreement"), among ZONEPERFECT NUTRITION COMPANY, a Delaware corporation (the "Company"), ABBOTT LABORATORIES, an Illinois corporation ("Buyer") and the stockholders of the Company identified on the signature pages hereof (the "Shareholders").

## BACKGROUND

A.      The Shareholders together own all of the issued and outstanding equity interests of the Company, which consist of 1,350 shares of Class A Common Stock, par value $.01 per share, of the Company (the "Class A Common Stock") and 486,676 shares of Class C Common Stock, par value $.0001 per share, of the Company (the "Class C Common Stock" and together with the Class A Common Stock, the "Common Stock")  The outstanding shares of the Common Stock are referred to herein as the "Shares".

B.      The respective Boards of Directors of Buyer and the Company have reviewed, considered and approved the acquisition of the Shares by Buyer on the terms and subject to the conditions set forth in this Agreement.

C.      Buyer desires to purchase from Shareholders and Shareholders desire to sell to Buyer the Shares, upon the terms and subject to the conditions set forth herein.

D.      Buyer, the Company and the Shareholders desire to make certain representations, warranties, covenants and agreements in connection with this Agreement and also to prescribe various conditions to this Agreement.

## TERMS

In consideration of the foregoing and the mutual covenants and agreements herein contained, and intending to be legally bound hereby, the parties hereto hereby agree as follows:

## ARTICLE I
## DEFINITIONS

1.1.    Definitions

(a)     Certain Definitions.  As used in this Agreement, the following terms shall have the following meanings:

"Acquisition Transaction" shall mean any transaction involving the sale, disposition or acquisition of all or a material portion of the Company's business or assets or any merger, consolidation, business combination, reorganization or similar transaction involving the Company.

"Affiliate" shall have the meaning given to such term in Rule 12b-2 under the Securities Exchange Act of 1934, as in effect as of the date of this Agreement.

"Applicable Law" means any statute, law (including common law), ordinance, rule or regulation applicable to the Company or its properties or assets and any license, permit, approval, consent, waiver or other authorization issued, granted or otherwise provided by or under the authority of any such statute, law, ordinance, rule or regulation or any governmental authority or body relating to the Company, its property and its assets.

"Buyer Material Adverse Effect" means a material adverse effect on the ability of Buyer to perform its obligations under this Agreement without material deviation from the time frame such actions would otherwise be consummated in the absence of such effect.

"Environmental Laws" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, the Resource Conservation and Recovery Act of 1976 and the Occupational Safety and Health Act of 1970, each as amended, together with all other Applicable laws (including rules, regulations, codes, common law, injunctions, judgments, orders, decrees, rulings and charges thereunder) of a governmental entity concerning pollution or protection of the environment, public health and safety, or employee health and safety, including laws relating to emissions, discharges, releases, or threatened releases of Hazardous Substances into ambient air, surface water, ground water, or lands or otherwise relating to the manufacture, generation, processing, distribution, use, treatment, storage, disposal, clean-up, transport, or handling of Hazardous Substances, in each case as now in effect.

"Hazardous Substances" means (a) any petrochemical or petroleum products, radioactive materials, asbestos in any form that is or could become friable, urea formaldehyde foam insulation, and transformers or other equipment that contain dielectric fluid containing polychlorinated biphenyls; (b) any chemicals, materials or substances defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "restricted hazardous materials," "extremely hazardous substances," "toxic substances," "contaminants" or "pollutants" under applicable environmental laws or words of similar meaning and regulatory effect; or (c) any other chemical, material or substance, exposure to which is prohibited, limited, or regulated by any applicable Environmental, Health and Safety law.

"Knowledge" of or with respect to (a) the Company means the actual current knowledge of Christopher P. Baker, Douglas M. Hagge, Rainer J. Park, William Paul Pruett, Bagus Tjahjono and Amanda Libby and (b) the Buyer means the actual current knowledge of Mark Gorman, Daniel Estay, Ned McCoy, and Christopher Turek.

"Material Adverse Effect" means a material adverse effect on the business, properties (including intangible properties), assets, liabilities, financial condition, operations or results of operations of the Company or a material adverse effect on the ability of the Company to perform its obligations under this Agreement; provided, however, that Material Adverse Effect shall exclude any adverse changes or conditions as and to the extent such changes or conditions result primarily from (i) public or industry knowledge of the transactions contemplated by this

Agreement (including but not limited to any action or inaction by the Company's employees, customers and vendors) or (ii) general economic conditions or other conditions generally affecting the industry in which the Company competes.

"Person" shall mean any individual, corporation (including any non-profit corporation), general partnership, limited partnership, limited liability partnership, joint venture, estate, trust, company (including any limited liability company or joint stock company), firm or other enterprise, association, organization or entity.

(b)     Other Definitions.  The following defined terms shall have the meaning set forth in the referenced Section:

| Term | As Defined on Page |
|---|---|
| Acquisition Transaction | 4 |
| Affiliate | 5 |
| Agents | 40 |
| Agreement | 4 |
| Applicable Law | 5 |
| Audited Financial Statements | 15 |
| Balance Sheet | 15 |
| Balance Sheet Date | 15 |
| Benefit Plans | 21 |
| Buyer | 4 |
| Buyer Indemnified Parties | 44 |
| Buyer Material Adverse Effect | 5 |
| Cap | 48 |
| Class A Common Stock | 4 |
| Class C Common Stock | 4 |
| Closing | 8 |
| Closing Date | 8 |
| Closing Date Exhibit G | 32 |
| Code | 17 |
| Collateral Source | 47 |
| Common Stock | 4 |
| Company | 4 |
| Company Employees | 34 |
| Company Option Plans | 32 |
| Company Stock Option | 32 |
| Confidential Information | 36 |
| Confidentiality Agreement | 32 |
| Contracts | 20 |
| Damage Threshold | 49 |
| Damages | 44 |

-3-

Environmental Laws ............................................................................................. 5
Environmental Permits ...................................................................................... 23
ERISA .................................................................................................................. 21
Escrow Agreement ............................................................................................... 9
Escrow Fund ......................................................................................................... 9
Financial Statements ........................................................................................ 15
Foreign Antitrust Laws ..................................................................................... 14
GAAP .................................................................................................................... 15
GUST .................................................................................................................... 22
Hazardous Substances ........................................................................................ 5
HSR Act ................................................................................................................. 8
Indemnified Party ............................................................................................. 44
Indemnifying Party .......................................................................................... 47
IRS ....................................................................................................................... 17
Knowledge ............................................................................................................ 5
Material Adverse Effect ...................................................................................... 6
Pension Plan ...................................................................................................... 22
Person .................................................................................................................... 6
Promotion Bucket ............................................................................................. 45
Promotion Information ..................................................................................... 40
Purchase Price ..................................................................................................... 8
Real Property ..................................................................................................... 18
Real Property Leases ........................................................................................ 18
Remediation ....................................................................................................... 24
Returns ............................................................................................................... 17
Shareholders ........................................................................................................ 4
Shareholders' Representative .......................................................................... 41
Shares .................................................................................................................... 4
Survival Period .................................................................................................. 44
Tax ....................................................................................................................... 17
Taxes ................................................................................................................... 17
Unaudited Financial Statements ..................................................................... 15

ARTICLE II
PURCHASE AND SALE OF THE SHARES; CLOSING

2.1.    Purchase and Sale of the Shares.  On the terms and subject to the conditions of this Agreement, at the Closing referred to below, each Shareholder shall sell, transfer and deliver to Buyer, and Buyer shall purchase from each such Shareholder, the Shares set forth opposite the name of each such Shareholder on the signature pages hereto.

2.2.    Purchase Price.  The aggregate purchase price for all of the Shares (the "Purchase Price") shall be One Hundred Sixty-Five Million Dollars ($165,000,000) (i) less the outstanding balance (1) owed by the Company under the 6% Subordinated Note due March 31, 2004 in the original principal amount of $2,887,500 made by the Company payable to Barry D. Sears, (2) owed by the Company under the 6% Subordinated Note due March 31, 2004 in the original principal amount of $1,537,500 made by the Company payable to Douglas Sears, and (3) owed by the Company under the 6% Subordinated Note due March 31, 2004 in the original principal amount of $975,000 made by the Company payable to Surfactant Technologies, Inc., (ii) less any amount in excess of (A) $3,500,000 (in the event that the Closing occurs on or before July 31, 2003), (B) $4,000,000 (in the event that the Closing occurs after July 31, 2003 and prior to August 16, 2003) or (C) $5,000,000 (in the event that the Closing occurs on or after August 16, 2003); if any, owed by the Company under the line of credit pursuant to the Loan and Security Agreement, dated February 26, 2001, by and among the Company and First Massachusetts Bank, N.A. (n/k/a Banknorth, N.A.), as amended, (iii) less one-half of all filing fees incurred in connection with any filing made pursuant to the Hart-Scott-Rodino Antitrust Improvements Act of 1976 and the regulations promulgated thereunder (the "HSR Act") related to the transactions contemplated by this Agreement, (iv) less the amount (including any and all principal and accrued and unpaid interest outstanding as of the Closing Date) owed by the Shareholders to the Company under the promissory notes in the original aggregate principal amount of $1,036,301.16, and (v) less the amount due to the holders of options pursuant to the Company Option Plans in the amounts set forth on Exhibit D delivered in accordance with Section 5.1(c). The Purchase Price shall be allocated among the Shareholders (with the value of a share of Class A Common Stock equal to 3000 times the value of a share of Class C Common Stock) as set forth on Exhibit B which exhibit shall be delivered by the Shareholders' Representative to Buyer five (5) business days prior to the Closing.

2.3.    Closing.  Unless this Agreement shall have been terminated and the transactions herein contemplated shall have been abandoned pursuant to Section 7.3, the closing of the purchase and sale of the Shares (the "Closing") will take place five business days after the satisfaction of the conditions set forth in Section 3.1, at the offices of Dechert LLP, 200 Clarendon Street, 27th Floor, Boston, Massachusetts, unless another date, time or place is agreed to in writing by the parties hereto (the "Closing Date").  The Closing shall be deemed to have occurred at 11:59 pm on the Closing Date

-5-

2.4.   Closing Obligations.

    (a)     Obligations of Shareholders and the Company.

        (i) Following the Closing, subject to Section 6.2, the Shareholders' Representative shall have responsibility for distributing such funds received pursuant to Section 2.4(b)(ii) to each Shareholder according to such Shareholder's portion of the Purchase Price determined pursuant to Section 2.2 above less such Shareholder's pro rata portion of the Escrow Fund.

        (ii) On the Closing Date, the Shareholders' Representative and the Company shall have delivered to Buyer the certifications specified in Sections 3.2(a), 3.2(b) and 3.2(c).

        (iii) At the time of the Closing, the Shareholders' Representative (on behalf of the Shareholders) shall deliver to Buyer certificates representing the Shares duly endorsed for transfer to Buyer, or with separate stock powers attached thereto duly endorsed for transfer to Buyer.

    (b)     Obligations of Buyer

        (i) On the Closing Date, Buyer shall have delivered to the Shareholders' Representative the certifications specified in Sections 3.3(a) and 3.3(b).

        (ii) At the time of the Closing, Buyer shall deliver to the Shareholders' Representative the Purchase Price less the Escrow Fund, by wire transfer of immediately available funds, to the bank account indicated in the payment instructions provided pursuant to Section 3.2(g)

2.5.     Escrow. On the Closing Date, Buyer shall deposit with an Escrow Agent mutually agreed upon by the parties, with its principal office in Minneapolis, Minnesota, an amount equal to $20,000,000 for the purpose of securing Buyer's rights and the Shareholders' obligations set forth in Section 7.4 of this Agreement. Such amount (the "Escrow Fund") shall evidence a portion of the Purchase Price and shall be held by the Escrow Agent under an Escrow Agreement in substantially the form attached as Exhibit A to be entered into among Buyer, the Shareholders' Representative and the Escrow Agent (the "Escrow Agreement") pursuant to the terms thereof. The Escrow Fund shall be held as a trust fund and shall not be subject to any lien, attachment, trustee process or any other judicial process of any creditor of any party, and shall be held and disbursed solely for the purposes and in accordance with the terms of the Escrow Agreement.

ARTICLE III
CONDITIONS TO CLOSING

3.1.    Conditions to the Obligations of Buyer and the Shareholders.    The respective obligations of Buyer and the Shareholders to effect the purchase and sale of the Shares shall be subject to the satisfaction or waiver by Buyer and the Shareholders (where permissible) at or prior to the Closing Date of the following conditions:

(a)    No Order.    No temporary restraining order, preliminary or permanent injunction, order or decree of any court or administrative agency of competent jurisdiction, or any pending litigation or proceeding seeking any such order, injunction or decree shall be in effect as of the Closing Date which restrains or prohibits, or seeks to restrain or prohibit the purchase and sale of the Shares.

(b)    Antitrust Waiting Periods.    Any applicable waiting period (and any extension thereof) under the HSR Act shall have expired or terminated.

(c)    Legality.    No statute, rule or regulation of the government (or any governmental agency) of the United States or any state, municipality or other political subdivision thereof shall be in effect that makes the purchase and sale of the Shares or any other transaction contemplated hereby illegal.

3.2.    Conditions to the Obligations of Buyer.    The obligation of Buyer to purchase and pay for the Shares and to take the other actions required to be taken by Buyer at the Closing shall be subject to the satisfaction at or prior to the Closing Date of each of the following conditions (any of which may be waived by Buyer, in whole or in part):

(a)    Representations and Warranties.

(i)    Each of the representations and warranties of the Company made in this Agreement that is qualified by materiality shall be true, accurate and correct on and as of the date of this Agreement and the Closing Date, as though made on and as of the Closing Date (except those representations and warranties that address matters only as of a particular date, each of which shall be true, accurate and correct as of that date), and each of the representations and warranties of the Company made in this Agreement that is not qualified by materiality shall be true, accurate and correct in all material respects on and as of the date of this Agreement and the Closing Date (except those representations and warranties that address matters only as of a particular date, each of which shall be true, accurate and correct in all material respects as of that date), and, notwithstanding the foregoing, each of the representations and warranties made by the Company in Sections 4.1(d) and 4.1(g) shall be true, accurate and correct on and as of the date of this Agreement and the Closing Date, as though made on and as of the Closing Date (except those representations and warranties that address matters only as of a particular date, each of which shall be true, accurate and correct as of that date); except in each case for changes contemplated by (A) Section 5.1(b)(i) with respect to the representations and warranties made in Sections 4.1(g) and (l), (B) Section 5.1(c) with respect to the representations and warranties

- 7 -

made in Section 4.1(d), and (C) Section 5.8 with respect to the representations and warranties made in Sections 4.1(l) and (w). The Company shall have delivered to Buyer a certificate signed by a duly authorized signatory of the Company to that effect.

(ii)    Each of the representations and warranties of the Shareholders set forth in Section 4.2 shall be true and correct on and as of the date of this Agreement and the Closing Date, as though made on and as of the Closing Date (except those representations and warranties that address matters only as of a particular date, each of which shall be true and correct as of that date), and the Shareholders' Representative (on behalf of the Shareholders) shall have delivered to Buyer a certificate signed by the Shareholders' Representative to that effect.

(b)    Agreements and Covenants. The Company and the Shareholders shall have performed or complied in all material respects with their respective agreements and covenants contained in this Agreement required to be performed or complied with by them on or prior to the Closing Date, and the Company and the Shareholders' Representative (on behalf of the Shareholders) shall have delivered to Buyer a certificate signed by the Shareholders' Representative and duly authorized signatories of the Company to that effect.

(c)    FIRPTA Certificate. The Company shall have delivered to Buyer a certificate, in accordance with Treasury Regulation Section 1.1445-2(c)(3), to the effect that the Shares are not U.S. real property interests as defined in Section 897(c) of the Code.

(d)    Escrow Agreement. Buyer shall have received a copy of the Escrow Agreement, executed and delivered by the Shareholders' Representative (on behalf of the Shareholders) and the Escrow Agent.

(e)    Certain Equity Cancellation and Repurchase. Buyer shall have received certification from the Company that the Company has the right to cancel and cash out all options of the Company outstanding immediately prior to the Closing and that the Company has taken all actions, other than the actual payment to such holders of options, required to have such options cancelled and cashed out simultaneously with the Closing.

(f)    Other Documents. Buyer shall have received the following:

(i)    a copy of the text of the resolutions by which the Board of Directors and stockholders of the Company approve this Agreement and the consummation of the transactions contemplated hereby;

(ii)    a certificate dated the Closing Date executed on behalf of the Company by its corporate secretary certifying to Buyer that the copy of the resolutions furnished pursuant to Section 3.2(f)(i) above is a true, correct and complete copy of such resolutions and that such resolutions were duly adopted and have not been amended or rescinded on or prior to the Closing Date;

- 8 -

(iii)    an incumbency certificate dated the Closing Date executed on behalf of the Company by its corporate secretary certifying the signature and office of each officer executing this Agreement or any other agreement, certificate or other instrument executed pursuant hereto on or prior to the Closing Date;

(iv)    good standing certificates for the Company from the State of Delaware and the Commonwealth of Massachusetts, each dated not earlier than 10 days prior to the Closing Date;

(v)    a copy of the Company's certificate of incorporation certified by the Secretary of State of Delaware;

(vi)    a copy of the Company's by-laws, certified by the Corporate secretary of the Company as of the Closing Date; and

(vii)    copies of all third party consents (or other evidence satisfactory to Buyer) that the Company is required to obtain in order to effect the transactions contemplated by this Agreement.

(g)    <u>Wire Instructions</u>  At least five business days prior to the Closing Date, (i) the Shareholders' Representative (on behalf of the Shareholders) shall have delivered to Buyer payment instructions indicating the bank account to which Buyer should transfer, by wire transfer of immediately available funds, an amount equal to the Purchase Price less the Escrow Fund, (ii) the Company shall have delivered to Buyer payment instructions indicating the bank account to which Buyer should transfer, by wire transfer of immediately available funds, an aggregate amount equal to the amount payable to the option holders as set forth on <u>Exhibit D</u> which shall be delivered in accordance with Section 5.1(c), and (iii) the Escrow Agent shall have delivered to Buyer payment instructions indicating the bank account to which Buyer should transfer, by wire transfer of immediately available funds, an amount equal to the Escrow Fund.

(h)    <u>Share Certificates</u>  Buyer shall have received from the Shareholders' Representative (on behalf of the Shareholders) all certificates representing the Shares duly endorsed for transfer to Buyer, or with separate stock powers attached thereto endorsed for transfer to Buyer.

(i)    <u>Resignations</u>.  Buyer shall have received from all officers and directors of the Company written resignations from such positions as an officer or director (and not as an employee if such person is an employee of the Company as of the Closing) in form reasonably satisfactory to Buyer, effective as of the Closing.

3.3.    <u>Conditions to the Obligations of the Shareholders</u>.  The obligation of the Shareholders to sell and deliver the Shares to Buyer, and to take the other actions required to be taken by the Shareholders at the Closing, shall be subject to the satisfaction at or prior to the Closing Date of each of the following conditions (any of which may be waived by the Shareholders, in whole or in part):

(a)    <u>Representations and Warranties</u>  Each of the representations and warranties of Buyer made in this Agreement that is qualified by materiality shall be true and correct on and as of the date of this Agreement and the Closing Date, as though made on and as of the Closing Date (except those representations and warranties that address matters only as of a particular date, each of which shall be true and correct as of that date) and each of the representations and warranties of the Buyer made in this Agreement that is not qualified by materiality shall be true and correct in all material respects on and as of the date of this Agreement and the Closing Date (except those representations and warranties that address matters only as of a particular date, each of which shall be true and correct as of that date), and Buyer shall have delivered to the Shareholders' Representative a certificate signed by a duly authorized signatory of Buyer to that effect.

(b)    <u>Agreements and Covenants</u>.  Buyer shall have performed or complied in all material respects with all agreements and covenants contained in this Agreement required to be performed or complied with by Buyer on or prior to the Closing Date, and Buyer shall have delivered to the Shareholders' Representative a certificate signed by a duly authorized signatory of Buyer to that effect.

(c)    <u>Escrow Agreement</u>.  The Shareholders' Representative shall have received a copy of the Escrow Agreement, executed and delivered by Buyer and the Escrow Agent.

(d)    <u>Other Documents</u>  Shareholders' Representative shall have received the following:

(i)    a copy of the text of the resolutions by which the Board of Directors of Buyer approve this Agreement and the consummation of the transactions contemplated hereby;

(ii)    a certificate dated the Closing Date executed on behalf of Buyer by an assistant corporate secretary of Buyer certifying to the Shareholders that the copy of the resolutions furnished pursuant to Section 3.3(d)(i) above is a true, correct and complete copy of such resolutions and that such resolutions were duly adopted and have not been amended or rescinded on or prior to the Closing Date;

(iii)    an incumbency certificate dated the Closing Date executed on behalf of Buyer by an assistant corporate secretary of Buyer certifying the signature and office of each officer executing this Agreement or any other agreement, certificate or other instrument executed pursuant hereto on or prior to the Closing Date;

(iv)    good standing certificate for Buyer from the State of Illinois, each dated not earlier than 10 days prior to the Closing Date;

(v)    a copy of Buyer's certificate of incorporation certified by the Secretary of State of Illinois;

- 10 -

(vi)    a copy of Buyer's by-laws, certified by an assistant corporate secretary of Buyer as of the Closing Date; and

(vii)    copies of all third party consents (or other evidence satisfactory to the Company) that Buyer is required to obtain in order to effect the transactions contemplated by this Agreement.

(e)    Purchase Price. The Shareholders' Representative (on behalf of the Shareholders) shall have received from Buyer the Purchase Price less the Escrow Fund, by wire transfer of immediately available funds, to the bank account indicated in the payment instructions provided pursuant to Section 3.2(g).

(f)    Release of Guaranties. The Shareholders, who are guarantors of certain Company's obligations, shall have been released as guarantors for such obligations of the Company set forth on Schedule 5.8(a).

ARTICLE IV
REPRESENTATIONS AND WARRANTIES

4.1.    Representations and Warranties of the Company. The Company hereby represents and warrants to Buyer as follows:

(a)    Organization and Standing of the Company. The Company is a corporation duly organized and validly existing and in good standing under the laws of the State of Delaware. Except as set forth on Schedule 4.1(a), the Company has all corporate power and corporate authority to own, lease or otherwise hold its properties and assets and to carry on its business as presently conducted, and is qualified or registered as a foreign corporation and is in good standing in all jurisdictions in which the character of the properties owned, operated or leased by the Company or the nature of its activities is such that qualification or registration by the Company as a foreign corporation is required by Applicable Law, except where the failure to be so qualified or registered and in good standing could not, individually or in the aggregate, be reasonably expected to have a Material Adverse Effect.

(b)    Authority. The Company has all requisite corporate power and corporate authority to enter into this Agreement and to consummate the transactions contemplated hereby. All corporate acts and other proceedings required to be taken by the Company to authorize the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby have been duly and properly taken. This Agreement has been duly executed and delivered by the Company and constitutes the legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms.

(c)    No Conflict.

- 11 -

(i) The execution, delivery and performance by the Company of this Agreement and the consummation by the Company of the transactions contemplated hereby will not (A) violate or conflict with the Certificate of Incorporation and Bylaws of the Company, (B) assuming satisfaction of the requirements set forth in Section 4.1(c)(ii) below, violate any provision of law, rule or regulation to which the Company is subject or violate or conflict with any order, judgment, injunction or decree applicable to the Company or (C) except as disclosed on Schedule 4.1(c)(i), materially violate, breach or constitute a default (with or without notice or lapse of time, or both) under or give rise to a right of termination, cancellation or acceleration of any material right or obligation of the Company under, or result in the creation of a material lien or encumbrance on any of the properties or assets of the Company pursuant to, any provision of any agreement, contract, note, bond, mortgage, indenture, or lease or other instrument binding upon the Company or any license, franchise, permit or other similar authorization held by the Company

(ii) The execution, delivery and performance by the Company of this Agreement and the consummation by the Company of the transactions contemplated hereby do not require any consent from, filing with or consent or approval of any governmental body, agency or official or any third party except for (A) the filing of a report under the HSR Act and the expiration of the applicable waiting period; (B) filings and consents under non-U.S. laws and regulations intended to prohibit, restrict or regulate actions or transactions having the purpose or effect of monopolization, restraint of trade, harm to competition or effectuating foreign investment ("Foreign Antitrust Laws"); (C) any consent or filing that Buyer is required to obtain or make disclosed on Schedule 4.1(c)(ii); and (D) consents and filings which, if not obtained or made, will not individually or in the aggregate have a material adverse effect on the ability of the parties hereto to consummate the transactions contemplated hereby and will not result in the creation of a lien, claim or right against the Buyer.

(d)    Capital Structure of the Company. The authorized capital stock of the Company consists of 2,500 shares of Class A Common Stock, of which 1,350 shares are validly issued and outstanding, fully paid and nonassessable, 2,500 shares of Class B Common Stock, par value $.01 per share, of which no shares are issued and outstanding, 3,000,000 shares of Class C Common Stock, of which 486,676 shares are validly issued and outstanding, fully paid and nonassessable, and 1,000 shares of Preferred Stock, par value $.01 per share, of which no shares are validly issued and outstanding, fully paid and nonassessable. Except as disclosed on Schedule 4.1(d), there are (i) no outstanding warrants, options, agreements, subscriptions, convertible or exchangeable securities or other instruments or commitments pursuant to which the Company is or may become obligated to issue any shares of capital stock of the Company or any other securities convertible, exchangeable or exercisable for any such shares of capital stock, and no equity securities of the Company are reserved for issuance for any purpose and (ii) no "phantom" stock rights, stock appreciation rights, stock-based performance units or other similar instruments or commitments tied to the equity of the Company pursuant to which the Company is or may become obligated to pay cash  There are not any (A) contractual obligations of the Company to repurchase, redeem or otherwise acquire any shares of capital stock of the Company, or (B) voting trusts or other agreements or understandings to which the Company is a

- 12 -

party with respect to the voting or transfer of capital stock of the Company. Except as set forth above, no shares of capital stock or other voting securities of the Company are issued, reserved for issuance or outstanding.

(e)     Subsidiaries and Equity Interests; Books and Records. The Company does not have any subsidiaries and does not, directly or indirectly, own any stock of, or any other equity interest in, any other corporation or business entity. The books of account, minute books, stock record books and other records of the Company, all of which have been made available to Buyer (other than specific portions of books and records relating to the potential sale of the Company), are complete and correct (in the case of the minute books, in all material respects) and have been maintained in accordance with sound business practices, including the maintenance of an adequate system of internal controls. The minute books of the Company contain accurate and complete records of all meetings held of, and actions taken by, the shareholders and the board of directors of the Company. At the Closing, all of those books and records will be in the possession of the Company.

(f)     Financial Statements. Schedule 4.1(f) sets forth (i) the audited balance sheet of the Company as of June 30, 2002, and the related statements of income, retained earnings and cash flows of the Company for the year then ended, together with the notes to such financial statements (the "Audited Financial Statements") and (ii) the unaudited balance sheet of the Company as of June 30, 2003, and the related statements of income and cash flows of the Company for the twelve (12) month period then ended (the "Unaudited Financial Statements" and, together with the Audited Financial Statements, the "Financial Statements"). The balance sheet of the Company as of June 30, 2003 is sometimes referred to as the "Balance Sheet", and June 30, 2003 is sometimes referred to as the "Balance Sheet Date". The Financial Statements have been prepared in accordance with the books and records of the Company. The Audited Financial Statements present fairly, in all material respects, the financial position of the Company as of June 30, 2002, and the results of operations and cash flows of the Company for the year then ended, in conformity with generally accepted accounting principles ("GAAP"). The Unaudited Financial Statements present fairly, in all material respects, the financial position of the Company as of June 30, 2003 and the results of its operations for the twelve (12) month period then ended, in conformity with GAAP except for the absence of footnotes, other disclosures, and year end adjustments and reclassifications in conformity with GAAP .

(g)     Absence of Changes or Events. Except as set forth in Schedule 4.1(g), since the Balance Sheet Date the business of the Company has been conducted in the ordinary course and there has not occurred any event or condition and there does not exist any circumstance which, individually or in the aggregate, has had or could reasonably be expected to have a Material Adverse Effect. Without limiting the generality of the foregoing since the Balance Sheet Date, except as set forth in Schedule 4.1(g), the Company has not:

(i)     paid or declared any dividends or other distributions in respect of any class of its capital stock, or made any payment to redeem, purchase or otherwise acquire, or call for redemption, any of such stock;

           (ii)    merged or consolidated with or acquired the business of any other corporation or other business organization or, except in the ordinary course of business, acquired any material property or material assets of any other person, firm, association, corporation or other business organization;

           (iii)    adopted or amended in any material respect any Company Benefit Plan or increased the compensation of any of its salaried employees except in the ordinary course of business;

           (iv)    made or committed to make any contributions or donations to any charitable organization or endeavor;

           (v)    entered into or, as of the date hereof, performed any agreement with any of its shareholders or any Affiliate thereof, including without limitation any agreement to make advances or loans;

           (vi)    incurred any new or additional indebtedness for borrowed money or issued any debt securities or assumed, guaranteed or endorsed the obligations of any person, except, after the date hereof, as may be necessary to consummate the transactions contemplated by Sections 5.1(b)(i) of this Agreement by drawing upon the line of credit pursuant to the Loan and Security Agreement dated February 26, 2001, between the Company and First Massachusetts Bank, N.A., as amended;

           (vii)    sold, pledged, leased, licensed or disposed of any of its material assets except in the ordinary course of business;

           (viii)    made any material change in the operation or nature of its business; or

           (ix)    been affected by an event, change, effect or development that, individually or in the aggregate, have had or could reasonably be expected to have a Material Adverse Effect.

           (h)    <u>Undisclosed Liabilities</u>. The Company does not have any material liabilities or obligations (whether known or unknown, absolute or conditional, accrued or unaccrued, matured or unmatured, liquidated or unliquidated, primary or secondary, potential, contingent or otherwise) except for (i) liabilities disclosed, reflected or reserved against in the Financial Statements, (ii) liabilities incurred after the date of such Financial Statements in the ordinary course of business, (iii) the matters disclosed in or arising out of matters disclosed in <u>Schedule 4.1(h)</u>, and (iv) liabilities and obligations incurred in connection with this Agreement and the transactions contemplated hereby.

           (i)    <u>Taxes</u>

(i)     For purposes of this Agreement, (A) "Tax" or "Taxes" shall mean all Federal, state, local and foreign taxes and assessments, including all interest, penalties and additions imposed with respect to such amounts and (B) "Code" shall mean the Internal Revenue Code of 1986, as amended.

(ii)     The Company has filed or caused to be filed in a timely manner (within any applicable extension periods) all Tax returns, reports and forms that were required to be filed by the Code or by applicable state, local or foreign Tax laws (collectively, "Returns"); all Taxes required to be paid, whether disputed or not and whether shown on any return have been timely paid in full; and no tax liens have been filed and no claims are being asserted in writing with respect to any Taxes, except as set forth on Schedule 4.1(i). Except as set forth on Schedule 4.1(i), no presently effective waivers or extensions of statutes of limitation with respect to Taxes have been given by the Company for any taxable years. Except as set forth above or on Schedule 4.1(i), as of the date of this Agreement, the Returns filed by, or with respect to, the Company are not being examined by, and no written notification of intention to examine has been received from the Internal Revenue Service ("IRS") or, to the Company's Knowledge, any other taxing authority with respect to Taxes. Except as set forth on Schedule 4.1(i), as of the date of this Agreement, no currently pending issues involving the Company have been raised in writing by the IRS or, to the Company's Knowledge, any other taxing authority in connection with any Return. Except as set forth in Schedule 4 1(i), the Company has entered into no listed transactions or any other reportable transactions as defined in Treasury Regulation 1 6011-4.

(j)     Properties.

(i) The Company has title to, or a valid and binding leasehold interest in, all of its real and personal properties and assets (including the Real Property, those properties and assets reflected in the Balance Sheet and acquired by the Company since the Balance Sheet Date (other than property sold or otherwise disposed of since the Balance Sheet Date in the ordinary course of business), and personal property and other assets described below), free and clear of all material liens and attachments, and free and clear of all material pledges, encumbrances or security interests to which the Company is a party or subject or of which the Company has Knowledge, of any nature whatsoever, except (A) those disclosed in Schedule 4.1(j)(i), (B) material leasehold interests and licenses granted by the Company to third parties as disclosed on Schedule 4.1(j)(i), (C) any liens for current Taxes not yet due and payable or which may thereafter be paid without penalty, and (D) liens imposed by operation of law (including without limitation mechanics', carriers', workmen's, repairmen's, landlord's or other similar liens arising from or incurred in the ordinary course of business and for which the underlying payments are not yet delinquent).

(ii) The Company does not own any real property.

(iii) Set forth on Schedule 4.1(j)(iii) is a list of all leases, subleases and licenses (the "Real Property Leases") for all real property leased, subleased or licensed by the Company as of the date hereof (the "Real Property"). The Company enjoys peaceful and undisturbed possession under such Real Property Leases sufficient for current use and

- 15 -

operations. The Company is not in default under any of the Real Property Leases and, to the Company's Knowledge, the respective landlords are not in default under and there are no current events that if left uncured will give rise to a default by the Company or, to the Company's Knowledge, the respective landlords.

        (iv) Set forth on Schedule 4.1(j)(iv) is a list of all assets with a fair market value of over $3,000 as of March 31, 2003, other than inventory and office supplies.

        (v) The Company is not a landlord, sublandlord or licensor of any real property as of the date hereof.

        (vi) All inventory of the Company consists of a quality and quantity usable and salable in the ordinary course of business, except for obsolete items which have been written off to net realizable value in the Financial Statements or on the accounting records of the Company as of the Closing Date, as the case may be. All inventories not written off shall have at least six (6) months of label shelf-life as of the Closing Date, and shall be costed at the average cost per unit for the fiscal year ended June 30, 2003 as set forth on Exhibit F which exhibit shall be delivered to Buyer five (5) business days prior to Closing.

        (k)    Intellectual Property. Schedule 4.1(k)(i) sets forth a list of all patents and patent applications, trademark and service mark registrations and applications for registration, copyright registrations and applications for registration and domain name registrations owned by the Company or with respect to which the Company has been granted rights (and sets forth the written licenses or other written arrangements pursuant to which the Company was granted such rights). Except as set forth in Schedule 4.1(k)(ii), the Company has no Knowledge of any claim currently being asserted or threatened by any third party, or having been asserted or threatened by any third party and remaining unresolved, that the operations of the Company infringe, misappropriate or otherwise violated, or have infringed, misappropriated or violated, the intellectual property rights of such third party. To the Knowledge of the Company, and except as set forth in Schedule 4.1(k)(iii) or as otherwise disclosed in a letter agreement between Buyer and the Company as of the date hereof, none of the manufacture, use or sale of any product of the Company, nor the practices or conduct of any business by the Company, have infringed, misappropriated or otherwise violated, or do or will infringe, misappropriate or violate, the intellectual property or other rights of any third party. Except as set forth in Schedule 4.1(k)(iii), the Company does not have any pending claim that a third party has infringed, misappropriated, violated or interfered with any intellectual property owned by the Company or with respect to which the Company has been granted rights.

        (l)    Contracts. Except as described in Schedule 4.1(l), the Company is not as of the date of this Agreement party to or bound by any:

        (i)    employment or consulting agreements (excluding (A) any such contracts or arrangements for which the total compensation during each of the last two years was less than $10,000 per person or (B) contracts which are terminable by the Company at will,

        (x)     agreement between the Company and any shareholder of the Company or any Affiliate of such shareholders; and

        (xi)    any partnership or joint venture agreement.

        The Company is not (with or without the lapse of time or the giving of notice, or both) in breach or default under or non-compliance with any agreement, contract, lease, license, commitment or instrument of the Company described on Schedule 4.1(l) or the other Schedules hereto (collectively, including the Real Property Leases, the "Contracts") and to the Knowledge of the Company no other party to any of the Contracts is (with or without the lapse of time or the giving of notice, or both) in breach or default thereunder or non-compliance therewith, except for such breaches or defaults which could not, individually or in the aggregate, be reasonably expected to have a Material Adverse Effect. No event has occurred or circumstance exists that may (with or without notice or lapse of time) give any other person or, to the Knowledge of the Company, the Company a right to declare a default or exercise any material remedy under, or to accelerate the maturity or performance of, or to cancel, terminate or modify any Contract. The Company has not given to or received from any other person (1) any written notice or other communication alleging any actual, possible or potential breach or default under or non-compliance with any Contract or (2) to the Knowledge of the Company, any oral notice alleging any actual breach or default under or non-compliance with any Contract. All of the Contracts are in full force and effect.

        (m)    Litigation; Decrees. Schedule 4.1(m) sets forth a list as of the date of this Agreement of all lawsuits, claims, proceedings or investigations pending or, to the Knowledge of the Company, threatened against the Company, or any of its properties, assets, operations or businesses in which the damages claimed against the Company exceed $10,000, or are unspecified and are reasonably likely to be a potential claim for an amount that exceeds $10,000, or which could reasonably be expected to have a Material Adverse Effect, or which challenge the legality of this Agreement or any action to be taken in connection herewith. To the Knowledge of the Company, no event has occurred or circumstances exist that could reasonably be expected to give rise to or serve as the basis for the commencement of any such lawsuit, claim, proceeding or investigation. Except as disclosed on Schedule 4.1(m), there are no judgments, orders, settlements and decrees of any court or any governmental or administrative agency against or affecting the Company or any of its properties, assets, operations or businesses that have not been satisfied or resolved that, individually or in the aggregate, would currently require or involve expenditures or liabilities exceeding $10,000 or could reasonably be expected to have a Material Adverse Effect. The Company is not in default under any judgment, order, ruling, decision, award, verdict, subpoena, settlement or decree, and no event has occurred and no circumstance exists that may constitute or result in (with or without notice or lapse of time) a violation of or failure to comply with any term or requirement thereof. The Company has not received (1) any written communication from any governmental entity or other person that alleges that the Company is or may be in actual, possible or potential violation of or non-compliance with any term or requirement of any such judgment, order, ruling, decision, award, verdict, subpoena, settlement or decree or (2) to the Knowledge of the Company, any oral

subject to the termination or severance policies of the Company) or any severance agreements or "change of control" agreements;

        (ii)    employee collective bargaining agreement or other contract with any labor organization that represents or, to the Company's Knowledge, asserts representation of, any Company employees;

        (iii)    lease or similar agreement under which the Company is lessee of, or holds or uses, any machinery, equipment, vehicle or other tangible personal property owned by a third party at an annual payment in excess of $25,000;

        (iv)    contract (excluding purchase orders in the ordinary course of business) that involves the obligation of the Company to purchase materials, supplies, equipment or services from others for payment of more than $25,000 and which is not terminable by the Company on not more than 90 days' notice without penalty or premium, or any purchase order of or on behalf of the Company involving an obligation in excess of $25,000;

        (v)    contract (excluding purchase orders in the ordinary course of business) that involves the obligation of the Company to deliver products or services to third parties for annual payment of more than $25,000 and which is not terminable by the Company on not more than 90 days' notice without penalty or premium;

        (vi)    contract pursuant to which the Company has since acquired or since January 1, 2001 agreed to acquire an equity interest in or all or substantially all of the assets or business of any other entity or person;

        (vii)    agreement or contract under which the Company has borrowed any money or issued any note, bond, indenture or other similar evidence of indebtedness or guaranteed indebtedness, liabilities or obligations of others, in each case for an amount in excess of $25,000 (other than endorsements for the purpose of collection in the ordinary course of business);

        (viii)    mortgage, pledge, security agreement, deed of trust or other document, in each case granting a lien (including liens upon properties acquired under conditional sales, capital leases or other title retention or security devices) securing obligations in excess of $25,000;

        (ix)    agreement restricting the right of the Company to compete with any other person or entity, or granting any other person or entity an option or other right to acquire, license, lease or otherwise use any material properties or assets of the Company other than the right to purchase products of the Company in the ordinary course, or agreeing to indemnify, defend or hold harmless with regard to the obligations, liabilities or expenses of any other person or entity;

communication from any governmental entity or other person that alleges that the Company is or may be in actual violation of or non-compliance with any term or requirement of any such judgment, order, ruling, decision, award, verdict, subpoena, settlement or decree.

(n)    Insurance. Set forth on Schedule 4.1(n) hereto is a list of all policies of insurance held by, or maintained on behalf of, the Company as of the date hereof in effect for policy periods beginning on or after January 1, 2001, indicating for each policy the carrier, the insured, the type of insurance, the amounts of coverage and the expiration date. Except as set forth on Schedule 4.1(n), all such policies are in full force and effect, all premiums due and payable thereon have been paid in full and the Company has not received any notice of cancellation, amendment or dispute as to coverage with respect to any such policies. The Company has not been refused any insurance with respect to its assets or operations and its coverage has not been limited by any carrier to which it has applied for such insurance.

(o)    Benefit Plans.

(i)    Schedule 4.1(o) sets forth a list of all "employee benefit plans" (as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA")), bonus, incentive, deferred compensation, stock or stock option plans or arrangements, severance, retention, employment, unemployment compensation, fringe benefit, change-in-control and other employee benefit plans or arrangements, whether oral or written, and whether or not subject to ERISA, under which any employee, former employee, director or consultant of the Company has any present or future right to benefits or under which the Company has any liability for present or future payment of benefits (the "Benefit Plans").

(ii)    Except as set forth on Schedule 4.1(o), as applicable with respect to each Benefit Plan, the Company has made available to Buyer current, accurate and complete copies of (A) each current Benefit Plan document, including any amendments, (B) all trust documents and custodial agreements relating thereto, (C) any summary plan description provided under a Benefit Plan, (D) the most recent annual report (Form 5500 and all schedules thereto) filed with the IRS, (E) any audited financial statements and actuarial valuation reports for the most recent fiscal year and attorney's response to an auditor's request for information and (F) the most recent IRS determination letter.

(iii)    Except as disclosed on Schedule 4.1(o):

(A)    Each Benefit Plan has been maintained, operated and administered in all material respects in compliance with its terms and any related documents or agreements and in compliance in all material respects with the applicable provisions of ERISA, the Code and other Applicable Laws.

(B)    No Benefit Plan is a "multiemployer plan" within the meaning of Section 3(37) of ERISA. The Company has never contributed to, or withdrawn from, any "multiemployer plan" or has any fixed or contingent liability under Section 4204 of ERISA.

- 19 -

(C)    The Benefit Plans which are "employee pension benefit plans" within the meaning of Section 3(2) of ERISA and which are intended to meet the qualification requirements of Section 401(a) of the Code (each a "Pension Plan") have received determination letters from the IRS to the effect that such Pension Plans are qualified and the related trusts are exempt from federal income taxes and no determination letter with respect to any Pension Plan has been revoked, and nothing has occurred which would cause the loss of such qualification. For each Benefit Plan and its related trust, the Company has either received a favorable determination letter from the IRS with respect to its qualified status under the Uruguay Round Agreements Act, the Uniformed Services Employment and Reemployment Rights Act of 1994, the Small Business Job Protection Act of 1996, the Taxpayer Relief Act of 1977, the IRS Restructuring and Reform Act of 1998 and the Community Renewal Tax Relief Act of 2000 (collectively referred to as "GUST") and the Economic Growth and Tax Relief Reconciliation Act of 2001 or has a remaining period of time under applicable Treasury regulations or IRS pronouncements in which to apply for such a determination letter

(D)    Neither the Company, nor any other party has engaged in a prohibited transaction, as defined under Section 4975 of the Code or Sections 406 of ERISA, which could subject the Company or Buyer to any material taxes, penalties or other liabilities under Section 4975 of the Code or Sections 409 or 502(i) of ERISA.

(E)    No Benefit Plan is a pension benefit plan that is subject to Section 302 of ERISA, section 412 of the Code or Title IV of ERISA.

(F)    Each Benefit Plan that is a "group health plan" within the meaning of ERISA Section 607(1) and that is subject to Code Section 4980B has been operated in compliance in all material respects with the continuation coverage requirements of those provisions.

(G)    No Benefit Plan provides retiree welfare benefits and the Company has no obligation to provide retiree welfare benefits except to the extent required by Code Section 4980B.

(H)    With respect to any Benefit Plan, no actions, audits, investigations, suits or claims (other than routine claims for benefits in the ordinary course) are pending or, to the Company's Knowledge, threatened which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect and no event has occurred and no condition exists that would reasonably be expected to subject the Company to any material Tax, lien, or other liability imposed by ERISA or the Code, including but not limited to Title IV of the Code. None of the assets of any Benefit Plan are invested in employer securities or employer real property.

(I)    The execution, delivery and performance by the Company of this Agreement and the transactions contemplated hereby will not constitute an event under any Benefit Plan that will result in any payment (whether as severance pay or otherwise), acceleration, vesting or increases in benefits with respect to any employee of the Company. The

- 20 -

consummation of the transactions contemplated by this Agreement will not result in or satisfy a condition to the payment of compensation that would, in combination with any other payment, result in an "excess parachute payment" within the meaning of Section 280G(b) of the Code.

(p)    <u>Compliance with Applicable Laws</u>. Except as set forth in <u>Schedule 4.1(p)</u>, the Company, its properties and assets (including the ownership and use thereof), and its conduct of business are in and have been in compliance (with or without notice or lapse of time) in all material respects with all Applicable Laws of any governmental authority or instrumentality. Except as set forth on <u>Schedule 4.1(p)</u>, the Company has not received (1) any written communication from any governmental entity or other person that alleges that the Company is or may be in actual, possible or potential material violation of or non-compliance with any Applicable Law and (2) to the Knowledge of the Company, any oral communication from any governmental entity or other person that alleges that the Company is or may be in actual material violation of or non-compliance with any Applicable Law.

(q)    <u>Licenses; Permits</u>. All governmental licenses, permits, approvals, consents, waivers or authorizations of the Company are validly held by the Company and in full force and effect, the Company has complied in all material respects with all requirements in connection therewith and the same (with or without notice or lapse of time) will not be subject to suspension, withdrawal, cancellation, termination, modification or revocation as a result of this Agreement or the consummation of the transactions contemplated hereby, except as set forth on Schedule 4.1(q). The Company has all of the material governmental licenses, permits or authorizations which are required to carry on the business of the Company as such business is now conducted and to own and use the properties and assets currently owned and used by the Company in the manner as are now owned and used. The Company has not received (1) any written communication from any governmental entity or other person that alleges that any such license, permit, approval, consent, waiver or authorization is or may be subject to actual, possible or potential suspension, withdrawal, cancellation, termination, modification or revocation and (2) to the Knowledge of the Company, any oral communication from any governmental entity or other person that alleges that any such license, permit, approval, consent, waiver or authorization is or may be subject to actual suspension, withdrawal, cancellation, termination, modification or revocation.

(r)    <u>Environmental Matters</u>. Except as set forth on <u>Schedule 4.1(r)</u>:

(i)    The Company has all permits, licenses, and other authorizations required for the operation or conduct of the business of the Company under applicable Environmental Laws ("Environmental Permits") and is in compliance in all material respects with all terms and conditions of such Environmental Permits. The Company is in compliance, in all material respects, with all applicable Environmental Laws.

(ii)    The Company has received no written communication or notice from any governmental entity that the Company is in violation of any Environmental Laws or the requirements of Environmental Permits, or fails to have the necessary Environmental Permits, the substance of which is unresolved.

- 21 -

(iii)    The Company has received no written requests for information, notice of claim, demand, or notification that they are, or may be, potentially responsible with respect to any investigation, cleanup or other remedial action ("Remediation") with respect to any actual or threatened Release (as defined in CERCLA) of any Hazardous Substance.

(iv)    There has been no Release of any Hazardous Substance by the Company or any other person at, from or on any property owned, operated or leased by the Company in violation of any Environmental Laws or the requirements of its Environmental Permits or which has created a condition which imposes liability or responsibility on the Company for Remediation.

This Section 4.1(r) shall be the exclusive representations and warranties for environmental matters, Environmental Laws and Hazardous Substances under this Agreement.

(s)    Employee and Labor Matters.  Except as set forth in Schedule 4.1(s), the Company is not a party to any collective bargaining agreement or other labor union contract applicable to persons employed by the Company, and no collective bargaining agreement is being negotiated by the Company. In the last three years, the Company has not experienced any organizational effort, labor strike, or organized labor dispute, or material work stoppage or lockout nor, to the Knowledge of the Company, have any been threatened against or affected the Company.  As of the date hereof, (i) the Company is in compliance with all applicable laws relating to employment and employment practices, wages, hours, and terms and conditions of employment, (ii) there are no charges against the Company pending before the Equal Employment Opportunity Commission, Department of Labor or any state, local or foreign agency responsible for the prevention of unlawful employment practices, (iii) there is no unfair labor practice charge or complaint against the Company pending or, to the Knowledge of the Company, threatened before the National Labor Relations Board or any comparable state agency, and (iv) there is no consent decree or settlement agreement with any governmental agency or any other person relating to employee or employment practices with terms that have not been fully satisfied , and (v) there are no pending or, to the Company's Knowledge, threatened lawsuits by any job applicant, employee or former employee.

(t)    Brokers.  No broker, investment banker, financial advisor, consultant or other Person, other than Adams Harkness & Hill (the fees and expenses of which shall be paid by the Shareholders), is entitled to any broker's, finder's, financial advisor's or other similar fee or commission in connection with this Agreement based upon arrangements made by or on behalf of the Company.

(u)    Assets.  Except as set forth on Schedule 4.1(u), the Company owns, leases or has the legal right to use all of the properties and assets used in, or necessary for, the conduct of its business and, with respect to contract rights, is a party to all, and enjoys the right to the benefits of all contracts described in Section 4.1(l) that are used in, or necessary for, the conduct of its business as it is presently operated. All of the property, plant and equipment of the Company has been maintained in good operating condition and repair, ordinary wear and tear

- 22 -

excepted, and is sufficient to permit the Company to conduct its operations as they are presently conducted in the ordinary course of business in a manner consistent with past practice.

(v)    Certain Business Practices. Neither the Company nor any director, officer, employee or agent of the Company acting on behalf of the Company has (a) used any funds for unlawful contributions, gifts, entertainment or other unlawful payments relating to political activity, (b) made any unlawful payment to any foreign or domestic government official or employee or to any foreign or domestic political party or campaign or violated any provision of the Foreign Corrupt Practices Act of 1977, as amended, (c) consummated any transaction, made any payment, entered into any agreement or arrangement or taken any other action in violation of Section 1128B(b) of the Social Security Act, as amended, or (d) made any other unlawful payment.

(w)    Affiliate Transactions. Except as set forth on Schedule 4.1(w), no officer or director of the Company or any affiliate of such officer or director is presently a party to any agreement or transaction with the Company or has any interest in any property used by the Company. Except as set forth on Schedule 4.1(w), the agreements in place with any Shareholders, officers or directors of the Company or any affiliate or relative of such Shareholders, directors or officers, were at the time entered into on terms and conditions no less favorable to the Company than those of an agreement for substantially the same services or items one could reasonably expect to enter into with an unrelated third-party at such time.

(x)    Public Knowledge of Transaction. As of the date hereof, to the Company's Knowledge, a material adverse effect on the business, properties (including intangible properties), assets, liabilities, financial condition, operations or results of operations of the Company would not result from public or industry knowledge of the transactions contemplated by this Agreement (including but not limited to any action or inaction by the Company's employees, customers and vendors).

(y)    Condition Generally Affecting Industry. To the Company's Knowledge, as of the date hereof, a material adverse effect on the business, properties (including intangible properties), assets, liabilities, financial condition, operations or results of operations of the Company could not reasonably be expected to result from any condition generally affecting the industry in which the Company competes.

(z)    Disclosure. The representations and warranties of the Company contained in this Agreement and the Schedules are true, accurate, and correct. The Schedules attached hereto set forth sufficient detail or description for a reasonable person to understand how the disclosure in such Schedule is responsive to the representation and warranty to which it relates.

4.2.    Representations and Warranties of the Shareholders. Each Shareholder hereby severally represents and warrants to Buyer only as follows:

(a)    Authority. This Agreement has been duly executed and delivered by such Shareholder and constitutes the legal, valid and binding obligation of such Shareholder,

- 23 -

enforceable against such Shareholder in accordance with its terms. The execution, delivery and performance by such Shareholder of this Agreement and the consummation by such Shareholder of the transactions contemplated hereby will not (i) violate any provision of law, rule or regulation to which such Shareholder is subject or (ii) violate or conflict with any order, judgment, injunction, award or decree applicable to such Shareholder. The execution, delivery and performance by such Shareholder of this Agreement and the consummation by such Shareholder of the transactions contemplated hereby does not require any consent from or filing with any governmental body, agency or official except for (i) the filing of a report under the HSR Act and the expiration of the applicable waiting period; (ii) filings and consents under Foreign Antitrust Laws; (iii) any consent or filing that Buyer or the Company is required to obtain or make; and (iv) consents and filings which, if not obtained or made, will not individually or in the aggregate have a material adverse effect on the ability of such Shareholder to consummate the transactions contemplated hereby or the ability of such Shareholder to consummate the transactions contemplated hereby, and will not result in the creation of a lien, claim or right against the Company or Buyer.

(b)    Ownership of Shares. Except as set forth in Schedule 4.2(b), such Shareholder owns all of the outstanding Shares set forth opposite such Shareholder's name on the signature pages hereto, free and clear of any claims, liens, encumbrances, security interests, options, charges or restrictions whatsoever. Such Shareholder has all requisite legal right, power and authority to transfer such Shares to Buyer. Assuming Buyer has the requisite corporate power and authority to be the lawful owner of the Shares, upon delivery to Buyer at the Closing of certificates representing such Shareholder's Shares duly endorsed for transfer to Buyer and receipt by such Shareholder of the consideration therefor, Buyer will acquire such Shareholder's Shares free and clear of any claims, liens, encumbrances, security interests, options, charges or restrictions whatsoever, other than those arising from acts of Buyer.

4.3.    Representations and Warranties of Buyer. Buyer hereby represents and warrants to the Company and the Shareholders as follows:

(a)    Organization, Authority. Buyer is a corporation duly organized and validly existing under the laws of the State of Illinois. Buyer has all requisite corporate power and corporate authority to enter into this Agreement and to consummate the transactions contemplated hereby. All corporate acts and other proceedings required to be taken by Buyer to authorize the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby have been duly and properly taken. This Agreement has been duly executed and delivered by Buyer and constitutes the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms.

(b)    No Conflict.

(i) The execution, delivery and performance by Buyer of this Agreement and the consummation by Buyer of the transactions contemplated hereby will not (A) violate or conflict with the Certificate of Incorporation, the Bylaws or other similar governing documents of Buyer, (B) assuming satisfaction of the requirements set forth in Section 4.3(b)(ii) below,

- 24 -

violate any provision of law, rule or regulation to which Buyer is subject or violate or conflict with any order, judgment, injunction or decree applicable to Buyer or (C) violate, breach or constitute a default under or give rise to a right of termination, cancellation or acceleration of any right or obligation of Buyer under, or result in the creation of a lien or encumbrance on any of the properties or assets of Buyer pursuant to, any provision of any agreement, contract, note, bond, mortgage, indenture, or lease or other instrument binding upon Buyer or any license, franchise, permit or other similar authorization held by Buyer, except in the case of the foregoing clause (C) for any such violation, conflict, default, right or lien which could not individually or in the aggregate reasonably be expected to have a Buyer Material Adverse Effect.

(ii) The execution, delivery and performance by Buyer of this Agreement and the consummation by Buyer of the transactions contemplated hereby do not require any consent from, filing with or consent or approval of any governmental body, agency or official or any third party except for (A) the filing of a report under the HSR Act and the expiration of the applicable waiting period; (B) filings and consents under Foreign Antitrust Laws; (C) any consent or filing that the Company is required to obtain or make; and (D) consents and filings which, if not obtained or made, could not reasonably be expected to individually or in the aggregate have a Buyer Material Adverse Effect.

(c)    Sufficient Funds.  Buyer has cash available to enable it to consummate the transactions contemplated hereby.

(d)    Investment Intent.  The Shares are being acquired by Buyer pursuant to this Agreement solely for its own account, for investment only and not with a view to any public distribution thereof.

(e)    Litigation; Decrees.  There are no lawsuits, claims, proceedings, investigations, injunctions, judgments, orders or decrees pending or, to the Knowledge of Buyer, threatened which challenge or seek to enjoin or delay this Agreement or the transactions contemplated hereby or which could reasonably be expected to have a Buyer Material Adverse Effect.

(f)    Investigation.  Buyer has conducted such investigation of the Company as it has deemed sufficient to make an informed decision concerning the transactions contemplated hereby. Buyer acknowledges that it has (i) had an opportunity to review all materials and information requested by it, (ii) had an opportunity to review all of the documents, records, reports and other materials identified in the Schedules, and (iii) been given access to the properties and assets of the Company and is familiar with the condition thereof. In connection with its investigation of the Company and all matters relating to the transactions contemplated hereby, Buyer has solely relied upon the advice and opinions of its own agents, representatives, experts, consultants, employees and officers. Buyer acknowledges that the Company and the Shareholders have made no representation, warranty or agreement except as expressly set forth in this Agreement. Buyer is not relying on any representation, warranty, agreement, statement, document, record, report, material or information made or provided by the Company and the Shareholders or any of their Affiliates, representatives or agents except as expressly set forth in

- 25 -

this Agreement: Buyer further acknowledges that (A) no promise or inducement for this Agreement has been made to Buyer except as set forth herein, (B) this Agreement is executed by Buyer freely and voluntarily and without reliance upon any statement or representation of the Company, the Shareholders, any Affiliates or any of their attorneys or agents except as set forth herein, (C) Buyer has read and fully understands this Agreement and the meaning of its provisions, (D) Buyer is legally able to enter into this Agreement and to accept full responsibility therefor, and (E) Buyer has consulted with counsel before entering into this Agreement.

(g)    Brokers. No broker, investment banker, financial advisory, consultant or other Person, is entitled to any broker's, finder's, financial advisor's or other similar fee or commission in connection with this Agreement based upon arrangements made by or on behalf of Buyer

(h)    Condition Generally Affecting Industry. To Buyer's Knowledge, as of the date hereof, a material adverse effect on the business, properties (including intangible properties), assets, liabilities, financial condition, operations or results of operations of the Company could not reasonably be expected to result from any condition generally affecting the industry in which the Company competes.

ARTICLE V
COVENANTS

5 1.    Covenants of the Company. The Company covenants and agrees as follows:

(a)    Access. Prior to the Closing, the Company will (i) give Buyer and its authorized representatives, employees, counsel and accountants reasonable access to the officers, management, agents, books, records, offices and other facilities and properties of the Company during mutually agreeable business hours and (ii) furnish to Buyer and its authorized representatives such information concerning the business, properties, contracts, assets, liabilities, personnel and other aspects of the Company which is reasonably requested; provided, however, that any such access shall be granted at reasonable times during normal business hours and in such a manner as not to interfere with the normal business operations of the Company; provided, further that Buyer and its authorized representatives shall not contact or hold discussions with customers, suppliers or non-management employees of the Company related to or in connection with the transactions contemplated by this Agreement without the prior consent of the Company. Notwithstanding the foregoing, the Company is under no obligation to disclose to Buyer any information the disclosure of which is restricted by contract or applicable law or which would result in the waiver of any privileges, and granting such access does not include access to conduct any environmental sampling or testing without the Company's prior written consent.

(b)    Ordinary Conduct. From and after the date hereto and prior to the Closing or earlier termination of this Agreement, and unless Buyer shall otherwise consent or agree in writing (which consent or agreement with respect to subsections (i), (xi), (xii), (xiii), (xv), (xvi), (xvii), (xviii), (xix), (xx), (xxii), (xxiii), (xxiv), (xxv) and (xxvi), from any time after the 21st day

following the date of the filing of the HSR Act notifications described in Section 5.3(a), would not be unreasonably withheld or delayed) and except as disclosed on Schedule 5.1(b), the Company will:

(i)    conduct its business in the ordinary course consistent with past practices;

(ii)    use its reasonable best efforts to preserve its business organization intact, to maintain the services of its present key employees and to preserve the goodwill of the suppliers, customers and others having business dealings with it;

(iii)    not amend its Certificate of Incorporation or Bylaws or other comparable charter organizational documents;

(iv)    not issue any capital stock (including, without limitation, not issuing any capital stock in exchange for options) or rights, warrants or options to acquire shares of such capital stock (including, without limitation, any phantom interest) or issue any securities convertible into such shares or convertible into securities in turn so convertible, or grant any options, warrants or rights to acquire any such convertible securities, other than the issuance after the date hereof of additional options pursuant to the ZonePerfect Nutrition Company Directors' Compensation Plan, as amended and restated effective September 13, 2000;

(v)    not split, subdivide, combine or reclassify, directly or indirectly, any of its outstanding capital stock;

(vi)    not declare or pay any dividend or other distribution in respect of any class of its capital stock, or make any payment to redeem, purchase or otherwise acquire, or call for redemption, any of such stock;

(vii)    not make or commit to make any contributions or donations to any charitable organization or endeavor in excess of $25,000 in the aggregate;

(viii)    not merge or consolidate with or acquire the business of any other person, firm, association, corporation or other business organization, acquire any material property or material assets of any other person, firm, association, corporation or other business organization, or restructure, recapitalize, liquidate or dissolve;

(ix)    not adopt or amend any Company Benefit Plan, enter into or amend any employment, severance, change-in-control or consulting agreement or arrangement with any present or former director, officer or employee, nor increase the compensation or fringe benefits of any of its officers, directors or employees, except in the ordinary course of business consistent with past practice in an amount of not more than 5% of their current compensation or retain any new officer, employee or consultant;

- 27 -

(x)    not enter into any agreement with any of its shareholders or any Affiliate thereof, including without limitation any agreement to make advances or loans;

(xi)    not sell, pledge, lease, license or dispose of any of its assets except for sales and dispositions (A) of equipment, supplies or fixed assets having a fair market value not in excess of $10,000 individually or $50,000 in the aggregate and that do not materially affect the selling of the Company's products or the operation of the Company's business or (B) of inventory, products or obsolete equipment in the ordinary course of business;

(xii)    not incur or assume any long-term indebtedness or not, except in the ordinary course of business such as is consistent with past practice, incur any additional short-term indebtedness for borrowed money or issue any debt securities or assume, guarantee or endorse the obligations of any person, except as necessary to consummate the transactions contemplated by Sections 5.1(b)(i) of this Agreement by drawing upon the line of credit pursuant to the Loan and Security Agreement dated February 26, 2001, between the Company and First Massachusetts Bank, N.A., as amended;

(xiii)    not enter into, amend or terminate any contract except in the ordinary course of business consistent with past practice;

(xiv)    not make any change in accounting methods, principles or practices affecting the reported consolidated assets, liabilities or results of operations of the Company, except insofar as may have been required by a change in GAAP;

(xv)    not make or agree to make any new capital expenditure or expenditures that, individually, is in excess of $25,000 or, in the aggregate, are in excess of $100,000;

(xvi)    not modify, amend or terminate any contract set forth on Schedule 4.1(l) or waive, release or assign any material rights or claims, except in the ordinary course of business and consistent with past practice;

(xvii)    not discharge, settle, assign or satisfy any claims, whether or not pending before a governmental authority or instrumentality, in excess of $25,000 individually or $250,000 in the aggregate, or waive any material benefits of, or agree to modify, in any respect adverse to the Company, any confidentiality, standstill or similar agreements to which the Company is a party;

(xviii)    not enter into or extend any contracts relating to the distribution, sale, license, promotion or marketing by third parties of the Company's products (including the Company's products under development), other than pursuant to any such agreements currently in place in accordance with their terms as of the date hereof and other than in the ordinary course of business and consistent with past practice;

(xix)   not transfer, assign, terminate, cancel, abandon or modify any licenses and permits described on Schedule 4.1(q) or fail to maintain such licenses and permits described on Schedule 4.1(q) as currently in effect;

(xx)   not fail to maintain all insurance policies as currently in effect or allow any of such policies to lapse;

(xxi)   not transfer or license to any person or entity or otherwise extend, amend, allow to lapse or go abandoned, or modify any intellectual property rights described on Schedule 4.1(k);

(xxii)   not enter into any license agreement with any person or entity to obtain any intellectual property rights;

(xxiii)  not terminate any employee without cause;

(xxiv)  except as requested by Buyer, not change any theoretical formulations of products;

(xxv)   with respect to the largest twenty-five (25) customers (in terms of purchases over the 12-month period prior to Closing), not make any written change to the terms upon which the Company extends credit to customers, discounts prices or offers other terms or sales incentives or coupons or free standing inserts, other than changes occurring in the ordinary course of business and consistent with past practice (provided that in no event will the Company be permitted to engage in sales tactics that artificially push the Company's products into distribution channels in greater amounts than in the ordinary course);

(xxvi)  not engage in any promotional sale or discount or other activity with customers that is not consistent in nature and timing with past practices and which has or would reasonably be expected to have the effect of changing the period in which sales would otherwise be expected to occur; and

(xxvii)  not authorize any of, or commit or agree to take any of, the foregoing actions or authorize an intention to do any of the foregoing.

(c)     Options.

(i)      Set forth on Exhibit D, which shall be delivered by the Company to Buyer five (5) business days prior to the Closing, will be a list of each option to acquire Company common stock (a "Company Stock Option") issued and outstanding as of the Closing under the ZonePerfect Nutrition Company 2000 Stock Option Plan, the ZonePerfect Nutrition Company Directors' Compensation Plan, the ZonePerfect Nutrition Company 2000 Stock Option Plan for Vendors, Lenders, Strategic and Other Business Partners, each as amended to the date of this Agreement and any other stock option plan or agreement of the Company (the "Company Option Plans") which remains unexercised. Exhibit D will also include the option holder's

- 29 -

name, the number of shares subject to each option held by that option holder, the exercise price, the calculated amount due, owing and to be paid to the option holder by the Company with respect to that option under subsection (ii) (the "Calculated Payment"), the amount by which the Calculated Payment exceeds the exercise price of such option, if any, and a breakdown of how such amounts were calculated.

(ii)    Effective simultaneously with the Closing, the Company will cancel each and every Company Stock Option, including those with respect to which the exercise price is less than, equals or exceeds the Calculated Payment listed on Exhibit D. If the Calculated Payment listed on Exhibit D is less than or equals the exercise price for such option, such option shall be deemed to have been paid in full and shall be canceled with no payment due the holder. To the extent that the Calculated Payment listed on Exhibit D exceeds the exercise price of such option, then simultaneously with the Closing, the Company shall make the payment of such excess amount (reduced by all legally required tax and other withholdings) to the holder of such option with the funds described in Section 5.2(f).

(iii)    As soon as possible after the execution hereof, the Company shall send to each option holder notice of the cancellation of their options as further described in subsection (ii) above.

(d)    Exhibit G. Attached hereto as Exhibit G is a substantially correct schedule of brand development promotional commitments binding on the Company as of the date hereof. On the Closing Date, the Company will update Exhibit G and deliver it to Buyer (the "Closing Date Exhibit G")

5.2.    Covenants of Buyer.  Buyer covenants and agrees as follows:

(a)    Confidentiality.  Buyer acknowledges that all information provided to it by the Company, including, but not limited to, information provided pursuant to Section 5.1(a), is subject to the terms of a confidentiality agreement dated March 21, 2003 between Buyer and the Company (the "Confidentiality Agreement"), the terms of which are incorporated herein by reference. Effective upon, and only upon, the Closing, the Confidentiality Agreement shall terminate.

(b)    Post-Closing Information.  After the Closing, to the extent records exist, Buyer shall make available and shall cause the Company to make available to the Shareholders' Representative and his accountants, agents and representatives any and all books, records, contracts and other information of the Company existing on the Closing Date (whether in the possession of Buyer or the Company) requested by the Shareholders' Representative in connection with requirements of law relating to personal tax matters; provided, however, that nothing contained herein will restrict Buyer from destroying or disposing of books and records of the Company in accordance with Buyer's records retention policy. Buyer agrees to keep any and all books, records, contracts and other information of the Company existing on the Closing Date in accordance with Buyer's record retention policy.

- 30 -

(c)    <u>Directors' and Officers' Indemnification and Insurance</u>.  Buyer shall cause the Company to indemnify and hold the past and existing directors and officers of the Company, and other persons entitled to indemnification under the Certificate of Incorporation and Bylaws of the Company as in effect on the date hereof, harmless from and against, to the maximum extent permitted under applicable law, any and all losses, claims, damages, liabilities (or actions or proceedings with respect to any thereof) or expenses (including, but not limited to, all legal expenses and any and all other out-of-pocket expenses incurred in investigating, preparing to defend or defending against any action or proceeding commenced or threatened by any third party, whether or not such officer or director is a formal party thereto) to which, jointly or severally, any such officer or director may be subject, which arise out of or are based upon such officer's or director's service or status as an officer or director of the Company prior to the Closing, whether asserted or claimed prior to, at or after the Closing, and Buyer shall, or shall cause the Company to, also advance expenses as incurred to the fullest extent Buyer or the Company are permitted under applicable law provided that the person to whom expenses are advanced provides an undertaking to repay such advances if it is ultimately determined that such person is not entitled to indemnification.  For a period of at least 6 years after the Closing Date, Buyer shall cause the Company to cause to be maintained in effect policies of directors' and officers' liability insurance which are, in the aggregate, no less advantageous to the insured than the policies of the Company currently in effect as of the date hereof, and including coverage with respect to claims arising from facts or events which occurred before the Closing to the extent reasonably available; provided, however that to the extent such coverage is not reasonably available, Buyer shall give 60 days notice to, at or before such coverage, to the parties set forth on Schedule 5.2(c) prior to letting such coverage lapse.  The provisions of this Section 5.2(c) are intended to be for the benefit of, and will be enforceable by, each Indemnified Party and his or her heirs and representatives.

(d)    <u>Solicitations of Employees</u>.  If this Agreement is terminated for any reason and the transactions contemplated hereby do not take place, Buyer agrees that for a period of two years from the date of termination, no representative of Buyer or its Affiliates will hire or will solicit to employ, whether as an employee, consultant or otherwise, any of the current officers or managerial or supervisory employees of the Company about whom such representative became aware as a result of this Agreement, so long as they are employed by the Company, without obtaining the prior written consent of the Company or except if (1) the Company terminates such employee, (2) such employee has not been an employee of the Company for the 6 month period prior to the date of such hiring or solicitation by Buyer or its Affiliates so long as there was no pre-existing agreement with such employee, or (3) such employee responds to an advertisement for employment not specifically targeting employees of the Company.

(e)    <u>Employees</u>.

(i)    For a period of twelve (12) months following the Closing, Buyer shall provide, or shall cause the Company to provide, employees of the Company ("Company Employees") with wages, salary, bonus and other cash compensation and benefit plans, programs, policies and arrangements that are no less favorable, in the aggregate, to Company

- 31 -

Employees than those provided generally to similarly situated employees of Buyer. In determining whether an employee is "similarly situated," for the purposes of the previous sentence, Buyer shall have sole and absolute discretion to determine in good faith whether an employee is similarly situated by reference to such factors as: nature and scope of the employee's duties; principal location where those duties are performed; grade level; and performance.

        (ii)    To the extent applicable with respect to employee benefit plans, programs, policies and arrangements established or maintained by Buyer for the benefit of Company Employees (and their eligible dependents), Company Employees (and their eligible dependents) shall be given credit for their service with the Company

        (1)    for purposes of eligibility to participate and vesting (but not benefit accrual under a defined benefit pension plan) to the extent such service was taken into account under a corresponding Company plan, and

        (2)    for purposes of satisfying any waiting periods, evidence of insurability requirements, or the application of any pre-existing condition limitations and shall be given credit for amounts paid under a corresponding Company plan during the same period for purposes of applying deductibles, co-payments and out-of-pocket maximums as though such amounts had been paid in accordance with the terms and conditions of the plans, programs, policies and arrangements maintained by Buyer; provided that no later than thirty (30) days after the Closing the administrator of the Company's plan has provided Buyer with all of the information requested by Buyer to calculate such deductibles, co-payments and out-of-pocket maximums. Notwithstanding the foregoing provisions of this clause (ii), service and other amounts shall not be credited to Company Employees (or their eligible dependents) to the extent the crediting of such service or other amounts would result in the duplication of benefits.

        (iii)    Nothing in this Section 5.2(e) shall require Buyer, the Company or any of their Affiliates to continue to employ any Company Employee for any period after the Closing.

        (f)    <u>Payment of Options and Cancellation of Promissory Notes</u>. Simultaneously with the Closing, Buyer shall transfer, by wire transfer of immediately available funds, into the bank account of the Company, indicated in the payment instructions delivered to Buyer by the Company five business days prior to the Closing, an aggregate amount equal to the amount payable to the option holders set forth on <u>Exhibit D</u>. Simultaneously with the Closing, Buyer shall cause the Company to cancel the promissory notes set forth on Schedule 5.2(f) as having been fully paid.

    5.3.    <u>Mutual Covenants</u>.  Each of the Company and Buyer covenants and agrees as follows:

        (a)    <u>Consents and Approvals. Antitrust</u>. Each of the Company and Buyer agrees to use its reasonable best efforts to obtain as soon as possible, and to file or cause to be filed all necessary documentation with the appropriate governmental authorities as soon as

- 32 -

practicable, to obtain as soon as possible, all consents, approvals, authorizations and waivers required by any governmental authorities in order to consummate the transactions contemplated by this Agreement. Each of the Company and Buyer further covenants and agrees to use its reasonable best efforts to prevent the entry, enactment or promulgation of any pending or threatened preliminary or permanent injunction or other order or decree that would adversely affect the ability of the parties hereto to consummate the transactions contemplated in this Agreement, and to lift or rescind any such existing injunction or other order or decree. Without limiting the generality of the foregoing, the Company and Buyer agree to file or cause to be filed, respectively, as soon as practicable after the date hereof, but in no event more than five business days after the date hereof, an acquired person's and acquiring person's HSR Act notification and report form with respect to the transactions contemplated by this Agreement and as required by the HSR Act. The Company and Buyer further agree to use their reasonable best efforts to comply promptly with and, where appropriate, to respond in cooperation with each other to, all requests or requirements which applicable federal, state, local, foreign or other applicable law or governmental officials may impose on them with respect to the transactions which are the subject of this Agreement.

(b)    Publicity. No party shall issue any press release or other public announcement concerning the transactions contemplated hereby without the prior consent (which consent shall not be unreasonably withheld) of Buyer (in the case of the Company) or the Company (in the case of Buyer), except as such release or announcement may be required by law or the rules or regulations of any United States or foreign securities exchange, in which case the party required to make the release or announcement shall allow Buyer or the Company (as the case may be) reasonable time to comment on such release or announcement in advance of such issuance; provided that notwithstanding the foregoing, a party may issue a press release or other public announcement concerning the transactions to the extent such information contained therein has already been publicly disclosed pursuant hereto and such information does not contain the financial terms of the transaction. Promptly after the Closing, Buyer will issue a press release regarding the transactions contemplated hereby in a form mutually agreeable, which agreement shall not be unreasonably withheld. Notwithstanding anything to the contrary, a party shall not be deemed in breach of this Section 5.3(b) for disclosing any information that has theretofore become generally known to or available for use by the public other than as a result of such party's fault.

(c)    Further Assurances; Covenant to Satisfy Conditions. Subject to the terms and conditions of this Agreement, each party will, severally, use its reasonable best efforts to (i) ensure the conditions set forth in Article III are satisfied, insofar as such matters are within the reasonable control of such party, (ii) defend any lawsuits or other legal proceedings, whether judicial or administrative, challenging this Agreement or the performance of the obligations hereunder or thereunder, (iii) execute and deliver such instruments and take such actions as the other parties hereto may reasonably require in order to carry out the intent of this Agreement and (iv) prepare and make or cause to be made any required filings, submissions and notifications under the laws of any domestic or foreign jurisdiction to the extent that such filings are necessary to consummate the transactions contemplated hereby in a manner consistent with applicable law.

- 33 -

(d)   Confidentiality.  Notwithstanding anything herein to the contrary or in the Confidentiality Agreement, each party (and each employee, representative or other agent of each party) hereto may disclose to any agent of the United States Internal Revenue Service, without limitation of any kind (except as reasonably necessary to comply with applicable securities laws), any information with respect to the United States federal income "tax treatment" and "tax structure" (in each case, within the meaning of Treasury Regulation Section 1.6011-4) of the transactions contemplated hereby and all materials of any kind (including opinions or other tax analyses) that are provided to such parties (or their representatives) relating to such tax treatment and tax structure.  To the extent not inconsistent with the immediately preceding sentence, this authorization does not extend to disclosure of any other information, including without limitation (a) the identities of participants or potential participants in this transaction, (b) the existence or status of any negotiations, or (c) any other term or detail, or portion of any documents or other materials, not related to the tax treatment or tax structure of the potential transaction.

5.4    Shareholder Confidentiality.

(a)    Each Shareholder acknowledges that (i) such Shareholder has occupied a position of trust and confidence with the Company prior to the date hereof and has become familiar with the following, any and all of which constitute confidential information of the Company, (collectively the "Confidential Information"): (x) any and all trade secrets concerning the business and affairs of the Company, product specifications, data, know-how, formulae, compositions, processes, designs, sketches, photographs, graphs, drawings, samples, inventions and ideas, past, current and planned research and development, current and planned manufacturing and distribution methods and processes, customer lists, current and anticipated customer requirements, price lists, market studies, business plans, computer software and programs (including object code and source code), computer software and database technologies, systems, structures and architectures (and related processes, formulae, compositions, improvements, devices, know-how, inventions, discoveries, concepts, ideas, designs, methods and information of the Company and any other information, however documented, of the Company that is a trade secret within the meaning of applicable state trade secret law); (y) any and all confidential, secret or nonpublic aspects of information concerning the business and affairs of the Company (which includes historical financial statements, financial projections and budgets, historical and projected sales, capital spending budgets and plans, personnel training and techniques and materials), however documented; and (z) any and all notes, analysis, compilations, studies, summaries, and other material prepared by or for the Company containing or based, in whole or in part, on any information included in the foregoing, (ii) the business of the Company is international in scope, (iii) its products and services are marketed throughout the United States and Canada; (iv) the Company competes with other businesses that are or could be located in any part of the world; (v) Buyer has required that such Shareholder make the covenants set forth in this Section as a condition to the Buyer's purchase of the Shares owned by such Shareholder; (vi) the provisions of this Section are reasonable and necessary to protect and preserve the Company's business; and (vii) the Company would be irreparably damaged if such Shareholder were to breach the covenants set forth in this Section.

(b)    Each Shareholder acknowledges and agrees that all Confidential Information known or obtained by such Shareholder, before the Closing hereof, is the property of the Company. Therefore, each Shareholder agrees that such Shareholder will not, at any time, disclose to any unauthorized persons or entities or use for his or her own account or for the benefit of any third party any Confidential Information, whether such Shareholder has such information in such Shareholder's memory or embodied in writing or other physical form, without Buyer's written consent, unless and to the extent that the Confidential Information (i) is or becomes generally known to or available for use by the public other than as a result of such Shareholder's fault or the fault of any other person or entity bound by a duty of confidentiality to Buyer or the Company, (ii) becomes available to such Shareholder on a non-confidential basis from a source other than the Company or Buyer, or (iii) is required to be disclosed by law, order or regulation of a court or tribunal or governmental authority; provided, however, that, in any such case, such Shareholder shall notify Buyer as early as reasonably practicable prior to disclosure to allow Buyer to take appropriate measures to preserve the confidentiality of such information.

(c)    If such Shareholder breaches the covenants set forth in this Section, Buyer and the Company will be entitled to the following remedies:

(i)    Damages from such Shareholder;

(ii)    To offset against any and all amounts owing to such Shareholder under this Agreement any and all Damages under Subsection (i) above; and

(iii)    In addition to its right to damages and any other rights it may have, to obtain injunctive or other equitable relief, to restrain any breach or threatened breach or otherwise, to specifically enforce the provisions of this Section, it being agreed that money damages alone would be inadequate to compensate the Buyer and the Company and would be an inadequate remedy for such breach.

5.5.    Shareholder Non-Competition. As an inducement for Buyer to enter into this Agreement and as additional consideration for the consideration to be paid to Shareholders under this Agreement, Christopher Baker agrees that:

(a)    For a period of three (3) years after the Closing:

(i)    Baker will not, directly or indirectly, engage or invest in, own, manage, operate, finance, control, or participate in the ownership, management, operation, financing, or control of, be employed by, associated with, or in any manner connected with, lend Baker's name or any similar name to, lend Baker's credit to, or render services or advice to, any nutrition bar or shake business or other nutrition business with products running off the 40/30/30 model that are competitive to those products marketed as of the Closing by the Company, anywhere within the United States or Canada; provided, however, that Baker may purchase or otherwise acquire up to (but not more than) one percent of any class of securities of any enterprise (but without otherwise participating in the activities of such enterprise) if such

- 35 -

securities are listed on any national or regional securities exchange or have been registered under Section 12(g) of the Securities Exchange Act of 1934. Baker agrees that this covenant is reasonable with respect to its duration, geographical area, and scope.

(ii)    Baker will not, directly or indirectly, either for himself or any other person or entity, (I) induce or attempt to induce any employee of the Company as of the Closing to leave the employ of the Company, or (II) in any way interfere with the relationship between the Company and any employee of the Company as of the Closing, (III) employ, or otherwise engage as an employee, independent contractor, or otherwise, any employee of the Company as of the Closing (except if (1) with regard to subsection (III) above, the Company terminates such employee, (2) with regard to subsection (III) above, such employee has not been an employee of the Company for the 6 month period prior to the date of such hiring or solicitation by Baker so long as there was no pre-existing agreement with such employee, or (3) with regard to subsections (I), (II) and (III) above, such employee responds to an advertisement for employment not specifically targeting employees of the Company).

(iii)    Baker will not, directly or indirectly, either for himself or any other person or entity, (I) solicit the business of any person or entity known to Baker to be a customer of the Company as of the Closing with respect to nutrition bars or shakes or products running off the 40/30/30 model that are competitive to those products marketed as of the Closing by the Company, whether or not Baker had personal contact with such person or entity, with respect to nutrition bars or shakes or products running off the 40/30/30 model that are competitive to those products marketed as of the Closing by the Company, or (II) induce or attempt to induce any customer, supplier, licensee, or business relation of the Company as of the Closing to cease doing business with the Company with respect to nutrition bars or shakes or products running off the 40/30/30 model that are competitive to those products marketed as of the Closing by the Company, or in any way interfere with the relationship between any customer, supplier, licensee, or business relation of the Company with respect to nutrition bars or shakes or products running off the 40/30/30 model that are competitive to those products marketed as of the Closing by the Company; and

(iv)    Baker will not disparage the Company or Buyer, with respect to nutrition bars or shakes or products running off the 40/30/30 model that are competitive to those products marketed as of the Closing by the Company.

(b)    In the event of a breach by Baker of any covenant set forth in Subsection 5.6(a) of this Agreement, the term of such covenant will be extended by the period of the duration of such breach.

(c)    If Baker breaches the covenants set forth in this Section, Buyer and the Company will be entitled to the following remedies:

(i)    Damages from Baker;

      (ii)     To offset against any and all amounts owing to Baker under this Agreement any and all Damages under Subsection (i) above; and

      (iii)     In addition to its right to damages and any other rights it may have, to obtain injunctive or other equitable relief to restrain any breach or threatened breach or otherwise to specifically enforce the provisions of this Section, it being agreed that money damages alone would be inadequate to compensate the Buyer and the Company and would be an inadequate remedy for such breach.

    5.6    Solicitations of Employees. After the Closing, each Shareholder, other than Baker, agrees that for a period of two years, such Shareholder will not, directly or indirectly, individually or on behalf of another entity, hire or solicit to employ, whether as an employee, consultant or otherwise, any of the officers or managerial or supervisory employees of the Company as of the Closing, so long as they are employed by the Company or any successor, without obtaining the prior written consent of the Buyer or except if (1) the Company terminates such employee, (2) such employee has not been an employee of the Company for the 6 month period prior to the date of such hiring or solicitation by such Shareholder so long as there was no pre-existing agreement with such employee, or (3) such employee responds to an advertisement for employment not specifically targeting employees of the Company.

    5.7.    No Negotiation  Between the date hereof and the earlier of the Closing or the date upon which this Agreement is terminated, neither the Company nor any Shareholder shall, directly or indirectly:

      (a)     solicit or encourage the initiation of any inquiry, proposal or offer from any Person (other than Buyer) relating to a possible Acquisition Transaction;

      (b)     participate in any discussions or negotiations or enter into any agreement with, or provide any non-public information or make any inquiry, proposal or offer to, any Person (other than Buyer) relating to or in connection with a possible Acquisition Transaction; or

      (c)     consider, entertain or accept any proposal or offer from any Person (other than Buyer) relating to a possible Acquisition Transaction.

    5.8.    Guaranties. On or prior to the Closing, the Buyer, the Shareholders and the Company shall use commercially reasonable efforts to cause certain individual Shareholders to be released as guarantors for the obligations of the Company set forth on Schedule 5.8(a) in exchange for the Buyer becoming the guarantor on the same terms and conditions; provided that for purposes of this Section 5.8 "reasonable efforts" shall not include any out-of-pocket expenses of any of the parties hereto (other than expenses of counsel or advisors). On or prior to the Closing, the Company and the Shareholders shall cause the Company to be released as a guarantor of any obligations of any affiliate or individual shareholder, including without limitation those set forth on Schedule 5.8(b)

5.9.    Brand Development Promotions. Following the Closing within twenty days after the end of each calendar month through January 31, 2004, Buyer shall deliver to the Shareholders' Representative a detailed accounting of all brand development promotional expenses of the Company (the "Promotion Information") for such month. If an indemnification claim is going to be made pursuant to Section 7.4(b)(iv) by a Buyer Indemnified Party, Buyer shall deliver to the Shareholders' Representative, along with the notice of such claim, the Promotion Information separated by customer for the period from the Closing Date through the date such claim is made. The expense related to creating and providing such information to the Shareholders' Representative shall be at Buyer's sole expense. The Shareholders' Representative agrees that the Shareholders' Representative will not, at any time, disclose any Promotion Information to any Person without the prior written consent of Buyer (except that the Promotion Information or portions thereof may be disclosed to the Shareholders and their agents and advisors (collectively with the Shareholders, the "Agents") for the purpose of evaluating such Promotion Information relative to Section 7.4(b)(iv); provided such Agents (a) shall be advised by the Shareholders' Representative of this Section 5.9, (b) agree in writing to hold the Promotion Information confidential and (c) agree in writing to be bound by the provisions of this Section 5.9 and to not use for his or her own account or for the benefit of any third party any Promotion Information, unless and to the extent that the Promotion Information (i) is or becomes generally known to or available for use by the public other than as a result of the Shareholders' Representative's fault or the fault of any Agent, (ii) becomes available to the Shareholders' Representative on a non-confidential basis from a source other than the Company, Buyer or another Agent, or (iii) is required to be disclosed by law, order or regulation of a court or tribunal or governmental authority; provided, however, that, in any such case, the Shareholders' Representative shall notify Buyer as early as reasonably practicable prior to disclosure to allow Buyer to take appropriate measures to preserve the confidentiality of such information.

5.10.    Disclosure of Formulations. At least five (5) business days prior to the Closing Date, the Company shall disclose to Buyer in writing the formulations for each of the products marketed by the Company as of the date hereof, which formulations shall be subject to the terms and conditions of the Confidentiality Agreement.

5.11.    Bonus Letter Agreements. In the event and to the extent the payments set forth on Exhibit D relating to the cancellation as of the Closing of the options held by Marilynn Martin, Luke Gernandt, Douglas Martin Hagge and William Paul Pruett are not sufficient to cover and do not effectively extinguish the claims of any such individual relating to the Letter Agreements between the Company and each such individual set forth in Schedule 4.1(l)(i), the Shareholders shall be responsible on a pro rata basis to cover such claims for payment.

## ARTICLE VI
## OTHER AGREEMENTS

6.1.    Certain Understandings. Each of the parties hereto is sophisticated and was advised by experienced counsel and, to the extent the party deemed it necessary, other advisors in connection with this Agreement. Buyer acknowledges that it has performed a comprehensive

due diligence investigation of the business and operations of the Company. Each of the parties hereto hereby acknowledges that (i) there are no representations or warranties by or on behalf of any party hereto or any of its respective Affiliates or representatives other than those expressly set forth in this Agreement, (ii) no party has relied or will rely in respect of this Agreement or the transactions contemplated hereby upon any document or written or oral information previously furnished to or discovered by it or its representatives, other than this Agreement (including the Schedules) and (iii) the parties' respective rights and obligations with respect to this Agreement and the events giving rise thereto will be solely as set forth in this Agreement. The Company and its Affiliates, agents, officers, directors and shareholders will not have or be subject to any liability to Buyer or any other person resulting from the distribution to Buyer, or Buyer's use of, any information not contained in or transferred pursuant to this Agreement or the closing certificates to be delivered pursuant to Section 3.2 (including, without limitation, any offering memorandum, brochure or other publication provided to Buyer, and any other document or information provided to Buyer in connection with the transactions contemplated hereby). Notwithstanding anything contained herein to the contrary, the Company makes no representation, warranty or covenant of any kind with respect to any projections, estimates or budgets heretofore delivered to or made available to Buyer of future revenues, expenses or expenditures, future results of operations (or any component thereof), future cash flows or future financial condition (or any component thereof) of the Company or the future business and operations of the Company.

6 2.    Shareholders' Representative. Each Shareholder hereby (except as provided below) irrevocably appoints David Friedson ("Shareholders' Representative") as such Shareholder's representative, attorney-in-fact and agent, with full power of substitution to act in the name, place and stead of such Shareholder with respect to the transfer of such Shareholder's Shares to Buyer in accordance with the terms and provisions of this Agreement and to act on behalf of such Shareholder in any litigation or arbitration involving this Agreement and to do or refrain from doing all such further acts and things, and to execute all such documents, as such Shareholders' Representative shall deem necessary or appropriate in connection with any of the transactions contemplated under this Agreement, including, without limitation, the power:

(a)    to take all action necessary or desirable in connection with the waiver of any condition to the obligations of Shareholders to consummate the transactions contemplated by this Agreement;

(b)    to receive, hold, and deliver to Buyer the certificates evidencing Shares accompanied by executed stock powers and any other documents relating thereto on behalf of such Shareholder;

(c)    to execute and deliver all ancillary agreements, certificates, statements, notices, approvals, extensions, waivers, undertakings, amendments and other documents required or permitted to be given in connection with the consummation of the transactions contemplated by this Agreement;

(d)     to receive funds and give receipt for funds including in respect of the Purchase Price, and any adjustment thereto, to distribute to the Shareholders their respective share of the Purchase Price, and any adjustment thereto, and to withhold from such funds a contingency reserve for the matters referred to below;

(e)     to terminate this Agreement if Shareholders are entitled to do so expressly under this Agreement;

(f)     to give and receive all notices and communications to be given or received under this Agreement and to receive service of process in connection with any claims under this Agreement, including service of process in connection with arbitration; and

(g)     to take all actions which under this Agreement may be taken by the Shareholders' Representative and to do or refrain from doing any further act or deed on behalf of such Shareholder which Shareholders' Representative deems necessary or appropriate in his sole discretion relating to the subject matter of this Agreement as fully and completely as such Shareholder could do if personally present.

If David Friedson dies or otherwise becomes incapacitated and unable to serve as Shareholders' Representative, the Shareholders, who collectively own 80% of the Shares immediately prior to the Closing shall appoint a replacement. The death or incapacity of any Shareholder shall not terminate the agency and power of attorney granted hereby to the Shareholders' Representative. Buyer and any other person may conclusively and absolutely rely, without inquiry, upon any action of Shareholders' Representative, as the action of Shareholders in all matters referred to herein, unless the Shareholders who collectively own a majority of the Shares immediately prior to the Closing provide prior written notice of the replacement of such Shareholders' Representative to Buyer. All actions, decisions and instructions of Shareholders' Representative shall be conclusive and binding upon all of the Shareholders and no Shareholder shall have any cause of action against Shareholders' Representative for any action taken or not taken by Shareholders' Representative in his role as such, except for any action or omission taken or made fraudulently or in bad faith with respect to such Shareholder.

The Shareholders agree that any payment by Buyer to the Shareholders' Representative shall be deemed a payment directly to each of the Shareholders in accordance with the terms of this Agreement and each Shareholder forever releases and discharges Buyer and its affiliates and subsidiaries and their respective officers, directors, employees, attorneys and agents, from any and all claims, actions, suits, liabilities and damages (including Damages) for any such payment made.

All reasonable out-of-pocket fees and expenses (including fees payable to counsel, accountants and other professional and brokerage fees) incurred by Shareholders' Representative in connection with performing such function and in connection with the transactions contemplated hereby and all payments, damages, costs, fees and expenses in connection with any dispute with Buyer under this Agreement shall be paid by the Shareholders.

Neither the Company nor Buyer will have any liability for any fees and expenses payable to the Shareholders' Representative.

### ARTICLE VII
### MISCELLANEOUS

7.1.    <u>Assignment</u>.  This Agreement and the rights and obligations hereunder shall not be assignable or transferable by any party (including by sale of stock, operation of law in connection with a merger, or sale of substantially all the assets of Buyer) without the prior written consent of the other parties hereto, except that Buyer may assign this Agreement to a wholly-owned subsidiary of Buyer, the performance of which is hereby guaranteed by Buyer. This Agreement shall inure to the benefit of, and be binding upon and enforceable against the parties and, the successors and permitted assigns of the respective parties hereto.

7.2.    <u>No Third-Party Beneficiaries</u>.  Except as provided in Section 5.2, this Agreement is for the sole benefit of the parties hereto and their permitted assigns and nothing herein expressed or implied shall give or be construed to give to any person or entity, other than the parties hereto and such assigns, any legal or equitable rights hereunder.

7.3.    <u>Termination</u>.

(a)    This Agreement may be terminated by written notice given by Buyer to the Shareholders' Representative or by the Shareholders' Representative to Buyer (i) if the Closing shall not have occurred on or before September 30, 2003, or (ii) if (A) the purchase and sale of the Shares contemplated hereby shall violate any non-appealable final order, decree or judgment of any court or governmental body having competent jurisdiction or (B) there shall be a statute, rule or regulation which makes the purchase and sale of the Shares contemplated hereby illegal or otherwise prohibited.

(b)    In the event of termination by the Company or Shareholders' Representative pursuant to paragraph (a) of this Section 7.3, written notice thereof shall forthwith be given to the other party and the transactions contemplated by this Agreement shall be terminated, without further action by either. If the transactions contemplated by this Agreement are terminated as provided herein:

(i)    Buyer shall return all documents and other material received from the Shareholders, the Company or any of their Affiliates relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof, to the Company or Shareholders, as applicable (except that one copy of each document may be retained in the legal department of the Buyer to be used by the Buyer's counsel solely for compliance purposes);

(ii)    all confidential information received by Buyer with respect to the business of the Company shall be treated in accordance with the Confidentiality Agreement, which shall remain in full force and effect notwithstanding the termination of this Agreement;

(iii)    the provisions of Sections 5.2(a), 5.2(d), 7.5, 7.9, 7.10, 7.11, 7.14 and 7.15 shall remain in full force and effect; and

(iv)    in no event shall any termination of this Agreement limit or restrict the rights and remedies of any party hereto against any other party which has willfully breached any of the agreements or other provisions of this Agreement prior to termination hereof.

7.4.    Survival of Representations, Warranties and Covenants.

(a)    Survival of Representations. The representations and warranties of the Company, Shareholders and Buyer contained in this Agreement (including the Schedules attached hereto) and in the certificates delivered pursuant to Sections 3.2(a), 3.2(b), 3.3(a) and 3.3(b) and the right to assert any claim for indemnification provided for in Section 7.4(b)(v) shall terminate twenty-four (24) months from the Closing Date; provided, however, that (i) the representations and warranties set forth in Section 4.1(c)(i)(A), 4.1(c)(i)(B), 4.1(c)(i)(C) (only to the extent such provisions relate to the acceleration or other right to acquire a substantial portion of the Company's assets or equity interest), 4.1(d) and (4.1(z) (to the extent relating to such representations and warranties mentioned in this subpart (i)), and Section 4.2, and in the certificates delivered pursuant to Sections 3.2(a) to the extent related thereto, shall survive for a period equal to the applicable statute of limitations (including any extensions thereof) plus 60 days after the closing of the applicable statute of limitations, and (ii) the right to assert any claim for indemnification provided for in Sections 7.4(b)(iv) and 7.4(b)(x) shall terminate twelve (12) months after the Closing Date, and (iii) right to assert any claim for indemnification provided in Sections 7.4(b)(vii), 7.4(b)(viii) and 7.4(b)(ix) shall terminate thirty-six (36) months after the Closing Date. The covenants of the Company, Shareholders and Buyer to be performed prior to Closing pursuant to Sections 5.1(a), 5.1(b), 5.3(a) and (c), and 5.8 of this Agreement shall terminate twenty-four (24) months from the Closing Date; and all other covenants shall survive the Closing and remain in effect indefinitely unless expressly limited herein. Each period until the termination of a representation, warranty, covenant or right to assert a claim for indemnification as provided in the two preceding sentences shall be defined as the "Survival Period" applicable thereto. The obligations to indemnify and hold harmless any Buyer Indemnified Party or Seller Indemnified Party (each an "Indemnified Party") under this Section 7.4 with respect to a breach of a representation or warranty or a breach of covenant shall terminate when the applicable Survival Period terminates; provided, however, that such indemnification rights shall not terminate with respect to any item as to which the Buyer Indemnified Party or Seller Indemnified Party, as applicable, shall have, before the expiration of the applicable Survival Period, previously made a claim by delivering a notice (stating in reasonable detail the basis of such claim) to the Shareholders' Representative or Buyer, as applicable, and provided further that any such claim which solely involves the parties hereto shall be deemed to have been withdrawn and waived one year after the expiration of the applicable Survival Period, unless (A) court proceedings shall have been commenced with respect to such claim within such one year period, (B) the parties are negotiating the resolution of such claim in good faith, or (C) such claim shall have been waived or satisfied within such one year period; provided that if the facts regarding a necessary element of the claim (including

Damages with respect thereto) are not reasonably determinable within such one-year period, such one-year period shall be extended until the expiration of 90 days after such facts are reasonably determinable. No investigation by or knowledge of any of the parties hereto (whether prior to, on, or after the Closing) shall in any way limit the representations and warranties of the parties or limit the right of the other party to rely on such representations or warranties.

(b)     Indemnification by the Shareholders. Subject to the other provisions of this Section 7.4, after the Closing each Shareholder hereby agrees severally (and not jointly) to indemnify, save and hold harmless Buyer and its Affiliates and subsidiaries and their respective officers, directors, principals, attorneys and agents (the "Buyer Indemnified Parties") from and against any and all costs, losses, Taxes, liabilities, obligations, damages, deficiencies and expenses (whether or not arising out of third-party claims), including interest, penalties, reasonable attorneys' fees and all reasonable amounts paid in investigation, defense or settlement of any of the foregoing ("Damages"), incurred as a result of or arising out of:

(i)     any breach of any representation or warranty made by the Company set forth in Section 4.1 hereof (including the Schedules attached hereto) and in the certificates delivered pursuant to Sections 3.2(a)(i), 3.2(b) and 3.2(c); provided that the phrase "Material Adverse Effect" and the word "material" or any derivative thereof set forth in Section 4.1 shall be deemed for purposes of this clause (i) (and for purposes of determining whether a breach of such representation or warranty has occurred that gives rise to a claim for indemnification hereunder) to be an amount of Damages equal to an amount greater than $25,000 in each matter; and provided further that, for purposes of determining whether such threshold of $25,000 is met, individual claims less than $25,000 may be aggregated if such individual claims arise out of the same occurrence, event or circumstance, or are continuous or repetitive in nature; provided further that a Buyer Indemnified Party will not be permitted to make a claim for Damages for a breach by the Company of the representations and warranties set forth in Section 4.1(y) relating to any condition generally affecting the industry to the extent Buyer has breached the representations and warranties set forth in Section 4.3(h) relating to such condition;

(ii)     any breach of any representation or warranty made by such Shareholder set forth in Section 4.2 hereof (including the Schedules attached hereto) and in the certificates delivered pursuant to Section 3.2(a)(ii); provided that the phrase "Material Adverse Effect" and the word "material" or any derivative thereof set forth in Section 4.2 shall be deemed for purposes of this clause (ii) (and for purposes of determining whether a breach of such representation or warranty has occurred that gives rise to a claim for indemnification hereunder) to be an amount of Damages equal to an amount greater than $25,000 in each matter; and provided further that, for purposes of determining whether such threshold of $25,000 is met, individual claims less than $25,000 may be aggregated if such individual claims arise out of the same occurrence, event or circumstance, or are continuous or repetitive in nature;

(iii)     any breach of any covenant or agreement made by the Company (prior to the Closing) or such Shareholder in this Agreement;

- 43 -

(iv)    (a) all expenses of commitments by the Company made prior to the Closing Date for brand development promotion after the Closing Date, to the extent that such expenses, in the aggregate, exceed the greater of (1) $13,000,000 (the "Promotion Bucket") or (2) eighteen and one-half percent (18.5%) of the actual total gross sales from July 1, 2003 though January 31, 2004 and (b) expenses of commitments by the Company made prior to the Closing Date for radio and television advertising after the Closing Date, to the extent that such expenses exceed $1,000,000 in the aggregate; provided that in the case of both (a) and (b) that any additions or changes by Buyer or the Company (following the Closing) to the brand development promotional liability set forth on the Closing Date Exhibit G after the Closing through January 31, 2004 will be added to the Promotion Bucket; provided further that Buyer agrees to be responsible for and to thereby bear the expense of maintaining  the accounting records relating to such expenditures,

(v)    all returns of the Company's products during the first three (3) months after the Closing Date, relating to the Company's products sold prior to the Closing Date, to the extent that such returns exceed the greater of (1) $1,000,000 or (2) four percent (4%) of gross sales in the aggregate;

(vi)    any claim for payment of fees or commissions due to any broker by the Company or any Shareholder in connection with this Agreement or the transactions contemplated thereby or in connection with the sale of the Company or all or substantially all of the assets of the Company;

(vii)    any product defects or liabilities for products of the Company manufactured prior to the Closing, and any disparagement or misrepresentation claims relating to labeling or written sales communications created by or on behalf of the Company at the Company's direction prior to the Closing, whether such products or communications were or are shipped or delivered prior to, on or after the Closing Date;

(viii)    with respect to products manufactured by or on behalf of the Company prior to the Closing, any failure of the Company to be in compliance (with or without notice or lapse of time) with all Applicable Laws, including without limitation any failure of the Company's products to comply with applicable laws and regulations of the Food and Drug Administration;

(ix)    with respect to products manufactured by or on behalf of the Company prior to the Closing, any infringement, misappropriation or violation of the intellectual property rights of any other person or entity based upon the manufacture, use, offer for sale or sale by or on behalf of the Company, whether such products were or are shipped or sold prior to, on or after the Closing Date; and

(x)    the failure of Christopher Baker, either before the Closing or as agent authorized to negotiate but not execute an agreement on behalf of the Company after the Closing by October 1, 2003, to negotiate a written agreement with acceptable terms (as "acceptable terms" is defined below) providing for a prospective price reduction of at least 2.5

- 44 -

:

cents per unit (based upon a weighted average using the relative proportions of each flavor of products purchased by the Company during the Company's fiscal year ended June 30, 2003, without regard to actual volumes) with respect to all flavors of products manufactured by Sweet Productions, Ltd. on behalf of the Company pursuant to the Agreement dated November 27, 2001, between Sweet Productions, Ltd. and the Company, as amended by that certain letter agreement dated October 30, 2002, which Agreement shall be superseded by such new agreement. The following provisions apply to indemnification under this Section 7.4(b)(x): (i) in the event Christopher Baker fails to so negotiate by October 1, 2003, a written agreement with acceptable terms providing for any prospective price reduction, the Buyer as a Buyer Indemnified Party will be entitled to a payment of $10,000,000 as indemnification from the Shareholders and the Shareholders shall pay such amount to the Buyer as indemnification; and (ii) in the event Christopher Baker so negotiates by October 1, 2003, a written agreement with acceptable terms providing for a prospective price reduction which is less than 2.5 cents per unit, the Buyer as a Buyer Indemnified Party shall be entitled to payment as indemnification from the Shareholders, and the Shareholders shall pay to the Buyer as indemnification, an amount determined in accordance with the following formula:

| | | |
|---|---|---|
| (2.5 cents per unit − [negotiated price reduction in cents per unit])  X  $10,000,000<br>(2.5 cents per unit) | = | Buyer Indemnified Parties' claim for indemnification |

The Parties acknowledge and agree that (A) the "Damages" for purposes of this Section 7.4(b)(x) shall be limited to the amount, if any, required to be paid by the Shareholders pursuant to the immediately prior sentence in accordance with the formula set forth above and (B) Sections 7.4(d) and 7.4(e) shall not be applicable to indemnification required to be paid in connection with this Section 7.4(b)(x).

For example, assuming Christopher Baker so negotiates by October 1, 2003, a written agreement with acceptable terms providing for a prospective price reduction of 1.5 cents per unit, the Buyer as a Buyer Indemnified Party would be entitled to $4,000,000 in indemnification and the Shareholders would be obligated to pay such amount to Buyer as indemnification, calculated as follows:

| | | |
|---|---|---|
| (2.5 cents per unit − [1.5 cents per unit])  X  $10,000,000<br>(2.5 cents per unit) | = | $4,000,000 |

For purposes of this Section 7.4(b)(x), "acceptable terms" shall mean the same terms and conditions as in existence as of the date hereof, except that: (i) the term shall be no less than one (1) year and up to two (2) years with an effective date no later than October 1, 2003; (ii) by

- 45 -

December 1, 2003, the products manufactured shall be required to meet the specifications heretofore provided by the Buyer to Sweet Productions, Ltd. which are attached hereto as Exhibit H; (iii) the manufacturer shall commit to being capable of supplying under such agreement at least 90 million units of product in each contract year; (iv) the Company may agree to place orders in each contract year committing to purchase 90 million units of products; and (v) the Company may agree to be required to provide six (6) months' notice of termination rather than the 30 days required under the Agreement identified in the first sentence of this Section 7.4(b)(x).

Notwithstanding anything to the contrary herein, with respect to any indemnification claims pursuant to Section 7.4(b)(vii), Section 7.4(b)(viii) or Section 7.4(b)(ix), a Buyer Indemnified Party's right to indemnification shall be limited to Damages incurred as a result of or arising out of claims of third parties and Damages of the Buyer Indemnified Party other than expenses incurred for the purpose of modifying the processes, facilities or equipment for the future production of product.

(c)    Indemnification by Buyer. Subject to the other provisions of this Section 7.4, Buyer shall indemnify, save and hold harmless the Shareholders and their respective Affiliates and subsidiaries and their respective officers, directors, principals, attorneys, agents, heirs and legal representatives (the "Seller Indemnified Parties") from and against any and all Damages incurred as a result of or arising out of:

(i)    any breach of any representation made by Buyer in Section 4.3 hereof and in the certificates delivered pursuant to Section 3.3(a) and 3.3(b); provided that the phrase "Buyer Material Adverse Effect" and the word "material" or any derivative thereof set forth in Section 4.3 shall be deemed for purposes of this clause (i) (and for purposes of determining whether a breach of such representation or warranty has occurred that gives rise to a claim for indemnification hereunder) to be an amount of Damages equal to an amount greater than $25,000 in each matter; and provided further that, for purposes of determining whether such threshold of $25,000 is met, individual claims less than $25,000 may be aggregated if such individual claims arise out of the same occurrence, event or circumstance, or are continuous or repetitive in nature; provided further that the remedy of a Seller Indemnified Party for a breach by Buyer of the representations and warranties set forth in Section 4.3(h) shall be limited to the inability of a Buyer Indemnified Party pursuant to Section 7.4(b)(i) to make a claim against the Shareholders for a breach by the Company of the representations and warranties set forth in Section 4.1(y) and neither any Shareholder nor any other Seller Indemnified Party shall have any other remedy, right or claim related to Section 4.3(h); and

(ii)    any breach of any covenant or agreement made by Buyer or the Company (following the Closing) in this Agreement.

(d)    Acknowledgements: Mitigation. Buyer, the Company and the Shareholders acknowledge and agree that no Indemnified Party shall have a right to assert claims under any provision of this Agreement for any Damages to the extent that such Damages relate

- 46 -

to actions taken by or omitted to be taken by Buyer or the Company after the Closing Date (with respect to claims by Buyer Indemnified Parties) or by any Shareholder after the Closing Date (with respect to claims by Seller Indemnified Parties). Nothing provided in this Section 7.4 shall limit any duty of an Indemnified Party to mitigate Damages under applicable law.

(e)    <u>Damages Net of Insurance, Etc.</u>  The amount of any Damages for which indemnification is provided under this Section 7.4 shall be net of (i) any accruals or reserves on the Balance Sheet that specifically relate to the matter(s) for which indemnification is claimed, (ii) any amounts actually recovered by Indemnified Parties pursuant to any indemnification by or indemnification agreement with any third party (net of any costs incurred to obtain such recovered amounts), (iii) any insurance proceeds or other cash receipts or sources of reimbursement received as an offset against such Damages (net of any costs incurred to obtain such proceeds or reimbursement and all deductions and adjustments to premiums; and no right of subrogation shall accrue to any insurer or third party indemnitor hereunder) (each such source named in clauses (ii) and (iii), a "Collateral Source") and (iv) an amount equal to the Tax benefit, if any (net of the Tax cost, if any), attributable to such Damages. If the amount to be netted hereunder from any payment required hereunder is determined after payment of any amount otherwise required to be paid to an Indemnified Party pursuant to this Section 7.4, the Indemnified Party shall repay to the Shareholders or to Buyer, as applicable, promptly after such determination, any amount that should not have been paid pursuant to this Section 7.4 had such determination been made at the time of such payment. Indemnification under this Section 7.4 shall not be available to any Indemnified Party unless such Indemnified Party first seeks, in good faith, recovery from any Collateral Source for such claim; provided that from the date a Buyer Indemnified Party makes a claim pursuant to Section 7 4 against an Indemnifying Party until the Buyer Indemnified Party completes its seeking of recovery from a Collateral Source as required pursuant to this Section 7.4(e), the Shareholders agree to maintain in the Escrow Fund, to the extent such amount exists at such time in the escrow account, a sufficient amount to cover the indemnifiable Damages pursuant to such claim. To the extent any Damages are indemnifiable under Section 7.4(b)(vii), the Shareholders shall only be responsible for the amount of Damages to the extent such amount is in excess of those Damages that would have been covered by the Company's insurance policies in place as of the Closing Date; provided however, if a dispute exists as to whether such insurance would have covered the matter in question or as to the amount such insurance would have paid, the Shareholders agree to maintain in the Escrow Fund, to the extent such amount exists at such time in the escrow account, a sufficient amount to cover the indemnifiable Damages pursuant to such disputed claim. To the extent that a Buyer Indemnified Party receives any tax benefits relating to the Company and its business pre-Closing or in connection with the transactions contemplated hereby, any Damages payable pursuant to an indemnification claim under Section 7.4(b) relating to a tax liability shall be reduced to the extent of the amount of any such tax benefit, up to and not to exceed two and one half million dollars ($2,500,000) in the aggregate of reductions for all such tax liabilities.

(f)    <u>Defense of Third Party Claims.</u>  If any lawsuit or enforcement action (including the commencement of any administrative proceeding, including without limitation an administrative proceeding with respect to Taxes) is filed against any Indemnified Party, written

- 47 -

notice thereof shall be given by the Indemnified Party to the indemnifying party (the "Indemnifying Party") as promptly as practicable (and in any event within 15 calendar days after the service of the citation or summons). The failure of any Indemnified Party to give timely notice hereunder shall not affect rights to indemnification hereunder, except to the extent that the Indemnifying Parties have suffered actual prejudice by such failure. After such notice, if the Indemnifying Party shall acknowledge in writing to the Indemnified Party that the Indemnifying Party shall be obligated under the terms of their indemnity hereunder in connection with such lawsuit or action, then the Indemnifying Parties shall be entitled, if they so elect at their own cost, risk and expense, (i) to take control of the defense and investigation of such lawsuit or action, (ii) to employ and engage attorneys of their own choice to handle and defend the same unless the named parties to such action or proceeding include both an Indemnifying Party and the Indemnified Party and the Indemnified Party has been advised by counsel that joint counsel for the Indemnified Party and the Indemnifying Party shall result in a conflict under the applicable rules of professional conduct, in which event the Indemnified Party shall be entitled, at the Indemnifying Parties' cost, risk and expense to separate counsel of its own choosing, and (iii) to compromise or settle such claim; provided that the Indemnifying Party shall not agree to any compromise or settlement that does not include a complete release of the Indemnified Party from all liability with respect thereto or that imposes any liability on the Indemnified Party without the consent of Indemnified Party. The Indemnified Party may, at its own cost, participate in (but not control) the investigation, trial and defense of such lawsuit or action and any appeal arising therefrom. If the Indemnifying Parties fail to assume the defense of such claim within 30 calendar days after receipt of the notice of claim by the Indemnifying Party, the Indemnified Party against which such claim has been asserted will (upon delivering notice to such effect to the Indemnifying Party) have the right to undertake, at the Indemnifying Parties' cost, risk and expense, the defense of such claim on behalf of and for the account and risk of the Indemnifying Parties (but shall not have authority to settle such claim without the consent of the Indemnifying Parties unless the Indemnifying Parties fail, within 10 days of notice that Indemnified Party intends to settle the claim (which notice shall describe the terms of such proposed settlement), to agree to assume control of the defense of such claim). If the Indemnified Party assumes the defense of the claim, the Indemnified Party will keep the Indemnifying Party reasonably informed of the progress of any such defense. Subject to the other provisions hereof, the Indemnifying Parties shall be liable for any settlement of any action effected pursuant to and in accordance with this Section 7.4 and for any final judgment (subject to any right of appeal) and the Indemnifying Parties agree to indemnify and hold harmless an Indemnified Party from and against any Damages by reason of such settlement or judgment.

(g)    Cooperation. Any Indemnified Party shall cooperate in all reasonable respects with the Indemnifying Parties and their attorneys in the investigation, trial and defense of such lawsuit or action and any appeal arising therefrom and, at no out-of-pocket cost to the Indemnified Party, shall furnish such records, information and testimony, and attend such conferences, discovery proceedings, hearings, trials and appeals as may be reasonably requested in connection therewith. Such cooperation shall include access during normal business hours afforded to Buyer and its agents and representatives to, and reasonable retention by the Indemnified Party of records and information which are reasonably relevant to such third party

claim, and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder. The parties shall cooperate with each other in any notifications to insurers.

(h)    Limitation on Claims. The maximum aggregate liability obligation of all Shareholders to the Buyer Indemnified Parties under Sections 7.4(b)(i) (other than for breaches relating to the representations and warranties set forth in Sections 4.1(b), 4.1(c)(i)(A), 4.1(c)(i)(B), 4.1(c)(i)(C) (only to the extent such representation relates to an acceleration or other right to acquire a substantial part of the assets or equity interest of the Company) and 4.1(d)), 7.4(b)(iv), 7.4(b)(v), 7.4(b)(vii), 7.4(b)(viii), and 7.4(b)(ix) (including, but not limited to, liabilities of the Shareholders for costs, expenses and attorneys' fees paid or incurred by the Indemnified Parties in connection therewith or in connection with the curing of any or all breaches of the Company's and Shareholders' representations, warranties, covenants and agreements) shall not exceed Thirty-Five Million Dollars ($35,000,000) (the "Cap"), provided that in any event, (A) no Buyer Indemnified Party may proceed against any Shareholder to recover any Damages separate from the Escrow Fund unless and until there are no funds available for recovery of Damages from such Shareholder in the Escrow Fund and (B) each Shareholder shall only be responsible for a portion of any Damages of a Buyer Indemnified Party, based on any claim other than a claim relating to a breach by such Shareholder of a representation, warranty or covenant made by such Shareholder in this Agreement, equal to a fraction, the numerator of which is the number of shares of Common Stock, calculated on a fully diluted basis (but not taking into account any outstanding options of the Company immediately prior to the Closing), owned by such Shareholder immediately prior to the Closing, and the denominator of which is the number of shares of Common Stock, calculated on a fully diluted basis (but not taking into account any outstanding options of the Company immediately prior to the Closing), owned in the aggregate by the Shareholders immediately prior to the Closing, as set forth on Exhibit B. Notwithstanding anything to the contrary and without limiting the foregoing, each Shareholder's total liability to the Buyer Indemnified Parties for any Damages shall not exceed the aggregate amount of the Purchase Price received by such Shareholder. The maximum aggregate liability obligation of the Buyer to all Seller Indemnified Parties under Section 7.4(c)(i) (including, but not limited to, liabilities of the Buyer for costs, expenses and attorneys' fees paid or incurred by the Seller Indemnified Parties in connection therewith or in connection with the curing of any or all breaches of the Buyer's representations, warranties, covenants and agreements) shall not exceed the Cap.

(i)    Other Limitations. No Buyer Indemnified Parties shall be entitled to recover for any Damages pursuant to (i) Section 7.4(b)(i) (other than for breaches of the representations and warranties set forth in Sections 4.1(b), 4.1(d), and 4.1(i)), or (ii) Section 7.4(b)(viii) or Section 7.4(b)(ix) (unless there was Company Knowledge of a matter to be indemnified pursuant to such subsection as of the Closing that was not disclosed in Schedules 4.1(k) or 4.1(p)), unless the aggregate amount of all Damages for which the Buyer Indemnified Parties would, but for this sentence, be entitled to receive indemnification pursuant to such Sections 7.4(b)(i), 7.4(b)(viii) and 7.4(b)(ix) exceeds Five Hundred Thousand Dollars ($500,000) (the "Damage Threshold"), and then only for such Damages in excess of the Damage Threshold.

No Seller Indemnified Parties shall be entitled to recover for any Damages pursuant to Section 7.4(c)(i) unless the aggregate of all Damages for which the Seller Indemnified Parties would, but for this sentence, be entitled to receive indemnification pursuant to such Section 7.4(c)(i) exceeds the Damage Threshold, and then only for such Damages in excess of the Damage Threshold.

(j)    Damages.  The term "Damages" is not limited to matters asserted by third parties against an Indemnified Party, but includes Damages incurred or sustained by the Indemnified Party in the absence of third party claims.  Payments by an Indemnified Party for amounts for which it is indemnified hereunder shall not be a condition precedent to recovery provided that the Indemnified Party has actually incurred Damages.  Amounts payable by an Indemnifying Party to an Indemnified Party in respect of Damages for which an Indemnified Party is entitled to indemnification hereunder shall be payable by the Indemnifying Party as incurred by the Indemnified Party.

(k)    Exclusive Remedy  After the Closing, except for equitable remedies for obligations of confidentiality and non-competition pursuant to this Agreement, the rights set forth in this Section 7.4 shall be the Indemnified Parties' sole and exclusive remedies with respect to any and all claims relating to this Agreement, the parties hereto, the events giving rise to this Agreement and the transactions provided for herein or contemplated hereby.  Without limiting the generality or effect of the foregoing, as a material inducement to the other parties hereto entering into this Agreement, and in light of, among other factors, the acknowledgements contained in Section 6.1, the Indemnified Parties hereby waive, from and after the Closing, any claim or cause of action, known and unknown, foreseen and unforeseen, which they or any of their Affiliates may have against the other parties hereto, including without limitation under the common law or federal or state securities laws, trade regulation laws or other laws, by reason of this Agreement, the events giving rise to this Agreement and the transactions provided for herein or contemplated hereby or thereby, except for claims or causes of action brought under and subject to the terms and conditions of the provisions contained in this Section 7.4.  Notwithstanding the foregoing, nothing herein shall prevent any of the parties hereto from bringing an action based upon allegations of fraud or willful misconduct with respect to the other parties in connection with this Agreement.

(l)    Tax Treatment.  Any indemnification payments under this Section 7.4 shall be treated, for Tax purposes, as adjustments to the Purchase Price.

(m)    Subrogation.  Without otherwise limiting any and all other rights in law or equity of the Indemnifying Parties, the Indemnifying Parties shall be subrogated to the rights of an Indemnified Party, and shall be entitled to assert on behalf of and in the name of an Indemnified Party, any and all claims to recover such Damages that an Indemnified Party may have against any and all third parties (whether or not a party to this Agreement) to recover any amounts paid as Damages hereunder.  The Indemnified Party shall provide such reasonable assistance and cooperation as the Indemnifying Parties may request (and at the Indemnifying Parties' expense) in connection with the assertion and prosecution of any and all such claims

against third parties so that the Indemnifying Parties may be able to fully and effectively pursue any and all of such third party claims.

7.5.    Expenses.    Whether or not the transactions contemplated hereby are consummated, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs or expenses, except as may otherwise be expressly provided in this Agreement. The Shareholders will pay at the Closing all the costs, fees and expenses, including, without limitation, legal fees, incurred by the Company, and fees and expenses of the Shareholders' Representative incurred by the Shareholders pursuant to Section 6.2, in connection with this Agreement and the transactions contemplated hereby. Notwithstanding the foregoing, (a) Buyer, on behalf of the Company, will pay the accounting fees of Ernst & Young incurred in connection with the audit of the Company's financial statements and (b) Buyer shall be responsible for half of all filing fees incurred in connection with any filing made pursuant to the HSR Act related to the transactions contemplated by this Agreement. Not withstanding anything to the contrary herein, the Shareholders shall not be responsible for paying any amounts expended by the Company relating to product reformulation prior to the Closing.

7.6.    Amendments.    No amendment to or modification of this Agreement shall be effective unless it shall be in writing and signed by each of the parties hereto.

7.7.    Notices.    All notices and other communications hereunder shall be in writing and shall be deemed given (a) on the date of delivery if delivered personally; (b) on the date of transmission if sent via facsimile transmission to the facsimile number given below, and telephonic confirmation of receipt is obtained promptly after completion of transmission; (c) on the date after delivery to a reputable nationally recognized overnight courier service or (d) three days after being mailed by registered or certified mail (return receipt requested) to the parties at the following addresses (or at such other address for a party as shall be specified by like notice):

        (i)    If to Buyer,

              Abbott Laboratories
              Ross Products Division
              625 Cleveland Ave.
              Columbus, OH 43215
              Attention:    President
              Telecopier:    (614) 624-7030

              With a required copy to:

              Abbott Laboratories
              100 Abbott Park Road
              Abbott Park, IL 60064
              Attention:    Senior Vice President, Secretary

& General Counsel
Telecopier:    (847) 938-6277

(ii)    If to the Company, to:

ZonePerfect Nutrition Company
303 Congress Street, Suite 301
Boston, MA  02210
Attention:    Christopher P. Baker
Telecopier:    (801) 760-4776

With a required copy to:

Dechert LLP
4000 Bell Atlantic Tower
1717 Arch Street
Philadelphia, PA 1910
Attention:    Christopher G. Karras
Telecopier:    (215) 994-2222

(iii)    If to Shareholders or Shareholders' Representative:

David Friedson
300 Central Park West, Apt  21D
New York, NY  10024
Telecopier:    (305) 364-0502

With a required copies to:

Dechert LLP
4000 Bell Atlantic Tower
1717 Arch Street
Philadelphia, PA 19103
Attention:    Christopher G. Karras
Telecopier:    (215) 994-2222

and

Rubin and Rudman LLP
50 Rowes Wharf
Boston, Massachusetts  02110
Attention:    Michael Unger
Telecopier:    (617) 439-9556

- 52 -

Such addresses may be changed from time to time by means of a notice given in the manner provided in this Section (provided that no such notice shall be effective until it is received by the other parties hereto).

7.8.   Fees.   The Shareholders shall pay as of the Closing all fees or commissions which may be payable to Adams, Harkness & Hill, Inc. in connection with this Agreement or the transactions contemplated hereby.

7.9.   Consent to Jurisdiction.   With respect to any action or claim arising out of or relating to this Agreement or the transactions contemplated hereby, the parties hereto hereby expressly and irrevocably (i) agree and consent to be subject to the exclusive jurisdiction of the United States District Court located in Wilmington, Delaware (and in the absence of Federal jurisdiction, the parties consent to be subject to the exclusive jurisdiction of the state courts located in Wilmington, Delaware), (ii) agree not to bring any action related to this Agreement or the transactions contemplated hereby in any other court (except to enforce the judgment of such courts), (iii) agree not to object to venue in such courts or to claim that such forum is inconvenient and (iv) agree that notice or the service of process in any proceeding shall be properly served or delivered if delivered in the manner contemplated by Section 7.7. Final judgment by such courts shall be conclusive and may be enforced in any manner permitted by law.

7.10.   Severability   If any provision of this Agreement or the application of any such provision to any person or circumstance shall be held invalid, illegal or unenforceable in any respect by a court of competent jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision hereof.

7.11.   Interpretation.   All references to immediately available funds or dollar amounts contained in this Agreement shall mean United States dollars. All references to GAAP contained in this Agreement shall mean United States generally accepted accounting principles. The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. The parties acknowledge and agree that (i) each party and its counsel have reviewed the terms and provisions of this Agreement and have contributed to its drafting, (ii) the normal rule of construction, to the effect that any ambiguities are resolved against the drafting party, shall not be employed in the interpretation of it, and (iii) the terms and provisions of this Agreement shall be constructed fairly as to all parties hereto and not in favor of or against any party, regardless of which party was generally responsible for the preparation of this Agreement.

7.12.   Waiver   Waiver of any term or condition of this Agreement by any party shall be effective if in writing and shall not be construed as a waiver of any subsequent breach or failure of the same term or condition, or a waiver of any other term of this Agreement. No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

7.13. <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, all of which shall be considered one and the same agreement, and shall become effective when one or more such counterparts have been signed by each of the parties and delivered to the other parties.

7.14. <u>Entire Agreement</u>. This Agreement, including the Schedules hereto, Exhibits hereto, the certificates delivered in connection herewith and the letter agreement described in Section 4.1(k) hereof, and the Confidentiality Agreement contain the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersede all prior and contemporaneous agreements, negotiations, correspondence, undertakings and understandings, oral or written, relating to such subject matter.

7.15. <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware applicable to agreements made and to be performed entirely within the State of Delaware, without regard to the conflicts of law principles thereof.

Signature pages and exhibits have been intentionally omitted.

**Exhibit 5**

EXECUTION COPY

## ESCROW AGREEMENT

ESCROW AGREEMENT (the "Agreement") dated as of August [ ] [26], 2003, among Abbott Laboratories, an Illinois corporation ("Buyer"), David Friedson as the stockholder representative and any successor thereto (the "Stockholder Representative"), on behalf of the Stockholders listed on Exhibit A attached hereto (each a "Stockholder" and collectively, the "Stockholders"), and Wells Fargo Bank Minnesota, National Association, a national banking association, as escrow agent (the "Escrow Agent").

## RECITALS

A.      Buyer, ZonePerfect Nutrition Company, a Delaware corporation, and the Stockholders have entered into a Stock Purchase Agreement dated as of July 22, 2003 (the "Purchase Agreement").

B.      Pursuant to Section 2.5 of the Purchase Agreement, the parties hereto are entering into this Agreement in order to provide for the deposit with the Escrow Agent of funds that will be held and disbursed, as hereinafter provided.

C.      Capitalized terms used in this Agreement without definition shall have the respective meanings ascribed to such terms in the Purchase Agreement.

NOW, THEREFORE, the parties hereby agree as follows:

1.      Appointment of the Escrow Agent; Deposit of Escrow Amount.  Buyer and the Stockholder Representative hereby constitute and appoint the Escrow Agent as, and the Escrow Agent hereby agrees to assume and perform the duties of, escrow agent under and pursuant to this Agreement and the Purchase Agreement. The Escrow Agent acknowledges receipt of an executed copy of the Purchase Agreement. On the Closing Date, the Escrow Agent will acknowledge in writing the receipt of the amount of $20,000,000 from the Buyer (the "Escrow Amount").

2.      The Escrow Fund.

(a)      With respect to each Stockholder listed on Exhibit A attached hereto, the product of the percentage set forth next to each Stockholder (the "Allocation Percentage"), multiplied by the Escrow Amount (as reduced by any losses on investments), is hereinafter referred to as the "Individual Escrow Fund," and the total Individual Escrow Funds, collectively, are hereinafter referred to as the "Escrow Fund." The Allocation Percentages when added together total 100%. The Escrow Fund shall be held by the Escrow Agent in accordance with the terms and conditions hereinafter set forth.

(b)      The Escrow Fund shall be held by the Escrow Agent as an escrow fund in a separate account maintained for the purpose, on the terms and subject to the conditions of this Agreement. The Escrow Agent shall maintain for each Stockholder (i) a spreadsheet-based accounting of such Stockholder's Individual Escrow Fund reflecting (x) such Stockholder's allocable portion of the Escrow Fund minus (y) any amounts distributed to such Stockholder or a Buyer Indemnified Party in accordance with this Agreement and (ii) a spreadsheet based accounting of such Stockholder's income earned or realized on any cash or

884691.12.01

permitted investment set forth in Section 3 hereof (each an "Individual Income Account"). For the avoidance of doubt, no income (whether interest or otherwise) earned or realized on the Escrow Fund shall be included in or constitute a part of the Escrow Fund, and such income shall be distributed to the Stockholders in accordance with Section 3(c) below. The Escrow Fund shall not constitute property of the Stockholder Representative or the Stockholders and shall not be subject to lien or attachment by any creditor and any party hereto and shall be used solely for the purpose set forth in this Agreement. Except as set forth in Section 8 hereof, amounts held in the Escrow Fund shall not be available to, and shall not be used by, the Escrow Agent to set off any obligations of Buyer or the Stockholder Representative owing to the Escrow Agent in any capacity. The parties acknowledge that the property rights of Buyer or the Stockholder Representative in the Escrow Fund, if any, shall be limited to their right to receive distributions therefrom in accordance with this Agreement.

(c) If at the end of any calendar quarter the balance in the Escrow Fund is below (i) $20,000,000 (or such lesser amount as reduced by payment of any Owed Amount or Other Amount, as applicable) for any such calendar quarter prior to the Partial Release Date or (ii) $10,000,000 (or such lesser amount as reduced by payment of any Owed Amount or Other Amount, as applicable) for any such calendar quarter after the Partial Release Date but prior to the Termination Date (in either case, the "Minimum Escrow Amount"), then each Stockholder shall contribute to the Escrow Fund an amount in accordance with his/her/its Allocation Percentage so that the Escrow Fund equals the applicable Minimum Escrow Amount. The Escrow Agent shall calculate the balance of the Escrow Fund at the end of each calendar quarter, and if the Escrow Fund is below the applicable Minimum Escrow Amount, the Escrow Agent shall issue a notice of the amount of the difference between the applicable Minimum Escrow Amount and the then-current balance in the Escrow Fund (the "Shortfall") to the Stockholder Representative within three (3) business days of the end of such calendar quarter, and concurrently provide a confirming copy to Buyer. The Stockholder Representative shall communicate to each Stockholder such Stockholder's pro rata portion of the Shortfall (each, an "Individual Shortfall") and each Stockholder shall have thirty (30) days from the end of such calendar quarter to contribute such Stockholder's Individual Shortfall. If any Stockholder does not make such contribution within such thirty (30) day period, then the following shall apply: (i) the income earned (whether interest or otherwise) in any successive quarter will be applied to any such Individual Escrow Fund to the extent of such Stockholder's Individual Shortfall, (ii) the Escrow Agent shall make no further disbursements to such Stockholder, including without limitation any on the Partial Release Date, pursuant to Section 3(c) until the Termination Date, for such time as the Stockholder has an Individual Shortfall or (iii) the income earned (whether interest or otherwise) in any successive quarter to the extent of such Stockholder's Individual Shortfall will become part of any such Individual Escrow Fund subject to claims of the Buyer.

3. Investment of the Escrow Fund; Taxes; Distribution of Income.

(a) As directed in writing by the Stockholder Representative, the Escrow Agent shall invest and reinvest all cash funds held from time to time as part of the Escrow Fund, in any of the following kinds of investments, or in any combination thereof which in any case shall only be denominated in United States dollars:

(i) bonds or other obligations of, or guaranteed by, the government of the United States of America or any State thereof or the District of Columbia, or agencies of any of the foregoing, having maturities of not greater than 90 days (or if earlier, the

2

Termination Date (as defined in Section 5)); provided that such bonds or other obligations are rated at least "AA" by Moody's Investors Service, Inc. ("Moody's") and "AA" by Standard & Poor's Corporation ("S&P");

(ii) commercial paper rated, at the time of the Escrow Agent's investment therein or contractual commitment providing for such investment, at least "P-1" by Moody's and "A-1" by S&P and having maturities of not greater than 90 days (or, if earlier, the Termination Date);

(iii) corporate obligations rated, at the time of the Escrow Agent's investment therein or contractual commitment providing for such investment, among the two highest ratings by any nationally recognized statistical ratings organization and having maturities of not greater than 90 days (or, if earlier, the Termination Date);

(iv) demand or time deposits in, certificates of deposit of, or bankers' acceptances issued or managed by (A) a depository institution, trust company or bank subsidiary incorporated under the laws of the United States of America, any State thereof or the District of Columbia or (B) a United States branch office or agency of a foreign depository Institution or trust company, if in any such case, the depository institution, trust company or office or agency described in subclause (A) or (B) has combined capital and surplus of not less than $500,000,000 and rated at least AA by Moody's and S&P (any such institution being herein called a "Permitted Bank") having maturities of not greater than 90 days (or, if earlier, the Termination Date); or

(v) money market mutual funds rated at least "AAA" by Moody's and S&P.

(b) For Federal income tax purposes only, all income on the Escrow Fund shall be treated as property of the Stockholders and includible in the taxable income of the Stockholders. The Escrow Agent shall have no duty or obligation with respect to notifying any party of any taxes due or monitoring the payment of any taxes, or tax reporting to the IRS.

(c) Subject to Section 2(c), at the end of each calendar quarter during the term of this Agreement and on each of the Partial Release Date and the Termination Date, the Escrow Agent shall, as notified in writing by the Stockholder Representative (with a confirming copy sent to Buyer), transfer from each Individual Escrow Fund to a sub-account which shall be in the sole control of the Stockholder Representative (the "Release Account") the sum of all income (whether interest or otherwise) earned as of such date on such Individual Escrow Fund. Any amounts distributed to the Stockholder Representative pursuant to this Section 3(c) shall be distributed by the Stockholder Representative to each Stockholder in accordance with such Stockholder's Individual Income Account.

4.    Claims Against the Escrow Fund; Minimum Escrow Amount.

(a) Buyer shall give the Escrow Agent written notice of any claim for payment due to Buyer pursuant to Section 7.4(b) of the Purchase Agreement (a "Claim Notice"). Concurrently with the delivery of a Claim Notice to the Escrow Agent, Buyer will deliver to the Escrow Agent a certificate in substantially the form of Annex I attached hereto (a "Certificate of Instruction"). No Certificate of Instruction may be delivered by Buyer after 5:00 p.m. New York

3

City time on the business day immediately preceding the Termination Date (as defined below). The Escrow Agent shall give written notice to Buyer and the Stockholder Representative of its receipt of a Certificate of Instruction not later than the second business day next following receipt thereof, together with a copy of such written notice of claim for payment due to Buyer and such Certificate of Instruction.

(b) If the Escrow Agent (i) shall not, within thirty (30) calendar days following its receipt of a Certificate of Instruction (the "Objection Period"), have received from the Stockholder Representative a certificate in substantially the form of Annex II attached hereto (an "Objection Certificate") disputing the right of the applicable indemnified party (the "Buyer Indemnified Party") to the Owed Amount (as defined in the Certificate of Instruction) referred to in such Certificate of Instruction, or (ii) shall have received such an Objection Certificate within the Objection Period and shall thereafter (whether before or after the end of the Objection Period) have received either (x) a certificate from Buyer and the Stockholder Representative substantially in the form of Annex III attached hereto (a "Resolution Certificate") stating that Buyer and the Stockholder Representative have agreed that the Owed Amount referred to in such Certificate of Instruction (or a specified portion thereof) is payable to one or more of the Buyer Indemnified Parties or (y) a copy of a final, non-appealable order of a court of competent jurisdiction (a "Court Order") accompanied by a certificate of Buyer and the Stockholder Representative substantially in the form of Annex IV attached hereto (a "Court Order Certificate") stating that the Owed Amount referred to in such Certificate of Instruction (or a specified portion thereof) is payable to one or more of the Buyer Indemnified Parties, then the Escrow Agent shall, on the second business day next following (I) the expiration of the Objection Period or (II) the Escrow Agent's receipt of a Resolution Certificate or a Court Order Certificate, as the case may be, pay over to the Buyer from the Escrow Fund, by wire transfer of immediately available funds to a bank account of Buyer's designation, the amount set forth in said Certificate of Instruction, or if such Resolution Certificate or Court Order Certificate specifies that an amount other than such Owed Amount is payable, such other amount (the "Other Amount"); provided that (1) if the underlying indemnity claim for payment is made pursuant to Section 7.4(b)(ii) or (iii) (for breach of a covenant or agreement by a Stockholder) of the Purchase Agreement, the Escrow Agent shall pay to Buyer such Owed Amount or Other Amount, as the case may be, out of the Individual Escrow Fund relating to the Stockholder to which such claim relates and (2) for any other indemnity claim, the Escrow Agent shall pay to Buyer out of each Individual Escrow Fund, an amount equal to the Owed Amount, or such Other Amount, as the case may be, multiplied by the applicable Allocation Percentage.

(c) The Escrow Agent shall give written notice to Buyer and the Stockholder Representative of its receipt of an Objection Certificate not later than the second business day next following receipt thereof, together with a copy of such Objection Certificate. The Escrow Agent shall give written notice to Buyer and the Stockholder Representative of its receipt of a Resolution Certificate or a Court Order Certificate not later than the second business day next following receipt thereof, together with a copy of such Resolution Certificate or Court Order Certificate, as the case may be.

(d) Upon the payment by the Escrow Agent of the Owed Amount referred to in a Certificate of Instruction, such Certificate of Instruction shall be deemed cancelled. Upon the receipt by the Escrow Agent of a Resolution Certificate or Court Order Certificate and the payment by the Escrow Agent of the Owed Amount (or if such Resolution

4

Certificate or Court Order Certificate specifies, such Other Amount), the related Certificate of Instruction shall be deemed cancelled.

(e)     Upon Buyer's determination that it has no claim or has released or withdrawn without prejudice its claim with respect to an Owed Amount referred to in a Certificate of Instruction (or a specified portion thereof), Buyer shall promptly deliver to the Escrow Agent a certificate substantially in the form of Annex V attached hereto (a "Buyer Cancellation Certificate") canceling such Certificate of Instruction (or such specified portion thereof, as the case may be), and such Certificate of Instruction (or portion thereof) shall thereupon be deemed cancelled. The Escrow Agent shall give written notice to Buyer and the Stockholder Representative of its receipt of a Buyer Cancellation Certificate not later than the second business day next following receipt thereof, together with a copy of such Buyer Cancellation Certificate.

(f)     Upon receipt of a final, non-appealable order of a court of competent jurisdiction stating that it is a final order and that none of the Owed Amount referred to in a Certificate of Instruction as to which the Stockholder Representative delivered an Objection Certificate within the Objection Period is payable to any Buyer Indemnified Party pursuant to Section 7.4 of the Purchase Agreement, Buyer and the Stockholder Representative shall promptly deliver to the Escrow Agent a copy of such order (accompanied by a certificate substantially in the form of Annex VI attached hereto (a "Cancellation Certificate")) canceling such Certificate of Instruction, and such Certificate of Instruction shall thereupon be deemed cancelled. The Escrow Agent shall give written notice to the Company, Buyer and the Stockholder Representative of its receipt of a Cancellation Certificate not later than the second business day next following receipt thereof, together with a copy of such Cancellation Certificate. .

5.     Release of Escrow Fund; Termination Date.

(a)     The Escrow Agent shall, as notified (subject to the provisions of Section 4 above) in writing by the Stockholder Representative (with a confirming copy sent to Buyer), transfer from each Individual Escrow Fund to the Release Account on the eighteen (18) month anniversary of the date hereof (the "Partial Release Date"), an amount equal to (x) fifty percent (50%) of the initial balance of such Individual Escrow Fund, less (y) the sum of all Owed Amounts and Other Amounts paid or payable from such Individual Escrow Fund, less (z) the sum of any amounts that may be payable from such Individual Escrow Fund designated in Certificates of Instruction received by the Escrow Agent prior to 5:00 p.m. New York City time on the business day immediately preceding the Partial Release Date that have not been cancelled in accordance with paragraph (d), (e) or (f) of Section 4.

(b)     The Escrow Agent shall, as notified (subject to the provisions of Section 4 above) in writing by the Stockholder Representative (with a confirming copy sent to Buyer), transfer from each Individual Escrow Fund to the Release Account on the twenty-four (24) month anniversary of the date hereof (the "Termination Date"), an amount equal to (x) the remaining balance of such Individual Escrow Fund, less the sum of (y)(A) any amounts that may be payable from such Individual Escrow Fund designated in Certificates of Instruction received by the Escrow Agent prior to 5:00 p.m. New York City time on the business day immediately preceding the Termination Date that have not been cancelled in accordance with paragraph (d),

5

(e) or (f) of Section 4 and (B) such Stockholder's proportionate share of the fees and expenses of the Escrow Agent to be deducted from the Escrow Fund as set forth in Section 8.

(c)     If at any time after the Termination Date the entire balance of an Individual Escrow Fund exceeds the sum at that time of the amounts relating to such Individual Escrow Fund designated in Certificates of Instruction received by the Escrow Agent prior to the Termination Date that have not been cancelled in accordance with paragraph (d), (e) or (f) of Section 4, the Escrow Agent shall promptly transfer to the Release Account the amount of such excess. At such time on or following the Termination Date as all Certificates of Instruction with respect to an Individual Escrow Fund received by the Escrow Agent prior to 5:00 p.m. New York City time on the business day immediately preceding the Termination Date have been cancelled in accordance with paragraph (d), (e) or (f) of Section 4, the Escrow Agent shall promptly transfer to the Release Account the balance in such Individual Escrow Fund. Promptly following any such transfer to the Release Account, the Escrow Agent shall provide written notice of such transfer to Buyer and the Stockholder Representative. Funds (if any) deposited and held from time to time pursuant to this Agreement in the Release Account shall be released only to the Stockholder Representative, as instructed in writing by the Stockholder Representative. After all funds have been disbursed from the Escrow Account and the Release Accounts, this Agreement (other than Sections 6, 7 and 8) shall automatically terminate.

(d)     Any amount of the Escrow Fund distributed to the Stockholder Representative pursuant to Section 5(a), (b), or (c), above, shall be distributed by the Stockholder Representative to each Stockholder in accordance with such Stockholder's Individual Escrow Fund.

6.     Duties and Obligations of the Escrow Agent. The duties and obligations of the Escrow Agent shall be limited to and determined solely by the provisions of this Agreement and the certificates delivered in accordance herewith, and the Escrow Agent is not charged with knowledge of or any duties or responsibilities in respect of any other agreement or document (including the Purchase Agreement). In furtherance and not in limitation of the foregoing:

(a)     the Escrow Agent shall not be liable for any loss of interest or any penalty sustained or imposed as a result of investments, reinvestments, sales or liquidations made hereunder in accordance with the terms hereof, including any liquidation of any investment of the Escrow Fund prior to its maturity effected in order to make a payment (including any payment of taxes) required by the terms of this Agreement;

(b)     the Escrow Agent shall be fully protected and shall incur no liability in relying in good faith upon any written certification, notice, direction, request, waiver, consent, receipt or other document delivered to the Escrow Agent as provided herein that the Escrow Agent reasonably believes to be genuine and duly authorized, executed and delivered;

(c)     the Escrow Agent shall not be liable for any error of judgment, or for any action taken, suffered or omitted by it, or for any mistake in fact or law, or for anything that it may do or refrain from doing in connection herewith; provided, however, that notwithstanding any other provision in this Agreement, (a) the Escrow Agent shall be liable for its willful misconduct or gross negligence or breach of this Agreement; and (b) in no event shall the Escrow Agent be liable for special, punitive, indirect, consequential or incidental loss or

6

damage of any kind whatsoever (including, but not limited to, lost profits), even if the Escrow Agent has been advised of the likelihood of such loss or damage;

(d)     the Escrow Agent may seek the advice of legal counsel selected with reasonable care in the event of any dispute or question as to the construction of any of the provisions of this Agreement or its duties hereunder, and it shall incur no liability and shall be fully protected in respect of any action taken, omitted or suffered by it in good faith in accordance with the opinion of such counsel;

(e)     in the event that the Escrow Agent shall in any instance, after seeking the advice of legal counsel pursuant to the immediately preceding clause, in good faith be uncertain as to its duties or rights hereunder, it shall be entitled to refrain from taking any action in that instance and its sole obligation, in addition to those of its duties hereunder as to which there is no such uncertainty and which are not impacted by such uncertainty, shall be to keep safely all property held in the Escrow Fund until it shall be directed otherwise in writing by each of the parties hereto or by a final, nonappealable order of a court of competent jurisdiction; provided, however, in the event that the Escrow Agent has not received such written direction or court order within one hundred eighty (180) calendar days after requesting the same, it shall have the right to interplead any interested party in any court of competent jurisdiction and request that such court determine its rights and duties hereunder;

(f)     the Escrow Agent may execute any of its powers or responsibilities hereunder and exercise any rights hereunder either directly or by or through agents or attorneys selected with reasonable care; and

(g)     nothing in this Agreement shall be deemed to impose upon the Escrow Agent any duty to qualify to do business in any jurisdiction other than Minnesota or to act as fiduciary, and the Escrow Agent shall not be responsible for and shall not be under a duty to examine into or pass upon the validity, binding effect, execution or sufficiency of this Agreement or of any agreement amendatory or supplemental hereto.

7.     Cooperation. Buyer and the Stockholder Representative shall provide to the Escrow Agent all instruments and documents within their respective powers that are necessary for the Escrow Agent to perform its duties and responsibilities hereunder.

8.     Fees and Expenses: Indemnity. The fees, costs and expenses of the Escrow Agent for its services hereunder shall be paid one-half by Buyer and one-half shall be deducted by the Escrow Agent directly from the Escrow Fund, such deduction to be allocated to the Stockholders' Individual Escrow Funds in accordance with their respective Allocation Percentages, prior to any payments or releases therefrom pursuant to Section 5; provided that in no event shall (i) the initial acceptance fee exceed $1,000 and (ii) the annual administration, transaction and other fees exceed $2,500 per year in the aggregate. Subject to the foregoing limitations on fees, Buyer and the Stockholder Representative shall jointly and severally indemnify the Escrow Agent and shall reimburse the Escrow Agent for, and hold it harmless against, any loss, damages, judgment, fine, penalty, claim, demand, settlement, cost or expense, including but not limited to reasonable attorneys' fees, reasonably incurred by the Escrow Agent in connection with acceptance and administration of this Agreement and its performance of its duties and obligations under this Agreement, as well as the reasonable costs and expenses of defending against any claim or liability relating to this Agreement; provided that notwithstanding

7

the foregoing, neither of the Buyer nor the Stockholder Representative shall be required to indemnify the Escrow Agent for any such loss, liability, cost or expense arising as a result of the Escrow Agent's willful misconduct or gross negligence or breach of this Agreement.

9.   Resignation and Removal of the Escrow Agent.

(a)   The Escrow Agent may resign as such thirty (30) calendar days following the giving of prior written notice thereof to Buyer and the Stockholder Representative. In addition, the Escrow Agent may be removed and replaced on a date designated in a written instrument signed by Buyer and the Stockholder Representative and delivered to the Escrow Agent. Notwithstanding the foregoing, no such resignation or removal shall be effective until a successor escrow agent has acknowledged its appointment as such as provided in paragraph (c) below. In either event, upon the effective date of such resignation or removal and upon receipt by the Escrow Agent of any fees, costs and expenses owed or due to it, if any, hereunder the Escrow Agent shall deliver the property comprising the Escrow Fund to such successor escrow agent, together with such records maintained by the Escrow Agent in connection with its duties hereunder and with respect to the Escrow Fund as such successor may reasonably request.

(b)   If a successor escrow agent shall not have acknowledged its appointment as such as provided in paragraph (c) below, in the case of a resignation, prior to the expiration of thirty (30) calendar days following the date of a notice of resignation, or in the case of a removal, on the date designated for the Escrow Agent's removal, as the case may be, because Buyer and the Stockholder Representative are unable to agree on a successor escrow agent, or for any other reason, the Escrow Agent may petition a court of competent jurisdiction to select a successor and any such resulting appointment shall be binding upon all of the parties to this Agreement.

(c)   Upon written acknowledgment by a successor escrow agent appointed in accordance with the foregoing provisions of this Section 9 of its agreement to serve as escrow agent hereunder and the receipt of the property then comprising the Escrow Fund, the Escrow Agent shall be fully released and relieved of all duties, responsibilities and obligations under this Agreement, subject to the proviso contained in clause (c) of Section 6, and such successor escrow agent shall for all purposes hereof be the Escrow Agent.

10.   Notices. All notices, requests and other communications hereunder must be in writing and shall be deemed to have been duly given if delivered personally or by facsimile transmission (promptly followed by a hard-copy delivered in accordance with this Section 10) or mailed (certified return receipt) to the parties at the following addresses or facsimile numbers:

(a)   if to the Stockholder Representative to:

David Friedson
300 Central Park West, Apt. 21D
New York, NY 10024
Fax No.: (305) 364-0502

8

with a required copy to:

Dechert LLP
1717 Arch Street
Philadelphia, PA 19103
Attn: Christopher G. Karras, Esq.
Fax No.: (215) 994-2222

and

Rubin and Rudman LLP
50 Rowes Wharf
Boston, MA 02110
Attention: Michael Unger
Fax No.: (617) 439-9556

(b)     if to Buyer to:

Abbott Laboratories
Ross Products Division
625 Clevaland Ave.
Columbus, OH 43215
Attention: President
Fax No.:   (614) 624-7030

with a required copy to:

Abbott Laboratories
100 Abbott Park Road
Abbott Park, IL 60064
Attention: Senior Vice President, Secretary
              and General Counsel
Fax No.:   (847) 938-6277

(c)     If to the Escrow Agent:

Wells Fargo Bank Minnesota, National Association
Corporate Trust
Sixth and Marquette
MAC N9303-110
Minneapolis, Minnesota 55479
Facsimile No.: (612) 667-2160
Attention: Jayne E. Sillman

All such notices, requests and other communications will (i) if delivered personally to the
address as provided in this Section, be deemed given upon delivery, (ii) if delivered by facsimile
transmission to the facsimile number as provided in this Section, be deemed given upon receipt,
and (iii) if delivered by mail (certified return receipt) in the manner described above to the
address as provided in this Section, be deemed given upon receipt (in each case regardless of

whether such notice, request or other communication is received by any other Person to whom a copy of such notice is to be delivered pursuant to this Section). Any party from time to time may change its address, facsimile number or other information for the purpose of notices to that party by giving notice specifying such change to the other parties hereto.

11.    Amendments, etc. This Agreement may be amended or modified, and any of the terms hereof may be waived, only by a written instrument duly executed by or on behalf of Buyer and the Stockholder Representative and, with respect to any amendment that would adversely affect the Escrow Agent, the Escrow Agent. No waiver by any party of any term or condition contained in this Agreement, in any one or more instances, shall be deemed to be or construed as a waiver of the same or any other term or condition of this Agreement on any future occasion.

12.    Business Day. For all purposes of this Agreement, the term "business day" shall mean a day other than Saturday, Sunday or any day on which banks located in the City of New York, New York are authorized or obligated to close.

13.    Miscellaneous. This Agreement is binding upon and will inure to the benefit of the parties hereto and their respective successors and permitted assigns. The headings used in this Agreement have been inserted for convenience of reference only and do not define or limit the provisions hereof. This Agreement may be executed in any number of counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

14.    Governing Law; Consent to Jurisdiction.

(a)    This Agreement shall be construed in accordance with and governed by the laws of the State of Delaware applicable to agreements made and to be performed wholly within that jurisdiction. Each party hereto, for itself and its successors and assigns, irrevocably agrees that any suit, action or proceeding arising out of or relating to this Agreement may be instituted in the United States District Court located in Delaware or in the absence of jurisdiction, the state courts located Delaware, and generally and unconditionally accepts and irrevocably submits to the non-exclusive jurisdiction of the aforesaid courts and irrevocably agrees to be bound by any final judgment rendered thereby from which no appeal has been taken or is available in connection with this Agreement. Each party, for itself and its successors and assigns, irrevocably waives any objection it may have now or hereafter to the laying of the venue of any such suit, action or proceeding, including, without limitation, any objection based on the grounds of forum non conveniens, in the aforesaid courts.

15.    Severability. In the event that any part of this Agreement is declared by any court or other judicial or administrative body to be null, void, or unenforceable, said provision shall survive to the extent it is not so declared, and all of the other provisions of this Agreement shall remain in full force and effect.

[SIGNATURE PAGE FOLLOWS]

10

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written.

ABBOTT LABORATORIES

By:

Name: Gary L. Flynn
Title: Senior Vice President


Name: David Friedson, as
        Stockholder Representative


WELLS FARGO BANK MINNESOTA,
NATIONAL ASSOCIATION

By:
Name:
Title

11

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written.

ABBOTT LABORATORIES

By:    _____
Name:
Title:

Name: David Friedson, as
      Stockholder Representative

WELLS FARGO BANK MINNESOTA,
NATIONAL ASSOCIATION

By:    _____
Name:
Title

11

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written.

ABBOTT LABORATORIES

By: _____
Name:
Title:

_____
Name: David Friedson, as
       Stockholder Representative

WELLS FARGO BANK MINNESOTA,
NATIONAL ASSOCIATION

By: _____
Name:        JAYNE SILLMAN
Title        Assistant Vice President

11

EXHIBIT A

**Stockholders**

**Allocation Percentage**

Anasazi Partners                    [____]%

Christopher P. Baker                [____]%

Lawrence Chud                       [____]%

Douglas M. Hagge                    [____]%

Steven Lampe                        [____]%

Rainer Park                         [____]%

William Paul Pruett                 [____]%

Robert Rafferty                     [____]%

Godfrey Rockefeller, Jr.            [____]%

David Sloan                         [____]%

Tanya Spear                         [____]%

David Thibodeau                     [____]%

Bagus Tjahjono                      [____]%

**TOTAL**                           100.00%

12

| | Class A Shares | Class C Shares Equivalent | % of Total Shares Owned | | Amount of Escrow | | Pro Rata Escrow |
|---|---|---|---|---|---|---|---|
| Christopher Perry Baker | 230 | 690,000 | 15.2% | $ | 20,000,000.00 | $ | 3,041,874.71 |
| | 30 | 90,000 | 2.0% | $ | 20,000,000.00 | $ | 396,766.27 |
| | 17 | 51,000 | 1.1% | $ | 20,000,000.00 | $ | 224,834.22 |
| | - | 93,750 | 2.1% | $ | 20,000,000.00 | $ | 413,298.19 |
| | - | 34,855 | 0.8% | $ | 20,000,000.00 | $ | 153,658.76 |
| | - | 11,237 | 0.2% | $ | 20,000,000.00 | $ | 49,538.47 |
| | *Sub-total* | *970,842* | *21.4%* | | | *$* | *4,279,970.62* |
| | | | | | | | |
| Anasazi Partners | 948 | 2,844,000 | 62.7% | $ | 20,000,000.00 | $ | 12,537,814.03 |
| | *Sub-total* | *2,844,000* | *62.7%* | | | *$* | *12,537,814.03* |
| | | | | | | | |
| Steven Lampe | 45 | 135,000 | 3.0% | $ | 20,000,000.00 | $ | 595,149.40 |
| | - | 46,667 | 1.0% | $ | 20,000,000.00 | $ | 205,732.13 |
| | *Sub-total* | *181,667* | *4.0%* | | | *$* | *800,881.53* |
| | | | | | | | |
| Larry Chud | 60 | 180,000 | 4.0% | $ | 20,000,000.00 | $ | 793,532.53 |
| | 20 | 60,000 | 1.3% | $ | 20,000,000.00 | $ | 264,510.84 |
| | *Sub-total* | *240,000* | *5.3%* | | | *$* | *1,058,043.38* |
| | | | | | | | |
| Bagus Tjahjono | - | 22,500 | 0.5% | $ | 20,000,000.00 | $ | 99,191.57 |
| | - | 12,500 | 0.3% | $ | 20,000,000.00 | $ | 55,106.43 |
| | *Sub-total* | *35,000* | *0.8%* | | | *$* | *154,297.99* |
| | | | | | | | |
| William Paul Pruett | - | 65,000 | 1.4% | $ | 20,000,000.00 | $ | 286,553.41 |
| | - | 20,000 | 0.4% | $ | 20,000,000.00 | $ | 88,170.28 |
| | *Sub-total* | *85,000* | *1.9%* | | | *$* | *374,723.70* |
| | | | | | | | |
| Godfrey Anderson Rockefeller | - | 10,000 | 0.2% | $ | 20,000,000.00 | $ | 44,085.14 |
| | - | 5,000 | 0.1% | $ | 20,000,000.00 | $ | 22,042.57 |
| | *Sub-total* | *15,000* | *0.3%* | | | *$* | *66,127.71* |
| | | | | | | | |
| David Sloan | - | 39,167 | 0.9% | $ | 20,000,000.00 | $ | 172,668.27 |
| | *Sub-total* | *39,167* | *0.9%* | | | *$* | *172,668.27* |
| | | | | | | | |
| David Thibodeau | - | 15,000 | 0.3% | $ | 20,000,000.00 | $ | 66,127.71 |
| | - | 5,000 | 0.1% | $ | 20,000,000.00 | $ | 22,042.57 |
| | *Sub-total* | *20,000* | *0.4%* | | | *$* | *88,170.28* |
| | | | | | | | |
| Robert Rafferty | - | 17,500 | 0.4% | $ | 20,000,000.00 | $ | 77,149.00 |
| | - | 5,000 | 0.1% | $ | 20,000,000.00 | $ | 22,042.57 |
| | *Sub-total* | *22,500* | *0.5%* | | | *$* | *99,191.57* |
| | | | | | | | |
| Rainer Park | - | 27,500 | 0.6% | $ | 20,000,000.00 | $ | 121,234.14 |
| | - | 12,500 | 0.3% | $ | 20,000,000.00 | $ | 55,106.43 |
| | *Sub-total* | *40,000* | *0.9%* | | | *$* | *176,340.56* |
| | | | | | | | |
| Tanya Spear | - | 6,000 | 0.1% | $ | 20,000,000.00 | $ | 26,451.08 |
| | *Sub-total* | *6,000* | *0.1%* | | | *$* | *26,451.08* |
| | | | | | | | |
| Douglas Marty Hagge | - | 37,500 | 0.8% | $ | 20,000,000.00 | $ | 165,319.28 |
| | *Sub-total* | *37,500* | *0.8%* | | | *$* | *165,319.28* |
| | | | | | | | |
| | **Total:** | **4,536,676** | **100.0%** | | | **$** | **20,000,000.00** |

Adams, Harkness & Hill, Inc. - Confidential

## Exhibit B
### Shareholder Indemnification

| Name | Percentage |
|------|-----------|
| Christopher P. Baker | 21.4% |
| Steven G. Lampe | 4.0% |
| Larry Chud | 5.3% |
| David M. Sloan | 0.9% |
| Douglas M. Hagge | 0.8% |
| Rainer Park | 0.9% |
| William Paul Pruett | 1.9% |
| Robert Bruce Rafferty II | 0.5% |
| Godfrey Anderson Rockefeller, Jr. | 0.3% |
| Tanya Spear | 0.1% |
| David Thibodeau | 0.4% |
| Bagus Tjahjono | 0.8% |
| Anasazi Partners, Limited Partnership | 62.7% |

EXECUTION COPY

ANNEX I

## CERTIFICATE OF INSTRUCTION

to

## WELLS FARGO BANK MINNESOTA, NATIONAL ASSOCIATION

### as Escrow Agent

The undersigned, Abbott Laboratories, an Illinois corporation ("Buyer"), pursuant to

Section 4(a) of the Escrow Agreement dated as of _____, 2003, among Buyer,

the Stockholder Representative and you (the "Escrow Agreement") (terms defined in the Escrow

Agreement have the same meanings when used herein), hereby:

        (a)    certifies that (i) Buyer has sent to the Escrow Agent and the Stockholder Representative a Claim Notice, a copy of which is attached hereto, and (ii) the amount of $_____ (the "Owed Amount") is payable to the Buyer Indemnified Parties pursuant to Section 7.4(b) of the Purchase Agreement by reason of the matter described in such Claim Notice; and

        (b)    instructs you to pay to Buyer from the Escrow Fund the Owed Amount, by wire transfer of immediately available funds to Buyer's account at _____, _____, _____, _____, (Account No.: _____), unless you receive an Objection Certificate from the Stockholder Representative prior to the expiration of the Objection Period. If you receive an Objection Certificate within the Objection Period, within two business days following your receipt of a Resolution Certificate, you are to pay to Buyer the amount specified in such Resolution Certificate or Court Order Certificate, as the case may be.

ABBOTT LABORATORIES

By: _____

Name:
Title:

Dated: _____, _____

ANNEX II

## OBJECTION CERTIFICATE

to

## WELLS FARGO BANK MINNESOTA, NATIONAL ASSOCIATION

as Escrow Agent

The undersigned, Stockholder Representative pursuant to Section 4(b) of the Escrow

Agreement dated as of _____, ___, 2003 among Buyer, the Stockholder

Representative and you (the "Escrow Agreement") (terms defined in the Escrow Agreement have

the same meanings when used herein), hereby:

(a) disputes that the Owed Amount referred to in the Certificate of Instruction dated _____, _____ is payable to the Buyer Indemnified Parties pursuant to the Purchase Agreement;

(b) certifies that the undersigned has sent to Buyer a written statement dated _____, _____ of the undersigned, a copy of which is attached hereto, disputing its liability to the Buyer Indemnified Parties for the Owed Amount; and

(c) objects to your making payment to Buyer as provided in such Certificate of Instruction.

STOCKHOLDER REPRESENTATIVE

By: _____
    Name: _____, as
          Stockholder Representative

Dated: _____, ___

14

ANNEX III

## RESOLUTION CERTIFICATE

to

## WELLS FARGO BANK MINNESOTA, NATIONAL ASSOCIATION

as Escrow Agent

The undersigned, Abbott Laboratories, an Illinois corporation ("Buyer") and the

Stockholder Representative pursuant to Section 4(b) of the Escrow Agreement dated as of

_____ \_\_\_, 2003, among Buyer, the Stockholder Representative and you (the "Escrow

Agreement") (terms defined in the Escrow Agreement have the same meanings when used

herein), hereby:

(a)     certify that (i) Buyer and the Stockholder Representative have resolved their dispute as to the matter described in the Certificate of Instruction dated _____, \_\_\_ and the related Objection Certificate dated _____, \_\_\_ and (ii) the final Owed Amount with respect to the matter described in such Certificates is $_____;

(b)     instruct you to pay to Buyer from the Escrow Fund the final Owed Amount referred to in clause (ii) of paragraph (a) above, by wire transfer of immediately available funds to Buyer's account at _____, _____, _____, (Account No.: _____) within two business days of your receipt of this Certificate; and

(c)     agree that the Owed Amount designated in such Certificate of Instruction, to the extent, if any, it exceeds the Owed Amount referred to in clause (ii) of paragraph (a) above, shall be deemed not payable to the Buyer and such Certificate of Instruction is hereby cancelled.

ABBOTT LABORATORIES

By:     _____
        Name:
        Title:

15

Name: _____, as
Stockholder Representative

Dated: _____, ____

16

ANNEX IV

## COURT ORDER CERTIFICATE

to

### WELLS FARGO BANK MINNESOTA, NATIONAL ASSOCIATION

as Escrow Agent

The undersigned, Abbott Laboratories, an Illinois corporation ("Buyer") and the

Stockholder Representative pursuant to Section 4(b) of the Escrow Agreement dated as of

_____, ___, 2003 among the Stockholder Representative, Buyer and you (the

"Escrow Agreement") (terms defined in the Escrow Agreement have the same meanings when

used herein), hereby:

(a)     certifies that (i) attached hereto is a final non-appealable order of a court of competent jurisdiction resolving the dispute between Buyer and the Stockholder Representative as to the matter described in the Certificate of Instruction dated _____ __, 20__ and the related Objection Certificate dated _____, 20__ and (ii) the final Owed Amount with respect to the matter described in such Certificates, as provided in such order is $_____;

(b)     instructs you to pay to Buyer from the Escrow Fund the Owed Amount referred to in clause (ii) of paragraph (a) above, by wire transfer or immediately available funds to Buyer's Account at _____, _____, _____, (Account No.: _____)
within two business days of your receipt of this Certificate; and

(c)     agrees that the Owed Amount designated in such Certificate of Instruction, to the extent, if any, it exceeds the Owed Amount referred to in clause (ii) of paragraph (a) above, shall be deemed not payable to the Buyer and such Certificate of Instruction is hereby cancelled.

### ABBOTT LABORATORIES

By: _____

Name:
Title:

17

Name: _____, as
Stockholder Representative

Dated: _____, _____

ANNEX V

## BUYER CANCELLATION CERTIFICATE

to

## WELLS FARGO BANK MINNESOTA,
## NATIONAL ASSOCIATION

as Escrow Agent

The undersigned, Abbott Laboratories, an Illinois corporation (the "Buyer") pursuant to

Section 4(e) of the Escrow Agreement dated as of _____, ___, 2003 among the

Stockholder Representative, Buyer and you (the "Escrow Agreement") (terms defined in the

Escrow Agreement have the same meanings when used herein), hereby:

(a)     certifies that (i) it hereby releases or withdraws without prejudice its claim with respect to [all] [specify portion] of the Owed Amount designated in the Certificate of Instruction dated _____, _____ and (ii) as a result, the Owed Amount with respect to such Certificate of Instruction is $_____; and

(b)     agrees that such Certificate of Instruction is, to the extent of the claim released or withdrawn without prejudice as provided in clause (i) of paragraph (A) above, cancelled.

ABBOTT LABORATORIES

By: _____

Name:
Title:

Dated: _____, ___

ANNEX VI

## CANCELLATION CERTIFICATE

to

## WELLS FARGO BANK MINNESOTA, NATIONAL ASSOCIATION

as Escrow Agent

The undersigned, Abbott Laboratories, an Illinois corporation ("Buyer") and the

Stockholder Representative pursuant to Section 4(f) of the Escrow Agreement dated as of

_____, ___, 2003 among the Stockholder Representative, Buyer and you (the

"Escrow Agreement") (terms defined in the Escrow Agreement have the same meanings when

used herein), hereby certify that (i) attached hereto is a final, non-appealable order of a court of

competent jurisdiction resolving the dispute between Buyer and the Stockholder Representative

as to the matter described in the Certificate of Instruction dated _____,

20__ and the related Objection Certificate dated _____ __, 20__ and (ii) as

provided in such order, there is no Owed Amount with respect to the matter described in such

Certificates.

ABBOTT LABORATORIES

By: _____

Name:
Title:

_____

Name: _____, as
Stockholder Representative

20

Dated: _____, ____